## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**DR. STEVEN A. GUTTENBERG**
8801 Chalon Drive
Bethesda, MD 20717-3040

 **and**

**DOCTORS GUTTENBERG AND EMERY, P.C.**
2021 K Street, N.W., Suite 200
Washington, D.C. 20006-1003

              **Plaintiffs,**

        **v.**

**DR. ROBERT W. EMERY**
750 Potomac River Road
McLean, VA 22102

           **Defendant.**

Case: 1:08-cv-00085
Assigned To : Bates, John D.
Assign. Date : 1/16/2008
Description: Contract

### COMPLAINT FOR DECLARATORY AND OTHER RELIEF

COME NOW the Plaintiffs, Doctors Guttenberg and Emery, P.C. and Dr. Steven A. Guttenberg, by counsel, and move this Honorable Court for judgment against Defendant Dr. Robert W. Emery, on the grounds and in the amounts as set forth below.

### JURISDICTION AND VENUE

1.　　Jurisdiction of this matter is founded upon diversity of citizenship under 28 U.S.C. § 1332.

2.　　The amount of the matters in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars. ($75,000).

3.    Venue in this District is proper under 28 U.S.C. § 1391 because, among other reasons, a substantial part of the wrongful acts alleged herein were carried out within the District of Columbia, the corporate Defendant is a District of Columbia corporation, Plaintiffs suffered injury within the District and the Defendant conducts and transacts business within this District.

## PARTIES

4.    Plaintiff, Dr. Steven A. Guttenberg ("Guttenberg"), is a citizen of the State of Maryland. Guttenberg is an oral and maxillofacial surgeon practicing in the District of Columbia. Guttenberg is 63 years old.

5.    Plaintiff, Doctors Guttenberg and Emery, P.C. (the "Corporation") is a District of Columbia professional corporation. The Corporation was originally formed in 1977 as "Steven A. Guttenberg, D.D.S., P.C." In 1990, the name of the Corporation was changed to "Doctors Guttenberg and Emery, P.C."

6.    Defendant, Dr. Robert W. Emery ("Emery") is a citizen of the Commonwealth of Virginia. Emery is an oral and maxillofacial surgeon practicing in the District of Columbia. Emery is 50 years old.

### FACTS COMMON TO ALL COUNTS

A.    **Growth of Guttenberg's Practice: 1977-1990**

7.    In 1977 Guttenberg and the Corporation began an oral and maxillofacial surgery practice in downtown Washington, D.C. (the "Practice").

8.    Guttenberg's Practice grew substantially after 1977. Guttenberg became known locally, regionally and nationally as a recognized expert oral and maxillofacial surgeon

through teaching, speaking engagements and participation in professional organizations.
Through his practice and reputation, Guttenberg developed a large network of referral dentists
and physicians.

9.      Between 1977 and 1988, Guttenberg's practice increased consistently and
substantially in the volume of patients it served (with over 1000 patients) and its annual
billings reached approximately $750,000 per year.

10.     In 1984 Emery defendant, graduated from the University of Illinois Dental
School. In 1988, he was hired by the Corporation as an associate. Emery's starting salary
was $80,000 per year.

**B.      Guttenberg Admits Emery into the Practice**

11.     On July 30, 1990, Guttenberg agreed to admit Emery as a shareholder in the
Corporation. Emery was permitted to buy into the Practice over a period of time and to
become a fifty (50%) percent shareholder. One objective of Emery's admission was that
Emery and Guttenberg would grow the Practice, and that when Guttenberg would be ready to
retire, Emery would retain the Corporation and Guttenberg would be paid out for his share of
the Practice.

12.     Prior to the incidents described in this Complaint, that is early 2007, it was
Guttenberg's intent, as shared with Emery, that Guttenberg would retire within the next five
years.

13.     Pursuant to Emery's admission to the Corporation, Guttenberg and Emery
entered into certain agreements (as described below), and changed the name of the
Corporation from Steven A. Guttenberg, D.D.S., P.C., to Doctors Guttenberg and Emery, P.C.

**C.      The Stock Purchase and Shareholder Agreements**

3

14.     As part of Emery's buy-in, Guttenberg and Emery entered into a Stock

Purchase Agreement. Under the Stock Purchase Agreement, Emery was permitted to

purchase fifty (50%) of the stock of the Corporation for $31,250.00.

15.     Guttenberg and Emery also entered into a Shareholder Agreement (the

"Shareholder Agreement") whose terms are incorporated herein by reference and is attached

as Exhibit A. The Shareholder Agreement provides *inter alia:*

   a.     A procedure "for any Shareholder who wishes to withdraw from the
          Corporation . . . ." (Fifth Whereas Clause).

   b.     That the parties agreed it was their intention "to promote their *mutual* interests
          and the *interests of the Corporation* . . . ." (Eighth Whereas Clause) (Emphasis
          added).

   c.     That in the event a shareholder withdrew from the Corporation he would sell
          his shares back to the Corporation (¶ 6.B.1) and would resign as a director and
          officer. (¶ 14).

   d.     That each of the shareholders was obligated to vote for the other shareholder as
          a director. (¶ 18); and

   e.     A formula for a retiring doctor to be paid for his ownership interests in the
          Corporation upon retirement. (¶¶ 6.B.2 and D.3).

**D.     Emery's Employment Agreement**

16.     As part of the consideration to become a shareholder in the Corporation,

Emery agreed to enter into an employment agreement (the "Employment Agreement") whose

terms are incorporated herein by reference and is attached as Exhibit B.

   17.    Under the Employment Agreement, Emery agreed, *inter alia*

   a.     That he would "faithfully serve [the Corporation] in its Practice." (¶1).

   b.     That he would "diligently and conscientiously devote his entire time, attention
          and energies to the [Corporation's] Practice" (¶3.a.) and that he would
          "promote the practice." (¶ 3.a.(5).

4

c.   That he would not, while employed by the Corporation, "be engaged in any other practice of dentistry . . ." (¶ 3.b.)

d.   For five years after leaving the practice, for any reason, he would not solicit past or present patients and must refrain from causing or soliciting any dentist to not refer to the practice. (¶ 8.a).

e.   That he would not disclose any of the Corporation's proprietary and confidential information, including its patient list, outside of the Corporation "for any reason or purpose whatsoever." (¶ 8.b.).

f.   That for three (3) years after leaving the Practice, for any reason, he would not engage in any business competitive with the Corporation within the District of Columbia. (¶ 8.c.). This covenant further provides: "This covenant is deemed independent of any other provision of the Agreement and the existence of any claim or cause of action by the Employee against the Employer shall not constitute a defense to its enforcement." (*Id.*). The paragraph further provides that Emery may purchase relief from the covenant by paying $500,000.00 to the Corporation.

g.   That in the event of a breach or anticipatory breach of a covenant or a *threatened* breach of a covenant (¶ 8.d), Emery agreed that the Employer would be entitled to injunctive relief and would be required to indemnify the Employer for its attorneys fees and costs to enforce the covenants. (Emphasis added).

h.   The agreement contained a buy-in salary adjustment under which Emery paid Guttenberg $370,000 over a period of years (the "Buy-In Adjustment"). (¶ 5).

i.   That he could be terminated by the Corporation for cause or without cause. (¶¶ 13.B and D).

## E.   **Legal Implications of a Withdrawing Shareholder**

18.   Under the Shareholder and Employment Agreements, Emery may withdraw from the Corporation. If Emery withdraws or resigns from the Corporation, he must sell his shares back to the Corporation (for $31, 250), he is not entitled to the return of the Buy-In Adjustment and continues to be bound by the covenants to not compete. Emery, upon withdrawal from the Corporation, does have the right to buy his way out of the covenant to not operate an office in the District of Columbia by paying the Corporation $500,000.00.

F.    **Guttenberg's Appointment as President of the Corporation**

19.    Pursuant to the Shareholder Agreement, Emery and Guttenberg are at present, and have been since 1990, the sole directors of the Corporation.

20.    As part of the agreements permitting Emery to become a shareholder in the Corporation, Emery and Guttenberg were appointed the sole directors of the Corporation, and as its directors elected Guttenberg as the President of the Corporation.

21.    Since 1990 Guttenberg has without interruption been the President of the Corporation. In that capacity, Guttenberg has been in charge of managing the affairs of the Corporation and has acted as its chief executive officer. This management included the hiring and termination of employees, managing its financial affairs and setting the policy and procedures of the Practice.

22.    When Emery executed his Employment Agreement, he knew that Guttenberg, as President of the Corporation, had the right to terminate him with or without cause. Since July 30, 1990 Emery has known and accepted that Guttenberg, as President of the Corporation, has had the right to terminate Emery with or without cause.

23.    For seventeen years, from 1990 until 2007, Emery did not interfere with Guttenberg's management of the Corporation, and accepted that Guttenberg was the officer in charge of managing the affairs of the Corporation and acted in all ways in the capacity as the Corporation's President.

24.    During this period, 1990 until 2007, Guttenberg and Emery never held formal director meetings. Rather, Emery was satisfied with and never objected to permitting Guttenberg to manage the affairs of the Corporation without proceeding with corporate formalities. Emery conceded, formally and implicitly, that Guttenberg, as President of the

6

Corporation had the authority to make management and executive decisions for the Corporation.

25.    From 1990 to 2007 Emery, without interruption, served as the Corporation's Secretary. As the Corporation's Secretary, Emery was responsible for maintaining the Corporation's books and maintaining its corporate administrative filings.

## G.    Growth of the Practice through 2007

26.    Beginning in 1988, the Corporation and Guttenberg professionally promoted Emery, enhanced Emery's reputation in the field of oral surgery and made substantial investments of time and money in Emery as an employee of the Corporation by *inter alia* having Emery treat Guttenberg's patients; aiding Emery in developing a referral network of doctors and dentists; promoting Emery in professional associations; mentoring Emery to engage in professional speaking engagements and preparation of professional articles.

27.    Guttenberg made additional contributions to the growth and stature of the Practice through speaking engagements throughout the nation and the world and holding office in dental associations, including, *inter alia,* current President of the American College of Oral Surgeons and past President of the District of Columbia Society of Oral and Maxillofacial Surgeons.

28.    Through Guttenberg's efforts over the last thirty years, the Practice has grown in both billings and stature in the medical and dental communities. In 1990 the Corporation's billings were less than one million dollars. As of year end 2007 they were over five million dollars. The Practice became known as one of the premier Oral and Maxillofacial surgery practices in the nation, and ranks in the upper one percentile in profit per dentist.

29.    Through his association with the Corporation, and particularly Guttenberg, Emery has been able to establish a referral network of physicians and dentists and establish his own reputation. Emery's network and reputation have become valuable assets of the Corporation and are the product of Guttenberg's and the Corporation's investment in Emery, and their aid and mentoring of Emery.

**H.    Emery Manifest His Intent to Withdraw from the Practice in 2007**

30.    Upon information and belief, at some point in 2007 Emery formulated the intent to withdraw from the Practice.

31.    Despite his intent to withdraw from the Practice and there being a provision in the Shareholder and Employment Agreements to permit his withdrawal, Emery sought to not be bound by the non-competition covenants prohibiting him from opening an office in the District of Columbia and refraining from soliciting the Corporation's patients and referral network.

32.    In order to avoid his contractual obligations upon withdrawing from the Practice, in 2007 Emery formulated a scheme, concealed from Guttenberg, to find a way to relieve himself from his obligations under the Shareholder and Employment Agreements. This scheme has included: seeking to coerce and blackmail Guttenberg to force Guttenberg out of the Practice, in order to make it solely Emery's own; seeking to coerce Guttenberg to resign as President, and appoint Emery as President, in order that Emery might then terminate Guttenberg; seeking to harass and intimidate Guttenberg into relieving Emery of his contractual obligations; and, interfering with the operation of the Practice in order to declare that the Practice could not operate and should be dissolved.

8

33.     Beginning in mid-2007, Emery, (as more fully described below) in order to withdraw from the Corporation without adhering to his obligations as a withdrawing shareholder as provided in the Shareholder and Employment Agreements, *inter alia*:

a.     Breached or anticipatorily breached or threatened to breach his covenant to not compete by secretly seeking to establish, and taking actions to establish, an office within the District of Columbia in direct competition with the Practice;

b.     Solicited, in breach of his fiduciary duties to the Corporation, the Corporation's Clinical Supervisor and marketing director, and possibly other of the Corporation's employees, to leave the Practice and establish a practice with Emery;

c.     Hired attorneys to seek to find ways for him to break out of his Shareholder and Employment Agreement obligations upon withdrawing from the Corporation and, specifically to break out of the non-competition and non-solicitation covenants;

d.     Engaged in acts of dishonesty intended to harm, destroy or dissolve the Corporation, including, but not limited to, seeking to blackmail Guttenberg, seeking to establish an office within three blocks of the Corporation's office, stealing Corporation property, harassing the Clinical Director after she expressed her loyalty to Guttenberg, seeking to destroy the morale of the Corporation's employees and their loyalty to Guttenberg and the Corporation, and committed corporate waste by seeking to train Corporation employees to take over functions in his new practice, whereas, there are Corporation employees who are already trained and carrying out these functions for the Corporation;

e.     Attempted to blackmail Guttenberg into appointing Emery President of the Corporation, in order that Emery would then be able to terminate Guttenberg from the Practice;

9

       f.      Concealed the fact that the Corporation's charter had been administratively revoked, thereby exposing the Corporation and its shareholders to potential liability and then, as Secretary of the Corporation, refused to aid in the administrative reinstatement of the Corporation;

       g.      Failed to support the Corporation in an asserted claim by a disgruntled employee and took actions which if exposed during litigation would have adversely affected the Corporation and its shareholders;

       h.      Breached the non-solicitation covenant by directing referral dentists and physicians toward himself and not to the practice;

       i.      Harassed Guttenberg and the Corporation's professional consultants (accountants, benefits administrators) by having his attorneys pepper them with e-mails and phone calls intended to embarrass and harass Guttenberg and interfere with the efficient operation of the Corporation.

## I.    Emery's Attempt to Blackmail Guttenberg In Order to Withdraw from the Practice

34.      Emery's first gambit was to attempt to take advantage of Guttenberg when Guttenberg received a frivolous claim of sexual harassment by a former disgruntled employee of the Practice (the "Employee Claim"). On or about May 3, 2007, this employee had abruptly quit after receiving what she perceived as an unfavorable reassignment within the office.

35.      The Employee Claim was settled by the Corporation's insurance company as a nuisance case, without any admission of liability on Guttenberg or the Corporation's behalf through a confidential settlement agreement in August, 2007. However, during the period the

Employee Claim was pending, Emery sought to have Guttenberg execute an amendment to the Shareholder Agreement (known between Guttenberg and Emery as the "Unilateral Agreement") that would result in Guttenberg's being terminated by the Corporation and Emery being appointed its President.

36.    Under the Unilateral Agreement proposed by Emery, if any "accusation" was ever made against Guttenberg for sexual harassment, including the pending Employee Claim, Emery could replace Guttenberg as President, Emery would have the right to purchase all of Guttenberg's stock for the accrual basis book value (a negative number for years) and Emery as President could then terminate Guttenberg.

37.    During the period that the Employee Claim was pending, Emery threatened Guttenberg that if Guttenberg did not sign the Unilateral Agreement, that Guttenberg's wife would be informed of the Employee Claim (for sexual harassment). Emery informed an employee of the Corporation during this period that he believed he had leverage over Guttenberg, to force Guttenberg to sign the Unilateral Agreement, because Emery believed that Guttenberg feared that if his wife learned of the claim, she would leave him. As Guttenberg and Emerys' wives had been friendly, Guttenberg assumed this would have been a path for such a communication.

38.    On August 9, 2007, Guttenberg informed Emery he was unwilling to sign a Unilateral Agreement, but proposed a bilateral agreement, that would cover both him and Emery and would only be triggered by actual findings of harassment, not simply "accusations." Emery would never agree to even consider the bilateral agreement. Rather, Emery sought alternate ways to get out from under his contractual obligations.

39.    Again, Emery demanded Guttenberg agree that Emery would become President. Emery sought to become President as it was his position that as President he would have the power and authority to terminate Guttenberg from the Corporation.

40.    Emery's seeking Guttenberg's execution of the Unilateral Agreement during the Employee Claim negotiations and while the Corporation was seeking to defend itself against a potential action created adverse legal implications for the Corporation and Guttenberg. Emery's action constituted a breach of his fiduciary duties of loyalty, due care and good faith to the Corporation and constituted a breach of the duties he owed the Corporation and Guttenberg.

**J.    Emery's Solicitation of the Practices Clinical Supervisor and Marketing Director and Subsequent Harassment**

41.    Donna Breeyear is the highest ranking staff employee in the Practice. For the past nine years she has been the Clinical Supervisor and marketing director.

42.    On August 15, 2007, Emery asked Breeyear to meet with him in a private meeting. Emery informed Breeyear that he planned on leaving the Practice and opening his own practice at 1145-19th Street, N.W., Washington, D.C.. This location is less than three blocks from the Corporation's Practice and within the area prohibited under the non-competition covenant. Emery asked Breeyear if she would leave with him, offered her the position of Clinical Director and head of marketing with his new practice at a higher salary, and offered her an interim paid sabbatical. During the meeting, Emery also informed Breeyear that he planned on working only 3 or 4 days a week by hiring an associate who was presently a resident at the Washington Hospital Center.

43.    Breeyear rejected Emery's proposal and advised him to patch up his differences with Guttenberg and reminded him of what a great practice they had.

44.    Emery upon realizing that Breeyear would not be his confidant, was loyal to Guttenberg and the Corporation and realizing Breeyear could be an adverse witness against him, thereafter implemented a strategy to terminate Breeyear from the Practice or coerce her to quit.  Among the actions taken by Emery, *inter alia,* through the present date, are: he has attempted to turn the Practice's other employees against her; has mocked her in private and publicly; has intimidated her by leering at her when they were alone, or asking her in a mocking tone "whether everything is okay"; has intimidated that he would interfere with her ability to do her job; has intimidated her as to her standing in a professional association and her continued ability to appear as a speaker and presenter; and has conspired to manufacture grievances against her.  In addition, on information and belief, Emery has stolen from her personnel file five years of superb annual evaluations. Breeyear has now retained her own attorney who has placed Emery on notice of his inappropriate conduct, which if not terminated,  would expose him and the Corporation to potential liability.

## K.    Emery's Allowance of the Corporate Charter to be Revoked and His Refusal to File for Corporate Reinstatement

45.    Emery as the Corporation's Secretary had the responsibility to file annual registration statements with the District of Columbia Corporation Commission.

46.    Unbeknownst to Guttenberg, since the Practice moved its offices in 1996 (from 19th Street to K Street) the Corporation had failed to pay its annual registration fee.

47.    On information and belief, either Emery was always aware that the charter had been revoked or was negligent in maintaining the charter and was informed of its lapse at

13

some unknown time by his lawyer, hired to find ways for Emery to be relieved of his
Agreements. On September 25, 2007, Emery informed Guttenberg of the administrative
revocation. Guttenberg thereafter requested that Emery, as the Corporation's Secretary file
for reinstatement of the Corporation.

48.     Though operating as the Corporation since 1996, and though Emery was the
Secretary of the Corporation and a Director, and though Emery has reaped the annual salary,
bonus and other benefits from the Corporation since 1996, Emery informed Guttenberg that
he refused to execute the corporate reinstatement papers, considered the Corporation
dissolved and claimed he was therefore now free of his obligations under the Agreements, and
demanded that the Corporation's assets be sold off and the Practice terminated.

49.     Failure to administratively reinstate the Corporation would expose the
Corporation and its shareholders to substantial legal and tax liabilities, including subjecting
the Corporation and its officers to potential criminal liability. Further, Emery's refusal as
Secretary of the Corporation (and the officer responsible for the filings) was contrary to
Emery's Agreement to take all actions to promote and protect the Corporation and a breach of
his fiduciary duties of loyalty, preservation and good faith owed to the Corporation as a
director and its Secretary.

50.     On October 1, 2007, the Corporation was administratively reinstated. Since
that date, Emery has continued to accept the benefits of the Corporation, including receipt of
salary, bonus, health insurance, pension and other benefits.

51.     Beginning in October, 2007, Emery and his attorneys have engaged in
additional actions meant to harass and coerce Guttenberg into relieving Emery of his
Agreements. Emery's lawyers have unleashed a barrage of email and letter complaints,

14

complaining about virtually every aspect of the Corporation's practice. Since October 1, 2007, they have sent countless emails and letters claiming among other things that Guttenberg took inappropriate managerial action, that certain employees (particularly Breeyear) should be terminated, and that profits and pensions were not calculated properly.

52.    From 1988 until October, 2007, Guttenberg, as the Corporation's President had always managed the communications and relations with the Corporation's professional advisors and consultants, including its accountant, benefits administrator and insurance broker. Emery had virtually no contact with these individuals and had always been content to respect these relationships as Guttenberg saw fit to manage them. However, also, commencing in October, 2007, Emery's attorneys began to directly contact the Corporation's professional consultants, pelting them with numerous emails and telephone calls. These contacts were designed to seek to embarrass Guttenberg and interfere with Guttenberg's ability to manage the Corporation's affairs, intimidate the consultants by implying that they may be subject to litigation, coerce Guttenberg into relieving Emery of his Agreements, and fabricate a record that the affairs of the Corporation were deadlocked and the Corporation should be dissolved.

53.    Despite Emery and his counsels' attempts to interfere with the affairs of the Corporation and build a record that it should be dissolved, the Corporation under Guttenberg's Presidency has functioned as before. In fact its billings for 2007 were 6.4 per cent greater than in 2006, and even with the interference that began in the second half of 2007, the Corporation's profits in the second half of 2007 were 5.6 per cent higher than in the first half of 2007.

54.    Beginning in October, 2007, on information and belief, Emery began to solicit referring dentists to himself as opposed to the Corporation.

55.    On information and belief, Emery has stolen the Employee Claim file from the Corporation's offices, as that file has suddenly disappeared. Emery has been observed in unauthorized presence in Guttenberg's private office while Guttenberg was not present in the office.

56.    Despite the Corporation having employees capable of performing certain tasks, beginning in September, 2007, Emery began to teach other employees how to conduct the same procedures. On information and belief, he did this in order to be able to take trained employees with him when he withdrew from the Practice.

57.    Since at least May, 2007, Emery has failed to devote his full time, attention and loyalty to the Corporation. Rather he has devoted his time to seeking ways to either force Guttenberg out of the Practice, or establish his own practice without being bound by the non-competition and non-solicitation covenants.

**L.    Guttenberg's Attempts to Protect the Practice and Offer to Emery to Cure His Contractual and Fiduciary Breaches**

58.    Guttenberg, as the President of the Corporation, has the authority to terminate employees and, as President of the Corporation, to enforce the Corporation's contracts, including Emery's Employment Agreement and the responsibility to protect and defend the Corporation.

59.    On November 2, 2007, Guttenberg, in his capacity as President of the Corporation, delivered a notice to Emery. This letter placed Emery on notice that his actions

manifested an intention to withdraw from the Practice or, alternatively, to destroy the Practice and identified, without limitation, the grounds that existed to terminate Emery for cause.

60.     Under the Emery Employment Agreement, termination for cause would result in immediate termination and loss to Emery of repayment of the Buy-in Salary Adjustment, $370,000.00.  (¶¶13.D and 14).

61.     Despite having grounds to terminate Emery for cause, Guttenberg in order to preserve the Corporation and its Practice, protect the Corporation's employees, avoid litigation, and seek to resolve Emery's activities in an amicable manner, advised Emery that Emery could:

a.     remain with the Practice, by curing his actions, including those in violation of the non-competition and non-solicitation covenants, and those designed to destroy or dissolve the Corporation;

b.     or, resign pursuant to the § 13.C of the Employment Agreement, in which event the Corporation was prepared to pay Emery his salary for six months as provided in the Employment Agreement, but he would not be entitled to repayment of the Buy-In Salary Adjustment;

c.     or, if he chose to not resign, the Corporation would be willing to terminate him without cause, in which event he would be paid for six months' salary and be entitled to repayment of the Buy-In Salary Adjustment.

**M.     Emery's Intentional Infliction of Emotional Distress**

62.     Emery's attorneys responded to the November 2, 2007 notice on November 5, 2007. The letter rejected Guttenberg's right as President of the Corporation to place Emery

17

on notice of grounds to terminate him for cause, failed to address any of the options open to Emery under his Employment Agreement and contended the Corporation had been dissolved.

63.    Since November 2, 2007, Emery and his attorneys have intensified their efforts to harass Guttenberg, Breeyear and the Corporation's professional advisors, all with the intent to harass and coerce Guttenberg to relieve Emery from his contractual obligations and to fabricate grounds to dissolve the Corporation.  Between November 2, 2007 and the date of this Complaint, Emery's attorneys have sent numerous and ceaseless emails and letters complaining about and contesting Guttenberg's day-to-day management of the Corporation, the accountant's calculation of profits and the benefits administrator's implementation of the Corporation's pension and profit sharing plans.

64.    These actions are intentional and are calculated to cause Guttenberg emotional distress, stress and anxiety to force him to buckle under to Emery's demands.

65.    On May 2, 2007 Guttenberg was elected President of the American College of Oral and Maxillofacial Surgeons.  On June 5, 2007 Guttenberg received the District of Columbia Dental Society's Sterling V. Mead life-time achievement award, the highest award that it gives.  Emery's activities have been taken intentionally and calculated to place additional pressure, stress and anxiety on Guttenberg by threatening to embarrass him before Guttenberg's professional colleagues and to place pressure on him while Guttenberg seeks not only to manage the affairs of the Corporation but also to conduct the duties of his office as President of the American College, so that Guttenberg would agree to permit Emery to be relieved of his contractual obligations.

66.     In November and early December, 2007, the parties sought to mediate a

resolution of the matters raised by Emery's actions. The mediation, however, was

unsuccessful.

67.     On December 14, 2007, Guttenberg, in his capacity as President of the

Corporation, delivered a notice to Emery that he was terminated without cause pursuant to

paragraph 13.B of the Employment Agreement. The notice provided, *inter alia*:

a.     That Emery was provided with six months' notice of the termination;

b.     In accordance with the Shareholder Agreement, Emery received a check in the amount of $31, 250;

c.     Emery was advised that he would receive repayment of the Buy-In Adjustment of $370,000 as provided in ¶ 14.B. of the Employment Agreement; and

d.     Advised Emery, that he would remain bound by the covenants specified in ¶ 8 of his Employment Agreement; and

e.     That in accord with ¶ 8.c. of his Employment Agreement, Emery could obtain relief from the non-competition covenant through the payment of $500,000.00.

68.     On December 17, 2007 Emery, through his counsel, rejected Guttenberg's

authority as President of the Corporation to terminate Emery, and on December 19, 2007

returned the check for $31,250.

## CAUSES OF ACTION

### COUNT I
(Breach of Contract and Injunctive Relief)

69.     Plaintiffs incorporate herein by reference the allegations contained in

paragraphs 1 through 68 of this Complaint, and further allege against Defendant as follows:

70.     Paragraph 13.d. of the Employment Agreement provides in *inter alia*:

In the event of a breach or anticipatory breach by the Employee of his obligation under this paragraph 8 [the non-competition and non-solicitation

covenants], the Employee hereby acknowledges and stipulates that the Employer shall not have an adequate remedy at law, shall suffer irreparable harm, and therefore, it is mutually agreed and stipulated by the parties hereto, that, in addition to any other remedies at law or in equity which the Employer may have, the Employer shall be entitled to obtain in a court of law and/or equity a temporary and/or permanent injunction restraining the Employee from any further violation or breach of such covenants. In the event of a breach or threatened breach of a covenant by Employee, Employer shall give Employee written notice of said breach or threatened breach and shall give Employee a reasonable time to cure said breach or threatened breach. The giving of said notice shall not prevent Employer from seeking and obtaining injunctive relief from said breach or threatened breach during the period within which Employee may cure said breach or threatened breach. . . . The Employee further agrees to indemnify and hold harmless the Employer from all damages and costs, including reasonable attorney's fees, relating to the enforcement of this Paragraph 8, incurred by the Employer arising out of the Employee's breach or threatened breach of this Paragraph 8. Nothing in this Agreement will be construed as prohibiting the Employer from pursuing other remedies available to it for a breach or threatened breach of this paragraph 8. The provision of this Paragraph 8 will survive the termination of this Agreement and/or Employee's employment.

71.    Through Emery's conduct as alleged in paragraphs 30 through 57, and 62 through 65 above, Emery has threatened to breach, has anticipatorily breached and/or breached ¶¶ 8.a and 8.c. of his Employment Agreement in that he, *inter alia* has:

a.    breached his covenant not to compete included in ¶ 8.c. of the Employment Agreement by threatening to establish, and taking actions to establish, an office withinin the District of Columbia in direct competition with the Practice;

b.    sought to have Breeyear terminate her employment with the Corporation and join Emery at his new practice as his Clinical Supervisor and marketing director;

c.    on information and belief, commissioned a commercial real estate broker to locate space for Emery's new practice in the District of Columbia;

d.    contacted medical and dental equipment companies to obtain pricing for equipment to outfit his new practice;

e.      trained Corporation employees in skills already being performed by other of the Corporation's employees, so that when he establishes his new office he will have trained employees immediately available to him;

f.      hired attorneys to find ways for Emery to "break out of" or relieve himself from the non-competition and non-solicitation covenants of his employment agreement;

g.      black-mailed, coerced and harassed Guttenberg and Breeyear in order to break out of the non-competition and non-solicitation covenants;

h.      engaged in acts of dishonesty intended to harm, destroy or dissolve the Corporation, including, but not limited to, concealing his intentions from Guttenberg, misleading Guttenberg as to the consequences of entering the Unilateral Agreement, black-mailing Guttenberg, and on information and belief stealing Corporation property (the Employee Claim file and Breeyear's annual evaluations);

i.      sought to destroy the morale of the Corporation's employees by *inter alia* seeking to divide the employees into camps, promoting disloyalty toward Guttenberg and pandering to the employees;

j.      refused to reinstate the corporate charter, concealing from the Corporation and its President that the charter had been revoked, and therefore exposing the Corporation and its shareholders to potential liability;

k.      failed to support the Corporation in its litigation against the Employee Claim by pursuing the Unilateral Agreement, which if exposed during litigation would have adversely effected the Corporation and its shareholders; and

l.      sought to establish his own referral network of dentists and physicians, loyal to himself and not to the Practice, including but not limited to, changing his correspondence from including the Corporation, to referring only to himself.

72.     On November 2, 2007, and December 14, 2007, Emery was given notice of his breaches.

73.     Under Emery's Employment Agreement, he has agreed to the entry of injunctive relief upon his threatened or anticipatory breach or breach of the ¶ 8 covenants and has agreed to be liable for the Corporation's attorney's fees in obtaining such relief.

74.     Emery's conduct has caused, and continues to cause, irreparable harm to Guttenberg and the Corporation.

WHEREFORE, as to Count I of this Complaint, the Plaintiffs pray the Court enter the following relief:

A.      The Court issue temporary, preliminary and permanent injunctions enjoining Emery from taking any further actions or threatened actions in violation of the non-competition and non-solicitation covenants, including, without limitation:

(1).    Establishing, or threatening to establish, in the District of Columbia an office in competition with the Corporation;

(2)     Seeking to establish, or threatening to establish, his own referral network of dentists and physicians loyal to himself and not to the Corporation;

(3).    harassing Guttenberg and the Corporation Employees;

(4).    soliciting Corporate Employees or take any other actions designed to transfer Corporation Employees to another practice;

(5).    taking, or threatening to take, any action designed to destroy or dissolve the

Corporation; and

(6).    for such other and further relief as the Court may deem just and proper.

B.    The Court order that Emery pay the Corporation's attorneys' fees and costs in

pursuing this Count.

## COUNT II
(For Declaratory Judgment-Emery's Withdrawal from the Corporation)

75.    Plaintiffs incorporate herein by reference the allegations contained in

paragraphs 1 through 74 of this Complaint, and further allege against Defendant as follows:

76.    Under paragraph 13.C. of the Emery Employment Agreement, Emery may

withdraw as an employee of the Corporation.

77.    Through his actions as alleged in paragraphs 30 through 57 and 62 through 65

above, Emery has manifested his intent to withdraw from the Corporation.

78.    Plaintiffs contend that Emery has manifested his intent to withdraw from the

Corporation and that ¶ 13.C of the Emery Employment Agreement has been invoked.

79.    Emery claims, however, that his actions do not manifest an intent to resign and

that ¶ 13.C has not been invoked.

80.    Paragraphs 6.B.1 and 14 of the Shareholder Agreement provide that a

shareholder who withdraws from the Corporation must sell his shares back to the Corporation

and resign as a director and officer.

81.    On December 14, 2007, the Corporation tendered to Emery, pursuant to ¶

6.B.1 of the Shareholder Agreement the amount required to purchase back Emery's shares

23

upon withdrawal from the Corporation. Emery has refused the tender, and has refused to resign as a director of the Corporation.

82.    The Plaintiffs contend that upon tender of the share buy out provision, Emery is no longer a shareholder of the Corporation. Emery, however, disputes that he is no longer a shareholder or the Corporation and that he is obligated to resign as a director.

83.    An actual controversy exists between Plaintiffs and Defendant as to:

(1).    whether Emery has withdrawn from the Corporation;

(2).    whether Emery is no longer a shareholder or director of the Corporation; and;

(3)    the rights of the parties under ¶¶ 13.B and 14 of the Employment Agreement and ¶¶ 6 and 14 of the Shareholder Agreement.

84.    Pursuant to 28 U.S.C. § 2201, this Court should resolve this controversy and determine the rights and obligations of the parties.

WHEREFORE, on Count II of this Complaint, Plaintiffs pray that this Court enter a declaratory judgment determining the rights and obligations of the parties and:

(a)    Declare Emery has manifested his intent to withdraw from the Corporation;

(b)    Declare that as Emery has manifested his intent to withdraw from the Corporation he has invoked the provisions of ¶¶ 13.C. and 14 of the Employment Agreement and ¶¶ 6.B.1 and 14 of the Shareholder Agreement have been invoked and satisfied, that Emery is no longer a director and shareholder of the Corporation;

(c)    Declare that under ¶¶ 6.B.1 and 14 of the Shareholder Agreement, by the tender of check in the amount of $31,250, the Corporation has complied with its obligation to purchase Emery's stock and, therefore, Emery is no longer a shareholder or director of the Corporation;

(d)    And for such other and further relief as the Court may deem just and proper.

## COUNT III
(For Declaratory Judgment-Emery's Termination Without Cause)

85.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 84 of this Complaint, and further allege against Defendant as follows:

86.    Plaintiffs plead alternatively that if Emery has not manifested his intent to withdraw from the Corporation and has not invoked the provisions identified in paragraph 78 and 80 above, then Emery has been terminated without cause.

87.    As the President of the Corporation, pursuant to the terms of Emery's Employment Agreement, the implicit agreement between Guttenberg and Emery is that their custom and practice over the last seventeen (17) years, confirms Guttenberg has the responsibility and authority to terminate employees, including Emery, to which Emery has agreed and conceded by seeking for himself to assume the position of President of the Corporation so that he could terminate Guttenberg.

88.    On December 14, 2007 the Corporation, through Guttenberg acting as its President, issued a notice to Emery that he was terminated without cause and given the six months prior notice requirement pursuant to ¶ 13.B of the Employment Agreement.

89.    Emery, however, disputes Guttenberg's ability to terminate him on behalf of the Corporation without cause.

90.    Pursuant to the ¶¶ 6.B.1 and 14 of the Shareholder Agreement, as of the December 14, 2007 notice of termination to Emery, Emery was obligated to sell his shares in the Corporation back to the Corporation and to resign as an officer and director of the Corporation.

91.    Pursuant to the Shareholder Agreement, as of December 14, 2007, as the Corporation tendered a check to Emery in the amount of $31,250, Emery is no longer a shareholder, officer or director of the Corporation.

92.    Emery, however, disputes that under the December 14, 2007 notice he was required to sell his shares back to the Corporation and to resign as an officer and director.

93.    An actual controversy exists between Plaintiffs and Defendant as to the effect and import of the December 14, 2007 notice of termination to Emery.

94.    Pursuant to 28 U.S.C. § 2201, this Court should resolve this controversy and determine the rights and obligations of the parties.

WHEREFORE, on Count III of this Complaint, Plaintiffs pray that this Court enter a declaratory judgment determining the rights and obligations of the parties and:

(a)    Declare that under the December 14, 2007 notice, defendant Emery was terminated without cause;

(b)    Declare that under the December 14, 2007 notice and the Shareholder Agreement Emery must sell his shares back to the Corporation for $31,250 and resign as an officer and director of the Corporation.

(c)    And such other and further relief as the Court may deem just and proper.

### COUNT IV
(For Declaratory Judgment-Emery Termination with Cause)

95.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 94 of this Complaint, and further allege against Defendant as follows:

96.     Plaintiff's plead alternatively that if Emery has not manifested his intent to withdraw from the Corporation and not invoked the provisions identified in paragraph 78 and 80 above, then Emery may be terminated with cause.

97.     The conduct alleged in paragraphs 30 through 5 and 62 through 65 above constitute grounds for Emery's termination with cause.  Emery, however, disputes that there exist grounds to terminate him for cause.

98.     An actual controversy exists between Plaintiffs and Defendant as to whether Emery may be terminated by the Corporation's President for cause, and as to whether grounds for cause exist.

99.     Pursuant to 28 U.S.C. § 2201, this Court should resolve this controversy and determine the rights and obligations of the parties.

WHEREFORE, on Count IV of this Complaint, Plaintiffs pray that this Court enter a declaratory judgment determining the rights and obligations of the parties and:

(a)     Declare that the President of the Corporation is authorized to terminate Emery for cause;

(b)     Declare that the grounds for termination with cause have been established by the Plaintiffs;

(c)     And for such other and further relief as the Court deems just and proper.

### COUNT V
(Breach of Contract)

100.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 99 of this Complaint, and further allege against Defendant as follows:

101.    Through his actions as alleged above, Emery has breached the following provisions of the Shareholder Agreement:

a.    He has failed to promote the mutual interests of he and Guttenberg and the interests of the Corporation as agreed in the Eighth Whereas Clause;

b.    He has breached ¶ 14 by failing to resign as a director and shareholder of the Corporation, as required upon his withdrawal or termination from the Corporation.

102.    Through his actions as alleged above, including but not limited to the allegations set forth in paragraph 33 above, Emery has breached the following provisions of the Employment Agreement:

a.    He has failed to "faithfully serve [the Corporation] in its Practice." (¶ 1).

b.    He has failed to "diligently and conscientiously devote his entire time, attention and energies to the [Corporation's] Practice." (¶ 3.a).

c.    He has failed to "promote the practice." (¶ 3.a.5)

d.    He has solicited referring dentist to himself as opposed to the Practice in violation of ¶ 8.a.

e.    He has sought to establish a business practice in competition with the Corporation within the District of Columbia, in violation of ¶ 8.c.

g.    He has refused to accept his termination notice under ¶ 13.B.

103.    As a proximate cause of Emery's breaches, Plaintiffs have suffered, and will continue to suffer, compensatory damages in an amount in excess of $75,00 to be proven at trial.

104.    Emery knowingly, willfully and wantonly breached the contracts in reckless disregard for the consequences, and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count V, Plaintiffs demand judgment against Defendant Emery for compensatory damages in an amount in excess of $75,000 to be proven at trial, and punitive damages in the amount of $5,000,000, plus interest and the costs of this action, and such other and further relief as this Court may deem just and proper.

## COUNT VI
(Breach of Fiduciary Duty-Duty of Loyalty)

105.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 104 of this Complaint, and further allege against Defendant as follows:

106.    As part of Emery's fiduciary duty of loyalty, as a director and officer, he must remain loyal to the Corporation, acting at all times in the best interests of the Corporation and its shareholders, whose interest must take precedence over any self interest of Emery.  Emery has breached this fiduciary duty as the actions described above taken by him have not been in the best interests of the Corporation or Guttenberg as a shareholder, and have, rather, been designed to destroy the Corporation for the self interest of Emery in order to withdraw from the Corporation without having to adhere to the provisions of the Shareholder and Employment Agreements.

107.    Emery has breached his fiduciary duty to the Corporation and Guttenberg as a shareholder because his actions have been faithless and constitute self-dealing.

108.    Emery's fiduciary duty of loyalty prohibits him from:

a.      Engaging in, or threatening to engage in, a competing business to the detriment of the Corporation;

b.      Engaging in, or threatening to engage in, a competing business and taking actions intended to cripple or injure the Corporation or seeking to defeat it in order to do so;

c.    Seeking to organize, or threatening to organize, a business that competes with the Corporation.

109.    The duty of loyalty encompasses a duty of candor, and requires directors to disclose information relevant to the Corporation and to not withhold relevant information concerning any potential conflict of interests with the Corporation.

110.    As a director (and shareholder of a close corporation) Emery owes the Corporation, and Guttenberg as a shareholder of the Corporation, a duty of the utmost loyalty. Through the actions taken above, including but not limited to those alleged in paragraphs 30 through 57 and 62 through 65 above, Emery has breached his fiduciary duty of loyalty.

111.    As a direct and proximate result of Emery's breaches of his fiduciary duty of loyalty, the Plaintiffs have suffered, and will continue to suffer compensatory damages in an amount in excess of $75,000 to be proven at trial.

112.    Emery knowingly, willfully and wantonly breached his fiduciary duty of loyalty in reckless disregard for the consequences and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count VI, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,00 in an amount to be proven at trial and $5,000,000.00 in punitive damages, plus interest and the costs of this action, and such other and further relief as this Court deems just and proper.

### COUNT VII
(Breach of Fiduciary Duty-Duty of Due Care)

113.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 112 of this Complaint, and further allege against Defendant as follows:

114.    As a director of the Corporation Emery owes the Corporation, and Guttenberg as a shareholder of the Corporation, a duty of due care and is bound to protect the assets of the Corporation and not appropriate the Corporation's assets for his own use and purposes.

115.    As part of the duty of due care, a director owes a duty of preservation of corporate property and assets, including keeping the Corporation within its corporate powers and obeying the law and includes a duty of care in the execution of directorial responsibilities.

116.    Emery has breached his duty of care to the Corporation and Guttenberg as a shareholder of the Corporation, by *inter alia*:

(a).    Engaging in the actions alleged in paragraphs 30 through 57 and 62 through 65 above;

(b).    Refusing to reinstate the corporate charter, concealing from the Corporation and its President that the charter had been revoked, and therefore exposing the Corporation and its shareholders to potential liability.

117.    As a direct and proximate result of Emery's breaches of his fiduciary duty of due care, Plaintiffs have suffered, and will continue to suffer compensatory damages in excess of $75,000 to be proven at trial.

118.    Emery knowingly, willfully and wantonly breached his fiduciary duties in reckless disregard for the consequences and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count VII of this Complaint, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,000 in an amount to be proven at trial and $5,000,000.00 in punitive damages, plus interest and the costs of this action, and for such other and further relief as this Court deems just and proper.

31

## COUNT VIII
(Breach of Fiduciary Duty-Duty of Good Faith)

119.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 118 of this Complaint, and further allege against Defendant as follows:

120.    Emery owes the Corporation and Guttenberg the fiduciary duty of good faith which requires that he discharge corporate responsibilities in good faith and with conscientious fairness, morality and honesty in purpose, and displaying good and prudent acts in management of the corporation.

121.    In order to relieve himself of his obligations under the Shareholder and Employment Agreements upon withdrawing from the Corporation, Emery has breached his fiduciary duty of good faith by, *inter alia,* engaging in the actions alleged in paragraphs 30 through 57 and 62 through 65 above as well as the following:

a.    seeking to establish and taking actions to establish an office within the District of Columbia in direct competition with the Practice;

b.    soliciting in breach of his fiduciary duty, Breeyear, and possibly other of the Corporation's employees to leave the Practice and establish a practice with Emery;

c.    engaging in acts of dishonesty, or that are morally incorrigible, intended to harm, destroy or dissolve the Corporation, including, but not limited to, blackmailing Guttenberg, stealing company property (the Employee Claim file and Breeyear's annual evaluations), harassing Breeyear and Guttenberg, seeking to destroy the morale of the Corporation's employees, and committing corporate waste by seeking to train Corporation Employees to take over functions in his new practice, whereas, there are Corporation employees who are already trained in these functions;

d.     Refusing to reinstate the corporate charter, concealing from the Corporation and its President that the charter had been revoked, and therefore exposing the Corporation and its shareholders to potential liability;

e.     Failing to support the Corporation in its litigation against the Employee Claim by pursuing the Unilateral Agreement, which if exposed during litigation would have adversely effected the Corporation and its shareholders; and

f.     Breaching the non-solicitation covenant by directing referral dentists and physicians to himself and not to the practice.

122.   As a direct and proximate result of Emery's breaches of his fiduciary duty of good faith, Plaintiffs have suffered, and will continue to suffer compensatory damages in excess of $75,000 in an amount to be proven to at trial.

123.   Emery knowingly, willfully and wantonly breached his fiduciary duties in reckless disregard for the consequences, and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count VIII of this Complaint, Plaintiffs demand judgment against Defendant Emery for compensatory damages in excess of $75,000 in an amount to be proven at trial and $5,000,000.00 in punitive damages, plus interest and the costs of this action, and such other and further relief as this Court deems just and proper.

### COUNT IX
(Intentional Infliction of Emotional Distress-Plaintiff Guttenberg)

124.   Plaintiff Guttenberg incorporates herein by reference the allegations contained in paragraphs 1 through 123 of this Complaint, and further alleges against Defendant as follows:

33

125.    Emery's actions were taken in order to intentionally inflict emotional distress, including stress and anxiety upon Guttenberg and to embarrass Guttenberg in the professional community.

126.    Emery, as a health care provider, is aware that stress and anxiety will cause physical injury.

127.    As a result of Emery's intentional acts, Guttenberg has suffered emotional distress, including stress, anxiety, and the physical injury associated with such stress and anxiety and is entitled to compensatory damages.

128.    Defendant's conduct was intentional, reckless and in deliberate disregard of a high degree of probability that emotional distress would result to the Plaintiff Guttenberg.

129.    The aforesaid conduct by Defendant was extreme and outrageous and beyond the bounds of decency in society.

130.    The conduct of Emery was malicious, willful and intentional.

131.    As a direct and proximate result of Emery's breaches of his fiduciary duty of good faith, Plaintiff has suffered, and will continue to suffer compensatory damages.

132.    Emery knowingly breached his fiduciary duties in reckless disregard for the consequences, and is liable to the Plaintiff for punitive damages.

WHEREFORE, as to Count IX of this Complaint, Plaintiff Guttenberg demands judgment against Defendant Emery for compensatory damages in an amount to be proven at trial, and $2,000,000 in punitive damages, plus interest and the costs of this action, and for such other and further relief as this Court deems just and proper.

### COUNT X
(Promissory Estoppel)

133.    Plaintiffs incorporate herein by reference the allegations contained in
paragraphs 1 through 131 of this Complaint, and further allege against Defendant as follows:

134.    The Defendant made clear and unambiguous promises to Plaintiffs to practice
oral and maxillofacial surgery with Plaintiffs. His intent is evidenced in the Agreements and
in the course of conduct by the Defendant since 1990.

135.    The Defendant knew, or reasonably should have known that the Plaintiffs
would rely on the promises of the Defendant.

136.    The Plaintiffs did, in fact, rely on the Defendant's promises, and did, in fact,
compensate the Defendant handsomely, and did, in fact, promote Defendant's practice and
career as more fully set forth in paragraphs 11 through 29.

137.    The Defendant breached his promises to Plaintiffs when he violated the terms
of the Agreements and the trust imposed on him by Plaintiffs, as more fully set forth in
paragraphs 30 through 57 and 62 through 65 above. As a result of his breaches of promise,
the Plaintiffs suffered economic loss.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory
damages in excess of $75,000 in an amount to be determined at trial, plus interest and the
costs, and such other and further relief as this Court deems just and proper.

### COUNT XI
(Tortious Interference with Business Relations
and Prospective Economic Advantage)

138.    Plaintiffs incorporate herein by reference the allegations contained in
paragraphs 1 through 137 of this Complaint and further allege against Defendant as follows:

139.    The Defendant violated the terms of his Agreements and understandings with Plaintiffs without cause or justification, as more fully set forth in paragraphs 30 through 57 and 62 through 65 above.

140.    All such conduct was intentional and willful, calculated to cause damage and loss to the Plaintiffs in their lawful business, and done with the unlawful purpose of causing such damage and loss without justifiable cause or right. Such conduct was further wanton, malicious and outrageous, showing a conscious indifference to the consequences of Defendant's actions.

141.    As a direct result of Defendant's interference with the Plaintiffs' business relations and prospective economic advantage, Plaintiffs have suffered, and will continue to suffer, substantial damages to their business relations and expectancies.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,000, in an amount to be determined at trial, and punitive damages in the amount of $5,000,000, plus interest and costs, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

Geoffrey P. Gitner (D.C. Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Ph: (202) 772-5926

Richard T. Tomar (D.C. Bar No. 13094)
KARP, FROSH, LAPIDUS, WIGODSKY &
NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850
Ph: (301) 948-3800

*Counsel to the Plaintiffs*

## VERIFICATION

I, Dr. Steven Guttenberg, being sworn, as the President of the Corporate Plaintiff, and

as an individual Plaintiff herein, have personal knowledge of the facts alleged herein, and

hereby verify under oath that the factual set forth in this Complaint are to the best of my

knowledge true and correct.

Dr. Steven A. Guttenberg

SUBSCRIBED AND SWORN TO
BEFORE ME THIS _15_ DAY OF JANUARY, 2008

Notary Public

My Commission Expires On: _7/31/12_

My Commission Expires July 31, 2012
MARGARET ALEXANDRITE
Notary Public

as identification.
personally known to me or has/have produced
is/are _____

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DR. STEVEN A. GUTTENBERG and DOCTORS GUTTENBERG AND EMERY, P.C. | DR. ROBERT W. EMERY |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **MD**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **VA**
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Geoffrey P. Gitner, Esq.
Law Office of Geoffrey P. Gitner
Watergate Building, 600 New Hampshire Avenue, NW
Washington, DC  20037

ATTORNEYS (IF KNOWN)

Joseph Shull, Esq.
Venable, LLP
575 7th Street, NW
Washington, DC  20004

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

- ☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

◉ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. Sec. 1332 Declaratory and injunctive relief. Breach of Contract and fiduciary duty.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ Above $75,000<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☐   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  1 / 16 / 08    SIGNATURE OF ATTORNEY OF RECORD  _Jeffrey P. Miller_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed _only_ if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the _primary_ cause of action found in your complaint. You may select only _one_ category. You _must_ also select _one_ corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# Exhibit A

L2474.501 P

EXHIBIT C

STEVEN A. GUTTENBERG, D.D.S., P.C.

SHAREHOLDERS' AGREEMENT

BETWEEN

STEVEN A. GUTTENBERG, D.D.S.

AND

ROBERT W. EMERY, D.D.S.

DATED July 30, 1990

STEVEN A. GUTTENBERG, D.D.S., P.C.
SHAREHOLDERS' AGREEMENT
<u>Table of Contents</u>

<u>Page</u>

Recitals . . . . . . . . . . . . . . . . . . . . .    1
1.  Restriction on Transfer . . . . . . . . . . . .    3
2.  Insurance . . . . . . . . . . . . . . . . . . .    3
3.  Purchase of Stock on Death. . . . . . . . . . .    5
4.  Purchase Price of Stock Upon Death. . . . . . .    6
5.  Closing Date. . . . . . . . . . . . . . . . . .    8
6.  Lifetime Restrictions on Shares . . . . . . . .    9
    A.  Offers by Third Parties . . . . . . . . . .    9
    B.  Termination of Employment . . . . . . . . .   11
    C.  Determination of Value  . . . . . . . . . .   12
    D.  Settlement. . . . . . . . . . . . . . . . .   13
    E.  Death Prior to Transfer . . . . . . . . . .   17
    F.  Restrictive Covenant. . . . . . . . . . . .   17
    G.  Surplus . . . . . . . . . . . . . . . . . .   18
    H.  Stock Certificate Legends . . . . . . . . .   18
7.  Option Upon Involuntary Transfer. . . . . . . .   19
8.  Disability. . . . . . . . . . . . . . . . . . .   19
    A.  Total Disability Defined. . . . . . . . . .   19
    B.  Total Disability; Mandatory Sale of Stock . .  21
    C.  Cessation of Total Disability . . . . . . .   21
    D.  Death of Totally Disabled Shareholder . . .   21
    E.  Compensation During Disability. . . . . . .   22
    F.  Restrictive Covenant. . . . . . . . . . . .   22
    G.  Disability Insurance Purchase . . . . . . .   22
9.  Term . . . . . . . . . . . . . . . . . . . . .   24
10  Simultaneous Death. . . . . . . . . . . . . . .   24
11. Benefit . . . . . . . . . . . . . . . . . . . .   25
12. Amendment and Revocation. . . . . . . . . . . .   25
13. Specific Performance. . . . . . . . . . . . . .   25
14. Resignation as Officer and Director . . . . . .   26
15. Grammatical Usage . . . . . . . . . . . . . . .   26
16. Severability. . . . . . . . . . . . . . . . . .   27
17. Election of Directors . . . . . . . . . . . . .   27
18. Disagreement Between Directors. . . . . . . . .   27
19. Additional Actions. . . . . . . . . . . . . . .   28
20. Notice. . . . . . . . . . . . . . . . . . . . .   28
21. Notice of Breach and Opportunity to Cure. . . .   29
22. Entire Agreement. . . . . . . . . . . . . . . .   30
23. Construction. . . . . . . . . . . . . . . . . .   30
24. Waiver. . . . . . . . . . . . . . . . . . . . .   30
25. Amendment . . . . . . . . . . . . . . . . . . .   30
26. Headings. . . . . . . . . . . . . . . . . . . .   30

- i -

## EXHIBIT C

## STEVEN A. GUTTENBERG, D.D.S., P.C.
### SHAREHOLDERS' AGREEMENT

THIS SHAREHOLDERS' AGREEMENT (the "Agreement") is made as of the 30th day of July, 1990 by and among STEVEN A. GUTTENBERG, D.D.S. and ROBERT W. EMERY, D.D.S., both of whom are licensed to practice dentistry in the District of Columbia (the "Shareholders"), and STEVEN A. GUTTENBERG, D.D.S., P.C., a professional corporation authorized to practice dentistry in the District of Columbia through individuals licensed to practice dentistry in the District of Columbia (the "Corporation").

### RECITALS

WHEREAS, upon the Closing pursuant to the Stock Purchase Agreement dated July 30, 1990 (the "Purchase Agreement") the Shareholders shall collectively own One Hundred Percent (100%) of the issued and outstanding stock of the Corporation (the "Stock"); and

WHEREAS, upon Closing under the Purchase Agreement the Shareholders will be actively engaged in managing and operating the Corporation, and the success of the Corporation will be dependent entirely upon the efforts and cooperation of the Shareholders, so that all parties hereto are cognizant of the fact that the death or lifetime sale of the Corporation's Stock by either of them during the life of the other would substantially disrupt the harmonious and successful management

and control of the Corporation; and

WHEREAS, the parties to this Agreement wish to provide for the purchase by the other Shareholder of the shares of Stock owned by the deceased shareholder in order to prevent interference with the business policies of the surviving Shareholder by the family of the deceased Shareholder; and

WHEREAS, the parties to this Agreement wish to provide for the purchase by the other Shareholder of the shares of Stock owned by the disabled Shareholder in order to prevent interference with the business policies of the non-disabled Shareholder by the family of the disabled Shareholder; and

WHEREAS, the parties to this Agreement wish to provide for the purchase by the Corporation of the shares of any Shareholder who wishes to withdraw from the Corporation and to sell his shares of Stock during his lifetime; and

WHEREAS, the parties to this Agreement which to provide the funds necessary for the purchase of the shares of Stock of any Shareholder under the terms of this Agreement, through insurance to the extent possible, under the terms of this Agreement; and

WHEREAS, all parties hereto wish to act in concert toward ownership, management, operation and control thereof; and

WHEREAS, the Shareholders desire to promote their mutual interests and the interests of the Corporation by imposing

- 2 -

certain restrictions and obligations on the shares of Stock of the Corporation; and

WHEREAS, Emery and Guttenberg have entered into Employment Agreements with the Corporation on even date ("Employment Agreements").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1.    Restriction on Transfer.  Except as hereinafter provided in this Agreement, no Shareholder shall, at any time, sell, assign, pledge, hypothecate or in any other manner transfer or encumber (hereinafter all such actions are collectively referred to as a "transfer") any or all of the shares of stock of the Corporation now or hereafter owned by him to any persons, firm, association, partnership, corporation, trust or any other entity.  Any purported transfer of such shares not in accordance with the terms herein provided shall be void, and shall not be recognized or recorded on the stock transfer books of the Corporation.

2.    Insurance.  The Shareholders will purchase, and agree to continue in force by the continuous payment of premiums when due, insurance policies in the an amount equal initially to

- 3 -

L2474.501 P

$1,000,000 on the life of Dr. Guttenberg and $500,000 on the life of Dr. Emery.  The Shareholders shall review their needs for insurance at least annually and shall increase the amounts of insurance as necessary to provide sufficient insurance in order to fund the purchase of shares from the estate of a Shareholder who shall become deceased.  Each Shareholder shall be the owner of such policy or policies of insurance purchased on the life of the other Shareholder pursuant to the terms of this paragraph, but no rights of ownership in such policy or policies shall be exercised unless written notice of the intention to exercise such right is given to the other Shareholder or Shareholders with the other Shareholder's or Shareholders' consent to the exercise of such right.  The beneficiaries of each Shareholder's life insurance policy shall be the other Shareholder, in the amount necessary to allow the other Shareholder to purchase the deceased Shareholder's stock, and, for the remainder of the proceeds of the life insurance policy, the beneficiary shall be the Shareholder's spouse or other designated beneficiary.  The amount of insurance for each Shareholder and the allocation to the other Shareholder shall be reviewed at least annually by the Corporation's insurance agent and shall be increased, when and as necessary, so that each Shareholder's policy shall be sufficient at least to allow the other Shareholder to purchase his stock in the event of his death.  If a Shareholder is not insurable at the

- 4 -

time any additional insurance is required, the other Shareholder shall take any steps he shall deem necessary to insure that the necessary funds will be available to implement this agreement.

       3.  <u>Purchase Of Stock On Death</u>.  Upon the death of any Shareholder, the Corporation's Stock owned by the deceased Shareholder shall be purchased and the estate of the deceased Shareholder shall sell to the other Shareholder all of the deceased Shareholder's Stock in the Corporation (whether held individually, jointly, beneficially, or constructively) now owed or hereafter acquired by him.  The purchase price of the Stock shall be equal to the lower of:  (a) the amount of insurance then in effect for the decedent Shareholder, or (b) the price calculated under Section 4 below.  Each Shareholder agrees that any shares of Stock owned by him in the Corporation at the time of his death shall be sold and transferred by the legal representative of his estate pursuant to the terms and conditions of this Agreement.  Upon transfer of the Stock, as set forth above, the Shareholder receiving the Stock shall provide the deceased Shareholder's estate with a complete and absolute release of all the obligations of the deceased Shareholder under the Stock Purchase Agreement, Stock Pledge Agreement, Promissory Note, this Shareholders' Agreement, and the Employment Agreement (hereinafter collectively referred to as the "Agreements").

L2474.501 P

4.    Purchase Price of Stock Upon Death

      A.    Upon the death of a Shareholder, the other Shareholder shall purchase all (but not less that all) of the shares of stock of the Corporation owned by the Shareholder at the time of his death for a per share purchase price as follows: (i) if the Shareholder has been employed by the Corporation for less than five (5) years or, in the case of Robert W. Emery, if Dr. Emery has not completed the Buy-In Adjustment specified in the Employment Agreement of even date hereof, then the greater of (a) the accrual basis book value of each of such shares, or (b) the amount such Shareholder paid for such shares; or (ii) if the Shareholder has been employed by the Corporation for longer than five (5) years or, in the case of Robert W. Emery, if Dr. Emery has completed the Buy-In Adjustment specified in the Employment Agreement of even date hereof, the Purchase Price as determined under the procedure described in B. below.

      B.    The other Shareholder ("Purchasing Shareholder") and the personal representatives of the deceased Shareholder shall have 90 days from the date of death of the deceased Shareholder to agree on the Purchase Price.  If, after the 90-day period, the Purchasing Shareholder and the personal representatives of the deceased Shareholder shall not have agreed in writing to a Purchase Price, then the Purchasing Shareholder and the personal representatives of the deceased Shareholder

- 6 -

shall select an independent appraiser to determine the value of the deceased's shares, which determination shall be binding on all parties. If the Purchasing Shareholder and the personal representatives of the deceased Shareholder have not agreed on an independent appraiser within 20 days following the aforementioned 90-day period, then for 15 days following the aforementioned 20-day period, the Purchasing Shareholder shall have the right to select one independent appraiser and the personal representatives of the deceased Shareholder shall have the right to select one independent appraiser, and the average of the two resulting appraisals shall be the Purchase Price. Prompt notice of such selection by the Purchasing Shareholder or by the personal representatives of the deceased Shareholder during this 15-day period shall be given in accordance with Section 21 hereof. If either the Purchasing Shareholder or the personal representatives of the deceased Shareholder fails to select an appraiser, then the determination of the appraiser selected by the other party shall be the Purchase Price, which determination shall be binding on all parties. The Purchasing Shareholder will furnish the independent appraisers with all data reasonably requested by them and will cooperate fully in the appraisal process. The Purchasing Shareholder and the personal representatives of the deceased Shareholder, will each request that the appraisers render their opinion, in writing, as expeditiously as possible.

- 7 -

C.   Each Shareholder agrees that upon receipt of cash in full payment for his shares of Stock, he, or the legal representative of his estate, as the case may be, shall deliver the certificates for Stock subject to this Agreement to the Corporation.  The legal representative of the decedent's estate shall also execute and deliver to the Purchasing Shareholder all the documents which are required to transfer the decedent's Stock to the Purchasing Shareholder.  If the Purchasing Shareholder gives a Note to the estate of a deceased Shareholder in partial payment of the shares herein purchased and sold, the estate of the deceased Shareholder shall be entitled to retain possession of the certificates for such shares until the purchase price for the shares if paid in full.

5.   <u>Closing Date</u>.  Unless otherwise agreed by the parties, the Closing of the sale and purchase of Shares shall take place at the principal place of business of the Corporation. In the case of a purchase of Shares from a deceased Shareholder's estate, the Closing shall take place ninety (90) calendar days after the appointment of a personal representative for the deceased Shareholder's estate.  In the case of a purchase of Shares from a disabled Shareholder (as hereinafter defined), or upon the voluntary withdrawal, the Closing of the sale and purchase shall take place, in the case a disabled Shareholder, ninety (90) calendar days after the conclusion of the required

- 8 -

period of disability.

      6.    <u>Lifetime Restriction on Shares.</u>

      A.    <u>Offers by Third Parties</u>.

      A.1.  In the event that at any time a Shareholder desires to sell any part or all of his shares of stock of the Corporation and receives a bona fide written offer to purchase such shares of stock from a third party (a "Proposed Purchaser"), the Shareholder shall give prompt written notice to the Corporation of such offer and intention to sell (the "Selling Notice"); provided, however, that the Selling Notice shall not be delivered and the shares shall in no event be sold unless the Proposed Purchaser is licensed to practice dentistry in Washington, D.C., has executed an agreement to be bound by and become signatory to an Employment Agreement and a Shareholders' Agreement identical to those executed by Doctors Guttenberg and Emery on July 30, 1990, unless amended, in which event those amendments shall prevail. The Selling Notice shall set forth the following: (i) the identity of the Proposed Purchaser; (ii) the number of shares the Proposed Purchaser has offered to purchase from the Shareholder; (iii) all of the terms and conditions of such offer of purchase; (iv) the Purchaser's acknowledgement of his review of the Employment and Shareholder Agreement and willingness to be bound and become a signatory thereto; and (v) the Shareholder's offer to sell such shares to the Corporation in

accordance with the terms of this Section 6.

A.2.  The Corporation shall have the option to purchase all (but not less than all) of the shares of stock of the Corporation offered in the Selling Notice, as hereinafter provided, for a per share purchase price equal to the lesser of: (i) the per share price set forth in the Selling Notice; or (ii) the accrual basis book value of each of such shares.  The Corporation shall have the option to purchase all (but not less than all) of the shares for a period of thirty (30) days.  Such option shall be exercised by giving written notice within thirty (30) days after the date of the Selling Notice to the selling Shareholder setting forth the Corporation's intention to purchase the shares.  If the Corporation shall not exercise its option to purchase the shares of stock of the Corporation offered in the Selling Notice, then the remaining shareholders, either individually or collectively, on a prorata basis, according to their percentage ownership of the Corporation, shall have the same right to purchase the shares of stock as the Corporation had and as specified above.

A.3.  Settlement for the purchase of the shares in accordance with this Section 6 shall take place within ninety 90 days after either the date of the Selling Notice or the determination of the accrual basis book value of such shares, whichever is later, in accordance with Section 7.D.1 of this

- 10 -

Agreement.  Payment of the purchase price shall be in accordance
with the terms and conditions set forth in Section 6.D.2 of this
Agreement.

A.4.  In the event that the Corporation does
not exercise the option afforded it by this Section 6, then the
selling Shareholder shall be free to sell such shares pursuant to
the bona fide offer received by him at any time for a period of
sixty (60) days from the date the Shareholders' option expired;
provided, however, that: (i) any such transferee must be licensed
to practice dentistry in Washington, D.C. and must be an employee
of the Corporation, and (ii) the transferee agrees in writing to
be bound by all the terms and conditions in this Agreement.  If
the Shareholder does not sell such shares within such 60 day
period, then he must again offer his shares to the Corporation
and the other Shareholders in accordance with the terms of this
Section 7 before selling such shares.

B.    <u>Termination of Employment</u>.

B.1.  In the event that at any time a
Shareholder's employment with the Corporation is terminated by
the Corporation for any reason (other than his death as provided
in Section 4, above or his disability as provided for in Section
8, below), the Corporation shall purchase all (but not less than
all) of the terminated Shareholder's shares of stock of the
Corporation for a per share purchase price equal to the greater

- 11 -

of (i) the accrual basis book value of each of such shares; or (ii) the amount such Shareholder paid for such shares when they were purchased from the Corporation.

B.2. In the event that at any time a Shareholder's employment with the Corporation is terminated by the Shareholder after the Shareholder has reached the age of 55, the Corporation shall purchase all (but not less than all) of such Shareholders' shares of stock of the Corporation for a per share purchase price equal to the accrual basis book value of each of such shares. As set forth in these Agreements, "accrual value" or "accrual book value" shall be computed by said independent accountant pursuant to and following the Generally Accepted Accounting Principles governing accounting professionals.

B.3. Settlement for the purchase of the shares in accordance with this Section 7.B shall take place within ninety (90) days after either the date of such termination or the determination of the accrual basis book value of such shares, whichever is later, in accordance with Section 7.D.1 of this Agreement. Payment of the purchase price shall be in accordance with the terms and conditions set forth in Section 6.2 of this Agreement.

C. <u>Determination of Value</u>. For the purposes of this Agreement, the accrual basis book value of the shares and/or

- 12 -

the Formula shall be determined as of the last day of the last complete fiscal year of the Corporation which occurred prior to the day the Selling Notice was delivered (as provided in Section 8.A, above); the date on which the Shareholder ceases to be employed by the Corporation due to his death (as provided in Section 6, above); or the date the Shareholder's employment with the Corporation was terminated or the Shareholder quits or retires (as provided in Section 7.B, above) (collectively referred to as a "Date of Termination").  The accrual basis book value of the shares and/or the Formula shall be determined by the independent certified public accountant regularly serving the Corporation, and such determination shall be final and binding upon the parties hereto for the purposes of this Agreement, except in the event of fraud or mistake.  Each shareholder may, at his option and sole expense, hire his own accountant to review the work of the Corporation's independent accountant.  The Corporation shall cause such determination to be made as promptly as possible after the Date of Termination.  The Shareholders hereby agree that such a determination of accrual basis book value shall be made annually by the independent certified public accountant regularly serving the Corporation.

     D.   <u>Settlement</u>.  Settlement for the purchase of the shares shall take place as hereinafter provided.

     D.1.  At settlement, which shall occur at the

- 13 -

times set forth in Sections 6, 7.A and 7.H of this Agreement, the selling Shareholder, or the personal representatives of the deceased Shareholder, shall deliver to the Corporation a certificate or certificates representing the shares being sold properly endorsed in blank.

D.2. Unless otherwise agreed, the purchase price for the shares (as provided in Sections 6, 8.A and 8.B, above) shall be payable by the Corporation by the delivery at settlement to the selling Shareholder, or the personal representatives of the deceased Shareholder, of a promissory note. The purchase price shall be paid by means of a Promissory Note, calling for one hundred twenty (120) consecutive equal monthly payments of principal with interest thereon at the Citibank Prime Rate then in effect plus one percent (1%) determined as follows: For the period of time from the execution of the Note to the last day of the first twelve (12) months in questions, the interest rate in each month therein shall be the Citibank Prime Rate in effect as of the last day immediately preceding the commencement of the Note, plus one percent (1%). The interest rate for each month in each successive year shall be the Citibank Prime Rate if effect as of the last day of the immediately preceding year plus on percent (1%).

Notwithstanding the above, if such an arrangement is found to be unacceptable by any taxing authority, then in all

- 14 -

L2474.501 P

cases, at such interest rate as determined by the taxing authority.  The Note shall be unsecured as to the Corporate Maker, but shall be guaranteed by each surviving or remaining Shareholder and all shares owned by each such surviving or remaining Shareholder shall be pledged to the Payee of the Note to secure the payment of the guaranteed.  The Note shall provide that the Maker shall have an unlimited right of prepayment without penalty, and shall further provide for acceleration at the option of the holder in the event of default in the payment of any installment of principal or interest, if such default continues for a period of 30 days after the maker receives written notice of such default; furthermore, the promissory note shall be personally guaranteed by the other Shareholders. Notwithstanding the foregoing provisions of this Section 4.2, in the event that the shares are being purchased by the other Shareholder following the death of a Shareholder and the other Shareholder receives proceeds from any life insurance policy purchased on the life of the deceased Shareholder, the purchase price for the shares shall be payable by the other Shareholder in cash at the settlement to the extent of the amount of such life insurance proceeds received by the other Shareholder.  In the event that the shares are being purchased by the other Shareholder following the disability of a Shareholder, the other Shareholder shall be entitled to an offset against the purchase

- 15 -

price payable to the Shareholder equal to the amount of any
payments received by the Shareholder pursuant to any disability
policy maintained by the other Shareholder on behalf of the
Shareholder.

D.3   A Shareholder may elect to retire from
the practice of dentistry upon reaching the age of fifty-five
(55) years, or earlier, with the permission of the other
Shareholder.  Notwithstanding the foregoing provisions of this
Section 7.D, in the event that a Shareholder should retire from
the practice of dentistry, receive payment for his shares as
provided for in Section 7.D.2 of this Agreement and at any time,
except as provided below, subsequently return to the practice of
dentistry in the District of Columbia on a full or part-time
basis without the prior written consent of the Corporation, or in
the event that a Shareholder shall be in breach of any covenant
not to compete with the Corporation found in any other agreement,
the Corporation shall no longer be required to make any payment
to the Shareholder on any promissory note required hereunder,
and, within thirty (30) days of his unauthorized return to the
practice of dentistry, the Shareholder shall pay the Corporation
an amount equal to the difference between the amount actually
received by the Shareholder hereunder for his shares, and the
amount the Shareholder would have been entitled to receive
pursuant to Section 7.B.2 hereof if the Shareholder's employment

- 16 -

with the Corporation had been terminated, together with interest on the amount due at that rate of interest per annum provided in Section 8.D.2 hereof.  Notwithstanding anything contained to the contrary in this Section 8.D.3, the forfeiture and repayment provisions of this Section 8.D.3 shall not apply by reason of a retiring Shareholder working at an emergency room treating emergencies, being employed by a company for the exclusive purpose of treating the company's employees, or performing administrative or teaching duties for a hospital or other teaching facility.

E.    <u>Death Prior to Transfer</u>.  If a Shareholder who proposes to transfer Shares does prior to the Closing of the sale and purchase, his Shares shall be subject to sale and purchase under Section 6.

F.    <u>Restrictive Covenant</u>.  In the event that a Shareholder wishes to sell, transfer, encumber, gift or otherwise dispose of all or any portion of his Stock, or, withdraws from the Corporation under the terms of this Article 7, the withdrawing Shareholder shall comply with the terms, conditions and provisions of his Employment Agreement.  In the event the Shareholder breaches any of the terms set forth in his Employment Agreement, and, the Corporation is, in whole or in part, a purchasing party of such Shareholder's Stock, then the withdrawing Shareholder shall be obligated to pay to the

- 17 -

Corporation under the terms, conditions and provisions of the Employment Agreement, the amount of Five Hundred Thousand Dollars ($500,000.00).

In addition, the Corporation shall have, in the event of such a breach, all other rights and remedies to which it is otherwise entitled under the Employment Agreement and by law.

G.  <u>Surplus</u>.  If, on the date of settlement or at the due date of any payment of any installment of principal or interest on any promissory note, the Corporation does not have sufficient surplus to make the payment provided for by such note, then the Corporation shall promptly take such good faith action as may be required to create a surplus that would permit it to pay any such installments of principal or interest, including, but not limited to, the recapitalization of the Corporation so as to reduce its capital and increase its surplus, or a reappraisal of the assets of the Corporation to reflect the fair market value of the assets in the event such fair market value exceeds book value thereof.

H.  <u>Stock Certificate Legends</u>.  The Shareholders agree to cause all of the certificates representing the stock of the Corporation now owned by them or hereafter owned by them to carry the following legend:

The transferability of the shares of

- 18 -

stock represented by this certificate are
subject to an Agreement among the
Shareholders of the Corporation and the
Corporation, dated July 30, 1990.  The
Corporation will furnish information
concerning the restriction to any shareholder
of the Corporation on request without charge.

7.   <u>Option Upon Involuntary Transfer</u>.  If other than
by reason of a Shareholder's death Shares are transferred by
operation of law to any person other than the Corporation (such
as but not limited to a Shareholder's trustee in bankruptcy, a
purchaser at any creditor's or court sale or the guardian or
committee or an incompetent Shareholder), the Corporation or the
remaining Shareholders, within one hundred (100) days of the
Corporation's receipt of actual notice of the transfer, may
exercise an option to purchase all but not less than all of the
Shares so transferred in the same manner and upon the same terms
as provided in Article 7 with respect to Shares proposed to be
transferred.

8.   <u>Disability</u>.

A.   <u>Total Disability Defined</u>.  "Disability" and
the commencement thereof are hereby defined to be:

A.1.  "Disability" shall mean the total and
permanent inability of a Shareholder to satisfactorily perform
his regular full-time duties as contemplated under his Employment
Agreement for eighteen (18) consecutive months; provided,
however, that a Shareholder shall be deemed totally and

- 19 -

permanently disabled upon certification by two (2) attending physicians to the Board of Directors of the Corporation that such Shareholder shall be unable to perform his regular full-time duties as contemplated under his Employment Agreement for eighteen (18) consecutive months.  For the purposes of this Agreement, the potentially disabled Shareholder and the Corporation shall each have the right to select one (1) physician to examine the potentially disabled Shareholder, and, in the event that the two (2) physicians do not unanimously agree that the potentially disabled Shareholder meets the definition set forth herein for "disability" the potentially disabled Shareholder and the Corporation shall each have the right to select a third (3rd) physician to re-examine the potentially disabled Shareholder every six (6) months thereafter until the termination of the said eighteen (18) months.

A.2.  The term "commencement of total disability" shall be the date upon which a Shareholder has not performed his regular full-time duties as set forth under his Employment Agreement for eighteen (18) consecutive months, or, the date upon which two (2) physicians certify to the Board of Directors of the Corporation that such Shareholder shall not be able to perform his regular full-time duties as set forth under his Employment Agreement for eighteen (18) consecutive months, whichever event occurs first.

- 20 -

L2474.501 P

B.   Total Disability; Mandatory Sale of Stock.   If a Shareholder shall become totally disabled, the remaining Shareholders, within sixty (60) days of the date of commencement of such total disability, shall have an option for sixty (60) days thereafter to purchase all but not less than all of the shares owned by the disabled Shareholder at the time of the commencement of his total disability, in the same manner and upon the same terms and conditions as provided in Section 7.   In the event that the remaining Shareholders do not exercise said option, then the Corporation shall purchase said shares within thirty (30) days after the expiration of the sixty (60) day option period in the same manner and upon the same terms set forth in this Section for purchase by the remaining Shareholders.

C.   Cessation of Total Disability.   If a totally disabled Shareholder ceases to be so totally disabled at some time after the Note payments have commenced, but before they have been completed, the parties have the option to mutually agree to cease said buy-out and, in such case of the former, totally disabled Shareholder shall repay the amount of monies he has received and shall receive his Stock back from the Corporation.

D.   Death of Totally Disabled Shareholder.   Should the totally disabled Shareholder die during the buy-out period under this Article, then said Shareholder's and his estate's rights are limited to those under this Section 9.

- 21 -

E.  <u>Compensation During Disability</u>.  The Corporation shall compensate a partially disabled Shareholder, based only upon the compensation to which he is otherwise entitled under his Employment Agreement, but without reference to any minimum salary under that Employment Agreement.  The parties hereto acknowledge that the amount of such compensation may be zero dollars (-0-) as compensation is based under the Employment Agreements solely upon gross collected production.

F.  <u>Restrictive Covenant</u>.  In the event that a Shareholder becomes totally disabled, he shall comply with the terms, conditions and provisions of his Employment Agreement.  In the event that the Shareholder breaches any of the terms set forth in his Employment Agreement, if the Corporation is in whole or in part, a purchasing party or parties or such Shareholder's Stock, then the Shareholder shall be obligated to pay to the Corporation, under the terms, conditions and provisions of the Employment Agreement, the amount of Five Hundred Thousand Dollars ($500,000.00).

In addition, the Corporation shall have in the event of such a breach, all other rights and remedies to which is otherwise entitled under the Employment Agreement and by law.

G.  <u>Disability Insurance Purchase</u>.  The Shareholders will purchase, and agree to continue in force by the

continuous payment of premiums when due, insurance policies in an amount equal initially to $360,000.00 on Dr. Guttenberg and $360,000.00 on Dr. Emery. The Shareholders shall review their needs for disability buy-out insurance at least annually and shall increase the amounts of insurance as necessary to provide sufficient insurance in order to fund the purchase of shares from the estate of a Shareholder who shall become deceased. Each Shareholder shall be the owner of such policy or policies of disability buy-out insurance purchased on the other Shareholder pursuant to the terms of this paragraph, but no rights of ownership in such policy or policies shall be exercised unless written notice of the intention to exercise such right is given to the other Shareholder or Shareholders with the other Shareholder's or Shareholders' consent to the exercise of such right. The beneficiaries of each Shareholder's disability buy-out insurance policy shall be the other Shareholder in the amount necessary to allow the other Shareholder to purchase the deceased Shareholder's stock, and the Shareholder's spouse or other designated beneficiary, for the remainder of the proceeds of the life insurance policy. The amount of disability buy-out insurance for each Shareholder and the allocation to the other Shareholder shall be reviewed at least annually by the Corporation's insurance agent and shall be increased, when and as necessary, so that each Shareholder's policy shall be sufficient

- 23 -

L2474.501 P

at least to allow the other Shareholder to purchase his stock in the event of his death.  If a Shareholder is not insurable at the time any additional insurance is required, the other Shareholder shall take any steps he shall deem necessary to insure that the necessary funds will be available to implement this agreement.

9.    Term.  This Agreement shall terminate and the certificates representing the Shares of Stock subject to this Agreement shall be released from the terms of this Agreement on the occurrence of any of the following events:

A.    Cessation of the business of the Corporation;

B.    Written agreement of the Corporation and the Shareholders then bound by the terms of this Agreement;

C.    Bankruptcy, receivership or dissolution of the Corporation;

D.    A single Shareholder's becoming the owner of all the Shares of the Corporation, which are then subject to this Agreement;

E.    The death of all the Shareholders within a 30-day period.

10.    Simultaneous Death.  In the event of the simultaneous death of Steven A. Guttenberg, D.D.S. and Robert W. Emery, D.D.S. or their death within thirty (30) days of each other, the estate of each of them shall retain ownership of its respective decedent's Shares of Common Stock and the legal

- 24 -

representatives of their estates shall be entitled to collect the proceeds of the policies held by them and to retain such proceeds free of the terms of this Agreement. Such an occurrence and death shall immediately release both Shareholders and their Estates from any obligations to make any payments pursuant to these Agreements and the Promissory Note.

11. <u>Benefit</u>. This Agreement shall be binding upon the parties, their heirs, legal representatives, successors and assigns. Each Shareholder, in furtherance thereof, shall execute a Will directing his Executor to perform this Agreement and to execute all documents necessary to effectuate the purposes of this Agreement, but the failure to execute such Will shall not affect the rights of any Shareholder or the obligations of any estate as provided in this Agreement. This Agreement shall also be binding upon any person to whom any of the Stock of the Shareholders is transferred in violation of the provisions of this Agreement and the executor or administrator or such person. For the purposes of this article, "person" shall include individuals, estates, trusts, partnerships, joint ventures and corporations.

12. <u>Amendment and Revocation</u>. This Agreement shall not be modified, amended or revoked except by a writing signed by the Corporation and each Shareholder.

13. <u>Specific Performance</u>. The Shares of the

- 25 -

L2474.501 P

Corporation cannot be readily purchased or sold in the open market, and for that reason, among others, the parties to this Agreement will be irrevocably damaged in the event that this Agreement is not specifically enforced. Accordingly, if any person so required under this Agreement fails to give a notice, make an offer, sell shares or close a sale, then, in any such event, if the failure continues for thirty (30) days after the notice to the one in default by one of the Shareholders then holding Shares or by the Corporation, any of the Shareholders then holding Shares or the Corporation, as the case may be, may institute and maintain a proceeding to compel the specific performance of this Agreement by the one in default. For the purposes of this Article "person" shall mean any individual, trust, estate, administrator, executor, partnership, joint venture or corporation.

14. <u>Resignation as Officer and Director</u>. In the event that any Shareholder sells his Stock in the Corporation to the Corporation, or to any other Shareholder in the Corporation, said Shareholder agrees (by himself or, if unable to act, by his committee or nominee) to resign as an Officer and Director upon the acceptance of the offer of sale by the Corporation or the other Shareholder, as the case may be.

15. <u>Grammatical Usage</u>. In construing this Agreement, masculine or neuter pronouns shall be substituted for those

- 26 -

feminine in form and vice versa and plural terms shall be substituted for singular and singular for plural at any place in which the context so requires.

16.  <u>Severability</u>.  If any term or provision of this Agreement or the application thereof to any person or the Corporation where circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or the Corporation or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

17.  <u>Election of Directors</u>.  Each Shareholder shall vote all the shares of stock of the Corporation held by him from time to time, in person or by proxy, in favor of each of the other Shareholders at each and every meeting at which directors of the Corporation are elected; provided that, if a Shareholder is no longer the owner of stock of the Corporation, no Shareholder shall vote for him.

18.  <u>Disagreement Between Directors</u>.  In the event of any disagreement between the directors of the Corporation that occurs prior to the full payment by Dr. Emery of the Buy-In Amount referred to in Section 5.c. of the Employment Agreement of even date herewith, the position of Dr. Guttenberg shall prevail

- 27 -

in such matters, except as to decisions concerning and dealing with the following issues: (1) decisions concerning Key Man Life Insurance and Disability Insurance maintained by the parties and supporting this Agreement and (2) the addition of new stockholders to the Corporation and dental practice.  If Dr. Guttenberg wishes to add a new stockholder to the Corporation and Dr. Emery does not wish the proposed individual to become a shareholder, Dr. Guttenberg shall have the absolute right to dissolve the Corporation or to cause the Corporation to terminate Dr. Emery pursuant to the provisions set forth in the Agreements.

19.  <u>Additional Actions</u>.  The Shareholders hereby covenant and agree to execute any and all instruments and to do any and all things necessary or desirable to carry out the purposes of this Agreement.  Whenever corporate action on the part of the Corporation is required under any of the terms of this Agreement, the Shareholders shall vote or cause their shares of stock in the Corporation to be voted in favor thereof and shall attend any meetings of shareholders of the Corporation as may be required, and shall do or cause to be done any and all things at such meetings or otherwise as may be necessary to cause such action to be taken.

20.  <u>Notice</u>.  Whenever notice is required or permitted to be given under the terms of this Agreement, such notice shall

be given in writing by hand delivery or United States registered or certified mail, return receipt requested, postage prepaid, and will be deemed to have been given on the date such notice is so delivered or posted, and if to the Corporation it shall be addressed to:

> Doctors Guttenberg and Emery, P.C.
> 916 19th Street, N.W.
> Suite 728
> Washington, D.C. 20006

and if to the Shareholders it shall be addressed to:

> Steven A. Guttenberg, D.D.S.
> 8801 Chalon Drive
> Bethesda, Maryland 20817
>
> With a copy to:
> Geoffrey P. Gitner, Esquire
> Mark L. Rosenberg, Esquire
> Gordon, Feinblatt, Rothman,
>  Hoffberger & Hollander
> 1800 K Street, N.W., Suite 600
> Washington, D.C.  20006
>
> Robert W. Emery, D.D.S.
> 8324 Sweet Cherry Court
> Laurel, Maryland 20707
>
> With a copy to:
> Robert B. Scarlett, Esquire
> Heneson and Scarlett
> 19 East Fayette Street, Suite 401
> Baltimore, Maryland 21202-1606

    21.  <u>Notice of Breach and Opportunity to Cure</u>.  In case of any breach of this Agreement, the breaching party shall be given thirty (30) days notice of said breach and an opportunity to cure said breach within thirty (30) day period.

- 29 -

L2474.501 P

22. <u>Entire Agreement</u>. This Agreement sets forth the entire integrated understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements.

23. <u>Construction</u>. This Agreement is made, and all questions relating hereto shall be construed, in accordance with the laws of the District of Columbia.

24. <u>Waiver</u>. Any waiver by the Corporation or the purchasing Shareholders of any provision of this Agreement shall not operate or be construed as a waiver of any other provision or as a subsequent waiver of the same provision.

25. <u>Amendment</u>. This Agreement may not be amended except by an instrument in writing signed by all of the parties to this Agreement.

26. <u>Headings</u>. The headings to the sections of this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal, with the intention of making it a sealed instrument, as of the day and year first above written.

ATTEST:                           STEVEN A. GUTTENBERG, D.D.S., P.C.

_____       By: _____ (SEAL)
        Secretary                  Steven A. Guttenberg, President

[SIGNATURES CONTINUED ON NEXT PAGE]

- 30 -

L2474.501 P

WITNESS:                          SHAREHOLDERS

_____          _____ (SEAL)
                                 Steven A. Guttenberg, D.D.S.

_____          _____ (SEAL)
                                 Robert W. Emery, D.D.S.

- 31 -

# Exhibit B

EXHIBIT D

EMERY EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of this 30th day of July, 1990, by and between Steven A. Guttenberg, D.D.S., P.C. ("Employer") and Robert W. Emery, D.D.S. ("Employee").

WITNESSETH:

WHEREAS, the Employer is a professional corporation authorized to practice dentistry in the District of Columbia through individuals licensed to practice dentistry in the District of Columbia ("Practice"), and wishes to acquire the services of the Employee to render professional services for it; and

WHEREAS, the Employee is a licensed dentist in the District of Columbia, and wishes to perform such services for the Employer, all in accordance with the following terms, conditions and provisions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency all of which is hereby acknowledged, the parties hereto agree as follows:

1.  <u>Term of Employment</u>.  Effective from and after the date hereof until December 31, 1990, the Employee shall faithfully serve the Employer in its Practice.

2.  <u>Renewal Terms</u>.  This Agreement shall be automatically renewed from year to year, unless otherwise terminated as hereinafter provided.

3.  <u>Duties</u>.

    a.  The Employee is engaged as a Dentist by the Employer, and shall diligently and conscientiously devote his entire time, attention and energies to the Employer's Practice. The Employee shall, at all times during the term hereof:

        (1)  Observe and conform to all laws, customs and standards of professional ethics and practice as may from time to time be applicable during the term hereof.

(2) Keep and maintain, or cause to be kept and maintained, appropriate records relating to all professional services rendered by him.

(3) Prepare and attend to, in connection with such services or reports, claims and correspondence, necessary or appropriate in the circumstances.

(4) Attend professional conventions and postgraduate seminars, participate in professional societies, and engage in all other activities necessary, useful and/or desirable, as may be determined in the sole discretion of the Board of Directors from time to time, to maintain and improve his professional skills.

(5) Promote the Practice by entertainment or otherwise as and to the extent permitted by law, the applicable Canons of Professional Ethics, and the professional practice of the Employer.

b. The Employee shall not, at any time during the term of this Agreement, be engaged in any other practice of dentistry, whether or not such activity is pursued for gain, profit or pecuniary advantage. If the Employee is elected or appointed a Director or Officer of the Employer, at any time during the term hereof, the Employee will serve in such capacity or capacities without further compensation; but nothing herein shall be constructed as requiring the election or employment of the Employee as such Director or Officer.

4. <u>Limitation on Duties</u>. The Employee shall, at all times, discharge his duties in consultation with, and under the direction, approval and control of the Board of Directors of the Employer; provided, however, that the Board of Directors shall not interfere with the Employee's exercise of his professional judgment in the rendering of dental opinions or in the providing of dental treatment. Except in the area of the exercise of this Employee's professional judgment, the Employer reserves the absolute right to veto, in its sole and absolute discretion, whether with or without cause, as it deems fit, any and all actions taken or to be taken by the Employee on behalf of the Practice.

5. <u>Compensation</u>.

a. The Employee shall be entitled to have a base salary of Eighty Thousand and 00/000 Dollars ($80,000.00) per

- 2 -

L2707.501 P

annum and to receive, as a bonus, a percentage of the total
dollars available for compensation of all stockholder/employees,
an amount based on the following percentages and adjusted,
pursuant to 5.b. below:

|  | Dr. Guttenberg | Dr. Emery |
|---|---|---|
| Calendar Year One | 75.0% | 25.0% |
| Calendar Year Two | 70.0% | 30.0% |
| Calendar Year Three | 65.0% | 35.0% |
| Calendar Year Four | 60.0% | 40.0% |
| Calendar Year Five | 55.0% | 45.0% |
| Calendar Year Six and Thereafter | 50.0% | 50.0% |

b.    The compensation under Section 5.a. above
shall be adjusted, on an annual basis, by an amount (the "Buy-In
Adjustment"), which shall be added to Dr. Guttenberg's total
amount and subtracted from Dr. Emery's total amount.  For
purposes of this agreement, the Buy-In Adjustment shall be
calculated as follows:

i. First, the amount of total dollars
available for compensation of Guttenberg and Emery shall be
calculated;

ii. Second, from the amount calculated above,
there shall be subtracted $380,000, representing base compensa-
tion of $300,000 per annum for Guttenberg (the "Guttenberg Base")
and $80,000 per annum for Emery (the "Emery Base");

iii. Third, the sum of $37,000 shall be
subtracted from the amount calculated in ii above;

iv. Fourth, the amount calculated in iii.
above shall be multiplied times the Emery factor for the year, as
stated in b. above; and

v. Fifth, the Buy-In Adjustment shall be 50%
of the amount calculated in iv. above plus $37,000.

c.    The Buy-In Adjustment shall continue until
the amount of $370,000, plus interest at an annual rate of nine
and one-half percent (9.5%) compounded annually, on the unpaid
amount of $370,000 until paid (the "Buy-In Amount"), shall have
been allocated to Dr. Guttenberg under the above section.  The

- 3 -

entire amount of the unpaid Buy-In Adjustment may be paid at any
time by Dr. Emery directly to Dr. Guttenberg, without penalty.

    d.   The Buy-In Amount shall be increased in the
event of any change in the tax laws of the United States that
provides for a different rate for capital gains taxation than for
ordinary income, by the use of the following formula:

$$A = \frac{B\ (OT-CT)}{1-OT} \qquad = \frac{(31-28)}{1-31}$$

    where A = adjustment to Buy-In Amount;
           B = Buy-In Amount;
         OT = highest federal tax rate for ordinary income
              of individuals pursuant to Internal Revenue
              Code Sections 1(a) through 1(d); and
         CT = highest federal tax rate for capital gains
              of individuals.

    e.   In any year in which there shall not be
sufficient profit in order to pay both the Guttenberg Base and
the Emery Base, the difference between the profit available and
the total of the Guttenberg Base and the Emery Base (the
"Shortfall") shall be subtracted from the Guttenberg Base.  The
amount so subtracted from the Guttenberg Base (the "Guttenberg
Reduction") shall be added to the Buy-In Amount, and such amount
shall be allocated to Guttenberg as part of a Buy-In Adjustment
in the next year without reference to Section 5.b.iv. above.  In
other words, the Guttenberg Reduction shall be repaid from the
first dollars available from Dr. Emery's bonus, after payment of
the Emery Base.

    f.   The Employee shall be entitled to have and
receive such compensation, payable in cash, not less frequently
than quarterly and not later than the tenth (10th) day following
the expiration of the calendar quarter in question; provided,
however, and subject to Paragraphs 2, 13 and 14, that no such
compensation shall be paid in respect of any calendar year or a
portion thereof subsequent to the termination of this Agreement.
In addition, the Board of Directors of the Employer may, from
time to time, but shall not be obligated to, grant bonuses to the
Employee.  The Employer shall deduct and withhold all necessary
Social Security and withholding taxes, and any other similar sums
required by law, from the Employee's compensation.

    g.   For the purpose of calculating Employee's
compensation and bonus under this Paragraph 5, this Employment

- 4 -

L2707.501 P

Agreement shall be deemed effective as of January 1, 1990.

6.   Fringe Benefits.  The Employer may, from time to time, grant to the Employee such fringe benefits as the Employer may determine in its sole discretion.  Notwithstanding anything hereinabove to the contrary, the Employer may discontinue or modify any of the fringe benefits which it may grant under this Paragraph 6 at any time due to economic, tax or other business reasons, as determined in the sole discretion of the Board of Directors of the Employer.

7.   Billing and Collections.  All billing and collec-tions shall be done only by the Company, or at the direction of the Employer.  The Employee will in no way attempt to collect fees from Employer's patients except at the direction of the Employer's Board of Directors.

8.   Covenants.  The Employee covenants and warrants to the Employer that:

a.   Non-Solicitation:  The Employee shall not, either personally or through any individual, association, partnership, corporation or entity, solicit or induce, or attempt to solicit or induce, in any manner whatsoever (i) any past or present patient of the Practice, from seeking consultation with, or treatment from, the Practice, or (ii) any dentist to refrain from referring any patients to the Practice for such consultation or treatment.  For the purpose of this Agreement, the term "patient" shall mean any person, or the parent or guardian of any person, who has received dental treatment by the Practice within five (5) years prior to the execution of this Agreement and continuing for five (5) years after the termination of Employee's employment with Employer.

b.   Non-Disclosure Covenants.  The Employee acknowledges that the list of the Practice's patients, as it may exist from time to time, is a valuable, special and unique asset of the Practice, and shall not, inadvertently or otherwise, disclose the list of the Practice's patients, or any part thereof, to any person, association, partnership, corporation or other entity for any reason or purposes whatsoever.  The Employee further acknowledges that all information, knowledge and data connected with or related to the Practice, including, without limitation, all techniques, methods, systems, methodologies, facts, data or other information, of whatever kind and whatever form, concerning the business or affairs of the Practice, are valuable, special and unique assets of the Practice, and that

- 5 -

Employee shall not, disclose or divulge any such information, knowledge or data, to any person, association, partnership, corporation or entity for any reason or purpose whatsoever.

        c.   <u>Covenant Not to Compete</u>.  The Employee covenants and agrees that Employee shall not enter into or engage in any business competitive with that of the Practice, either as an individual or on his own account, or as a partner or joint venturer, or as an officer, director or stockholder of a corporation or otherwise, for the three (3) year period commencing after the termination of his employment with Employer, within the District of Columbia.  The Employee represents and warrants that his background, training and experience are such that the restrictions contained in this Paragraph 8, in general, and this Paragraph 8C, specifically, shall not result in an inability on his part to pursue a livelihood, and that other alternatives or representations of employment or business endeavors are reasonably available to him.  This covenant is hereby deemed to be independent of any other provision of this Agreement, and the existence of any claim or cause of action by the Employee against the Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to its enforcement.  The Employee may relieve himself of the obligation to be bound by the covenants of this Paragraph 8C after Employee's employment has been terminated, by paying to the Employer the sum of Five Hundred Thousand Dollars ($500,000.00).

        d.   <u>Breach or Anticipatory Breach of Covenants</u>. In the event of a breach or anticipatory breach by the Employee of his obligations under this Paragraph 8, the Employee hereby acknowledges and stipulates that the Employer shall not have an adequate remedy at law, shall suffer irreparable harm, and, therefore, it is mutually agreed and stipulated by the parties hereto that, in addition to any other remedies at law or in equity which the Employer may have, the Employer shall be entitled to obtain in a court of law and/or equity a temporary and/or permanent injunction restraining the Employee from any further violation or breach of such covenants.  In the event of a breach or threatened breach of a covenant by Employee, Employer shall give Employee written notice of said breach or threatened breach and shall give Employee a reasonable time to cure said breach or threatened breach.  The giving of said notice shall not prevent Employer from seeking and obtaining injunctive relief from said breach or threatened breach during the period within which Employee may cure said breach or threatened breach.  In the event that any one or more of the provisions contained herein shall, for any reason, be held to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be construed as limiting and reducing it as determined by a

- 6 -

court of competent jurisdiction and shall be enforceable to the extent compatible with applicable law.  The Employee further agrees to indemnify and hold harmless the Employer from all damages and costs, including reasonable attorney's fees, relating to the enforcement of this Paragraph 8, incurred by the Employer arising out of the Employee's breach or threatened breach of this Paragraph 8.  Nothing in this Agreement will be construed as prohibiting the Employer from pursuing any other remedies available to it for a breach or threatened breach of this Paragraph 8.  The provisions of this Paragraph 8 will survive the termination of this Agreement and/or Employee's employment.

9.  <u>Vacation</u>.  The Employee shall be entitled, per annum, to a vacation mutually agreed upon by the Employer and the Employee from year to year.  The vacation shall be taken on reasonable prior notice to the Employer, and at a time and manner mutually agreed upon by both parties not to interfere with the proper operation of the Practice.  The Employee shall not have the right to accrue any unused vacation time, without the prior written consent of the Board of Directors of the Employer.  In the event of the termination of this Agreement as set forth in Paragraph 12, whether with or without cause, the Employer shall not be obligated hereunder to pay for any portion of any accrued, but unused, vacation time.

10.  <u>Leave of Absence</u>.  In addition to the aforesaid vacation, the Employee shall be entitled, without loss of basic pay, to absent himself voluntarily from the performance of his employment with the Employer for such additional periods of time and for such valid and legitimate reasons as the Board of Directors of the Employer, in its discretion, may determine in advance.  Further, the Board of Directors shall be entitled to grant to the Employee a leave or leaves of absence, with or without pay, at such time or times and upon such terms and conditions as the Board of Directors of the Employer, in its sole discretion, may determine.

11.  <u>Expenses</u>.  The Employer recognizes that the Employee will incur, from time to time, for the Employer's benefit and in furtherance of the Employer's Practice, various expenses; and the Employer agrees either to directly pay advance sums to the Employee to be used for expenses, or to reimburse the Employee for said expenses; provided, however, that the Employee shall, at all times during the time of this Agreement, submit to the Employer all necessary documentation, including, without limitation, receipts and vouchers, necessary to substantiate and justify the deductibility of such expenses for income tax purposes and to maintain the books and records of the Employer.

- 7 -

12. <u>Offices and Assistants</u>. The Employer shall provide and pay for suitable office space, facilities, furniture, fixtures, equipment, supplies and other employees and assistants, as are suitable to the Employee's position and appropriate for the performance of his duties.

13. <u>Conditions of Termination</u>. Employee's employment shall terminate on the occurrence of any of the following events:

A. At any time by mutual agreement in writing between the Employer and the Employee.

B. At any time, without cause, at the option of the Employer, upon six (6) months written notice to the Employee.

C. At any time, without cause, at the option of the Employee, upon six (6) months written notice to the Employer.

D. At any time, with cause, at the option of the Employer, upon written notice to Employee. For the purposes of this Agreement, "with cause" shall include but not be limited to (1) Employee's repeated failure to discharge his material duties pursuant to this Agreement after Employer having given Employee prior written notice thereof; (2) Employee's willful destruction of Employer's property; (3) the Employee is absent from work on repeated occasions without the permission of Employer; (4) act of dishonesty in respect of Employer or any other person either associated with Employer's business or with whom Employer does business; (5) Employee repeatedly fails to obey the directions of Employer; (6) the Employee divulges without Employer's approval any confidential information obtained in the course of his employment to any person not employed by the Employer to any other entity; (7) Employee engages in any contact harmful to Employee's business; (8) the commission by the Employee of fraud, embezzlement, theft, misappropriation or any other crime involving moral turpitude or (9) the license of Employee to practice dentistry in the District of Columbia is suspended or revoked. Nothing in this paragraph shall require Employee to modify his reasonable professional judgment concerning a patient.

E. Upon the Employee's license being revoked, cancelled, suspended or otherwise restricted.

F. At the death of the Employee.

14. <u>Termination Compensation</u>.

A. Upon termination of Employment, the Employer shall be obligated to pay to the Employee all accrued, but unpaid

- 8 -

compensation due through the effective date of termination, as set forth under Paragraph 5 of this Agreement; provided, however, that if the Employer should terminate Employee's employment under Paragraph 13D, (4), (6), or (8), then the Employer shall have no obligation whatsoever to pay the Employee any accrued, but unpaid, compensation.

B.   Upon termination of Employee under Section 13.B. above, Employer, or the remaining Shareholder of Employer, shall be obligated to pay to Employee a sum equal to one hundred percent (100%) of the cumulative amount of the Buy-In Adjustment credited to Guttenberg under Section 5.c. above.  At the option of Employer, said sum may be paid with fifty percent (50%) paid within thirty (30) days of the termination, and the remaining fifty percent (50%) payable over the term that has elapsed since the execution of this Agreement, with interest at the Prime Rate established by Citibank, New York, New York.



15.   Employee Accounts.  The Employee shall render, as often as may be necessary or appropriate, a true account of all professional visits and all patients attended to in the Practice and of all money received by Employee on account of the Practice, and shall pay the money to the Employer for deposit in the Practice account.

16.   Patients, Patient's Records and Telephone Numbers.

A.   The Employer and the Employee agree that all patients, patients' records, patients' charts, professional records, patients' lists, and patients' telephone numbers are the sole and exclusive property of the Employer.  Upon the termination of this Agreement, for any cause whatsoever, the Employee shall surrender to the Employer, in good condition, any record or records kept by Employee containing the names, addresses and other information with respect to patients or potential patients of the Employer which have been served or treated by the Employee; provided, however, that the Employee shall be entitled to retain all patients and records relating thereto who request to remain with the Employee upon written notification to the Employer to that effect, and provided, further that the furnishing of professional services to any patient who requests to remain with the Employee shall not be deemed a violation of Paragraph 8 of this Employment Agreement unless Employee has solicited any patient in violation of Paragraph 8(a) above.

B.   Upon termination of the Employee's employment relationship with the Employer as contemplated hereunder, whether with or without cause, the Employee shall take all steps reasonably requested by the Employer to transfer all of his patients to

- 9 -

the Employer.

C. At Employer's sole option, all treatment begun by Employee shall be completed by the Employee regardless of termination of this Agreement.

17. <u>Indemnity and Malpractice Insurance</u>. The Employee shall hold harmless and indemnify the Employer, its successors and assigns, from and against any and all liabilities, costs, damages, expenses and attorneys' fees resulting from or attributable to any and all acts and omissions of the Employee; provided, however, that to the extent any such liabilities, costs, damages, expenses and attorneys' fees are compensated for by insurance purchased by the Employer, the Employee shall not be required to reimburse the Employer or the insurer for the same.

18. <u>Resignation as Officer and Director</u>. In the event that the Employee's employment with the Employer is terminated for any reason whatsoever, the Employee agrees to immediately resign as an Officer and Director of the Employer.

19. <u>Repurchase of Stock Upon Termination</u>. The purchase of any capital stock of the Employer which may be owned by the Employee shall be governed by a Shareholders' Agreement between the parties.

20. <u>Assignment</u>. The rights and the obligations of the parties under this Agreement shall not be assignable.

21. <u>Disposition of Equipment Upon Termination</u>. The disposition of certain equipment referred to in a Purchase Agreement of even date herewith between the parties shall be governed by the terms of such Purchase Agreement.

22. <u>Notices</u>. Any and all notices, designations, consents, offers, acceptances or any other communication provided for herein, shall be given in writing, by registered or certified mail, return receipt requested, which shall be addressed, in the case of the Employer, to its principal place of business, and in the case of the Employee, to his personal residence. The effective date of such notice, designation, consent or any other communication provided for herein, any law or statute to the contrary, shall be deemed to have been given at the time it is duly deposited and registered in any United States Post Office or Branch Post Office.

23. <u>Amendment</u>. No modification, amendment, addition to or termination of this Agreement, nor waiver of any of its provisions, shall be valid or enforceable, unless in writing and

- 10 -

signed by all of the parties hereto.

24. <u>Severability</u>. If any term or provision of this Agreement or the application thereof to the Employer or any other person, where circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to the Employer or any other person or circumstances other than as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

25. <u>Governing Law</u>. This Agreement shall be governed by the laws of the District of Columbia.

26. <u>Binding Effect</u>. This Agreement shall be binding upon the parties, their legal representatives, successors and assigns.

27. <u>Captions and Marginal Notes</u>. Captions and marginal notes of this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope or intent of this Agreement, nor in any way affect this Agreement.

28. <u>Grammatical Usage</u>. In constructing this Agreement, masculine or neuter pronouns shall be substituted for those feminine in form and visa versa, and plural terms shall be substituted for singular, and singular for plural, in any place in which the context so requires.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed under seal, with the intent that this be a sealed instrument, as of the day and year first above written.

WITNESS/ATTEST

_____,Secretary

_____

EMPLOYER:

STEVEN A. GUTTENBERG, D.D.S., P.C.

_____ (SEAL)
Steven A. Guttenberg, D.D.S.,
President

EMPLOYEE:

_____ (SEAL)
Robert W. Emery, D.D.S.

- 11 -

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Nancy M. Mayer-Whittington
Clerk

## NOTICE OF RIGHT TO CONSENT TO TRIAL
## BEFORE UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in a delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to a trial of your case by a United States Magistrate Judge. By statute, 28 U.S.C. § 636(c), Fed.R.Civ.P.73 and Local Rule 502, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a District Judge in a civil case.

### WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Rule 206 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial.

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are not foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Attached is a copy of the "Consent to Proceed Before a United States Magistrate Judge for All Purposes" form. Your response should be made to the Clerk of the United States District Court only.

### WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form and with the approval of the District Judge, the case will be assigned for all purposes to a Magistrate Judge.

CO-942A
Rev 3/95
Rev 7/99

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____        )
       Plaintiff(s)      )
                         )        Civil Action No. __08  0085__ JOB
       v.                )
                         )
_____        )
       Defendant(s)      )
```

**CONSENT TO PROCEED BEFORE**
**A UNITED STATES MAGISTRATE JUDGE FOR ALL PURPOSES**

In accordance with the provisions of 28 U.S.C. § 636(c)(3), the parties to the above-captioned civil matter by and with the advice of their counsel hereby voluntarily waive their rights to proceed before a District Judge of the United States District Court and consent to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial.

_____                    _____
Attorney for the Plaintiff(s)               Date


_____                    _____
Attorney for the Defendant(s)               Date

NOTICE: The foregoing Consent by Counsel shall be accepted upon the understanding that all counsel have secured the consent of their respective clients to the Consent and Referral to a United States Magistrate Judge for all purposes.

**ORDER OF REFERENCE**

IT IS HEREBY ORDERED that the above-captioned matter be referred to a United Sates Magistrate Judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C.§ 636(c)(3) and the foregoing consent of the parties.

_____        _____
United States District Judge             Date

NOTE:   RETURN THIS FORM TO THE CLERK OF THE COURT ONLY IF ALL PARTIES HAVE CONSENTED
        TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE.

CO-942B
Rev 3/95
Rev 7/99

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Nancy M. Mayer-Whittington
Clerk

## NOTICE OF RIGHT TO CONSENT TO TRIAL
## BEFORE UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in a delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to a trial of your case by a United States Magistrate Judge. By statute, 28 U.S.C. § 636(c), Fed.R.Civ.P.73 and Local Rule 502, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a District Judge in a civil case.

## WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Rule 206 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial.

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are not foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Attached is a copy of the "Consent to Proceed Before a United States Magistrate Judge for All Purposes" form. Your response should be made to the Clerk of the United States District Court only.

## WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form and with the approval of the District Judge, the case will be assigned for all purposes to a Magistrate Judge.

CO-942A
Rev 3/95
Rev 7/99