**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        **Plaintiffs,**

    v.

DR. ROBERT W. EMERY

        **Defendant.**

Case No. 1:08-cv-00085
(Judge John D. Bates)

**PLAINTIFFS' MOTION FOR**
**A TEMPORARY RESTRAINING ORDER, EMERGENCY STATUS AND**
**SCHEDULING CONFERENCE AND PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, LCvR 65.1 and 7.(m)

Plaintiffs Dr. Steven A. Guttenberg and Doctors Guttenberg and Emery, P.C. (the "Corporation")

respectfully request the Court:

    1.    To issue a temporary restraining order, that Defendant Emery immediately be

enjoined and restrained, directly or indirectly, and whether alone or in concert with others,

pending hearing and disposition of the Plaintiffs' pending Motion for a Preliminary Injunction

from doing the following:

    (a)    breaching the covenants contained in his Employment Agreement, dated
July 30, 1990, at ¶¶ 8.a through c;

    (b)    establishing an office or practice that would be competitive with the
Corporation within the District of Columbia;

    (c)    soliciting, or attempting to solicit any referring patients, or referring
doctors or dentists to himself, and not to the Corporation;

    (d)    soliciting, or attempting to solicit, employees of the Corporation to leave
the Corporation to establish a competitive practice;

(e)     destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in a computer media) in Defendant's possession or control which were obtained from or contain information derived from Corporation records, which pertain to patients or referring dentists and physicians, or which relate to any of the events in the Complaint in this action; and

(f)     that Defendant, and anyone acting in concert or participation with Defendant, be further ordered to return to the Corporation any and all information pertaining to the Employee Claim file, Breeyear's personnel file and any other Corporation records which relate to any of the events in the Complaint of this action.

2.     To issue a preliminary injunction enjoining Defendant Emery, directly or indirectly, and whether alone or in concert with others:

(a)     breaching the covenants contained in his Employment Agreement, dated July 30, 1990, at ¶¶ 8.a through c.;

(b)     establishing an office or practice that would be competitive with the Corporation within the District of Columbia;

(c)     soliciting, or attempting to solicit any referring patients, or referring doctors or dentists to himself, and not to the Corporation;

(d)     soliciting, or attempting to solicit, employees of the Corporation to leave the Corporation to establish a competitive practice;

(e)     destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in a computer media) in Defendant's possession or control which were obtained from or contain information derived from Corporation records, which pertain to patients or referring dentists and physicians, or which relate to any of the events in the Complaint in this action; and

(f)     that Defendant, and anyone acting in concert or participation with Defendant, be further ordered to return to the Corporation any and all information pertaining to the Employee Claim file, Breeyear's personnel file and any other Corporation records which relate to any of the events in the Complaint of this action.

3.    That the Court set an emergency status and scheduling conference at its earliest opportunity to hear the Plaintiffs' motion for a temporary restraining order, to set a date for a preliminary injunction and the pleadings supporting and opposing such an injunction and to hear Plaintiffs' attached motion for expedited discovery.

4.    The bases for this motion are set forth more fully in the accompanying memorandum of law and in the accompanying Verified Complaint, Declarations and Exhibits.

5.    Counsel for Plaintiffs certifies, as required by Local Rule 7.1(m), that he has discussed this motion with opposing counsel in a good faith effort to determine whether there is any opposition to the relief sought and to narrow the areas of disagreement. The motion is opposed in all respects.

January 30, 2008                                      Respectfully submitted,

                                                     _____
                                                     Geoffrey P. Gitner (D.C. Bar No. 176479)
                                                     Law Offices of Geoffrey P. Gitner
                                                     Watergate, Twelfth Floor
                                                     600 New Hampshire Ave., N.W.
                                                     Washington, D.C. 20037
                                                     Ph: (202) 772-5926


                                                     _____
                                                     Richard T. Tomar (D.C. Bar No. 13094)
                                                     KARP, FROSH, LAPIDUS, WIGODSKY &
                                                     NORWIND, P.A.
                                                     2273 Research Blvd., Suite 200
                                                     Rockville, Maryland 20850
                                                     Ph: (301) 948-3800

                                                     *Counsel to the Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        **Plaintiffs,**

    v.

DR. ROBERT W. EMERY

        **Defendant.**

Case No. 1:08-cv-00085
(Judge John D. Bates)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs, Dr. Steven A. Guttenberg ("Guttenberg") and Doctors Guttenberg and Emery,

P.C. (the "Corporation") submit this memorandum in support of their motion for a temporary

restraining order and preliminary injunction enjoining Defendant, Dr. Robert W. Emery

("Emery"), ("Emery") from breaching, or threatening to breach, the non-competition and non-

solicitation covenants in ¶¶ 8.a through 8.c of his employment agreement (the "Employment

Agreement") with the Plaintiffs.

This motion is presented solely on Count I of Plaintiffs' Verified Complaint ("V. Comp."

attached as Ex. 1), premised on breach of the covenants. Plaintiffs do not seek to raise the issues

addressed under Counts II through IV, seeking declaratory judgments as to whether, through his

actions, Emery has manifested his intention to withdraw as an employee and shareholder of the

Corporation (Count II), or whether Emery may be terminated with or without Cause (Counts III and IV). Nor does this motion address the remaining Counts of the Complaint.

Rather, the motion addresses Emery's attempts to establish an independent competitive business while avoiding the restrictive covenants, in his Employment Agreement (attached as Ex. 2). These covenants prohibit Emery upon his withdrawal from the Corporation—for any reason, whether voluntarily or involuntarily—from:

(1) establishing a competing business within the District of Columbia for three years (¶8.c);

(2) soliciting the Corporation's patients or referral network of dentists and doctors for five years (¶ 8.a); and

(3) utilizing the Corporation's proprietary information (¶ 8.b).

The District of Columbia holds that restrictive covenants among dentists, including the geographic scope and duration of Emery's covenant, are reasonable and therefore enforceable. *See Deutsch v. Barsky,* 795 A.2d 669, 676 (D.C. 2002) (a five mile and two year covenant between dentists is reasonable and enforceable); *Erikson v. Hawley,* 56 App. D.C. 268, 12 F.2d 491 (D.C.Cir. 1926) (covenant to not compete in the District of Columbia for an orthodontist for 10 years was reasonable)

Since mid-summer 2007, Emery has secretly engaged in a course of conduct designed to allow him to withdraw from the Corporation without having to abide by the covenants that survive his tenure as a Corporation employee. Specifically, Emery has employed maneuvers designed to leave the Corporation, establish an office within the District of Columbia (indeed within three blocks of the Corporation's K Street office), solicit for his independent practice Corporation patients and referral network dentists and doctors and solicit to his independent practice top level employees of the Corporation. In order to accomplish this move, Emery has

employed tactics meant to either nullify the Employment Agreement or create such an intolerable work environment for Guttenberg and the staff loyal to Guttenberg, that Guttenberg would succumb to relieving Emery of his contractual promises.

As described in greater detail below, Emery's scheme has consisted of: (1) seeking to arrange for the use of offices at 1145-19th Street, N.W.; (2) soliciting the Corporation's clinical supervisor and marketing director to leave with him to open the office on 19th Street; (3) arranging to hire a dental surgeon to join him at his new practice; (4) seeking to coerce and blackmail Guttenberg into resigning as president of the Corporation and then permitting Emery to assume that position in order to then terminate Guttenberg and convert Guttenberg's equity in the Corporation; (5) attempting to destroy the Corporation based on fabricated grounds of managerial deadlock and arguing his restrictive covenants would be nullified in a judicial dissolution; and (6) harassing, pressuring and coercing Guttenberg, employees loyal to him and the Corporation's long-time outside consultants (accountant and benefits counselor) through a bombardment of complaints and allegations in order to have Guttenberg succumb to invalidating Emery's restrictive covenants.

In ¶ 8.d of Emery's Employment Agreement he contractually agreed, and stipulated, if he breached a ¶ 8 covenant, or threatened to breach a covenant, that temporary and permanent injunctive relief would be the appropriate relief and agreed that it should be entered against him. Even without this stipulation, however, Plaintiffs will suffer irreparable injury if an injunction is not granted. The case law is clear that, upon breach of a covenant, irreparable injury is presumed. Further, case law recognizes the inherent difficulty in ascertaining a standard of damages under the circumstances as presented in this case for potential loss of business, patients, referral network and good will. Here, also, there is the potential that if not abated, Emery's

3

tactics will begin to drive away the Corporation's employees, destroy the referral network
Guttenberg and the Corporation have built over thirty years and endanger patient care.

Accordingly, Plaintiffs' Motion should be granted because: (1) there is a high likelihood
that Plaintiffs will prevail on the merits, as the evidence shows Emery has taken overt steps to
establish an office on 19th Street and to solicit employees and referral doctors to his new location
and continues to threaten to establish a competing practice; (2) Plaintiffs will be irreparably
harmed unless action is taken to prevent Emery from his continued pursuit to destroy the
Corporation and its practice, harassing Plaintiff Guttenberg, harassing other employees of the
Corporation and committing corporate waste; (3) the balance of harms tips decidedly in
Plaintiffs' favor as there can be no harm to Emery to abide by his contractual agreements, and, if
relief is not granted, the Plaintiffs will continue to incur substantial irreparable and immediate
injury; and (4) the public interest favors the enforcement and "sanctity of legal agreements" and
discourages scandalous methods employed to break contractual promises.

## FACTUAL BACKGROUND

### A.    Guttenberg's Admission of Emery to the Corporation's Practice

Guttenberg established the practice of "Steven A. Guttenberg, D.D.S. P.C." in 1977 in
downtown Washington.  Through lecturing throughout the world and authoring numerous
articles in ten years, he built up a substantial following of referral dentists and doctors to his oral
and facial surgery practice. Guttenberg is a recognized authority in his field and is presently the
President of the American College of Oral and Maxillofacial Surgeons and the recipient in 2007
of the Sterling W. Mead award from the District of Columbia Society of Oral Surgeons for
"Lifetime Achievement."  (Ex. 1, V. Comp. at ¶¶ 7-9; 65) (Dr. Guttenberg's curriculum vitae is
attached as Ex. 18).

4

After graduating from dental school in 1984 and completing a residency in 1988, Emery became employed by Guttenberg's professional corporation as an associate. When he joined Guttenberg, Emery had no patients or referral network. His starting pay was $80,000. (*Id*. at ¶ 10.) On July 30, 1990, Guttenberg agreed to admit Emery as a shareholder into the Corporation. The objective of Emery's admission was that Emery and Guttenberg would grow the Practice and that when Guttenberg would be ready to retire, Emery would retain the Corporation and Guttenberg would be paid out for his share of the Practice. (*Id*. at ¶ 11). Prior to the incidents described in this Complaint, that is early 2007, it was Guttenberg's intent, as shared with Emery, that Guttenberg would retire within the next five years. (*Id*. at ¶¶ 12).

## B.    The Parties' Agreements

Guttenberg and Emery entered into three agreements, the Shareholder Agreement and two Employment Agreements (one for Emery and one for Guttenberg) and a Stock Purchase Agreement. Under the Stock Purchase Agreement, Emery purchased fifty per cent (50%) of the Corporation's stock for $31,250.00. (*Id*. at ¶ 14; Stock Purchase Agreement attached as Ex. 3). The name of the Corporation was then changed from "Steven A. Guttenberg, D.D.S., P.C." to "Doctors Guttenberg and Emery, P.C." (Resolution attached as Ex. 4).

The Shareholder Agreement (attached as Ex. 5) provides that Emery and Guttenberg agree to always vote for the other as a director of the Corporation (Ex. 5 at ¶ 18). As the sole directors, they elected Guttenberg President. (Resolution attached as Ex. 6). This provision effectively guarantees Guttenberg remaining as President until removed by the directors or until he resigned. Guttenberg has remained President of the Corporation since 1990, and has to this date executed the managerial and administrative functions of the Corporation. (Ex. 1, V. Comp. at ¶¶ 20-23).

5

The Shareholder Agreement also provides *inter alia:*

a.  A procedure "for any Shareholder who wishes to withdraw from the Corporation . . . ." (Fifth Whereas Clause).

b.  That the parties agreed it was their intention "to promote their *mutual* interests and the *interests of the Corporation* . . . ." (Eighth Whereas Clause) (Emphasis added).

c.  That in the event a shareholder withdrew from the Corporation he would sell his shares back to the Corporation (¶ 6.B.1) and would resign as a director and officer. (¶ 14).

As part of the consideration to acquire an interest in the business, Emery also agreed to

enter the Employment Agreement whose terms are incorporated herein by reference and is

attached as Exhibit 2. Under the Employment Agreement, Emery agreed, *inter alia*:

a.  That he would "faithfully serve [the Corporation] in its Practice." (¶1).

b.  That he would "diligently and conscientiously devote his entire time, attention and energies to the [Corporation's] Practice" (¶3.a.) and that he would "promote the practice." (¶ 3.a.(5).

c.  That he would not, while employed by the Corporation, "be engaged in any other practice of dentistry . . ." (¶ 3.b.)

d.  That for five years after leaving the practice, for any reason, he would not solicit past or present patients and must refrain from causing or soliciting any dentist to not refer to the practice. (¶ 8.a).

e.  That he would not disclose any of the Corporation's proprietary and confidential information, including its patient list, outside of the Corporation "for any reason or purpose whatsoever." (¶ 8.b.).

f.  That for three (3) years after leaving the Practice, for any reason, he would not engage in any business competitive with the Corporation within the District of Columbia. (¶ 8.c.). This covenant further provides: "This covenant is deemed independent of any other provision of the Agreement and the existence of any claim or cause of action by the Employee against the Employer shall not constitute a defense to its enforcement." (*Id.*). The paragraph further provides that Emery may purchase relief from the covenant by paying $500,000.00 to the Corporation.

6

g.    That in the event of a breach or anticipatory breach of a covenant or a *threatened* breach of a covenant (¶ 8.d), Emery agreed that the Employer would be entitled to injunctive relief and Emery would be required to indemnify the Employer for its attorneys fees and costs to enforce the covenants. (Emphasis added).

h.    The agreement contained a buy-in salary adjustment under which Emery paid Guttenberg $370,000 over a period of years (the "Buy-In Adjustment"). (¶ 5).

i.    That Emery could be terminated by the Corporation for cause or without cause. (¶¶ 13.B and D).

By 1996, Guttenberg and Emery received the same compensation, which has exceeded $600,000 a year for the last several years. The practice has steadily increased its revenues over the years, and according to a national health practice consultant is one of the most profitable oral and facial surgery practices in the country. (Ex. 1 at ¶ 28) (Supplemental Declaration of Dr. Steven A. Guttenberg ["SAG Supp. Dec."], Ex. 7 at ¶ 3).

Guttenberg and Emery have now practiced together for 19 years. Since 1996 Emery has enjoyed the same substantial salary and benefits as Guttenberg. In 2007, however, for reasons unknown to Guttenberg, Emery began to scheme to establish his own independent practice in downtown Washington in violation of the covenants in the Employment Agreement, an agreement under which he has prospered for the last 17 years. (V. Comp., Ex. 1 at ¶¶ 30 to 33).

## C.    Legal Implications of a Withdrawing Shareholder

The Employment Agreement clearly contemplates that there may come a time that Emery desires to voluntarily withdraw from the Corporation. (Ex. 2, ¶ 13). If he withdraws, however, he must sell his shares back to the Corporation (for $31,250) and he is not entitled to the return of the Buy-In Adjustment ($370,000).[1]  (Ex. 2 at ¶¶ 13.C and 14.B). Under the Employment and

---

[1] Contrariwise, if Emery is terminated without cause (which is discussed below), Emery must be given six months prior notice or severance and is entitled to return of the Buy-In Adjustment ($370,000), and Emery must sell his stock back to the Corporation for $31,250. (Ex. 2, ¶ 13; Ex. 5 at ¶ 6.B.). If Emery is terminated for cause, he would not be entitled to any prior notice or

Shareholder Agreements, however, Emery can relieve himself of the ¶ 8.c. non-competition

covenant upon a payment to the Corporation of $500,000.00.  (Ex. 2  at ¶ 8.c; Ex. 5 at ¶ 8.F ).

**D.**    **Emery's Attempts to Extricate Himself From the Restrictive Covenants**

      **1.**    **Emery's Attempt to Blackmail Guttenberg**

      In order to extricate himself from the Corporation and yet be able to establish an office in

downtown D.C., without paying the $500,000 required under ¶ 8.c., at some point in 2007, on

information and belief, Emery began to consult with Dr. Keith Progebin ("Progebin"), a

prosthodontist with offices at 1145-19th Street, N.W.  Progebin had recently been successful in

separating from his senior partner of many years.  Emery thereafter hired the same attorneys and

accountants who had maneuvered Progebin out of his former association to find ways for Emery

to break his covenants.  (Ex. 7, SAG Supp. Dec. at ¶ 4).

      Emery's first gambit was to attempt to take advantage of Guttenberg after Guttenberg

was served with a frivolous claim of sexual harassment by a former, disgruntled employee of the

Practice.  On May 3, 2007, the employee abruptly quit and stomped out of the Practice after

being reassigned duties by Guttenberg from the front desk to the back office.  (Ex. 1, V. Comp.

at ¶ 34).  She had been serving in front desk reception, but complaints had been received from

patients, referring doctors and staff concerning her performance.  On May 24, 2007, Guttenberg

received a demand letter from the employee's attorney demanding money or a sexual

discrimination action would be filed against Guttenberg and the Corporation (hereafter referred

to as the "Employee Claim").  (Ex. 8, SAG Supp. Dec. at ¶ 5).  During the period Guttenberg

was arranging defense through his insurance carriers, Emery, through his newly obtained counsel

---

severance pay, would have no entitlement to the return of the Buy-In adjustment and, again,
would be required to sell his stock back to the Corporation for $31,250.  (Ex. 2, at ¶¶ 13.D and
14.A; Ex. 5 at ¶ 6.B.).  In each case, Emery would remain bound by the restrictive covenants
after leaving the Corporation.  (Ex. 2 at ¶ 8; Ex. 5 at ¶ 6.F).

demanded that Guttenberg enter into what has become known as the "Unilateral Agreement." (Ex. 1, V.Comp. at ¶ 34; Unilateral Agreement attached as Ex. 8). Emery's counsel demanded that Guttenberg execute this agreement by June 15, 2007. Under this Agreement, if any "accusation" was ever made against Guttenberg for "sexual harassment" (including the instant Employee Claim) Emery would instantaneously replace Guttenberg as President (Ex. 8 at ¶ 5), Emery would have the right to purchase all of Guttenberg's stock for the accrual basis book value (a negative number for years) and Guttenberg could then be terminated (by Emery as President). (*Id.*). .

Thereafter, Plaintiffs' litigation counsel on the Employee Claim advised Emery's attorney of the adverse implications of pursuing the Unilateral Agreement while seeking to defend the Employee Claim. (Ex.7, SAG. Supp. Dec. at ¶ 5). Despite the adverse impact on potential litigation of the Unilateral Agreement over the ensuing months, Emery strongly pressed Guttenberg to sign the Agreement. The leverage he sought to hold over Guttenberg was that if Guttenberg refused to sign the Agreement, Guttenberg's wife would be informed of the Employee Claim. (*Id.*). As Emery told one of the Corporation's employees, he believed that Guttenberg feared his wife would then leave him. (Declaration of Donna Breeyear ["Breeyear Dec."], attached as Ex. 10, at ¶¶ 7, 8, 9).

Donna Breeyear is the highest ranking staff employee in the Practice. For the past nine years she has been the Clinical Supervisor and marketing director. According to her attached declaration, she met privately with Emery at his request in August 2007. (Ex. 10, Breeyear Dec. at ¶ 7). On August 1, 2007, Emery told Breeyear he was pressing to have Guttenberg sign the Unilateral Agreement that would result in Guttenberg being terminated and Emery becoming President based upon any allegation of sexual misconduct in the work place. Emery further told

Breeyear that he had given Guttenberg an ultimatum—sign or his wife would find out. (Ex. 10, Breeyear Dec., at ¶¶ 8 and 9).

The Employee Claim was settled without litigation in August 2007 as a nuisance value case by the insurance carrier. (Ex. 7, SAG Supp. Dec. at ¶ 6). The confidential settlement agreement provides no admission of liability by Guttenberg, who has always denied any wrongdoing. (*Id.*). Even after the Employee Claim was settled, however, Emery's lawyer intensified his efforts for the Unilateral Agreement. (*Id.* at ¶ 6). The lawyer wrote Guttenberg that Emery was "VERY SERIOUS." (capitals in original). Guttenberg interpreted this to mean that unless he signed, his wife (who, apparently unknown to Emery, already was aware at that time of the Employee Claim) would be informed about the Claim and settlement. (Ex. 1, V.Comp. at ¶ 38) (Ex. 7, SAG Supp. Dec. at ¶ 6). In August 2007, Guttenberg informed Emery that he would not sign the Unilateral Agreement. Rather, he proposed a "bilateral agreement" which would be signed by both doctors, under which only upon a "finding" (as opposed to merely an "allegation") of sexual harassment or discrimination would there be adverse consequences. (Ex. 7, SAG Supp. Dec. at ¶ 6; bilateral agreement attached as Ex. 9).

As shown below, Emery never agreed to even consider a bilateral agreement. Instead he sought alternate means to relieve himself of his contractual obligations. (*Id.*; Ex. 1, V. Comp. at ¶ 38).

## 2.   Emery's Solicitation to Breeyear to Establish Offices at 1145-19[th] Street

On August 15, Emery asked Breeyear to meet him for a private dinner. (Ex. 10, Breeyear Dec. at ¶¶ 4, 5 and 6). During their meeting, Emery told Breeyear that he was planning to leave Guttenberg and open an office 1145-19[th] Street, N.W. in an association with Dr. Progebin, who has offices at that building. These offices are less than three blocks from the Corporation's

office at 2021 K Street, N.W.  Progebin had been a referring dentist to the Practice for years.

Emery offered Breeyear the position of Clinical Supervisor and head of marketing with his new

practice at a higher salary, and he offered her an interim paid sabbatical.  During the meeting,

Emery also informed Breeyear that he planned on working only 3 or 4 days a week, by bringing

on an associate, then a resident at the Washington Hospital Center.  (Ex. 10, Breeyear Dec. at ¶¶

4, 5 and 6).

On August 23, 2007, Emery rejected the bilateral agreement and demanded to be made

President, immediately "or else."[2]  (Ex. 7, SAG Supp. Decl. at ¶ 7).  Emery again solicited

Breeyear to leave the Practice with him.  In fact, she received a call from Emery who was at the

time in Florida with Progebin and told her they had "discussed everything."  (Ex. 10, Breeyear

Dec. at ¶ 10).  Breeyear interpreted this to mean that Emery had everything set up to leave and

open offices with Progebin.[3]  (Breeyear Supplemental Declaration ["DB Supp. Dec."], Ex. 11, at

¶ 2).

### 3.    Breeyear's Rejection of Emery's Solicitation and Emery's Turning On Breeyear

---

[2] Evidently Emery wanted to become President so he could terminate Guttenberg under
Guttenberg's employment agreement.  Guttenberg's offer to Emery that they become co-
Presidents was rejected by Emery.  Thus, Emery's actions may be deemed an admission that he
believes the Corporation's President has the authority and right to terminate him under his
Employment Agreement.

[3] Progebin has been with Emery at other key times throughout this ordeal.  In fact, days after this
Complaint was filed, Emery and Progebin spent a week together in Telluride, Colorado.  (Ex. 7,
SAG Supp. Dec. at ¶ 4).

During her August 14, 2007 dinner with Emery, Breeyear advised Emery that she would not accept his offer. Rather, she sought to advise him to patch up his differences with Guttenberg and reminded him of what a great practice they jointly had. This was apparently a turning point for Emery. (Ex. 11, DB Supp. Dec. at ¶ 3).

Emery now realizing that Breeyear would not be his confidant and was, in fact, loyal to Guttenberg and the Corporation and could potentially be as an adverse witness against him in any future legal proceedings, sought to nullify Breeyear as a witness. Emery did an immediate and abrupt 180 degree turn on Breeyear and implemented a strategy to terminate her from the Practice and turn the firm's other employees against her. (See Ex. 9, Breeyear Decl. at ¶¶ 11-13, 15-17; Ex. 12, letter from Breeyear's attorney to Emery).

In early September Emery maneuvered to have an employee (closely aligned to him in the Practice) file a grievance against Breeyear. (Ex. 10, Breeyear Dec. at ¶¶ 10-11).[4]  On September 11, 2007, Emery called Breeyear into his office, closed the door and screamed at her, angrily and shaking. (Ex. 10, ¶¶ 11-13).  After he began to ridicule Guttenberg, Breeyear cut him off, only making Emery angrier. He then told Breeyear to "just do her work" and stay out of his personal business. (*Id.*).  She was told later to stay away from Progebin's office (apparently out of Emery's fear that Breeyear might learn more about Emery's plans with Progebin during her customary and professional visits with his staff). (Ex. 10, Breeyear Dec. at ¶ 15).  In addition, ever since that last encounter Emery has subtly sought to harass Breeyear into quitting. (Ex. 11, Breeyear Supp. Dec. at ¶ 3).  He has toyed with, mocked and otherwise harassed Breeyear. (*Id.*).  He has demanded for the first time in her nine years of employment that she prepare time sheets showing her whereabouts. (Ex. 10. Breeyear Dec. at ¶ 17).  When they are alone in the offices,

---

[4] Being unable to substantiate these charges before Guttenberg, the grievance was dismissed, and Emery had to concur. See Ex. 13.

he continually leers at Breeyear and sarcastically asks her "is everything okay? Are you sure?" Or he stands over her desk and gives her a Cheshire cat smile. Recently, when they were alone he has intentionally bumped into her. (Ex. 11, DB Supp. Dec. at ¶ 3). He has also engaged in similar conduct with another employee loyal to Guttenberg, including deliberately and annoyingly bumping into her when they are alone. (Ex. 11, DB Supp. Decl. at ¶ 3).

Breeyear has felt compelled to retain her own attorney and has placed Emery on notice of his inappropriate conduct. (Ex. 12). Emery's continued harassment of the Corporation's employees thus places the Corporation in continuing legal jeopardy.

### 4.   Emery's Refusal to Reinstate the Lapsed Corporate Charter

Shortly after Guttenberg's refusal to be coerced into signing the Unilateral Agreement, on or about September 25, 2007, Emery began to employ a new tact. He advised Guttenberg that he had discovered that since the Corporation moved its offices in 1996 (from 19th Street to K Street), the P.C. had failed to pay its annual registration fee. (Ex. 1, V. Comp. at ¶¶ 46-47). Though operating as the P.C. since 1996, and though Emery was the secretary of the corporation (therefore ostensibly responsible for making the corporate filings) and has reaped the annual handsome salary and bonus benefits from the P.C., he informed Guttenberg that he would refuse to execute the corporate reinstatement papers and therefore considered the Corporation dissolved. (*Id.* at ¶ 48).

Guttenberg as President reinstated the Corporation on October 1, 2007, as failing to administratively reinstate the Corporation would constitute a criminal act (acting as a corporation while not incorporated) and expose the Corporation to potential legal and tax liabilities. (*Id.* at 50). Further, Emery's refusal as the secretary of the Corporation was also in violation of Emery's Shareholder Agreement to take all actions to promote and protect the Corporation. In

13

any case, since his discovery of the lapsed charter (the date of which Emery has refused to provide to Guttenberg), Emery has continually accepted salary and bonuses from the Corporation, received its health and other benefits and held himself out as a member of the Corporation, willingly accepting those benefits thus clearly waiving and abandoning his argument that the Corporation had been dissolved. (Ex. 10, SAG Supp. Dec. at ¶ 8).

### 5.   Emery's Attempts to Manufacture Grounds for Dissolution

Having abandoned his argument that the lapsing of the corporate charter dissolved the Corporation, Emery's team since October 2007 has engaged in a new strategy designed to fabricate grounds for a complaint for judicial dissolution. Emery's counsel have engaged in an incessant campaign of emails and letters complaining about virtually every aspect of the management of the Corporation. (Ex. 1, V. Compl. at ¶ 51). They have unilaterally, typically without Guttenberg's prior permission or knowledge, pummeled the Corporation's accountant and benefits coordinator—both having long term business relationships with Guttenberg—with ceaseless inquiries for information or arguments as to the propriety of certain actions, such as accounting entries and pension and profit sharing contributions. Likewise they have sought to interfere with supervision of the Corporation's staff, calling for inquiries into termination of Breeyear or other employees perceived to be loyal to Guttenberg. (Ex. 7, SAG Supp. Dec. at ¶ 9).

Emery has also engaged in corporate waste in order to prepare for his move to his own practice. Despite the Corporation having employees well-trained to perform certain surgical and administrative tasks, beginning in September 2007, Emery began to teach other employees how to conduct the same procedures. Breeyear and Guttenbergs' belief is that Emery did this in order

to be able to take these employees, trained on the Corporation's time and at its expense, with him when he withdraws from the Practice. (Ex. 1, V. Comp. at ¶ 56; Ex. 10, Breeyear Dec. at ¶ 18).

While seeking to manufacture grounds for dissolution, Emery has also begun to solicit referral doctors and dentists to be loyal to himself as opposed to the Corporation (Ex. 7, SAG Supp. Dec. at ¶ 10); appears to have stolen the Employee Claim litigation file (*Id.* at 11); has taken 5 years of superb annual evaluations from Breeyear's personnel file that he signed (*Id.* at 11); Breeyear Dec. at ¶ 16; and has removed from the Corporation's offices his American Express credit card statement verifying his August 15 2007 dinner meeting when he solicited Breeyear. (Ex. 7, SAG Supp. Dec. at ¶ 11).

Despite claiming grounds for judicial dissolution, Emery, since October, has failed to file any action seeking to establish such grounds. (Ex. 7, SAG Supp. Dec. at ¶ 12). This is likely as no grounds exist and even if there was a judicial dissolution, the court would likely enforce Emery's agreements.[5]

### 6.    Guttenberg's Attempts to Protect the Practice and Offer to Emery to Cure His Contractual and Fiduciary Breaches

---

[5] The grounds for involuntary judicial dissolution are set forth in DC Code § 29-101.90. Emery meets none of these grounds. Only one ground appears potentially relevant, section (c). Section (c) requires, however, not only a deadlock, but a showing of *irreparable injury*. The stalemate must paralyze the functioning of the corporation. FLETCHER CYCLOPEDIA CORPORATIONS (PERM ED.["FLETCHER"]) at 8066,10 n. 8. For example, the profitable operation of a deadlocked corporation will not warrant involuntary dissolution. *Id.* at n. 10; *e.g., Woodward v. Andersen,* 627 N.W.2d 742 (Neb. 2001) (no judicial dissolution where the corporation has made a profit and there is no evidence of corporate assets being misapplied or wasted). Mere disagreement on how to run the business is not sufficient. FLETCHER at § 8066.10 n. 12. Nor does a shareholder's dislike of the other shareholder warrant dissolution. *Id.* n. 13. Here, not only has the corporation's income steadily grown over the years, in its latest 9 months it has increased by 30 per cent. Next, even if the Court were to order a dissolution it would enforce Emery's pre-dissolution employment and shareholder agreements including the non-competition covenants. *Id.* at § 8123; *see also e.g., Fine v. Laband,* 35 Wash.. App. 368 (1983) (physician stock purchase agreement enforced); *Nardis Sportswear v. Simmons,* 213 S.W. 2d 864 (Tex. App. 1948)

Guttenberg as President has the common law power to enforce the Corporation's employment agreements. (Ex. 1, V. Compl. at ¶ 58). See *International Tours, Inc. v. Khalil,* 491 A.2d 1149, 1153 (D.C. 1985); *see generally*, 18B Am. Jur. 2d Corporations, § 3129. Guttenberg's authority to terminate Emery is further reinforced by the by the express language of Emery's Employment Agreement, under which he may be terminated by the Corporation, with or without cause, and by the fact that in 1990 he agreed that Guttenberg would remain President, with the inherent and contractual powers of that office, until such time as Guttenberg chose to resign.

On November 2, 2007, Guttenberg delivered notice to Emery that he was in breach of the Employment Agreement including the covenants in ¶ 8. (V. Compl. at ¶¶ 58-61) (Notice attached as Ex. 14). As included in the notice, Guttenberg invited Emery to choose what to do consistent with the promises made in the Employment and Shareholder Agreements. First, Guttenberg invited Emery to stay with the Corporation, reaffirm their association and move forward. If, however, Emery chose to not stay, Guttenberg, instead of terminating Emery for cause (while believing such grounds existed) and in order to avoid litigation and further disruptive involvement of the Corporation's employees, offered to accept Emery's resignation, or if he chose to not resign Guttenberg, would agree to terminate Emery without cause, thereby triggering the Employment Agreement requirement to give Emery 6 months' notice or pay him 6 months' severance and health benefits, pay him $31,250 for his stock and repay the $370,000 Buy-In Ssalary adjustment. (Ex. 2. at ¶¶13.D and 14).

Emery's response came on November 5, 2007. (Attached as Ex. 15). Instead of responding to whether he would cease his violations of the covenants, and chose to either stay or

be terminated, Emery skirted those requests and requested that Guttenberg retire from the Practice, leaving it to Emery.

After November 2, 2007, Emery's harassing tactics continued and intensified with the year end closing. (Ex. 1, V. Compl. at ¶ 63). Despite Emery and his counsels' attempts to interfere with the affairs of the Corporation and build a record that it should be dissolved, the Corporation under Guttenberg's Presidency has functioned successfully as before. In fact its billings for 2007 were 6.4 per cent greater than in 2006, and even with the interference that began in the second half of 2007, the Corporation's profits in the second half of 2007 were 5.6 per cent higher than in the first half of 2007. (Ex. 7, SAG Supp. Dec. at ¶ 12).

Since at least May, 2007 Emery has failed to devote his full time, attention and loyalty to the Corporation. Rather he has devoted his time to seeking ways to either force Guttenberg out of the Practice or establish his own practice without being bound by the non-competition and non-solicitation covenants. These actions are intentional and are calculated to coerce and pressure Guttenberg to force him to buckle under to Emery's demands to nullify the restrictive covenants. This pressure has been intensified and leveraged by the fact of Guttenberg's election on May 2, 2007 as President of the American College of Oral and Maxillofacial Surgeons. (Ex. 1, V. Comp. at ¶ 65). Emery's actions appear calculated to place additional pressure, stress and anxiety on Guttenberg at a time when he is managing the affairs of the American College as well as the Corporation's office, and also threaten to embarrass Guttenberg before his professional colleagues with scandalous accusations, unless Guttenberg agrees to invalidation of Emery's restrictive covenants. (Ex. 7, SAG Supp. Dec. at ¶ 13).

In November and early December 2007, the parties sought to mediate a resolution of the matters raised by Emery's actions. The mediation was unsuccessful. (V. Comp. at ¶ 66).

On December 14, 2007, Guttenberg, in his capacity as President of the Corporation, again in a last attempt to avoid litigation, delivered a notice to Emery that he was terminated without cause pursuant to ¶ 13.B of the Employment Agreement, though he believed grounds for termination with cause exist. (Ex. 1, V. Comp. at ¶ 67) (Notice attached as Ex. 16). The notice provided that, *inter alia*:

a.   Emery was provided with six months' notice of the termination;

b.   In accordance with the Shareholder Agreement, Emery received a check in the amount of $31, 250;

c.   Emery was advised that he would receive repayment of the Buy-In Adjustment of $370,000 as provided in ¶ 14.B. of the Employment Agreement;

d.   Emery, remained bound by the covenants specified in ¶ 8 of his Employment Agreement; and

e.   In accord with ¶ 8.c. of his Employment Agreement, Emery could obtain relief from the non-competition covenant through the payment of $500,000.00.

On December 17, 2007 Emery, through his counsel, rejected Guttenberg's authority as President of the Corporation to terminate Emery, and on December 19, 2007 returned the check for $31,250.[6]  (Ex. 1, V. Comp. at ¶ 68).  (Letter attached as Ex. 17).

## ARGUMENT

**I.    Standard for Interim Injunctive Relief**

In *National Head Start Association v. Department of Health and Human Services*, 297 F.Supp.2d 242 (D.D.C. 2004), this Court stated that the standard for temporary restraining orders

---

[6] The facts described regarding Emery's termination are provided in order to present a complete factual context to the Court.  Plaintiffs, however, are not requesting that the Court address the legality of the termination on the motions for preliminary injunctive relief.  Rather, Plaintiffs' Complaint contains three counts for Declaratory Judgment, in which the issues of whether Emery has constructively resigned, or may be terminated with or without cause, are presented, and therefore, believe that those issues should be addressed at a later time.   Accordingly,  Plaintiffs have under a separate filing of even date herewith filed a Motion for an Expedited Discovery, Briefing and Hearing Schedule on the requests for declaratory relief.

and preliminary injunctions are the same.  In order to obtain a "preliminary injunction or temporary restraining order, a litigant must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Id.* at 246 -247, *citing Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C.Cir. 1998).   These factors must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits. *Id.* 247, *citing Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360, 366 (D.C.Cir.1999) and *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995).

Here, Plaintiffs can satisfy the relevant elements for obtaining injunctive relief and, as a result, are entitled to a temporary restraining order and preliminary injunction against Emery in order to protect the Corporation, Guttenberg's interest in the Corporation and the interests of the Corporation's employees and patients.

## II.    Interim Injunctive Relief is Appropriate and Necessary

### A.    Plaintiffs Are Likely to Prevail on the Merits

A review of the Verified Complaint and supporting declarations and exhibits makes clear that Plaintiffs are likely to prevail on Count I.  On balance, the available evidence demonstrates that since mid-summer 2007 Emery had been in continuous breach of his restrictive covenants and has begun to divert the Corporation's business, employees and good will or threatens to divert these corporate assets.  From Guttenberg and Breeyears' declarations and the demonstrative coincidence of Emery's using the same attorneys, accountants and similar tactics employed by Emery's confidante, Progebin, Emery has in fact breached and continues to breach his agreement to not establish a competitive office in the District of Columbia.

1.    **Emery breached the Employment Agreement**

Under District of Columbia law an enforceable contract requires both (a) agreement to the material terms and (b) intention by the parties to be bound. *Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1238 (D.C. 1995). Here, there is no doubt that the parties operated for 17 years in accordance with the actual Employment and Shareholder Agreements. Along with Guttenberg's reasonable and expected reliance on those promises, there is a sound basis for enforcing those promises.

2.    **Validity and Construction of restrictive covenants in medical practitioner's, employment agreement.**

The old rule that a covenant to not compete was a restraint upon trade, and hence was void and contrary to public policy, has been replaced by the modern view that such a covenant, if enforceable by consideration, ancillary to a lawful contract, and reasonable and consistent with the public interest, is enforceable. *See Deutsch v. Barsky,* 795 A.2d 669 (D.C. 2002) (a covenant to not compete that is ancillary to a valid agreement between dentists is enforceable and does not constitute a *per se* restraint on trade in violation of public policy); . *See Erikson v. Hawley,* 56 App. D.C. 268, 12 F.2d 491 (D.C.Cir. 1926) (covenant to not compete in the District of Columbia for an orthodontist for 10 years was reasonable). *See generally* 54A Am. Jur.2d, Monopolies, Restraints of Trade, and Unfair Trade Practices § 840.

Under the modern rule, the criteria to be evaluated on the enforceability of non-competition covenants between physicians are:

(1)    was the covenant ancillary or incidental to a lawful contract;

(2)    the effects of the restrictions upon the parties and the public; and

(3)    based on the facts and circumstances of the particular case, are the time and

territorial limitations in the covenants reasonable.[7]

The ultimate test of the validity of a covenant against competition is not whether there is

a restraint, but whether the restraint is reasonable under the facts and circumstances of the

particular case.  54A Am. Jur.2d, Monopolies, Restraints of Trade, and Unfair Trade Practices §

846.  Courts, in determining the reasonableness of a restrictive covenant, have allowed greater

latitude when the covenant relates to the sale of the business than when the covenant is ancillary

to a contract of employment. (*Id.*).

### 3.    Emery's covenant is ancillary to both his Employment Agreement and the Shareholder Agreement

An anticompetitive covenant is enforceable if it is ancillary to a lawful contract. *Deutsch*

*supra* 795 A.2d at 674.  *See generally* 54A Am. Jur. 2d, Monopolies, Restraints of Trade and

Unlawful Trade Practices § 843.  Restrictive covenants may also be ancillary to agreements for

the sale of a business or part of a business.  *E.g., Physician Specialists in Anesthesia, P.C. v.*

*MacNeill*, 539 S.E.2d 216 (Ga. App. 2000) (restrictive covenant ancillary to partnership

agreement will be enforced).  Here, this element is satisfied as Emery's covenants are

incorporated in both his Employment Agreement and in his Shareholder Agreement and

comprised part of the sale by Guttenberg of the shares of his business to Emery.

### 4.    Emery Will Not Suffer an Undue Burden upon Enforcement of the Covenant

---

[7] See generally *Deutsch v. Basrky,* 795 A.2d 669 (D.C. 2002).  There are few cases in District of
Columbia's jurisprudence that  address the factors taken into account in enforcing restrictive
covenants in medical practitioner employment agreements.  There is, however, a comprehensive
legal annotation at 62 A.L.R.3d 1014, *Validity and Construction of Contractual restrictions on*
*Right of Medical Practitioner to Practice, Incident to Employment Agreement* which collects
cases on each of the above criteria.  Many of the cases cited in this brief are taken from that
annotation.

A restrictive covenant in a medical practitioner's employment contract must be reasonable in imposing only such restraint upon the employee as is necessary to protect the interests of the employer.   Thus, enforcement of the covenant has been decreed where the employee-medical practitioner, in the course of his employment was introduced to and became intimately acquainted with his employer's clientele or patients, the courts pointing out in this situation that the employee, after the termination of his employment, should not draw off his former employer's business. *See Erikson v. Hawley,* 56 App. D.C. 268, 12 F.2d 491 (D.C.Cir. 1926) (where employee placed in position of becoming acquainted with the practice's patients there existed danger of enticing them away and therefore the covenant to not compete in the District of Columbia for an orthodontist for 10 years was reasonable). *See also, e.g., Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.,* 45 F.Supp. 2d 1164 (D.Kan. 1999) (agreement was reasonable as to geographic scope and duration, as it had purpose to protect business' initial investment in helping physician establish a practice); *Valley Medical Specialists v. Farber,* 950 P.2d 1184 (Ariz. 1997), review granted (Feb. 18, 1998) (medical practice had protectable interest in its current patients and referral sources, for determining whether restrictive covenant in physician's shareholder and employment agreements with medical practice were enforceable after he withdrew from practice; continued success of medical practice was dependent upon patient referrals, and practice was specialty practice that largely depended on patient referrals from other doctors); *Ballesteros v. Johnson,* 812 S.W.2d 217 (Mo. App. 1991) (covenant held reasonable where evidence indicated that physician who had hired employee had established and developed practice for several years prior to associating employee; employee had never been in private practice prior to association with employer, and employee had no prior referral base). Likewise, here, Emery entered Guttenberg's practice with no patients, no referral base. (Ex. 7,

SAG Supp. Dec. at ¶ 14).  And like the cases cited, the Corporation's practice is a specialty

practice relying primarily on referrals from other doctors and dentists, and enforcement of the

covenant is necessary in order to prevent the business of the Corporation from being siphoned

off.

Under the Employment Agreement, Emery is prohibited from establishing a practice

within the District of Columbia. Cases in this Circuit and throughout the nation have held

covenants similar in geographic and temporal scope to those in Emery's Employment Agreement

to be reasonable and to not impose an undue burden on the medical practitioner.  For example, in

*Hayes v. Altman*, 225 A.2d 670 (Pa. 1967) the court held that the an agreement in an optometrists

employment contract that he would not engage in the practice of optometry in the municipality,

or elsewhere within 6 miles, for a period of three years was reasonable and did not impose any

undue hardship upon the employee.  *See also Erik v. Hawley* and *Deutsch v. Barsky supra.*

(covenant in *Erik* included all of the District of Columbia; covenant in *Deutsch* covered 5 miles,

which would include all of the District of Columbia).

Provided that a dentist or physician can avail himself of similar opportunities in other

areas, restrictive covenants have been held reasonable and enforceable.  Here, Emery is licensed

to practice in both Virginia and Maryland, as well as the District of Columbia (Ex. 7, SAG Supp.

Dec. at ¶ 15) and could easily, if he so chose, relocate to the Maryland or Virginia suburbs.

(Emery in fact lives in McLean, with obvious close proximity, for example, to such close-by

cities as Tysons Corner, Reston and Roslyn). *See, e.g., Phoenix Orthopaedic Surgeons, Ltd. v.*

*Peairs,* 790 P.2d 752 (Ariz. App. 1989) (where physician could practice in other locations, five

mile radius covenant held reasonable); *Vascular & General Surgical Assoc., Ltd. v. Loiterman,*

599 N.E.2d 1246 (Ill. App. 1992) (two year restriction on vascular surgeon reasonable in light of surgeon's right to resume practice elsewhere).

     **5.**       **The Coveant is Not Injurious to the Public**

     In determining the reasonableness of a covenant in a medical practitioner's agreement the courts have also considered the effect of the covenant on the public. Some courts have considered whether there are enough practitioners in the area involved to serve the community. *E.g., Dick v. Geist,* 693 P.2d 1133 (Idaho 1985) (only pediatrician within a 25 mile radius). *Cf. Medical Specialists v. Sleweon,* 652 N.E.2d 517 (Ind. App. 1995) (covenant enforceable covering infectious-disease specialist, as plaintiff did not establish that other physicians in area were incapable of providing adequate medical care to patients suffering from infectious disease).

     Here, there is no scarcity of oral surgeons in either the entire District of Columbia or even downtown Washington.  Washington contains one of the highest concentrations of oral surgeons in the country.  (Ex. 7, SAG Supp. Dec. at ¶ 15).  Under such circumstances the courts have consistently enforced restrictive covenants as reasonable.  *See, e.g., Valley Medical Specialists supra* (availability of pulmonologists in restricted area would not be inadequate if physician precluded from practicing within five mile radius, and restrictions did not make it impossible for patients to continue to see physician); *Concord Orthopaedics Professional Ass'n v. Forbes,* 702 A.2d 1273 (N.H. 1997) (partially restricted access to one orthopedic surgeon involved no undue public burden).

     **6.**       **District of Columbia Court have emphasized the importance of holding parties to restrictive covenants to their agreements**

     In *Deutsch v. Barsky*, 795 A.2d 669, 674 (D.C. 2002) a primary factor in the Court's upholding the covenant to not compete in a contract between dentists was "[a]fter a party has deliberately made his contract, and received consideration therefore, it must plainly appear that it

24

contravenes public policy before the courts will declare it void upon that ground." (citations

omitted). The *Deutsch* Court cited *Erikson v. Hawley*, 56 App.D.C. 268, 12 F.2d 491, 495

(1926) "which stressed ' the right to contract and the policy of the courts to see that this right is

not unreasonably abridged.'"

Based upon District of Columbia and national law, Emery's covenant is reasonable and

enforceable and it is not unduly burdensome to him or injurious to the public. As such, Plaintiffs

have a high likelihood that they will succeed on the merits.

**B.    Irreparable Harm is Probable in the Absence of Interim Injunctive Relief**

The second prerequisite for injunctive relief is a probability that the movant will suffer

irreparable harm if an injunction is not granted. Under the circumstances of this case, it is more

than probable that Plaintiffs will suffer irreparable harm if Emery is not ordered to cease his

maneuvering to relieve himself from the restrictive covenants.

First, cases hold that where there is a non-competition agreement, breach is the

controlling factor and injunctive relief follows as a matter of course. 43 Am. Jur. 2d Injunctions

§ 168. Damage from the breach is presumed to be irreparable and the remedy at law inadequate.

*Id.* It is not necessary to show actual damage by instances of successful competition, but it is

sufficient if such competition, in violation of the covenant, *may* result in injury. *Id. citing e.g.*

*National Homes Corp. v. Lester Industries, Inc.*, 293 F.Supp. 1025 (W.D. Va. 1968), *judgment*

*aff'd in part, rev'd in part on other grounds*, 404 F.2d 225 (4th Cir. 1968) (emphasis added). The

rationale behind these cases is that to be protected, an employer or contractor should not have to

actually wait to experience the irreparable harm before getting an injunction against breaching a

contract where there is the potential for such harm. 42 Am. Jur 2d, Injunctions § 126, *citing e.g.,*

*Overholt Crop. Ins. Service Co. v. Travis*, 941 F.2d 1361 (8th Cir. 1991); *Osage Glass Inc. v.*

25

*Donovan*, 693 S.W.2d 71 (Mo. 1985). As stated in *Basicomputer v. Scott*, 973 F.2d 507 (6th Cir.

1992): "[I]t is not the initial breach of a covenant not to compete which necessarily establishes

the existence of irreparable harm and warrants injunctive relief, but rather the *threat* of unbridled

continuation of the violation and the *resulting incalculable damage* to the former employer's

business." (Emphasis added).

Second, here Emery has contractually agreed and stipulated to the entry of injunctive

relief upon a breach or a *threatened* breach. In ¶ 13.d. of Emery's Employment Agreement he

promised that:

> In the event of a breach or anticipatory breach by the Employee of his obligation
> under this paragraph 8, *the Employee hereby acknowledges and stipulates that the
> Employer shall not have an adequate remedy at law, shall suffer irreparable harm, and
> therefore, **it is mutually agreed and stipulated** by the parties hereto, that, in addition to
> any other remedies at law or in equity which the Employer may have, the Employer shall
> be entitled to obtain in a court of law and/or equity a temporary and/or permanent
> injunction restraining the Employee from any further violation or breach of such
> covenants.* . . . Nothing in this Agreement will be construed as prohibiting the Employer
> from pursuing other remedies available to it for a breach or threatened breach of this
> paragraph 8. The provision of this Paragraph 8 will survive the termination of this
> Agreement and/or Employee's employment. (Emphasis added).

The District of Columbia courts follow the general rule that although not dispositive as to

the existence of irreparable injury, such clause are persuasive as to its existence. *See Ellis v.

James v. Hurson Associates, Inc.*, 565 A.2d 615, 619 n. 14 (while a court of equity is not bound

by such a provision, "the clause may be influential in determining how the court will exercise its

discretion," *citing* CALAMARI & PERILLO, THE LAW OF CONTRACTS § 14-31 at 564 n.88 (1977))

Third, such clauses have been found to be particularly persuasive, if not dispositive, when

it would be difficult to ascertain an amount of damages or because the nature of the right

inherent in a restrictive covenant is such that there exists no certain pecuniary standard for the

measure of damages, such as for lost future business, potential loss of valuable employees, lost

patients and referral sources and good will and reputation. Nor can the value of harm caused by

continued stress, coercion and harassment be readily ascertained.

In *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69, (2d Cir. 1999) the Second Circuit found

irreparable harm on the basis of both a contractual provision stipulating to the entry of injunctive

relief and the difficulty in calculating monetary damages for the potential future loss of business

related to lost clients. The court, in reviewing the grant of an injunction involving an employer's

enforcement of a covenant to not compete and an employment contract that stipulated to a

finding of irreparable injury and an agreement to the entry of an injunction upon a breach of the

covenant, held:

> it would be very difficult to calculate monetary damages that would successfully
> redress the loss of a relationship with a client that would produce an
> indeterminate amount of business in years to come. In fact, the employment
> contract sought to be enforced concedes that in the event of [the employee's]
> breach of the post-employment competition provision, [employer] shall be
> entitled to injunctive relief, because it would cause irreparable injury. *Such, we*
> *think, might arguably be viewed as an admission by [employee] that plaintiff*
> *will suffer irreparable harm were he to breach the contract's no-compete*
> *provision.*

Accord, *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, (2d Cir. 1999) (finding

irreparable harm on the basis of both contractual provision and impossibility of measuring harm

from loss of trade secrets in monetary terms). Emery has likewise admitted to the difficulty of

measuring damages and to the propriety of entry of an injunction. He has, in fact, stipulated that

such is the case—a stipulation constituting a judicial admission.

An additional factor weighing in favor of finding irreparable injury is that courts have

found irreparable injury in the form of lost good will, reputation, and valuable business

relationships where an employee had a long career with the employer (such as Emery with 19

years with the Corporation) which permitted the employee to develop close relationships and

27

business with the employer's clients. *See, e..g., Benfield, Inc. v. Moline*, 351 F.Supp.2d 911

(D.Minn. 2004). Likewise cases in this Circuit have not hesitated in finding irreparable injury in

similar situations enforcing restrictive covenants. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*

*v. Wertz*, 298 F.Supp.2d 27 (D.D.C. 2002) (upon violation of a non-competition covenant the

loss of confidential customer information and customer goodwill and trust were concrete harm).

In *Morgan Stanley DW Inc. v. Rothe*, 150 F.Supp.2d 67 (D.D.C. 2001) (the court granted a

temporary restraining order and irreparable injury was held to exist based on the potential loss of

customers, confidential information and damaged relationships with their customers);

*Wineburgh v. Meyer*, 221 F.2d 543 (D.C.Cir. 1955) (employee permanently enjoined under non-

competition covenant).

Here, Emery has stipulated to the entry of an injunction and by implication has agreed to

the proposition that ascertaining the amount of the Corporation's damages would be difficult,

which in reality it would. Moreover, the need for relief under the circumstances of this case is

clearly immediate. At present, Defendant may continue to remove potential evidence from the

offices, force valuable employees to leave the Practice, cause confusion among the referral

network, lose the respect of that network as gossip begins to develop in the dental and medical

communities and lose incalculable business. There is the additional concern of potential harm.

Patients may not receive the focus on their care that they deserve, if that focus is diverted to the

on-going intra-office maneuvering and dissension. Also, without obtaining immediate injunctive

relief, the Defendant may be able to frustrate the Plaintiffs' ability to maintain the Corporation's

business, endangering the incalculable over life-time investment Guttenberg has in the

Corporation.

**C.    The Balance of Harms Favor Interim Injunctive Relief**

28

The temporary restraining order and preliminary injunction sought by Plaintiffs would not prevent Emery from continuing in his current position and adhering to his agreements as he had done for the prior 17 years. Indeed, the requested relief would simply preserve the status quo required under the contract, *i.e.,* not seeking to establish a competing business until such time as the Court could rule on Plaintiffs' request for declaratory judgment as to whether Emery has manifested his intent to resign from the firm, or may be terminated with or without cause.

To the extent that the requested relief might ultimately be determined to have wrongfully denied Emery an opportunity to breach, or threaten to breach, his covenants, Plaintiffs are prepared to post security for that potential loss. Surely, however, Emery cannot claim that he will be harmed by adhering to his promises, especially as his very actions, taken to free him from his promises, can be deemed an admission on his part that they are binding on him.

To the extent that an analysis of the balance of the respective harm to the parties is relevant here, that balance tips decidedly in Plaintiffs' favor. While the potential injuries to Plaintiffs if the Court does not issue a preliminary injunction would be substantial, the potential injuries to Emery are non-existent. *Almurbati v. Bush,* 366 F.Supp.2d 72, 81 (D.D.C. 2005). No discernible harm inures to Emery if he abides by his contractual agreements. Emery has successfully operated under these agreements for the last seventeen years, during which time he has profited handsomely from his engagement by the Corporation. It is appropriate to award a plaintiff interim injunctive relief when defendant will incur little or no discernible harm. Emery should have no argument that he will be harmed unless he can continue to breach his promises, continue with his pressure and coercion tactics, and continue to seek to destroy the Corporation in order to circumvent his contractual covenants. In short, the balance of harms favors the entry of an injunction.

### D.    The Public Interest Favors Interim Injunctive Relief.

The final consideration in granting a preliminary injunction or temporary restraining order is whether the public interest will be advanced or disserved by grant or denial of the motion. *See, e.g., NOW, Washington D.C. Chapter v. Social Sec. Admin. Of Dept. of Health & Human Servs.,* 736 F.2d 727, 742 (D.C. Cir. 1984). This Court has recognized a public interest in the "sanctity of contracts." *Barnstead Broad Corp. v. BAF Enters.,* 81 F.3d 1147 (D.C. Cir. 2003); *see also Pritchard v. Dent Wizard Int'l Corp.,* 275 F.Supp.2d 903, 920 (S.D. Ohio 2003) ("The public has an interest in the enforceability of contracts").

The issuance of preliminary injunctive relief in this matter will result in the furtherance of the public interest by preserving the Court's ability to enforce the parties' agreements. Conversely, permitting Emery, during the pendency of this action, to continue to establish a competitive office, siphon business and employees off of the Corporation, destroy the Corporation, destroy the morale of the staff, and continue to harass and pressure Guttenberg and Breeyear would not serve the public interest as it would encourage unscrupulous contractual parties to disregard their commitments whenever a "better" opportunity presents itself. Indeed, the only interests that would be served should the Court deny Plaintiffs' request would be Emery's improper promoting of his interests at the expense of his promises to the Plaintiffs.

Finally, the public interest would be negatively affected if contracts were capable of being circumvented and if coercive and scandalous stratagems were permitted to breach everyday commercial transactions. Emery's actions further only his own selfish goals and are antithetical to the elementary bonds inherent in the basis of commercial and fiduciary law.[8]

---

[8] A case presenting similar facts and circumstances to the one at bar is *Gismondi Paglia Sherling v. Franco*, 104 F.Supp.2d 223, 233 (S.D.N.Y. 2000). There, the court held that similar conduct was employed to break an employee out from under his restrictive covenants in order to compete

In the event that this Court finds there is no serious impact upon the public interest as a result of this dispute, the law of this Circuit provides that '[a]s a practical matter, if a plaintiff [can] demonstrate both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994). To this end, the public interest certainly favors the relief requested by the Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ordering and enjoining Emery: 1) to refrain from breaching his restrictive covenants, including establishing a new office within the District of Columbia; 2) to refrain from soliciting patients and referral doctors and employees to a new practice: 3) to refrain from harassing Guttenberg, Breeyear and any of the other Corporation employees; and 4) refrain from taking other action that may be deemed detrimental to the best interests of the Corporation  pending the outcome of this action.

DATED:  January 30, 2008              Respectfully submitted,


                                       Geoffrey P. Gitner (D.C. Bar No. 176479)
                                       Law Offices of Geoffrey P. Gitner
                                       Watergate, Twelfth Floor
                                       600 New Hampshire Ave., N.W.
                                       Washington, D.C. 20037
                                       Ph: (202) 772-5926

---

with the employer and that such conduct violated the employee's duty of good faith and fair dealing. There the court enforced the restrictive covenant and reasoned that to not enforce the covenant would permit employees and contractors to avoid reasonable non-compete agreements simply by creating false grounds for their nullification.

_Richard T. Tomar by GA_

Richard T. Tomar (D.C. Bar No. 13094)
KARP, FROSH, LAPIDUS, WIGODSKY &
NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850
Ph: (301) 948-3800

*Counsel to the Plaintiffs*

## **Exhibits**

1.    Verified Complaint

2.    Dr. Emery Employment Agreement

3.    Stock Purchase Agreement

4.    Name Change Resolution

5.    Shareholder Agreement

6.    Resolution appointing Dr. Guttenberg President

7.    Guttenberg Supplemental Declaration

8.    Unilateral Agreement

9.    Bilateral Agreement

10.    Ms. Breeyear Declaration

11.    Ms. Breeyear Supplemental Declaration

12.    Letter from Ms. Breeyear's attorney to Dr. Emery

13.    Dismissal of Grievance

14.    November 2, 2007 notice letter

15.    November 5, 2007 Dr. Emery response

16.    December 14, 2007 notice

17.    December 17, 2007 Dr. Emery response

18.    Dr. Guttenberg Resume

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

|  |  |
|---|---|
| **DR. STEVEN A. GUTTENBERG** and **DOCTORS GUTTENBERG AND EMERY, P.C.** <br><br> **Plaintiffs,** <br><br> v. <br><br> **DR. ROBERT W. EMERY** <br><br> **Defendant.** | Case No. 1:08-cv-00085 <br> (Judge John D. Bates) |

## PLAINTIFFS' NOTICE OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND EMERGENCY STATUS AND SCHEDULING CONFERENCE TO CONSIDER PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY AND SCHEDULING PRELIMINARY INJUNCTION HEARING

**TO:**    Bruce Kauffman, Esq.
Kauffman & Forman
406 W. Pennsylvania Avenue
Towson, MD 21204

Joe A. Shull, Esq.
Brian Schwalb, Esq,
Seth Rosenthal, Esq.
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004-1601

PLEASE TAKE NOTICE that on January 30, 2008, the PlaintiffsDr. Steven A.

Guttenberg and Doctors Guttenberg and Emery, P.C. will make application to the United States

District Court for the District of Columbia for:

1)    a hearing on the entry of a temporary restraining order (the relief of which is

described in the attached Motion for Temporary Restraining Order and Preliminary Injunction);

2)    an emergency status and scheduling conference at which the Court will be asked to consider the Plaintiffs' motion for a temporary restraining order, consider the attached Plaintiffs' Motion for Expedited Discovery, and to set a date and briefing schedule on plaintiffs' request for a preliminary injunction.

PLEASE TAKE FURTHER NOTICE that the Plaintiffs will request the Court to establish these hearings at its earliest opportunity.

Attached with this Notice are the following papers that have been filed with the Court: 1) Complaint; 2) Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Emergency Status and Scheduling Conference and supporting exhibits and declarations of Dr. Steven A. Guttenberg and Ms. Donna Breeyear; and 3) Plaintiff's Motion for Expedited Discovery with attached Interrogatories, Requests for Admission and Document Request.

DATED:  January 30, 2008                Respectfully submitted,

Geoffrey P. Gitner (DC Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Ph: (202) 772-5926
Fax: (202) 772-5858

Richard T. Tomar (D.C. Bar No. 13094)
KARP, FROSH, LAPIDUS, WIGODSKY &
NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850
Ph: (301) 948-3800

Counsel to Plaintiff

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        Plaintiffs,

        v.

DR. ROBERT W. EMERY

        Defendant.

Case No. 1:08-cv-00085
(Judge John D. Bates)

## PLAINTIFFS' LCvR 65.1 CERTIFICATION

PLEASE TAKE NOTICE that on January 30, 2008 at 12:45 p.m., the Plaintiffs, Dr.

Steven A. Guttenberg and Doctors Guttenberg and Emery, P.C., gave notice to the Defendant Dr.

Robert W. Emery, through service on his counsel, Brian Schwalb, Esq., that Plaintiffs would

make application to the United States District Court for the District of Columbia on January 30,

2008 for:

      1)      the entry of a temporary restraining order (the relief of which is described in the

attached Motion for Temporary Restraining Order and Preliminary Injunction);

      2)      an emergency status and scheduling conference at which the Court will be asked

to consider the plaintiffs' motion for a temporary restraining order, consider the attached

Plaintiffs' Motion for Expedited Discovery, and to set a date and briefing schedule on Plaintiffs'

request for a preliminary injunction.

PLEASE TAKE FURTHER NOTICE that the Plaintiffs advised Defendant, through

Brian Schwalb, Esq., that it would request the Court to establish these hearings at its earliest

opportunity.

Served upon Defendant, through Mr. Schwalb, were the following papers that have been

filed with the Court: 1) Verified Complaint; 2) Plaintiff's Motion for Temporary Restraining

Order and Preliminary Injunction and Emergency Status and Scheduling Conference and

supporting exhibits and declarations of Dr. Steven A. Gordon and Ms. Donna Breeyear; 3)

Plaintiffs' Motion for Expedited Discovery with attached Interrogatories, Requests for

Admissions and Document Request; and 4) Notice of Application for the above relief.

DATED:  January 30, 2008                         Respectfully submitted,

Geoffrey P. Gitner (DC Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Ph: (202) 772-5926
Fax: (202) 772-5858

Richard T. Tomar (D.C. Bar No. 13094)
KARP, FROSH, LAPIDUS, WIGODSKY &
NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850
Ph: (301) 948-3800

*Counsel to Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        **Plaintiffs,**

    **v.**

DR. ROBERT W. EMERY

        **Defendant.**

Case No. 1:08-cv-00085
(Judge John D. Bates)

**PLAINTIFFS' MOTION FOR**
**A TEMPORARY RESTRAINING ORDER, EMERGENCY STATUS AND**
**SCHEDULING CONFERENCE AND PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, LCvR 65.1 and 7.(m)

Plaintiffs Dr. Steven A. Guttenberg and Doctors Guttenberg and Emery, P.C. (the "Corporation")

respectfully request the Court:

    1.    To issue a temporary restraining order, that Defendant Emery immediately be

enjoined and restrained, directly or indirectly, and whether alone or in concert with others,

pending hearing and disposition of the Plaintiffs' pending Motion for a Preliminary Injunction

from doing the following:

        (a)    breaching the covenants contained in his Employment Agreement, dated
                July 30, 1990, at ¶¶ 8.a through c;

        (b)    establishing an office or practice that would be competitive with the
                Corporation within the District of Columbia;

        (c)    soliciting, or attempting to solicit any referring patients, or referring
                doctors or dentists to himself, and not to the Corporation;

        (d)    soliciting, or attempting to solicit, employees of the Corporation to leave
                the Corporation to establish a competitive practice;

(e)    destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in a computer media) in Defendant's possession or control which were obtained from or contain information derived from Corporation records, which pertain to patients or referring dentists and physicians, or which relate to any of the events in the Complaint in this action; and

(f)    that Defendant, and anyone acting in concert or participation with Defendant, be further ordered to return to the Corporation any and all information pertaining to the Employee Claim file, Breeyear's personnel file and any other Corporation records which relate to any of the events in the Complaint of this action.

2.    To issue a preliminary injunction enjoining Defendant Emery, directly or indirectly, and whether alone or in concert with others:

(a)    breaching the covenants contained in his Employment Agreement, dated July 30, 1990, at ¶¶ 8.a through c.;

(b)    establishing an office or practice that would be competitive with the Corporation within the District of Columbia;

(c)    soliciting, or attempting to solicit any referring patients, or referring doctors or dentists to himself, and not to the Corporation;

(d)    soliciting, or attempting to solicit, employees of the Corporation to leave the Corporation to establish a competitive practice;

(e)    destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in a computer media) in Defendant's possession or control which were obtained from or contain information derived from Corporation records, which pertain to patients or referring dentists and physicians, or which relate to any of the events in the Complaint in this action; and

(f)    that Defendant, and anyone acting in concert or participation with Defendant, be further ordered to return to the Corporation any and all information pertaining to the Employee Claim file, Breeyear's personnel file and any other Corporation records which relate to any of the events in the Complaint of this action.

3.    That the Court set an emergency status and scheduling conference at its earliest
opportunity to hear the Plaintiffs' motion for a temporary restraining order, to set a date for a
preliminary injunction and the pleadings supporting and opposing such an injunction and to hear
Plaintiffs' attached motion for expedited discovery.

4.    The bases for this motion are set forth more fully in the accompanying
memorandum of law and in the accompanying Verified Complaint, Declarations and Exhibits.

5.    Counsel for Plaintiffs certifies, as required by Local Rule 7.1(m), that he has
discussed this motion with opposing counsel in a good faith effort to determine whether there is
any opposition to the relief sought and to narrow the areas of disagreement.  The motion is
opposed in all respects.

January 30, 2008                              Respectfully submitted,

                                             _____
                                             Geoffrey P. Gitner (D.C. Bar No. 176479)
                                             Law Offices of Geoffrey P. Gitner
                                             Watergate, Twelfth Floor
                                             600 New Hampshire Ave., N.W.
                                             Washington, D.C. 20037
                                             Ph: (202) 772-5926


                                             _____
                                             Richard T. Tomar (D.C. Bar No. 130949)
                                             KARP, FROSH, LAPIDUS, WIGODSKY &
                                             NORWIND, P.A.
                                             2273 Research Blvd., Suite 200
                                             Rockville, Maryland 20850
                                             Ph: (301) 948-3800

                                             *Counsel to the Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

              **Plaintiffs,**

      v.

DR. ROBERT W. EMERY

              **Defendant.**

Case No. 1:08-cv-00085
(Judge John D. Bates)

## ORDER
## ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER,

UPON CONSIDERATION of Plaintiffs' Motion for a Temporary Restraining Order, and having heard the argument of counsel for both parties, it is this ____ day of _____, 2008, ORDERED, that the Plaintiffs' motion is GRANTED.

The Court finds as follows:

(1)    the Plaintiffs will suffer immediate and irreparable injury if relief is denied, as Defendant in his Employment Agreement stipulated and agreed that irreparable injury would exist upon a breach of his restrictive covenants, and further the Court finds that the Plaintiffs have made a showing of additional specific irreparable injury further exists, inter alia, that it would be difficult to ascertain the amount of lost business due to the restrictive covenant breaches, not possible to place a value on the loss of valuable Corporation employees and loss of morale among the staff of the Corporation and that further irreparable injury will occur unless the harassment and pressure being exerted on Dr. Guttenberg and Ms. Donna Breeyear is not terminated.

(2)    the Plaintiffs are likely to prevail on the merits, as the language of ¶ 8 is clear and unambiguous and that Emery has breached or threatened to breach the covenants in this provision of his Employment Agreement;

(3)    the balance of potential harm favors the Plaintiffs as there is little harm to defendant in requiring that he adhere to his Employment Agreement pending a preliminary injunction hearing, whereas the Plaintiffs will continue to suffer the irreparable injury addressed above;

(4)    the public interest favors granting relief as there is a public policy to protect and enforce contractual agreements.

IT IS FURTHER ORDERED:

Defendant Emery is enjoined, pending the hearing and disposition of the Plaintiffs' pending Motion for a Preliminary Injunction, from taking any action:

(a)    To breach, or threaten to breach, the covenants contained in his Employment Agreement, dated July 30, 1990, at ¶¶ 8.a through c.

(b)    To establish, or seek to establish, an office or practice that would be competitive with the Corporation within the District of Columbia;

(c)    To solicit, or attempt to solicit, any referring patients, or referring doctors or dentists to become loyal to himself, and not to the Corporation;

(d)    To solicit, or attempt to solicit, employees of the Corporation to leave the Corporation to establish a competitive practice.

(e)    That would be detrimental to promoting the best interests of the Corporation.

_____
Judge

COPIES TO:

2

Geoffrey P. Gitner, Esq.
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037

Richard T. Tomar, Esq.
KARP, FROSH, LAPIDUS, WIGODSKY &
      NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850

*Counsel to the Plaintiffs*

Brian Schwalb, Esq.
Venable
875-7th Street, N.W.
Washington, D.C.

*Counsel to Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        **Plaintiffs,**

    **v.**

DR. ROBERT W. EMERY

        **Defendant.**

Case No. 1:08-cv-00085
(Judge John D. Bates)

**ORDER**
**ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

UPON CONSIDERATION of Plaintiffs' Motion for a Preliminary Injunction, and having

heard the argument of counsel for both parties, it is this _____ day of _____, 2008,

ORDERED, that the Plaintiffs' motion is GRANTED.

The Court finds as follows:

(1)    the Plaintiffs will suffer immediate and irreparable injury if relief is denied, as

Defendant in his Employment Agreement stipulated and agreed that irreparable injury would

exist upon a breach of his restrictive covenants, and further the Court finds that the Plaintiffs

have made a showing of additional specific irreparable injury further exists, inter alia, that it

would be difficult to ascertain the amount of lost business due to the restrictive covenant

breaches, not possible to place a value on the loss of valuable Corporation employees and loss of

morale among the staff of the Corporation and that further irreparable injury will occur unless

the harassment and pressure being exerted on Dr. Guttenberg and Ms. Donna Breeyear is not

terminated.

(2)    the Plaintiff are likely to prevail on the merits, as the language of ¶ 8 is clear and unambiguous and that Emery has breached or threatened to breach the covenants in this provision of his Employment Agreement;

(3)    the balance of potential harm favors the Plaintiffs as there is little harm to Defendant in requiring that he adhere to his Employment Agreement pending a preliminary injunction hearing, whereas the Plaintiffs will continue to suffer the irreparable injury addressed above;

(4)    the public interest favors granting relief as there is a public policy to protect and enforce contractual agreements.

IT IS FURTHER ORDERED:

Defendant Emery is enjoined, until further Order by this Court, from taking any action:

(a)    To breach, or threaten to breach, the covenants contained in his Employment Agreement, dated July 30, 1990, at ¶¶ 8.a through c.;

(b)    To establish, or seek to establish, an office or practice that would be competitive with the Corporation within the District of Columbia;

(c)    To solicit, or attempt to solicit, any referring patients, or referring doctors or dentists to become loyal to himself, and not to the Corporation;

(d)    To solicit, or attempt to solicit, employees of the Corporation to leave the Corporation to establish a competitive practice;

(e)    That would be detrimental to promoting the best interests of the Corporation.

_____
Judge

COPIES TO:

Geoffrey P. Gitner, Esq.
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037

Richard T. Tomar, Esq.
KARP, FROSH, LAPIDUS, WIGODSKY &
        NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850

*Counsel to the Plaintiffs*

Brian Schwalb, Esq.
Venable
875-7[th] Street, N.W.
Washington, D.C.

*Counsel to Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of January, 2008, I caused a true and correct copy of the foregoing Plaintiffs' Motion for a Temporary Restraining Order, Emergency Status and Scheduling Conference and Preliminary Injunction, Plaintiffs' Notice of Application and Rule LCvR 61.1 Certification were served by electronic mail and first class mail, postage prepaid on the following:

> Brian Schwalb, Esq.
> Joseph Shull, Esq.
> Seth Rosenthal, Esq.
> Venable
> 875 7th Street, N.W.
> Washington, D.C.
>
> Counsel for Defendant

_____
Geoffrey P. Gitner

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**DR. STEVEN A. GUTTENBERG**
8801 Chalon Drive
Bethesda, MD 20717-3040

**and**

**DOCTORS GUTTENBERG AND EMERY, P.C.**
2021 K Street, N.W., Suite 200
Washington, D.C. 20006-1003

        **Plaintiffs,**

   **v.**

**DR. ROBERT W. EMERY**
750 Potomac River Road
McLean, VA 22102

      **Defendant.**

Civil Action No.

### COMPLAINT FOR DECLARATORY AND OTHER RELIEF

COME NOW the Plaintiffs, Doctors Guttenberg and Emery, P.C. and Dr. Steven A. Guttenberg, by counsel, and move this Honorable Court for judgment against Defendant Dr. Robert W. Emery, on the grounds and in the amounts as set forth below.

### JURISDICTION AND VENUE

1.     Jurisdiction of this matter is founded upon diversity of citizenship under 28 U.S.C. § 1332.

2.     The amount of the matters in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars. ($75,000).

3.    Venue in this District is proper under 28 U.S.C. § 1391 because, among other reasons, a substantial part of the wrongful acts alleged herein were carried out within the District of Columbia, the corporate Defendant is a District of Columbia corporation, Plaintiffs suffered injury within the District and the Defendant conducts and transacts business within this District.

## PARTIES

4.    Plaintiff, Dr. Steven A. Guttenberg ("Guttenberg"), is a citizen of the State of Maryland. Guttenberg is an oral and maxillofacial surgeon practicing in the District of Columbia. Guttenberg is 63 years old.

5.    Plaintiff, Doctors Guttenberg and Emery, P.C. (the "Corporation") is a District of Columbia professional corporation. The Corporation was originally formed in 1977 as "Steven A. Guttenberg, D.D.S., P.C." In 1990, the name of the Corporation was changed to "Doctors Guttenberg and Emery, P.C."

6.    Defendant, Dr. Robert W. Emery ("Emery") is a citizen of the Commonwealth of Virginia. Emery is an oral and maxillofacial surgeon practicing in the District of Columbia. Emery is 50 years old.

## FACTS COMMON TO ALL COUNTS

### A.    Growth of Guttenberg's Practice: 1977-1990

7.    In 1977 Guttenberg and the Corporation began an oral and maxillofacial surgery practice in downtown Washington, D.C. (the "Practice").

8.    Guttenberg's Practice grew substantially after 1977. Guttenberg became known locally, regionally and nationally as a recognized expert oral and maxillofacial surgeon

2

through teaching, speaking engagements and participation in professional organizations. Through his practice and reputation, Guttenberg developed a large network of referral dentists and physicians.

9.    Between 1977 and 1988, Guttenberg's practice increased consistently and substantially in the volume of patients it served (with over 1000 patients) and its annual billings reached  approximately $750,000 per year.

10.    In 1984 Emery defendant, graduated from the University of Illinois Dental School.  In 1988, he was hired by the Corporation as an associate.  Emery's starting salary was $80,000 per year.

**B.    Guttenberg Admits Emery into the Practice**

11.    On July 30, 1990, Guttenberg agreed to admit Emery as a shareholder in the Corporation.  Emery was permitted to buy into the Practice over a period of time and to become a fifty (50%) percent shareholder.  One objective of Emery's admission was that Emery and Guttenberg would grow the Practice, and that when Guttenberg would be ready to retire, Emery would retain the Corporation and Guttenberg would be paid out for his share of the Practice.

12.    Prior to the incidents described in this Complaint, that is early 2007, it was Guttenberg's intent, as shared with Emery, that Guttenberg would retire within the next five years.

13.    Pursuant to Emery's admission to the Corporation, Guttenberg and Emery entered into certain agreements (as described below), and changed the name of the Corporation from Steven A. Guttenberg, D.D.S., P.C., to Doctors Guttenberg and Emery, P.C.

**C.    The Stock Purchase and Shareholder Agreements**

14.     As part of Emery's buy-in, Guttenberg and Emery entered into a Stock

Purchase Agreement.  Under the Stock Purchase Agreement, Emery was permitted to

purchase fifty (50%) of the stock of the Corporation for $31,250.00.

15.     Guttenberg and Emery also entered into a Shareholder Agreement (the

"Shareholder Agreement") whose terms are incorporated herein by reference and is attached

as Exhibit A.  The Shareholder Agreement provides *inter alia:*

- a.     A procedure "for any Shareholder who wishes to withdraw from the Corporation . . . ."  (Fifth Whereas Clause).

- b.     That the parties agreed it was their intention "to promote their *mutual* interests and the *interests of the Corporation* . . . ."  (Eighth Whereas Clause) (Emphasis added).

- c.     That in the event a shareholder withdrew from the Corporation he would sell his shares back to the Corporation (¶ 6.B.1) and would resign as a director and officer.  (¶ 14).

- d.     That each of the shareholders was obligated to vote for the other shareholder as a director.  (¶ 18); and

- e.     A formula for a retiring doctor to be paid for his ownership interests in the Corporation upon retirement. (¶¶ 6.B.2 and D.3).

### D.     Emery's Employment Agreement

16.     As part of the consideration to become a shareholder in the Corporation,

Emery agreed to enter into an employment agreement (the "Employment Agreement") whose

terms are incorporated herein by reference and is attached as Exhibit B.

17.     Under the Employment Agreement, Emery agreed, *inter alia*

- a.     That he would "faithfully serve [the Corporation] in its Practice." (¶1).

- b.     That he would "diligently and conscientiously devote his entire time, attention and energies to the [Corporation's] Practice" (¶3.a.) and that he would "promote the practice."  (¶ 3.a.(5).

c.    That he would not, while employed by the Corporation, "be engaged in any other practice of dentistry . . ." (¶ 3.b.)

d.    For five years after leaving the practice, for any reason, he would not solicit past or present patients and must refrain from causing or soliciting any dentist to not refer to the practice. (¶ 8.a).

e.    That he would not disclose any of the Corporation's proprietary and confidential information, including its patient list, outside of the Corporation "for any reason or purpose whatsoever." (¶ 8.b.).

f.    That for three (3) years after leaving the Practice, for any reason, he would not engage in any business competitive with the Corporation within the District of Columbia. (¶ 8.c.). This covenant further provides: "This covenant is deemed independent of any other provision of the Agreement and the existence of any claim or cause of action by the Employee against the Employer shall not constitute a defense to its enforcement." (*Id.*). The paragraph further provides that Emery may purchase relief from the covenant by paying $500,000.00 to the Corporation.

g.    That in the event of a breach or anticipatory breach of a covenant or a *threatened* breach of a covenant (¶ 8.d), Emery agreed that the Employer would be entitled to injunctive relief and would be required to indemnify the Employer for its attorneys fees and costs to enforce the covenants. (Emphasis added).

h.    The agreement contained a buy-in salary adjustment under which Emery paid Guttenberg $370,000 over a period of years (the "Buy-In Adjustment"). (¶ 5).

i.    That he could be terminated by the Corporation for cause or without cause. (¶¶ 13.B and D).

## E.    Legal Implications of a Withdrawing Shareholder

18.    Under the Shareholder and Employment Agreements, Emery may withdraw

from the Corporation. If Emery withdraws or resigns from the Corporation, he must sell his

shares back to the Corporation (for $31, 250), he is not entitled to the return of the Buy-In

Adjustment and continues to be bound by the covenants to not compete. Emery, upon

withdrawal from the Corporation, does have the right to buy his way out of the covenant to

not operate an office in the District of Columbia by paying the Corporation $500,000.00.

5

**F.**    **Guttenberg's Appointment as President of the Corporation**

19.    Pursuant to the Shareholder Agreement, Emery and Guttenberg are at present, and have been since 1990, the sole directors of the Corporation.

20.    As part of the agreements permitting Emery to become a shareholder in the Corporation, Emery and Guttenberg were appointed the sole directors of the Corporation, and as its directors elected Guttenberg as the President of the Corporation.

21.    Since 1990 Guttenberg has without interruption been the President of the Corporation. In that capacity, Guttenberg has been in charge of managing the affairs of the Corporation and has acted as its chief executive officer. This management included the hiring and termination of employees, managing its financial affairs and setting the policy and procedures of the Practice.

22.    When Emery executed his Employment Agreement, he knew that Guttenberg, as President of the Corporation, had the right to terminate him with or without cause. Since July 30, 1990 Emery has known and accepted that Guttenberg, as President of the Corporation, has had the right to terminate Emery with or without cause.

23.    For seventeen years, from 1990 until 2007, Emery did not interfere with Guttenberg's management of the Corporation, and accepted that Guttenberg was the officer in charge of managing the affairs of the Corporation and acted in all ways in the capacity as the Corporation's President.

24.    During this period, 1990 until 2007, Guttenberg and Emery never held formal director meetings. Rather, Emery was satisfied with and never objected to permitting Guttenberg to manage the affairs of the Corporation without proceeding with corporate formalities. Emery conceded, formally and implicitly, that Guttenberg, as President of the

6

Corporation had the authority to make management and executive decisions for the Corporation.

25.     From 1990 to 2007 Emery, without interruption, served as the Corporation's Secretary. As the Corporation's Secretary, Emery was responsible for maintaining the Corporation's books and maintaining its corporate administrative filings.

## G.     Growth of the Practice through 2007

26.     Beginning in 1988, the Corporation and Guttenberg professionally promoted Emery, enhanced Emery's reputation in the field of oral surgery and made substantial investments of time and money in Emery as an employee of the Corporation by *inter alia* having Emery treat Guttenberg's patients; aiding Emery in developing a referral network of doctors and dentists; promoting Emery in professional associations; mentoring Emery to engage in professional speaking engagements and preparation of professional articles.

27.     Guttenberg made additional contributions to the growth and stature of the Practice through speaking engagements throughout the nation and the world and holding office in dental associations, including, *inter alia,* current President of the American College of Oral Surgeons and past President of the District of Columbia Society of Oral and Maxillofacial Surgeons.

28.     Through Guttenberg's efforts over the last thirty years, the Practice has grown in both billings and stature in the medical and dental communities. In 1990 the Corporation's billings were less than one million dollars. As of year end 2007 they were over five million dollars. The Practice became known as one of the premier Oral and Maxillofacial surgery practices in the nation, and ranks in the upper one percentile in profit per dentist.

29.     Through his association with the Corporation, and particularly Guttenberg, Emery has been able to establish a referral network of physicians and dentists and establish his own reputation. Emery's network and reputation have become valuable assets of the Corporation and are the product of Guttenberg's and the Corporation's investment in Emery, and their aid and mentoring of Emery.

**H.     Emery Manifest His Intent to Withdraw from the Practice in 2007**

30.     Upon information and belief, at some point in 2007 Emery formulated the intent to withdraw from the Practice.

31.     Despite his intent to withdraw from the Practice and there being a provision in the Shareholder and Employment Agreements to permit his withdrawal, Emery sought to not be bound by the non-competition covenants prohibiting him from opening an office in the District of Columbia and refraining from soliciting the Corporation's patients and referral network.

32.     In order to avoid his contractual obligations upon withdrawing from the Practice, in 2007 Emery formulated a scheme, concealed from Guttenberg, to find a way to relieve himself from his obligations under the Shareholder and Employment Agreements. This scheme has included: seeking to coerce and blackmail Guttenberg to force Guttenberg out of the Practice, in order to make it solely Emery's own; seeking to coerce Guttenberg to resign as President, and appoint Emery as President, in order that Emery might then terminate Guttenberg; seeking to harass and intimidate Guttenberg into relieving Emery of his contractual obligations; and, interfering with the operation of the Practice in order to declare that the Practice could not operate and should be dissolved.

33.     Beginning in mid-2007, Emery, (as more fully described below) in order to withdraw from the Corporation without adhering to his obligations as a withdrawing shareholder as provided in the Shareholder and Employment Agreements, *inter alia*:

a.      Breached or anticipatorily breached or threatened to breach his covenant to not compete by secretly seeking to establish, and taking actions to establish, an office within the District of Columbia in direct competition with the Practice;

b.      Solicited, in breach of his fiduciary duties to the Corporation, the Corporation's Clinical Supervisor and marketing director, and possibly other of the Corporation's employees, to leave the Practice and establish a practice with Emery;

c.      Hired attorneys to seek to find ways for him to break out of his Shareholder and Employment Agreement obligations upon withdrawing from the Corporation and, specifically to break out of the non-competition and non-solicitation covenants;

d.      Engaged in acts of dishonesty intended to harm, destroy or dissolve the Corporation, including, but not limited to, seeking to blackmail Guttenberg, seeking to establish an office within three blocks of the Corporation's office, stealing Corporation property, harassing the Clinical Director after she expressed her loyalty to Guttenberg, seeking to destroy the morale of the Corporation's employees and their loyalty to Guttenberg and the Corporation, and committed corporate waste by seeking to train Corporation employees to take over functions in his new practice, whereas, there are Corporation employees who are already trained and carrying out these functions for the Corporation;

e.      Attempted to blackmail Guttenberg into appointing Emery President of the Corporation, in order that Emery would then be able to terminate Guttenberg from the Practice;

9

f.      Concealed the fact that the Corporation's charter had been administratively revoked, thereby exposing the Corporation and its shareholders to potential liability and then, as Secretary of the Corporation, refused to aid in the administrative reinstatement of the Corporation;

g.      Failed to support the Corporation in an asserted claim by a disgruntled employee and took actions which if exposed during litigation would have adversely affected the Corporation and its shareholders;

h.      Breached the non-solicitation covenant by directing referral dentists and physicians toward himself and not to the practice;

i.      Harassed Guttenberg and the Corporation's professional consultants (accountants, benefits administrators) by having his attorneys pepper them with e-mails and phone calls intended to embarrass and harass Guttenberg and interfere with the efficient operation of the Corporation.

## I.      Emery's Attempt to Blackmail Guttenberg In Order to Withdraw from the Practice

34.     Emery's first gambit was to attempt to take advantage of Guttenberg when Guttenberg received a frivolous claim of sexual harassment by a former disgruntled employee of the Practice (the "Employee Claim"). On or about May 3, 2007, this employee had abruptly quit after receiving what she perceived as an unfavorable reassignment within the office.

35.     The Employee Claim was settled by the Corporation's insurance company as a nuisance case, without any admission of liability on Guttenberg or the Corporation's behalf through a confidential settlement agreement in August, 2007. However, during the period the

Employee Claim was pending, Emery sought to have Guttenberg execute an amendment to the Shareholder Agreement (known between Guttenberg and Emery as the "Unilateral Agreement") that would result in Guttenberg's being terminated by the Corporation and Emery being appointed its President.

36.    Under the Unilateral Agreement proposed by Emery, if any "accusation" was ever made against Guttenberg for sexual harassment, including the pending Employee Claim, Emery could replace Guttenberg as President, Emery would have the right to purchase all of Guttenberg's stock for the accrual basis book value (a negative number for years) and Emery as President could then terminate Guttenberg.

37.    During the period that the Employee Claim was pending, Emery threatened Guttenberg that if Guttenberg did not sign the Unilateral Agreement, that Guttenberg's wife would be informed of the Employee Claim (for sexual harassment). Emery informed an employee of the Corporation during this period that he believed he had leverage over Guttenberg, to force Guttenberg to sign the Unilateral Agreement, because Emery believed that Guttenberg feared that if his wife learned of the claim, she would leave him. As Guttenberg and Emerys' wives had been friendly, Guttenberg assumed this would have been a path for such a communication.

38.    On August 9, 2007, Guttenberg informed Emery he was unwilling to sign a Unilateral Agreement, but proposed a bilateral agreement, that would cover both him and Emery and would only be triggered by actual findings of harassment, not simply "accusations." Emery would never agree to even consider the bilateral agreement. Rather, Emery sought alternate ways to get out from under his contractual obligations.

11

39.     Again, Emery demanded Guttenberg agree that Emery would become President. Emery sought to become President as it was his position that as President he would have the power and authority to terminate Guttenberg from the Corporation.

40.     Emery's seeking Guttenberg's execution of the Unilateral Agreement during the Employee Claim negotiations and while the Corporation was seeking to defend itself against a potential action created adverse legal implications for the Corporation and Guttenberg. Emery's action constituted a breach of his fiduciary duties of loyalty, due care and good faith to the Corporation and constituted a breach of the duties he owed the Corporation and Guttenberg.

## J.     Emery's Solicitation of the Practices Clinical Supervisor and Marketing Director and Subsequent Harassment

41.     Donna Breeyear is the highest ranking staff employee in the Practice. For the past nine years she has been the Clinical Supervisor and marketing director.

42.     On August 15, 2007, Emery asked Breeyear to meet with him in a private meeting. Emery informed Breeyear that he planned on leaving the Practice and opening his own practice at 1145-19th Street, N.W., Washington, D.C.. This location is less than three blocks from the Corporation's Practice and within the area prohibited under the non-competition covenant. Emery asked Breeyear if she would leave with him, offered her the position of Clinical Director and head of marketing with his new practice at a higher salary, and offered her an interim paid sabbatical. During the meeting, Emery also informed Breeyear that he planned on working only 3 or 4 days a week by hiring an associate who was presently a resident at the Washington Hospital Center.

43.     Breeyear rejected Emery's proposal and advised him to patch up his differences with Guttenberg and reminded him of what a great practice they had.

44.     Emery upon realizing that Breeyear would not be his confidant, was loyal to Guttenberg and the Corporation and realizing Breeyear could be an adverse witness against him, thereafter implemented a strategy to terminate Breeyear from the Practice or coerce her to quit.  Among the actions taken by Emery, *inter alia,* through the present date, are: he has attempted to turn the Practice's other employees against her; has mocked her in private and publicly; has intimidated her by leering at her when they were alone, or asking her in a mocking tone "whether everything is okay"; has intimidated that he would interfere with her ability to do her job; has intimidated her as to her standing in a professional association and her continued ability to appear as a speaker and presenter; and has conspired to manufacture grievances against her.  In addition, on information and belief, Emery has stolen from her personnel file five years of superb annual evaluations. Breeyear has now retained her own attorney who has placed Emery on notice of his inappropriate conduct, which if not terminated,  would expose him and the Corporation to potential liability.

**K.     Emery's Allowance of the Corporate Charter to be Revoked and His Refusal to File for Corporate Reinstatement**

45.     Emery as the Corporation's Secretary had the responsibility to file annual registration statements with the District of Columbia Corporation Commission.

46.     Unbeknownst to Guttenberg, since the Practice moved its offices in 1996 (from 19th Street to K Street) the Corporation had failed to pay its annual registration fee.

47.     On information and belief, either Emery was always aware that the charter had been revoked or was negligent in maintaining the charter and was informed of its lapse at

13

some unknown time by his lawyer, hired to find ways for Emery to be relieved of his Agreements. On September 25, 2007, Emery informed Guttenberg of the administrative revocation. Guttenberg thereafter requested that Emery, as the Corporation's Secretary file for reinstatement of the Corporation.

48.     Though operating as the Corporation since 1996, and though Emery was the Secretary of the Corporation and a Director, and though Emery has reaped the annual salary, bonus and other benefits from the Corporation since 1996, Emery informed Guttenberg that he refused to execute the corporate reinstatement papers, considered the Corporation dissolved and claimed he was therefore now free of his obligations under the Agreements, and demanded that the Corporation's assets be sold off and the Practice terminated.

49.     Failure to administratively reinstate the Corporation would expose the Corporation and its shareholders to substantial legal and tax liabilities, including subjecting the Corporation and its officers to potential criminal liability. Further, Emery's refusal as Secretary of the Corporation (and the officer responsible for the filings) was contrary to Emery's Agreement to take all actions to promote and protect the Corporation and a breach of his fiduciary duties of loyalty, preservation and good faith owed to the Corporation as a director and its Secretary.

50.     On October 1, 2007, the Corporation was administratively reinstated. Since that date, Emery has continued to accept the benefits of the Corporation, including receipt of salary, bonus, health insurance, pension and other benefits.

51.     Beginning in October, 2007, Emery and his attorneys have engaged in additional actions meant to harass and coerce Guttenberg into relieving Emery of his Agreements. Emery's lawyers have unleashed a barrage of email and letter complaints,

14

complaining about virtually every aspect of the Corporation's practice. Since October 1,

2007, they have sent countless emails and letters claiming among other things that Guttenberg

took inappropriate managerial action, that certain employees (particularly Breeyear) should be

terminated, and that profits and pensions were not calculated properly.

52.    From 1988 until October, 2007, Guttenberg, as the Corporation's President had

always managed the communications and relations with the Corporation's professional

advisors and consultants, including its accountant, benefits administrator and insurance

broker. Emery had virtually no contact with these individuals and had always been content to

respect these relationships as Guttenberg saw fit to manage them. However, also,

commencing in October, 2007, Emery's attorneys began to directly contact the Corporation's

professional consultants, pelting them with numerous emails and telephone calls. These

contacts were designed to seek to embarrass Guttenberg and interfere with Guttenberg's

ability to manage the Corporation's affairs, intimidate the consultants by implying that they

may be subject to litigation, coerce Guttenberg into relieving Emery of his Agreements, and

fabricate a record that the affairs of the Corporation were deadlocked and the Corporation

should be dissolved.

53.    Despite Emery and his counsels' attempts to interfere with the affairs of the

Corporation and build a record that it should be dissolved, the Corporation under

Guttenberg's Presidency has functioned as before. In fact its billings for 2007 were 6.4 per

cent greater than in 2006, and even with the interference that began in the second half of

2007, the Corporation's profits in the second half of 2007 were 5.6 per cent higher than in the

first half of 2007.

54.     Beginning in October, 2007, on information and belief, Emery began to solicit referring dentists to himself as opposed to the Corporation.

55.     On information and belief, Emery has stolen the Employee Claim file from the Corporation's offices, as that file has suddenly disappeared. Emery has been observed in unauthorized presence in Guttenberg's private office while Guttenberg was not present in the office.

56.     Despite the Corporation having employees capable of performing certain tasks, beginning in September, 2007, Emery began to teach other employees how to conduct the same procedures. On information and belief, he did this in order to be able to take trained employees with him when he withdrew from the Practice.

57.  .  Since at least May, 2007, Emery has failed to devote his full time, attention and loyalty to the Corporation. Rather he has devoted his time to seeking ways to either force Guttenberg out of the Practice, or establish his own practice without being bound by the non-competition and non-solicitation covenants.

**L.     Guttenberg's Attempts to Protect the Practice and Offer to Emery to Cure His Contractual and Fiduciary Breaches**

58.     Guttenberg, as the President of the Corporation, has the authority to terminate employees and, as President of the Corporation, to enforce the Corporation's contracts, including Emery's Employment Agreement and the responsibility to protect and defend the Corporation.

59.     On November 2, 2007, Guttenberg, in his capacity as President of the Corporation, delivered a notice to Emery. This letter placed Emery on notice that his actions

16

manifested an intention to withdraw from the Practice or, alternatively, to destroy the Practice and identified, without limitation, the grounds that existed to terminate Emery for cause.

60.    Under the Emery Employment Agreement, termination for cause would result in immediate termination and loss to Emery of repayment of the Buy-in Salary Adjustment, $370,000.00. (¶¶13.D and 14).

61.    Despite having grounds to terminate Emery for cause, Guttenberg in order to preserve the Corporation and its Practice, protect the Corporation's employees, avoid litigation, and seek to resolve Emery's activities in an amicable manner, advised Emery that Emery could:

a.    remain with the Practice, by curing his actions, including those in violation of the non-competition and non-solicitation covenants, and those designed to destroy or dissolve the Corporation;

b.    or, resign pursuant to the § 13.C of the Employment Agreement, in which event the Corporation was prepared to pay Emery his salary for six months as provided in the Employment Agreement, but he would not be entitled to repayment of the Buy-In Salary Adjustment;

c.    or, if he chose to not resign, the Corporation would be willing to terminate him without cause, in which event he would be paid for six months' salary and be entitled to repayment of the Buy-In Salary Adjustment.

**M.    Emery's Intentional Infliction of Emotional Distress**

62.    Emery's attorneys responded to the November 2, 2007 notice on November 5, 2007. The letter rejected Guttenberg's right as President of the Corporation to place Emery

on notice of grounds to terminate him for cause, failed to address any of the options open to Emery under his Employment Agreement and contended the Corporation had been dissolved.

63.     Since November 2, 2007, Emery and his attorneys have intensified their efforts to harass Guttenberg, Breeyear and the Corporation's professional advisors, all with the intent to harass and coerce Guttenberg to relieve Emery from his contractual obligations and to fabricate grounds to dissolve the Corporation. Between November 2, 2007 and the date of this Complaint, Emery's attorneys have sent numerous and ceaseless emails and letters complaining about and contesting Guttenberg's day-to-day management of the Corporation, the accountant's calculation of profits and the benefits administrator's implementation of the Corporation's pension and profit sharing plans.

64.     These actions are intentional and are calculated to cause Guttenberg emotional distress, stress and anxiety to force him to buckle under to Emery's demands.

65.     On May 2, 2007 Guttenberg was elected President of the American College of Oral and Maxillofacial Surgeons. On June 5, 2007 Guttenberg received the District of Columbia Dental Society's Sterling V. Mead life-time achievement award, the highest award that it gives. Emery's activities have been taken intentionally and calculated to place additional pressure, stress and anxiety on Guttenberg by threatening to embarrass him before Guttenberg's professional colleagues and to place pressure on him while Guttenberg seeks not only to manage the affairs of the Corporation but also to conduct the duties of his office as President of the American College, so that Guttenberg would agree to permit Emery to be relieved of his contractual obligations.

66.     In November and early December, 2007, the parties sought to mediate a

resolution of the matters raised by Emery's actions.  The mediation, however, was

unsuccessful.

67.     On December 14, 2007, Guttenberg, in his capacity as President of the

Corporation, delivered a notice to Emery that he was terminated without cause pursuant to

paragraph 13.B of the Employment Agreement.  The notice provided, *inter alia*:

a.     That Emery was provided with six months' notice of the termination;

b.     In accordance with the Shareholder Agreement, Emery received a check in the amount of $31, 250;

c.     Emery was advised that he would receive repayment of the Buy-In Adjustment of $370,000 as provided in ¶ 14.B. of the Employment Agreement; and

d.     Advised Emery, that he would remain bound by the covenants specified in ¶ 8 of his Employment Agreement; and

e.     That in accord with ¶ 8.c. of his Employment Agreement, Emery could obtain relief from the non-competition covenant through the payment of $500,000.00.

68.     On December 17, 2007 Emery, through his counsel, rejected Guttenberg's

authority as President of the Corporation to terminate Emery, and on December 19, 2007

returned the check for $31,250.

## CAUSES OF ACTION

### COUNT I
(Breach of Contract and Injunctive Relief)

69.     Plaintiffs incorporate herein by reference the allegations contained in

paragraphs 1 through 68 of this Complaint, and further allege against Defendant as follows:

70.     Paragraph 13.d. of the Employment Agreement provides in *inter alia*:

In the event of a breach or anticipatory breach by the Employee of his obligation under this paragraph 8 [the non-competition and non-solicitation

19

covenants], the Employee hereby acknowledges and stipulates that the Employer shall not have an adequate remedy at law, shall suffer irreparable harm, and therefore, it is mutually agreed and stipulated by the parties hereto, that, in addition to any other remedies at law or in equity which the Employer may have, the Employer shall be entitled to obtain in a court of law and/or equity a temporary and/or permanent injunction restraining the Employee from any further violation or breach of such covenants. In the event of a breach or threatened breach of a covenant by Employee, Employer shall give Employee written notice of said breach or threatened breach and shall give Employee a reasonable time to cure said breach or threatened breach. The giving of said notice shall not prevent Employer from seeking and obtaining injunctive relief from said breach or threatened breach during the period within which Employee may cure said breach or threatened breach. . . . The Employee further agrees to indemnify and hold harmless the Employer from all damages and costs, including reasonable attorney's fees, relating to the enforcement of this Paragraph 8, incurred by the Employer arising out of the Employee's breach or threatened breach of this Paragraph 8. Nothing in this Agreement will be construed as prohibiting the Employer from pursuing other remedies available to it for a breach or threatened breach of this paragraph 8. The provision of this Paragraph 8 will survive the termination of this Agreement and/or Employee's employment.

71.    Through Emery's conduct as alleged in paragraphs 30 through 57, and 62 through 65 above, Emery has threatened to breach, has anticipatorily breached and/or breached ¶¶ 8.a and 8.c. of his Employment Agreement in that he, *inter alia* has:

a.    breached his covenant not to compete included in ¶ 8.c. of the Employment Agreement by threatening to establish, and taking actions to establish, an office withinin the District of Columbia in direct competition with the Practice;

b.    sought to have Breeyear terminate her employment with the Corporation and join Emery at his new practice as his Clinical Supervisor and marketing director;

c.    on information and belief, commissioned a commercial real estate broker to locate space for Emery's new practice in the District of Columbia;

d.    contacted medical and dental equipment companies to obtain pricing for equipment to outfit his new practice;

20

e.    trained Corporation employees in skills already being performed by other of the Corporation's employees, so that when he establishes his new office he will have trained employees immediately available to him;

f.    hired attorneys to find ways for Emery to "break out of" or relieve himself from the non-competition and non-solicitation covenants of his employment agreement;

g.    black-mailed, coerced and harassed Guttenberg and Breeyear in order to break out of the non-competition and non-solicitation covenants;

h.    engaged in acts of dishonesty intended to harm, destroy or dissolve the Corporation, including, but not limited to, concealing his intentions from Guttenberg, misleading Guttenberg as to the consequences of entering the Unilateral Agreement, black-mailing Guttenberg, and on information and belief stealing Corporation property (the Employee Claim file and Breeyear's annual evaluations);

i.    sought to destroy the morale of the Corporation's employees by *inter alia* seeking to divide the employees into camps, promoting disloyalty toward Guttenberg and pandering to the employees;

j.    refused to reinstate the corporate charter, concealing from the Corporation and its President that the charter had been revoked, and therefore exposing the Corporation and its shareholders to potential liability;

k.    failed to support the Corporation in its litigation against the Employee Claim by pursuing the Unilateral Agreement, which if exposed during litigation would have adversely effected the Corporation and its shareholders; and

21

1.    sought to establish his own referral network of dentists and physicians, loyal to himself and not to the Practice, including but not limited to, changing his correspondence from including the Corporation, to referring only to himself.

72.    On November 2, 2007, and December 14, 2007, Emery was given notice of his breaches.

73.    Under Emery's Employment Agreement, he has agreed to the entry of injunctive relief upon his threatened or anticipatory breach or breach of the ¶ 8 covenants and has agreed to be liable for the Corporation's attorney's fees in obtaining such relief.

74.    Emery's conduct has caused, and continues to cause, irreparable harm to Guttenberg and the Corporation.

WHEREFORE, as to Count I of this Complaint, the Plaintiffs pray the Court enter the following relief:

A.    The Court issue temporary, preliminary and permanent injunctions enjoining Emery from taking any further actions or threatened actions in violation of the non-competition and non-solicitation covenants, including, without limitation:

(1).    Establishing, or threatening to establish, in the District of Columbia an office in competition with the Corporation;

(2)    Seeking to establish, or threatening to establish, his own referral network of dentists and physicians loyal to himself and not to the Corporation;

(3).    harassing Guttenberg and the Corporation Employees;

(4).    soliciting Corporate Employees or take any other actions designed to transfer Corporation Employees to another practice;

22

(5).    taking, or threatening to take, any action designed to destroy or dissolve the Corporation; and

(6).    for such other and further relief as the Court may deem just and proper.

B.    The Court order that Emery pay the Corporation's attorneys' fees and costs in pursuing this Count.

### COUNT II

(For Declaratory Judgment-Emery's Withdrawal from the Corporation)

75.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 74 of this Complaint, and further allege against Defendant as follows:

76.    Under paragraph 13.C. of the Emery Employment Agreement, Emery may withdraw as an employee of the Corporation.

77.    Through his actions as alleged in paragraphs 30 through 57 and 62 through 65 above, Emery has manifested his intent to withdraw from the Corporation.

78.    Plaintiffs contend that Emery has manifested his intent to withdraw from the Corporation and that ¶ 13.C of the Emery Employment Agreement has been invoked.

79.    Emery claims, however, that his actions do not manifest an intent to resign and that ¶ 13.C has not been invoked.

80.    Paragraphs 6.B.1 and 14 of the Shareholder Agreement provide that a shareholder who withdraws from the Corporation must sell his shares back to the Corporation and resign as a director and officer.

81.    On December 14, 2007, the Corporation tendered to Emery, pursuant to ¶ 6.B.1 of the Shareholder Agreement the amount required to purchase back Emery's shares

upon withdrawal from the Corporation. Emery has refused the tender, and has refused to resign as a director of the Corporation.

82.    The Plaintiffs contend that upon tender of the share buy out provision, Emery is no longer a shareholder of the Corporation. Emery, however, disputes that he is no longer a shareholder or the Corporation and that he is obligated to resign as a director.

83.    An actual controversy exists between Plaintiffs and Defendant as to:

(1).    whether Emery has withdrawn from the Corporation;

(2).    whether Emery is no longer a shareholder or director of the Corporation; and;

(3)    the rights of the parties under ¶¶ 13.B and 14 of the Employment Agreement and ¶¶ 6 and 14 of the Shareholder Agreement.

84.    Pursuant to 28 U.S.C. § 2201, this Court should resolve this controversy and determine the rights and obligations of the parties.

WHEREFORE, on Count II of this Complaint, Plaintiffs pray that this Court enter a declaratory judgment determining the rights and obligations of the parties and:

(a)    Declare Emery has manifested his intent to withdraw from the Corporation;

(b)    Declare that as Emery has manifested his intent to withdraw from the Corporation he has invoked the provisions of ¶¶ 13.C. and 14 of the Employment Agreement and ¶¶ 6.B.1 and 14 of the Shareholder Agreement have been invoked and satisfied, that Emery is no longer a director and shareholder of the Corporation;

(c)    Declare that under ¶¶ 6.B.1 and 14 of the Shareholder Agreement, by the tender of check in the amount of $31,250, the Corporation has complied with its obligation to purchase Emery's stock and, therefore, Emery is no longer a shareholder or director of the Corporation;

(d)    And for such other and further relief as the Court may deem just and proper.

## COUNT III
(For Declaratory Judgment-Emery's Termination Without Cause)

85.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 84 of this Complaint, and further allege against Defendant as follows:

86.    Plaintiffs plead alternatively that if Emery has not manifested his intent to withdraw from the Corporation and has not invoked the provisions identified in paragraph 78 and 80 above, then Emery has been terminated without cause.

87.    As the President of the Corporation, pursuant to the terms of Emery's Employment Agreement, the implicit agreement between Guttenberg and Emery is that their custom and practice over the last seventeen (17) years, confirms Guttenberg has the responsibility and authority to terminate employees, including Emery, to which Emery has agreed and conceded by seeking for himself to assume the position of President of the Corporation so that he could terminate Guttenberg.

88.    On December 14, 2007 the Corporation, through Guttenberg acting as its President, issued a notice to Emery that he was terminated without cause and given the six months prior notice requirement pursuant to ¶ 13.B of the Employment Agreement.

89.    Emery, however, disputes Guttenberg's ability to terminate him on behalf of the Corporation without cause.

90.    Pursuant to the ¶¶ 6.B.1 and 14 of the Shareholder Agreement, as of the December 14, 2007 notice of termination to Emery, Emery was obligated to sell his shares in the Corporation back to the Corporation and to resign as an officer and director of the Corporation.

91.    Pursuant to the Shareholder Agreement, as of December 14, 2007, as the Corporation tendered a check to Emery in the amount of $31,250, Emery is no longer a shareholder, officer or director of the Corporation.

92.    Emery, however, disputes that under the December 14, 2007 notice he was required to sell his shares back to the Corporation and to resign as an officer and director.

93.    An actual controversy exists between Plaintiffs and Defendant as to the effect and import of the December 14, 2007 notice of termination to Emery.

94.    Pursuant to 28 U.S.C. § 2201, this Court should resolve this controversy and determine the rights and obligations of the parties.

WHEREFORE, on Count III of this Complaint, Plaintiffs pray that this Court enter a declaratory judgment determining the rights and obligations of the parties and:

(a)    Declare that under the December 14, 2007 notice, defendant Emery was terminated without cause;

(b)    Declare that under the December 14, 2007 notice and the Shareholder Agreement Emery must sell his shares back to the Corporation for $31,250 and resign as an officer and director of the Corporation.

(c)    And such other and further relief as the Court may deem just and proper.

## COUNT IV
(For Declaratory Judgment-Emery Termination with Cause)

95.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 94 of this Complaint, and further allege against Defendant as follows:

96.    Plaintiff's plead alternatively that if Emery has not manifested his intent to withdraw from the Corporation and not invoked the provisions identified in paragraph 78 and 80 above, then Emery may be terminated with cause.

97.    The conduct alleged in paragraphs 30 through 5 and 62 through 65 above constitute grounds for Emery's termination with cause. Emery, however, disputes that there exist grounds to terminate him for cause.

98.    An actual controversy exists between Plaintiffs and Defendant as to whether Emery may be terminated by the Corporation's President for cause, and as to whether grounds for cause exist.

99.    Pursuant to 28 U.S.C. § 2201, this Court should resolve this controversy and determine the rights and obligations of the parties.

WHEREFORE, on Count IV of this Complaint, Plaintiffs pray that this Court enter a declaratory judgment determining the rights and obligations of the parties and:

(a)    Declare that the President of the Corporation is authorized to terminate Emery for cause;

(b)    Declare that the grounds for termination with cause have been established by the Plaintiffs;

(c)    And for such other and further relief as the Court deems just and proper.

## COUNT V
### (Breach of Contract)

100.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 99 of this Complaint, and further allege against Defendant as follows:

101.    Through his actions as alleged above, Emery has breached the following provisions of the Shareholder Agreement:

a.    He has failed to promote the mutual interests of he and Guttenberg and the interests of the Corporation as agreed in the Eighth Whereas Clause;

b.    He has breached ¶ 14 by failing to resign as a director and shareholder of the Corporation, as required upon his withdrawal or termination from the Corporation.

102.    Through his actions as alleged above, including but not limited to the allegations set forth in paragraph 33 above, Emery has breached the following provisions of the Employment Agreement:

a.    He has failed to "faithfully serve [the Corporation] in its Practice." (¶ 1).

b.    He has failed to "diligently and conscientiously devote his entire time, attention and energies to the [Corporation's] Practice." (¶ 3.a).

c.    He has failed to "promote the practice." (¶ 3.a.5)

d.    He has solicited referring dentist to himself as opposed to the Practice in violation of ¶ 8.a.

e.    He has sought to establish a business practice in competition with the Corporation within the District of Columbia, in violation of ¶ 8.c.

g.    He has refused to accept his termination notice under ¶ 13.B.

103.    As a proximate cause of Emery's breaches, Plaintiffs have suffered, and will continue to suffer, compensatory damages in an amount in excess of $75,00 to be proven at trial.

104.    Emery knowingly, willfully and wantonly breached the contracts in reckless disregard for the consequences, and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count V, Plaintiffs demand judgment against Defendant Emery for compensatory damages in an amount in excess of $75,000 to be proven at trial, and punitive damages in the amount of $5,000,000, plus interest and the costs of this action, and such other and further relief as this Court may deem just and proper.

**COUNT VI**
(Breach of Fiduciary Duty-Duty of Loyalty)

105.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 104 of this Complaint, and further allege against Defendant as follows:

106.    As part of Emery's fiduciary duty of loyalty, as a director and officer, he must remain loyal to the Corporation, acting at all times in the best interests of the Corporation and its shareholders, whose interest must take precedence over any self interest of Emery.  Emery has breached this fiduciary duty as the actions described above taken by him have not been in the best interests of the Corporation or Guttenberg as a shareholder, and have, rather, been designed to destroy the Corporation for the self interest of Emery in order to withdraw from the Corporation without having to adhere to the provisions of the Shareholder and Employment Agreements.

107.    Emery has breached his fiduciary duty to the Corporation and Guttenberg as a shareholder because his actions have been faithless and constitute self-dealing.

108.    Emery's fiduciary duty of loyalty prohibits him from:

a.    Engaging in, or threatening to engage in, a competing business to the detriment of the Corporation;

b.    Engaging in, or threatening to engage in, a competing business and taking actions intended to cripple or injure the Corporation or seeking to defeat it in order to do so;

29

c.    Seeking to organize, or threatening to organize, a business that competes with the Corporation.

109.    The duty of loyalty encompasses a duty of candor, and requires directors to disclose information relevant to the Corporation and to not withhold relevant information concerning any potential conflict of interests with the Corporation.

110.    As a director (and shareholder of a close corporation) Emery owes the Corporation, and Guttenberg as a shareholder of the Corporation, a duty of the utmost loyalty. Through the actions taken above, including but not limited to those alleged in paragraphs 30 through 57 and 62 through 65 above, Emery has breached his fiduciary duty of loyalty.

111.    As a direct and proximate result of Emery's breaches of his fiduciary duty of loyalty, the Plaintiffs have suffered, and will continue to suffer compensatory damages in an amount in excess of $75,000 to be proven at trial.

112.    Emery knowingly, willfully and wantonly breached his fiduciary duty of loyalty in reckless disregard for the consequences and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count VI, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,00 in an amount to be proven at trial and $5,000,000.00 in punitive damages, plus interest and the costs of this action, and such other and further relief as this Court deems just and proper.

## COUNT VII
### (Breach of Fiduciary Duty-Duty of Due Care)

113.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 112 of this Complaint, and further allege against Defendant as follows:

114.    As a director of the Corporation Emery owes the Corporation, and Guttenberg as a shareholder of the Corporation, a duty of due care and is bound to protect the assets of the Corporation and not appropriate the Corporation's assets for his own use and purposes.

115.    As part of the duty of due care, a director owes a duty of preservation of corporate property and assets, including keeping the Corporation within its corporate powers and obeying the law and includes a duty of care in the execution of directorial responsibilities.

116.    Emery has breached his duty of care to the Corporation and Guttenberg as a shareholder of the Corporation, by *inter alia*:

(a).    Engaging in the actions alleged in paragraphs 30 through 57 and 62 through 65 above;

(b).    Refusing to reinstate the corporate charter, concealing from the Corporation and its President that the charter had been revoked, and therefore exposing the Corporation and its shareholders to potential liability.

117.    As a direct and proximate result of Emery's breaches of his fiduciary duty of due care, Plaintiffs have suffered, and will continue to suffer compensatory damages in excess of $75,000 to be proven at trial.

118.    Emery knowingly, willfully and wantonly breached his fiduciary duties in reckless disregard for the consequences and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count VII of this Complaint, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,000 in an amount to be proven at trial and $5,000,000.00 in punitive damages, plus interest and the costs of this action, and for such other and further relief as this Court deems just and proper.

31

**COUNT VIII**
(Breach of Fiduciary Duty-Duty of Good Faith)

119.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 118 of this Complaint, and further allege against Defendant as follows:

120.    Emery owes the Corporation and Guttenberg the fiduciary duty of good faith which requires that he discharge corporate responsibilities in good faith and with conscientious fairness, morality and honesty in purpose, and displaying good and prudent acts in management of the corporation.

121.    In order to relieve himself of his obligations under the Shareholder and Employment Agreements upon withdrawing from the Corporation, Emery has breached his fiduciary duty of good faith by, *inter alia,* engaging in the actions alleged in paragraphs 30 through 57 and 62 through 65 above as well as the following:

a.    seeking to establish and taking actions to establish an office within the District of Columbia in direct competition with the Practice;

b.    soliciting in breach of his fiduciary duty, Breeyear, and possibly other of the Corporation's employees to leave the Practice and establish a practice with Emery;

c.    engaging in acts of dishonesty, or that are morally incorrigible, intended to harm, destroy or dissolve the Corporation, including, but not limited to, blackmailing Guttenberg, stealing company property (the Employee Claim file and Breeyear's annual evaluations), harassing Breeyear and Guttenberg, seeking to destroy the morale of the Corporation's employees, and committing corporate waste by seeking to train Corporation Employees to take over functions in his new practice, whereas, there are Corporation employees who are already trained in these functions;

d.      Refusing to reinstate the corporate charter, concealing from the Corporation and its President that the charter had been revoked, and therefore exposing the Corporation and its shareholders to potential liability;

e.      Failing to support the Corporation in its litigation against the Employee Claim by pursuing the Unilateral Agreement, which if exposed during litigation would have adversely effected the Corporation and its shareholders; and

f.      Breaching the non-solicitation covenant by directing referral dentists and physicians to himself and not to the practice.

122.    As a direct and proximate result of Emery's breaches of his fiduciary duty of good faith, Plaintiffs have suffered, and will continue to suffer compensatory damages in excess of $75,000 in an amount to be proven to at trial.

123.    Emery knowingly, willfully and wantonly breached his fiduciary duties in reckless disregard for the consequences, and is liable to the Plaintiffs for punitive damages.

WHEREFORE, on Count VIII of this Complaint, Plaintiffs demand judgment against Defendant Emery for compensatory damages in excess of $75,000 in an amount to be proven at trial and $5,000,000.00 in punitive damages, plus interest and the costs of this action, and such other and further relief as this Court deems just and proper.

### COUNT IX
(Intentional Infliction of Emotional Distress-Plaintiff Guttenberg)

124.    Plaintiff Guttenberg incorporates herein by reference the allegations contained in paragraphs 1 through 123 of this Complaint, and further alleges against Defendant as follows:

125.   Emery's actions were taken in order to intentionally inflict emotional distress, including stress and anxiety upon Guttenberg and to embarrass Guttenberg in the professional community.

126.   Emery, as a health care provider, is aware that stress and anxiety will cause physical injury.

127.   As a result of Emery's intentional acts, Guttenberg has suffered emotional distress, including stress, anxiety, and the physical injury associated with such stress and anxiety and is entitled to compensatory damages.

128.   Defendant's conduct was intentional, reckless and in deliberate disregard of a high degree of probability that emotional distress would result to the Plaintiff Guttenberg.

129.   The aforesaid conduct by Defendant was extreme and outrageous and beyond the bounds of decency in society.

130.   The conduct of Emery was malicious, willful and intentional.

131.   As a direct and proximate result of Emery's breaches of his fiduciary duty of good faith, Plaintiff has suffered, and will continue to suffer compensatory damages.

132.   Emery knowingly breached his fiduciary duties in reckless disregard for the consequences, and is liable to the Plaintiff for punitive damages.

WHEREFORE, as to Count IX of this Complaint, Plaintiff Guttenberg demands judgment against Defendant Emery for compensatory damages in an amount to be proven at trial, and $2,000,000 in punitive damages, plus interest and the costs of this action, and for such other and further relief as this Court deems just and proper.

## COUNT X
(Promissory Estoppel)

34

133.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 131 of this Complaint, and further allege against Defendant as follows:

134.    The Defendant made clear and unambiguous promises  to Plaintiffs to practice oral and maxillofacial surgery with Plaintiffs. His intent is evidenced in the Agreements and in the course of conduct by the Defendant since 1990.

135.    The Defendant knew, or reasonably should have known that the Plaintiffs would rely on the promises of the Defendant.

136.    The Plaintiffs did, in fact, rely on the Defendant's promises, and did, in fact, compensate the Defendant handsomely, and did, in fact,  promote Defendant's practice and career as more fully set forth in paragraphs 11 through 29.

137.    The Defendant breached his promises to Plaintiffs when he violated the terms of the Agreements and the trust imposed on him by Plaintiffs, as more fully set forth in paragraphs 30 through 57 and 62 through 65 above.  As a result of his breaches of promise, the Plaintiffs suffered economic loss.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,000 in an amount to be determined at trial, plus interest and the costs, and such other and further relief as this Court deems just and proper.

## COUNT XI
(Tortious Interference with Business Relations
and Prospective Economic Advantage)

138.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 137 of this Complaint and further allege against Defendant as follows:

139.    The Defendant violated the terms of his Agreements and understandings with Plaintiffs without cause or justification, as more fully set forth in paragraphs 30 through 57 and 62 through 65 above.

140.    All such conduct was intentional and willful, calculated to cause damage and loss to the Plaintiffs in their lawful business, and done with the unlawful purpose of causing such damage and loss without justifiable cause or right. Such conduct was further wanton, malicious and outrageous, showing a conscious indifference to the consequences of Defendant's actions.

141.    As a direct result of Defendant's interference with the Plaintiffs' business relations and prospective economic advantage, Plaintiffs have suffered, and will continue to suffer, substantial damages to their business relations and expectancies.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,000, in an amount to be determined at trial, and punitive damages in the amount of $5,000,000, plus interest and costs, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

Geoffrey P. Gitner (D.C. Bar No. 176479)
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
Ph: (202) 772-5926

*Richard T. Tomar*

Richard T. Tomar (D.C. Bar No. 13094)
KARP, FROSH, LAPIDUS, WIGODSKY &
NORWIND, P.A.
2273 Research Blvd., Suite 200
Rockville, Maryland 20850
Ph: (301) 948-3800

*Counsel to the Plaintiffs*

## **VERIFICATION**

I, Dr. Steven Guttintiff, being sworn, as the President of the Corporate Plaintiff, and

as an individual Plaintiff herein, have personal knowledge of the facts alleged herein, and

hereby verify under oath that the factual set forth in this Complaint are to the best of my

knowledge true and correct.

Dr. Steven A. Guttenberg

SUBSCRIBED AND SWORN TO
BEFORE ME THIS _15_ DAY OF JANUARY, 2008

Notary Public

My Commission Expires On: _7/31/12_

My Commission Expires July 31, 2012
MARGARET ALBANONTE
Notary Public

personally known to me or has/have produced
_____ as identification.
is/are _____

38

# Exhibit 2

EXHIBIT D

EMERY EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of this 30th day of July, 1990, by and between Steven A. Guttenberg, D.D.S., P.C. ("Employer") and Robert W. Emery, D.D.S. ("Employee").

WITNESSETH:

WHEREAS, the Employer is a professional corporation authorized to practice dentistry in the District of Columbia through individuals licensed to practice dentistry in the District of Columbia ("Practice"), and wishes to acquire the services of the Employee to render professional services for it; and

WHEREAS, the Employee is a licensed dentist in the District of Columbia, and wishes to perform such services for the Employer, all in accordance with the following terms, conditions and provisions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency all of which is hereby acknowledged, the parties hereto agree as follows:

1.  Term of Employment.  Effective from and after the date hereof until December 31, 1990, the Employee shall faithfully serve the Employer in its Practice.

2.  Renewal Terms.  This Agreement shall be automatically renewed from year to year, unless otherwise terminated as hereinafter provided.

3.  Duties.

a.  The Employee is engaged as a Dentist by the Employer, and shall diligently and conscientiously devote his entire time, attention and energies to the Employer's Practice. The Employee shall, at all times during the term hereof:

(1)  Observe and conform to all laws, customs and standards of professional ethics and practice as may from time to time be applicable during the term hereof.

(2)  Keep and maintain, or cause to be kept and maintained, appropriate records relating to all professional services rendered by him.

(3)  Prepare and attend to, in connection with such services or reports, claims and correspondence, necessary or appropriate in the circumstances.

(4)  Attend professional conventions and postgraduate seminars, participate in professional societies, and engage in all other activities necessary, useful and/or desirable, as may be determined in the sole discretion of the Board of Directors from time to time, to maintain and improve his professional skills.

(5)  Promote the Practice by entertainment or otherwise as and to the extent permitted by law, the applicable Canons of Professional Ethics, and the professional practice of the Employer.

b.  The Employee shall not, at any time during the term of this Agreement, be engaged in any other practice of dentistry, whether or not such activity is pursued for gain, profit or pecuniary advantage.  If the Employee is elected or appointed a Director or Officer of the Employer, at any time during the term hereof, the Employee will serve in such capacity or capacities without further compensation; but nothing herein shall be constructed as requiring the election or employment of the Employee as such Director or Officer.

4.  <u>Limitation on Duties</u>.  The Employee shall, at all times, discharge his duties in consultation with, and under the direction, approval and control of the Board of Directors of the Employer; provided, however, that the Board of Directors shall not interfere with the Employee's exercise of his professional judgment in the rendering of dental opinions or in the providing of dental treatment.  Except in the area of the exercise of this Employee's professional judgment, the Employer reserves the absolute right to veto, in its sole and absolute discretion, whether with or without cause, as it deems fit, any and all actions taken or to be taken by the Employee on behalf of the Practice.

5.  <u>Compensation</u>.

a.  The Employee shall be entitled to have a base salary of Eighty Thousand and 00/000 Dollars ($80,000.00) per

- 2 -

annum and to receive, as a bonus, a percentage of the total
dollars available for compensation of all stockholder/employees,
an amount based on the following percentages and adjusted,
pursuant to 5.b. below:

|  | Dr. Guttenberg | Dr. Emery |
|---|---|---|
| Calendar Year One | 75.0% | 25.0% |
| Calendar Year Two | 70.0% | 30.0% |
| Calendar Year Three | 65.0% | 35.0% |
| Calendar Year Four | 60.0% | 40.0% |
| Calendar Year Five | 55.0% | 45.0% |
| Calendar Year Six and Thereafter | 50.0% | 50.0% |

      b.    The compensation under Section 5.a. above
shall be adjusted, on an annual basis, by an amount (the "Buy-In
Adjustment"), which shall be added to Dr. Guttenberg's total
amount and subtracted from Dr. Emery's total amount.   For
purposes of this agreement, the Buy-In Adjustment shall be
calculated as follows:

      i. First, the amount of total dollars
available for compensation of Guttenberg and Emery shall be
calculated;

      ii. Second, from the amount calculated above,
there shall be subtracted $380,000, representing base compensa-
tion of $300,000 per annum for Guttenberg (the "Guttenberg Base")
and $80,000 per annum for Emery (the "Emery Base");

      iii. Third, the sum of $37,000 shall be
subtracted from the amount calculated in ii above;

      iv. Fourth, the amount calculated in iii.
above shall be multiplied times the Emery factor for the year, as
stated in b. above; and

      v. Fifth, the Buy-In Adjustment shall be 50%
of the amount calculated in iv. above plus $37,000.

      c.    The Buy-In Adjustment shall continue until
the amount of $370,000, plus interest at an annual rate of nine
and one-half percent (9.5%) compounded annually, on the unpaid
amount of $370,000 until paid (the "Buy-In Amount"), shall have
been allocated to Dr. Guttenberg under the above section.   The

- 3 -

entire amount of the unpaid Buy-In Adjustment may be paid at any time by Dr. Emery directly to Dr. Guttenberg, without penalty.

d.    The Buy-In Amount shall be increased in the event of any change in the tax laws of the United States that provides for a different rate for capital gains taxation than for ordinary income, by the use of the following formula:

$$A = \frac{B \ (OT-CT)}{1-OT}$$

$$-\frac{(31-28)}{1-31}$$

where A = adjustment to Buy-In Amount;
   B = Buy-In Amount;
   OT = highest federal tax rate for ordinary income of individuals pursuant to Internal Revenue Code Sections 1(a) through 1(d); and
   CT = highest federal tax rate for capital gains of individuals.

e.    In any year in which there shall not be sufficient profit in order to pay both the Guttenberg Base and the Emery Base, the difference between the profit available and the total of the Guttenberg Base and the Emery Base (the "Shortfall") shall be subtracted from the Guttenberg Base.  The amount so subtracted from the Guttenberg Base (the "Guttenberg Reduction") shall be added to the Buy-In Amount, and such amount shall be allocated to Guttenberg as part of a Buy-In Adjustment in the next year without reference to Section 5.b.iv. above.  In other words, the Guttenberg Reduction shall be repaid from the first dollars available from Dr. Emery's bonus, after payment of the Emery Base.

f.    The Employee shall be entitled to have and receive such compensation, payable in cash, not less frequently than quarterly and not later than the tenth (10th) day following the expiration of the calendar quarter in question; provided, however, and subject to Paragraphs 2, 13 and 14, that no such compensation shall be paid in respect of any calendar year or a portion thereof subsequent to the termination of this Agreement. In addition, the Board of Directors of the Employer may, from time to time, but shall not be obligated to, grant bonuses to the Employee.  The Employer shall deduct and withhold all necessary Social Security and withholding taxes, and any other similar sums required by law, from the Employee's compensation.

g.    For the purpose of calculating Employee's compensation and bonus under this Paragraph 5, this Employment

- 4 -

Agreement shall be deemed effective as of January 1, 1990.

6.    <u>Fringe Benefits</u>.  The Employer may, from time to time, grant to the Employee such fringe benefits as the Employer may determine in its sole discretion.  Notwithstanding anything hereinabove to the contrary, the Employer may discontinue or modify any of the fringe benefits which it may grant under this Paragraph 6 at any time due to economic, tax or other business reasons, as determined in the sole discretion of the Board of Directors of the Employer.

7.    <u>Billing and Collections</u>.  All billing and collec-tions shall be done only by the Company, or at the direction of the Employer.  The Employee will in no way attempt to collect fees from Employer's patients except at the direction of the Employer's Board of Directors.

8.    <u>Covenants</u>.  The Employee covenants and warrants to the Employer that:

a.    <u>Non-Solicitation</u>:  The Employee shall not, either personally or through any individual, association, partnership, corporation or entity, solicit or induce, or attempt to solicit or induce, in any manner whatsoever (i) any past or present patient of the Practice, from seeking consultation with, or treatment from, the Practice, or (ii) any dentist to refrain from referring any patients to the Practice for such consultation or treatment.  For the purpose of this Agreement, the term "patient" shall mean any person, or the parent or guardian of any person, who has received dental treatment by the Practice within five (5) years prior to the execution of this Agreement and continuing for five (5) years after the termination of Employee's employment with Employer.

b.    <u>Non-Disclosure Covenants</u>.  The Employee acknowledges that the list of the Practice's patients, as it may exist from time to time, is a valuable, special and unique asset of the Practice, and shall not, inadvertently or otherwise, disclose the list of the Practice's patients, or any part thereof, to any person, association, partnership, corporation or other entity for any reason or purposes whatsoever.  The Employee further acknowledges that all information, knowledge and data connected with or related to the Practice, including, without limitation, all techniques, methods, systems, methodologies, facts, data or other information, of whatever kind and whatever form, concerning the business or affairs of the Practice, are valuable, special and unique assets of the Practice, and that

- 5 -

Employee shall not, disclose or divulge any such information, knowledge or data, to any person, association, partnership, corporation or entity for any reason or purpose whatsoever.

c.  <u>Covenant Not to Compete</u>.  The Employee covenants and agrees that Employee shall not enter into or engage in any business competitive with that of the Practice, either as an individual or on his own account, or as a partner or joint venturer, or as an officer, director or stockholder of a corporation or otherwise, for the three (3) year period commencing after the termination of his employment with Employer, within the District of Columbia.  The Employee represents and warrants that his background, training and experience are such that the restrictions contained in this Paragraph 8, in general, and this Paragraph 8C, specifically, shall not result in an inability on his part to pursue a livelihood, and that other alternatives or representations of employment or business endeavors are reasonably available to him.  This covenant is hereby deemed to be independent of any other provision of this Agreement, and the existence of any claim or cause of action by the Employee against the Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to its enforcement.  The Employee may relieve himself of the obligation to be bound by the covenants of this Paragraph 8C after Employee's employment has been terminated, by paying to the Employer the sum of Five Hundred Thousand Dollars ($500,000.00).

d.  <u>Breach or Anticipatory Breach of Covenants</u>. In the event of a breach or anticipatory breach by the Employee of his obligations under this Paragraph 8, the Employee hereby acknowledges and stipulates that the Employer shall not have an adequate remedy at law, shall suffer irreparable harm, and, therefore, it is mutually agreed and stipulated by the parties hereto that, in addition to any other remedies at law or in equity which the Employer may have, the Employer shall be entitled to obtain in a court of law and/or equity a temporary and/or permanent injunction restraining the Employee from any further violation or breach of such covenants.  In the event of a breach or threatened breach of a covenant by Employee, Employer shall give Employee written notice of said breach or threatened breach and shall give Employee a reasonable time to cure said breach or threatened breach.  The giving of said notice shall not prevent Employer from seeking and obtaining injunctive relief from said breach or threatened breach during the period within which Employee may cure said breach or threatened breach.  In the event that any one or more of the provisions contained herein shall, for any reason, be held to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be construed as limiting and reducing it as determined by a

- 6 -

court of competent jurisdiction and shall be enforceable to the extent compatible with applicable law. The Employee further agrees to indemnify and hold harmless the Employer from all damages and costs, including reasonable attorney's fees, relating to the enforcement of this Paragraph 8, incurred by the Employer arising out of the Employee's breach or threatened breach of this Paragraph 8. Nothing in this Agreement will be construed as prohibiting the Employer from pursuing any other remedies available to it for a breach or threatened breach of this Paragraph 8. The provisions of this Paragraph 8 will survive the termination of this Agreement and/or Employee's employment.

9. <u>Vacation</u>. The Employee shall be entitled, per annum, to a vacation mutually agreed upon by the Employer and the Employee from year to year. The vacation shall be taken on reasonable prior notice to the Employer, and at a time and manner mutually agreed upon by both parties not to interfere with the proper operation of the Practice. The Employee shall not have the right to accrue any unused vacation time, without the prior written consent of the Board of Directors of the Employer. In the event of the termination of this Agreement as set forth in Paragraph 12, whether with or without cause, the Employer shall not be obligated hereunder to pay for any portion of any accrued, but unused, vacation time.

10. <u>Leave of Absence</u>. In addition to the aforesaid vacation, the Employee shall be entitled, without loss of basic pay, to absent himself voluntarily from the performance of his employment with the Employer for such additional periods of time and for such valid and legitimate reasons as the Board of Directors of the Employer, in its discretion, may determine in advance. Further, the Board of Directors shall be entitled to grant to the Employee a leave or leaves of absence, with or without pay, at such time or times and upon such terms and conditions as the Board of Directors of the Employer, in its sole discretion, may determine.

11. <u>Expenses</u>. The Employer recognizes that the Employee will incur, from time to time, for the Employer's benefit and in furtherance of the Employer's Practice, various expenses; and the Employer agrees either to directly pay advance sums to the Employee to be used for expenses, or to reimburse the Employee for said expenses; provided, however, that the Employee shall, at all times during the time of this Agreement, submit to the Employer all necessary documentation, including, without limitation, receipts and vouchers, necessary to substantiate and justify the deductibility of such expenses for income tax purposes and to maintain the books and records of the Employer.

12.  <u>Offices and Assistants</u>.  The Employer shall
provide and pay for suitable office space, facilities, furniture,
fixtures, equipment, supplies and other employees and assistants,
as are suitable to the Employee's position and appropriate for
the performance of his duties.

13.  <u>Conditions of Termination</u>.  Employee's employment
shall terminate on the occurrence of any of the following events:

A.  At any time by mutual agreement in writing
between the Employer and the Employee.

B.  At any time, without cause, at the option of
the Employer, upon six (6) months written notice to the Employee.

C.  At any time, without cause, at the option of
the Employee, upon six (6) months written notice to the Employer.

D.  At any time, with cause, at the option of the
Employer, upon written notice to Employee.  For the purposes of
this Agreement, "with cause" shall include but not be limited to
(1) Employee's repeated failure to discharge his material duties
pursuant to this Agreement after Employer having given Employee
prior written notice thereof; (2) Employee's willful destruction
of Employer's property; (3) the Employee is absent from work on
repeated occasions without the permission of Employer; (4) act of
dishonesty in respect of Employer or any other person either
associated with Employer's business or with whom Employer does
business; (5) Employee repeatedly fails to obey the directions of
Employer; (6) the Employee divulges without Employer's approval
any confidential information obtained in the course of his
employment to any person not employed by the Employer to any
other entity; (7) Employee engages in any contact harmful to
Employee's business; (8) the commission by the Employee of
fraud, embezzlement, theft, misappropriation or any other crime
involving moral turpitude or (9) the license of Employee to
practice dentistry in the District of Columbia is suspended or
revoked.  Nothing in this paragraph shall require Employee to
modify his reasonable professional judgment concerning a patient.

E.  Upon the Employee's license being revoked,
cancelled, suspended or otherwise restricted.

F.  At the death of the Employee.

14.  <u>Termination Compensation</u>.

A.  Upon termination of Employment, the Employer
shall be obligated to pay to the Employee all accrued, but unpaid

- 8 -

compensation due through the effective date of termination, as set forth under Paragraph 5 of this Agreement; provided, however, that if the Employer should terminate Employee's employment under Paragraph 13D, (4), (6), or (8), then the Employer shall have no obligation whatsoever to pay the Employee any accrued, but unpaid, compensation.

B.    Upon termination of Employee under Section 13.B. above, Employer, or the remaining Shareholder of Employer, shall be obligated to pay to Employee a sum equal to one hundred percent (100%) of the cumulative amount of the Buy-In Adjustment credited to Guttenberg under Section 5.c. above.  At the option of Employer, said sum may be paid with fifty percent (50%) paid within thirty (30) days of the termination, and the remaining fifty percent (50%) payable over the term that has elapsed since the execution of this Agreement, with interest at the Prime Rate established by Citibank, New York, New York.

15.  <u>Employee Accounts</u>.  The Employee shall render, as often as may be necessary or appropriate, a true account of all professional visits and all patients attended to in the Practice and of all money received by Employee on account of the Practice, and shall pay the money to the Employer for deposit in the Practice account.

16.  <u>Patients, Patient's Records and Telephone Numbers</u>.

A.    The Employer and the Employee agree that all patients, patients' records, patients' charts, professional records, patients' lists, and patients' telephone numbers are the sole and exclusive property of the Employer.  Upon the termination of this Agreement, for any cause whatsoever, the Employee shall surrender to the Employer, in good condition, any record or records kept by Employee containing the names, addresses and other information with respect to patients or potential patients of the Employer which have been served or treated by the Employee; provided, however, that the Employee shall be entitled to retain all patients and records relating thereto who request to remain with the Employee upon written notification to the Employer to that effect, and provided, further that the furnishing of professional services to any patient who requests to remain with the Employee shall not be deemed a violation of Paragraph 8 of this Employment Agreement unless Employee has solicited any patient in violation of Paragraph 8(a) above.

B.    Upon termination of the Employee's employment relationship with the Employer as contemplated hereunder, whether with or without cause, the Employee shall take all steps reasonably requested by the Employer to transfer all of his patients to

- 9 -

the Employer.

C. At Employer's sole option, all treatment begun by Employee shall be completed by the Employee regardless of termination of this Agreement.

17. <u>Indemnity and Malpractice Insurance</u>. The Employee shall hold harmless and indemnify the Employer, its successors and assigns, from and against any and all liabilities, costs, damages, expenses and attorneys' fees resulting from or attributable to any and all acts and omissions of the Employee; provided, however, that to the extent any such liabilities, costs, damages, expenses and attorneys' fees are compensated for by insurance purchased by the Employer, the Employee shall not be required to reimburse the Employer or the insurer for the same.

18. <u>Resignation as Officer and Director</u>. In the event that the Employee's employment with the Employer is terminated for any reason whatsoever, the Employee agrees to immediately resign as an Officer and Director of the Employer.

19. <u>Repurchase of Stock Upon Termination</u>. The purchase of any capital stock of the Employer which may be owned by the Employee shall be governed by a Shareholders' Agreement between the parties.

20. <u>Assignment</u>. The rights and the obligations of the parties under this Agreement shall not be assignable.

21. <u>Disposition of Equipment Upon Termination</u>. The disposition of certain equipment referred to in a Purchase Agreement of even date herewith between the parties shall be governed by the terms of such Purchase Agreement.

22. <u>Notices</u>. Any and all notices, designations, consents, offers, acceptances or any other communication provided for herein, shall be given in writing, by registered or certified mail, return receipt requested, which shall be addressed, in the case of the Employer, to its principal place of business, and in the case of the Employee, to his personal residence. The effective date of such notice, designation, consent or any other communication provided for herein, any law or statute to the contrary, shall be deemed to have been given at the time it is duly deposited and registered in any United States Post Office or Branch Post Office.

23. <u>Amendment</u>. No modification, amendment, addition to or termination of this Agreement, nor waiver of any of its provisions, shall be valid or enforceable, unless in writing and

- 10 -

signed by all of the parties hereto.

24. <u>Severability</u>. If any term or provision of this Agreement or the application thereof to the Employer or any other person, where circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to the Employer or any other person or circumstances other than as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

25. <u>Governing Law</u>. This Agreement shall be governed by the laws of the District of Columbia.

26. <u>Binding Effect</u>. This Agreement shall be binding upon the parties, their legal representatives, successors and assigns.

27. <u>Captions and Marginal Notes</u>. Captions and marginal notes of this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope or intent of this Agreement, nor in any way affect this Agreement.

28. <u>Grammatical Usage</u>. In constructing this Agreement, masculine or neuter pronouns shall be substituted for those feminine in form and visa versa, and plural terms shall be substituted for singular, and singular for plural, in any place in which the context so requires.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed under seal, with the intent that this be a sealed instrument, as of the day and year first above written.

WITNESS/ATTEST

_____,Secretary

_____

EMPLOYER:

STEVEN A. GUTTENBERG, D.D.S., P.C.

_____ (SEAL)
Steven A. Guttenberg, D.D.S.,
President

EMPLOYEE:

_____ (SEAL)
Robert W. Emery, D.D.S.

- 11 -

# Exhibit 3

L2463.501 P

STOCK PURCHASE AGREEMENT

BETWEEN

STEVEN A. GUTTENBERG, D.D.S.

AND

ROBERT W. EMERY, D.D.S.

DATED July 30, 1990

L2463.501 P

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made this 30th day of July, 1990, by and between STEVEN A. GUTTENBERG, D.D.S. (hereinafter referred to as the "Seller") and ROBERT W. EMERY, D.D.S. (hereinafter referred to as the "Purchaser").

W I T N E S S E T H :

WHEREAS, the Seller owns one hundred percent (100%) of the issued and outstanding stock in Steven A. Guttenberg, D.D.S., P.C., a Professional Corporation authorized to practice dentistry in Washington, D.C. through individuals licensed to practice dentistry in Washington, D.C., with its principal place of business at 916 19th Street, N.W., Washington, D.C. ("Corporation"); and

WHEREAS, the Seller and the Purchaser are licensed dentists in Washington, D.C.; and

WHEREAS, the Seller wishes to sell, assign, transfer and deliver unto the Purchaser, and the Purchaser wishes to acquire, all of the Seller's right, title and interest in and to fifty percent (50%) of the Seller's issued and outstanding stock in the Corporation ("Stock"), all in accordance with the following terms, conditions and provisions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, and for other

- 1 -

good and valuable consideration, the receipt and sufficiency all
of which are hereby acknowledged, the parties hereto agree as
follows:

1.    Sale of Stock.  Subject to the terms, conditions
and provisions of this Agreement, the Seller shall sell, and the
Purchaser shall purchase, all of the Seller's right, title and
interest in and to the Stock.

2.    Surrender of Certificates.  At the time of Closing
specified in Paragraph 4 of this Agreement, the Seller shall
endorse the Stock Certificates for transfer to the Purchaser and
hold the Stock Certificates pursuant to the Stock Pledge
Agreement of even date herewith which is attached hereto as
Exhibit A.

3.    Purchase Price/Time and Manner of Payment.  The
total purchase price for the Stock and for the covenants
contained in Section 5 of this Agreement (collectively, the
"Purchase Price") shall be 50% of the Corporation's "book value"
as determined by the corporate accountant as of December 31,
1989, modified such that depreciation on all furniture, fixtures,
and equipment (except for calculation) shall be recalculated on a
straight line basis over a twelve-year useful life.  Amounts
representing prepaid malpractice insurance premiums and other
prepaid items as of December 31, 1989 shall be added to the
adjusted book value.  The total adjusted book value of the

- 2 -

Downpyment 7cos $4/00

Corporation has been calculated as of December 31, 1989 to be Sixty-Five Thousand Two Hundred and Twenty-Seven Dollars and Forty Cents ($65,227.40). For purposes of this Agreement, the parties have agreed that the stock purchase price shall be Thirty-One Thousand Two Hundred and Fifty Dollars ($31,250.00). The purchase price for the stock will therefore not in any way recognize outstanding accounts receivable or any goodwill of the practice. The total is payable as follows:

a.   Three Thousand Dollars ($3,000.00) in cash or certified check payable to the order of Seller at Closing; and

b.   The remaining sum of Twenty-Eight Thousand Two Hundred and Fifty Dollars ($28,250.00) shall be paid to the Seller by the execution and delivery by the Purchaser to the Seller at the Closing of a promissory note (the "Note") in the form attached hereto as Exhibit B, in such amount.

4.   <u>Closing</u>.   Subject to the terms, conditions and provisions of this Agreement, the Closing shall take place at the offices of Gordon, Feinblatt, Rothman, Hoffberger & Hollander, 1800 K Street, N.W., Suite 600, Washington, D.C. 20006, at a date and time otherwise mutually agreed to by the Purchaser and the Seller. The date on which this Closing is held is referred to herein as the "Closing Date".

5.   <u>Name of the Professional Corporation</u>.   At the time of Closing, the Corporation shall be renamed "Doctors Guttenberg

- 3 -

and Emery, P.C.".

      6.   <u>Representations and Warranties by the Seller</u>.  The Seller represents and warrants to the Purchaser as follows:

      A.   That he is sole legal and beneficial owner of all right, title and interest in and to the Stock.

      B.   That he has the sole and exclusive legal right and authority to enter into this Agreement, and to grant the right, title and interest set forth herein.

      C.   That the Stock shall be sold free and clear of any and all rights, actions, causes of action, claims, suits, damages, demands, amounts owed or alleged to be owed, liabilities, debts, obligations, encumbrances, indebtedness, liens, charges and pledges, of any nature whatsoever, whether fixed or contingent, disclosed or undisclosed, foreseen or unforeseen, as of the date hereof.

      D.   That the execution, delivery and performance of this Agreement by the Seller and the consummation of the transactions contemplated hereunder do not and will not:  (i) violate any provision of, or result in the breach of, or constitute a default under, any law, rule or regulation of any legal jurisdiction, or any order, writ, injunction, judgment, decree of any court, governmental agency or arbitration tribunal; or (ii) constitute a violation of, or a default under, or conflict with, or result in the imposition of an encumbrance,

- 4 -

lien, charge or claim, upon the Corporation, which will result in
the loss of any license, legal right or legal privilege,
possessed by the Seller, pursuant to any term or provision of any
contract, commitment or indenture, instrument or other agreement,
or any other restriction of any kind, to which the Seller is a
party or by which the Seller is or may be bound.

       E.   That no action by any federal, state,
municipal or other governmental department, commission, board,
bureau or instrumentality is necessary to make this Agreement a
valid instrument and binding upon the Seller in accordance with
its terms.

       7.   <u>Representations and Warranties by the Purchaser</u>.
The Purchaser represents and warrants to the Seller as follows:

       A.   That he understands that the sale of the
shares to be sold hereunder will be restricted by federal and
local securities laws and the terms of a Shareholders' Agreement
dated as of the Commencement Date, the form of which is attached
hereto as Exhibit C, that he understands that his execution of
the Shareholders' Agreement is a condition precedent to the
issuance of any shares of stock in the Corporation, and that he
agrees to sign such Shareholders' Agreement prior to the sale of
such shares.

       B.   That prior to the Closing Date, he or his
representative will have personal knowledge as to the operations

- 5 -

of the Corporation, and will have access to and the opportunity to examine all of the Corporation's books and records as of the date hereof, and the opportunity to make inquiry concerning the financial and other affairs of the Corporation and to receive information in response to such inquiries, and is aware of the risks involved in an investment in the Corporation.

C.    That he is acquiring the shares to be issued hereunder for his own account for investment purposes only, and not with a view to the resale or distribution of such shares.

D.    That he shall be bound by an Employment Agreement with the Corporation which is attached hereto as Exhibit D and that a condition of Seller's obligation to sell the Stock shall be that Purchaser's employment has not been terminated with the Corporation as of the Closing Date.

8.    <u>Stock Legend</u>.  The parties hereto agree that the Stock Certificates representing the Stock shall be stamped or otherwise conspicuously imprinted with a legend in substantially the following form:

> The securities represented by this Certificate have been issued pursuant to a claim of exemption from the registration provisions of Federal and State securities laws and may not be sold or transferred without compliance with the registration provisions of applicable Federal and State securities laws or applicable exemptions therefrom.

> The ownership and transfer of these

- 6 -

shares and the rights and obligations of
shareholders are subject to the limitations
of the District of Columbia Professional
Corporation Act.

The transferability of the shares of
stock represented by this certificate are
subject to an Agreement among the
Shareholders of the Corporation and the
Corporation, dated July 30, 1990.  The
Corporation will furnish information
concerning the restriction to any shareholder
of the Corporation on request without charge.

9.    <u>Binding Effect; Not Assignable</u>.  This Agreement
shall be binding upon the parties hereto and their respective
heirs, personal representatives, successors, transferees and
assigns.  Either party's right to purchase Stock in the
Corporation pursuant to this Agreement shall not be assignable
unless that party receives the written consent of the other
party, and shall not be exercisable by either party's heirs or
personal or legal representatives.  Any assignment without the
written consent of the other party shall be null and void and the
other party shall have no obligation to recognize such an
assignment.

10.    <u>Full Ownership Rights</u>.  It is agreed and
understood that, upon the payment in full of all amounts due by
Purchaser, including all principal and interest under the
Promissory Note attached hereto as Exhibit B and full payment of
the Buy-In Adjustment referred to in the Emery Employment
Agreement, attached hereto as Exhibit D, Purchaser shall be a

- 7 -

complete fifty percent (50%) owner of the Corporation with the
same rights and benefits as Seller.

11.  <u>Notices</u>.  Any and all notices, designations,
consents, offers, acceptances or any other communication provided
for herein, shall be given in writing, by registered or certified
mail, return receipt requested, which shall be addressed, in the
case of the Seller and the Purchaser, to their principal
residences.  The effective date of such notice, designation,
consent or any other communication provided for herein, any law
or statute to the contrary, shall be deemed to have been given at
the time it is duly deposited and registered in any United States
Post Office or Branch Post Office.

12.  <u>Amendment</u>.  No modification, amendment, addition
or termination of this Agreement, nor waiver of any of its
provisions, shall be valid or enforceable, unless in writing and
signed by all of the parties hereto.

13.  <u>Severability</u>.  If any term or provision of this
Agreement or the application thereof to the parties or any other
person shall to any extent be invalid or unenforceable, the
remainder of this Agreement or the application of such term or
provision to the parties shall not be affected thereby and each
term and provision of this Agreement shall be valid and be
enforced to the fullest extent permitted by law.

14.  <u>Governing Law</u>.  This Agreement shall be governed

- 8 -

L2463.501 P

in all respects by the laws of the District of Columbia.

     15.  <u>Notice and Opportunity to Cure</u>.  In case of any breach of this Agreement, the breaching party shall be given thirty (30) days written notice of said breach and an opportunity to cure said breach within said thirty (30) day period.

     16.  <u>Effective Date</u>.  This Stock Purchase Agreement and the attached Agreements shall become effective upon the issuance of all of the following insurance contracts:

     (a)  Life insurance on Dr. Guttenberg in the amount of $1,000,000;

     (b)  Life insurance on Dr. Emery in the amount of $500,000;

     (c)  Disability buy-out insurance on Dr. Guttenberg in the amount of $360,000; and

     (d)  Disability buy-out insurance on Dr. Emery in the amount of $360,000.

     IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal, with the intention of making it a sealed instrument, as of the day and year first above written.

WITNESS:               PURCHASER

_____    _____ (SEAL)
                       Robert W. Emery, D.D.S.

        [SIGNATURES CONTINUED ON NEXT PAGE]

- 9 -

SELLER

_____          _____ (SEAL)
                                 Steven A. Guttenberg, D.D.S

- 10 -

# Exhibit 4

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
BUSINESS REGULATION ADMINISTRATION



# C E R T I F I C A T E

THIS IS TO CERTIFY that all applicable provisions of the DISTRICT
OF COLUMBIA BUSINESS CORPORATION ACT have been complied with and
accordingly, this CERTIFICATE of Amendment  is hereby issued to

STEVEN A. GUTTENBERG, D.D.S., P.C.

                              Name Change To
DOCTORS GUTTENBERG AND EMERY, P.C.

as of August  3rd ,  1990 .

                    Donald G. Murray
                    Director

                    Henry C. Lee, III
                    Administrator
                    Business Regulation Administration

                    Ruby Coston- White
                    Superintendent of Corporations
                    Corporations Division

Marion Barry, Jr.
Mayor

C1463.545 P
1:8/1/90

## ARTICLES OF AMENDMENT
## TO THE
## ARTICLES OF INCORPORATION
## OF
## STEVEN A. GUTTENBERG, D.D.S., P.C.

TO:  Department of Consumer and Regulatory Affairs
     Corporation Division
     Washington, D.C.   20001

     Pursuant to the provisions of Title 29, Chapter 3 of
the Code of Laws of the District of Columbia, the undersigned
corporation adopts the following Articles of Amendment to its
Articles of Incorporation:

     FIRST:  The name of the Corporation is Steven A.

Guttenberg, D.D.S., P.C.

     SECOND:  The following amendment of the Articles of

Incorporation was adopted by the shareholders of the Corporation

on July 30, 1990 in the manner prescribed by the Code of Laws of

the District of Columbia.

          The name of the Corporation is hereby changed to
          "Doctors Guttenberg and Emery, P.C."

     THIRD:  The number of shares of the Corporation

outstanding at the time of such adoption was 1,000 and the number

of shares entitled to vote thereon was 1,000.

     FOURTH:  The designation and number of outstanding

shares of each class entitled to vote thereon as a class were as

follows:  None.

     FIFTH:  The number of shares voted for such amendment

was 1,000 and the number of shares voted against such amendment

was zero.

     SIXTH:  The number of shares of each class entitled to

F I L E D

3 - AUG 1990

BY:

C1463.545 P
1:8/1/90


vote thereon as a class voted for and against such amendment, respectively, was:  None.

SEVENTH:  The manner, if not set forth in such amendment, in which any exchange, reclassification, or cancellation of issued shares provided for amendment shall be effected, is as follows:  No change.

EIGHTH:  The manner in which such amendment effects a change in the amount of stated capital, or paid in surplus, or both, and the amount of stated capital and the amount of paid in surplus as changed by such amendment, are as follows:  None.

ATTEST:                         DOCTORS GUTTENBERG AND EMERY, P.C.
                                (formerly Steven A. Guttenberg,
                                D.D.S., P.C.)


_____         By:_____
Robert W. Emery                    Steven A. Guttenberg
Secretary                          Its President


(Corporate Seal)


- 2 -

# Exhibit 5

EXHIBIT C

STEVEN A. GUTTENBERG, D.D.S., P.C.

SHAREHOLDERS' AGREEMENT

BETWEEN

STEVEN A. GUTTENBERG, D.D.S.

AND

ROBERT W. EMERY, D.D.S.

DATED July 30, 1990

STEVEN A. GUTTENBERG, D.D.S., P.C.
SHAREHOLDERS' AGREEMENT
Table of Contents

Page

Recitals . . . . . . . . . . . . . . . . . . . .    1
1.  Restriction on Transfer . . . . . . . . . . .    3
2.  Insurance . . . . . . . . . . . . . . . . . .    3
3.  Purchase of Stock on Death. . . . . . . . . .    5
4.  Purchase Price of Stock Upon Death. . . . . .    6
5.  Closing Date. . . . . . . . . . . . . . . . .    8
6.  Lifetime Restrictions on Shares . . . . . . .    9
    A.  Offers by Third Parties . . . . . . . . .    9
    B.  Termination of Employment . . . . . . . .   11
    C.  Determination of Value  . . . . . . . . .   12
    D.  Settlement. . . . . . . . . . . . . . . .   13
    E.  Death Prior to Transfer . . . . . . . . .   17
    F.  Restrictive Covenant. . . . . . . . . . .   17
    G.  Surplus . . . . . . . . . . . . . . . . .   18
    H.  Stock Certificate Legends . . . . . . . .   18
7.  Option Upon Involuntary Transfer. . . . . . .   19
8.  Disability. . . . . . . . . . . . . . . . . .   19
    A.  Total Disability Defined. . . . . . . . .   19
    B.  Total Disability; Mandatory Sale of Stock . .   21
    C.  Cessation of Total Disability . . . . . .   21
    D.  Death of Totally Disabled Shareholder . . . .   21
    E.  Compensation During Disability. . . . . .   22
    F.  Restrictive Covenant. . . . . . . . . . .   22
    G.  Disability Insurance Purchase . . . . . .   22
9.  Term  . . . . . . . . . . . . . . . . . . . .   24
10  Simultaneous Death. . . . . . . . . . . . . .   24
11. Benefit . . . . . . . . . . . . . . . . . . .   25
12. Amendment and Revocation. . . . . . . . . . .   25
13. Specific Performance. . . . . . . . . . . . .   25
14. Resignation as Officer and Director . . . . .   26
15. Grammatical Usage . . . . . . . . . . . . . .   26
16. Severability. . . . . . . . . . . . . . . . .   27
17. Election of Directors . . . . . . . . . . . .   27
18. Disagreement Between Directors. . . . . . . .   27
19. Additional Actions. . . . . . . . . . . . . .   28
20. Notice. . . . . . . . . . . . . . . . . . . .   28
21. Notice of Breach and Opportunity to Cure. . . . .   29
22. Entire Agreement. . . . . . . . . . . . . . .   30
23. Construction. . . . . . . . . . . . . . . . .   30
24. Waiver. . . . . . . . . . . . . . . . . . . .   30
25. Amendment . . . . . . . . . . . . . . . . . .   30
26. Headings. . . . . . . . . . . . . . . . . . .   30

- i -

<u>EXHIBIT C</u>

STEVEN A. GUTTENBERG, D.D.S., P.C.
<u>SHAREHOLDERS' AGREEMENT</u>

THIS SHAREHOLDERS' AGREEMENT (the "Agreement") is made
as of the 30th day of July, 1990 by and among STEVEN A.
GUTTENBERG, D.D.S. and ROBERT W. EMERY, D.D.S., both of whom are
licensed to practice dentistry in the District of Columbia (the
"Shareholders"), and STEVEN A. GUTTENBERG, D.D.S., P.C., a
professional corporation authorized to practice dentistry in the
District of Columbia through individuals licensed to practice
dentistry in the District of Columbia (the "Corporation").

<u>RECITALS</u>

WHEREAS, upon the Closing pursuant to the Stock
Purchase Agreement dated July 30, 1990 (the "Purchase Agreement")
the Shareholders shall collectively own One Hundred Percent
(100%) of the issued and outstanding stock of the Corporation
(the "Stock"); and

WHEREAS, upon Closing under the Purchase Agreement the
Shareholders will be actively engaged in managing and operating
the Corporation, and the success of the Corporation will be
dependent entirely upon the efforts and cooperation of the
Shareholders, so that all parties hereto are cognizant of the
fact that the death or lifetime sale of the Corporation's Stock
by either of them during the life of the other would
substantially disrupt the harmonious and successful management

and control of the Corporation; and

WHEREAS, the parties to this Agreement wish to provide
for the purchase by the other Shareholder of the shares of Stock
owned by the deceased shareholder in order to prevent
interference with the business policies of the surviving
Shareholder by the family of the deceased Shareholder; and

WHEREAS, the parties to this Agreement wish to provide
for the purchase by the other Shareholder of the shares of Stock
owned by the disabled Shareholder in order to prevent
interference with the business policies of the non-disabled
Shareholder by the family of the disabled Shareholder; and

WHEREAS, the parties to this Agreement wish to provide
for the purchase by the Corporation of the shares of any
Shareholder who wishes to withdraw from the Corporation and to
sell his shares of Stock during his lifetime; and

WHEREAS, the parties to this Agreement which to provide
the funds necessary for the purchase of the shares of Stock of
any Shareholder under the terms of this Agreement, through
insurance to the extent possible, under the terms of this
Agreement; and

WHEREAS, all parties hereto wish to act in concert
toward ownership, management, operation and control thereof; and

WHEREAS, the Shareholders desire to promote their
mutual interests and the interests of the Corporation by imposing

- 2 -

certain restrictions and obligations on the shares of Stock of the Corporation; and

WHEREAS, Emery and Guttenberg have entered into Employment Agreements with the Corporation on even date ("Employment Agreements").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Restriction on Transfer</u>.  Except as hereinafter provided in this Agreement, no Shareholder shall, at any time, sell, assign, pledge, hypothecate or in any other manner transfer or encumber (hereinafter all such actions are collectively referred to as a "transfer") any or all of the shares of stock of the Corporation now or hereafter owned by him to any persons, firm, association, partnership, corporation, trust or any other entity.  Any purported transfer of such shares not in accordance with the terms herein provided shall be void, and shall not be recognized or recorded on the stock transfer books of the Corporation.

2.    <u>Insurance</u>.  The Shareholders will purchase, and agree to continue in force by the continuous payment of premiums when due, insurance policies in the an amount equal initially to

- 3 -

$1,000,000 on the life of Dr. Guttenberg and $500,000 on the life of Dr. Emery. The Shareholders shall review their needs for insurance at least annually and shall increase the amounts of insurance as necessary to provide sufficient insurance in order to fund the purchase of shares from the estate of a Shareholder who shall become deceased. Each Shareholder shall be the owner of such policy or policies of insurance purchased on the life of the other Shareholder pursuant to the terms of this paragraph, but no rights of ownership in such policy or policies shall be exercised unless written notice of the intention to exercise such right is given to the other Shareholder or Shareholders with the other Shareholder's or Shareholders' consent to the exercise of such right. The beneficiaries of each Shareholder's life insurance policy shall be the other Shareholder, in the amount necessary to allow the other Shareholder to purchase the deceased Shareholder's stock, and, for the remainder of the proceeds of the life insurance policy, the beneficiary shall be the Shareholder's spouse or other designated beneficiary. The amount of insurance for each Shareholder and the allocation to the other Shareholder shall be reviewed at least annually by the Corporation's insurance agent and shall be increased, when and as necessary, so that each Shareholder's policy shall be sufficient at least to allow the other Shareholder to purchase his stock in the event of his death. If a Shareholder is not insurable at the

- 4 -

time any additional insurance is required, the other Shareholder shall take any steps he shall deem necessary to insure that the necessary funds will be available to implement this agreement.

3.    <u>Purchase Of Stock On Death</u>.  Upon the death of any Shareholder, the Corporation's Stock owned by the deceased Shareholder shall be purchased and the estate of the deceased Shareholder shall sell to the other Shareholder all of the deceased Shareholder's Stock in the Corporation (whether held individually, jointly, beneficially, or constructively) now owed or hereafter acquired by him.  The purchase price of the Stock shall be equal to the lower of:  (a) the amount of insurance then in effect for the decedent Shareholder, or (b) the price calculated under Section 4 below.  Each Shareholder agrees that any shares of Stock owned by him in the Corporation at the time of his death shall be sold and transferred by the legal representative of his estate pursuant to the terms and conditions of this Agreement.  Upon transfer of the Stock, as set forth above, the Shareholder receiving the Stock shall provide the deceased Shareholder's estate with a complete and absolute release of all the obligations of the deceased Shareholder under the Stock Purchase Agreement, Stock Pledge Agreement, Promissory Note, this Shareholders' Agreement, and the Employment Agreement (hereinafter collectively referred to as the "Agreements").

- 5 -

### 4.   Purchase Price of Stock Upon Death

A.   Upon the death of a Shareholder, the other
Shareholder shall purchase all (but not less that all) of the
shares of stock of the Corporation owned by the Shareholder at
the time of his death for a per share purchase price as follows:
(i) if the Shareholder has been employed by the Corporation for
less than five (5) years or, in the case of Robert W. Emery, if
Dr. Emery has not completed the Buy-In Adjustment specified in
the Employment Agreement of even date hereof, then the greater of
(a) the accrual basis book value of each of such shares, or (b)
the amount such Shareholder paid for such shares; or (ii) if the
Shareholder has been employed by the Corporation for longer than
five (5) years or, in the case of Robert W. Emery, if Dr. Emery
has completed the Buy-In Adjustment specified in the Employment
Agreement of even date hereof, the Purchase Price as determined
under the procedure described in B. below.

B.   The other Shareholder ("Purchasing
Shareholder") and the personal representatives of the deceased
Shareholder shall have 90 days from the date of death of the
deceased Shareholder to agree on the Purchase Price.  If, after
the 90-day period, the Purchasing Shareholder and the personal
representatives of the deceased Shareholder shall not have agreed
in writing to a Purchase Price, then the Purchasing Shareholder
and the personal representatives of the deceased Shareholder

- 6 -

shall select an independent appraiser to determine the value of the deceased's shares, which determination shall be binding on all parties.   If the Purchasing Shareholder and the personal representatives of the deceased Shareholder have not agreed on an independent appraiser within 20 days following the aforementioned 90-day period, then for 15 days following the aforementioned 20-day period, the Purchasing Shareholder shall have the right to select one independent appraiser and the personal representatives of the deceased Shareholder shall have the right to select one independent appraiser, and the average of the two resulting appraisals shall be the Purchase Price.   Prompt notice of such selection by the Purchasing Shareholder or by the personal representatives of the deceased Shareholder during this 15-day period shall be given in accordance with Section 21 hereof.   If either the Purchasing Shareholder or the personal representatives of the deceased Shareholder fails to select an appraiser, then the determination of the appraiser selected by the other party shall be the Purchase Price, which determination shall be binding on all parties.   The Purchasing Shareholder will furnish the independent appraisers with all data reasonably requested by them and will cooperate fully in the appraisal process.   The Purchasing Shareholder and the personal representatives of the deceased Shareholder, will each request that the appraisers render their opinion, in writing, as expeditiously as possible.

- 7 -

C.   Each Shareholder agrees that upon receipt of cash in full payment for his shares of Stock, he, or the legal representative of his estate, as the case may be, shall deliver the certificates for Stock subject to this Agreement to the Corporation.  The legal representative of the decedent's estate shall also execute and deliver to the Purchasing Shareholder all the documents which are required to transfer the decedent's Stock to the Purchasing Shareholder.  If the Purchasing Shareholder gives a Note to the estate of a deceased Shareholder in partial payment of the shares herein purchased and sold, the estate of the deceased Shareholder shall be entitled to retain possession of the certificates for such shares until the purchase price for the shares if paid in full.

5.   <u>Closing Date</u>.  Unless otherwise agreed by the parties, the Closing of the sale and purchase of Shares shall take place at the principal place of business of the Corporation. In the case of a purchase of Shares from a deceased Shareholder's estate, the Closing shall take place ninety (90) calendar days after the appointment of a personal representative for the deceased Shareholder's estate.  In the case of a purchase of Shares from a disabled Shareholder (as hereinafter defined), or upon the voluntary withdrawal, the Closing of the sale and purchase shall take place, in the case a disabled Shareholder, ninety (90) calendar days after the conclusion of the required

- 8 -

period of disability.

      6.    <u>Lifetime Restriction on Shares.</u>

        A.    <u>Offers by Third Parties</u>.

          A.1.  In the event that at any time a Shareholder desires to sell any part or all of his shares of stock of the Corporation and receives a bona fide written offer to purchase such shares of stock from a third party (a "Proposed Purchaser"), the Shareholder shall give prompt written notice to the Corporation of such offer and intention to sell (the "Selling Notice"); provided, however, that the Selling Notice shall not be delivered and the shares shall in no event be sold unless the Proposed Purchaser is licensed to practice dentistry in Washington, D.C., has executed an agreement to be bound by and become signatory to an Employment Agreement and a Shareholders' Agreement identical to those executed by Doctors Guttenberg and Emery on July 30, 1990, unless amended, in which event those amendments shall prevail.  The Selling Notice shall set forth the following:  (i) the identity of the Proposed Purchaser; (ii) the number of shares the Proposed Purchaser has offered to purchase from the Shareholder; (iii) all of the terms and conditions of such offer of purchase; (iv) the Purchaser's acknowledgement of his review of the Employment and Shareholder Agreement and willingness to be bound and become a signatory thereto; and (v) the Shareholder's offer to sell such shares to the Corporation in

- 9 -

accordance with the terms of this Section 6.

A.2.  The Corporation shall have the option to purchase all (but not less than all) of the shares of stock of the Corporation offered in the Selling Notice, as hereinafter provided, for a per share purchase price equal to the lesser of: (i) the per share price set forth in the Selling Notice; or (ii) the accrual basis book value of each of such shares.  The Corporation shall have the option to purchase all (but not less than all) of the shares for a period of thirty (30) days.  Such option shall be exercised by giving written notice within thirty (30) days after the date of the Selling Notice to the selling Shareholder setting forth the Corporation's intention to purchase the shares.  If the Corporation shall not exercise its option to purchase the shares of stock of the Corporation offered in the Selling Notice, then the remaining shareholders, either individually or collectively, on a prorata basis, according to their percentage ownership of the Corporation, shall have the same right to purchase the shares of stock as the Corporation had and as specified above.

A.3.  Settlement for the purchase of the shares in accordance with this Section 6 shall take place within ninety 90 days after either the date of the Selling Notice or the determination of the accrual basis book value of such shares, whichever is later, in accordance with Section 7.D.1 of this

- 10 -

Agreement.   Payment of the purchase price shall be in accordance with the terms and conditions set forth in Section 6.D.2 of this Agreement.

A.4.   In the event that the Corporation does not exercise the option afforded it by this Section 6, then the selling Shareholder shall be free to sell such shares pursuant to the bona fide offer received by him at any time for a period of sixty (60) days from the date the Shareholders' option expired; provided, however, that: (i) any such transferee must be licensed to practice dentistry in Washington, D.C. and must be an employee of the Corporation, and (ii) the transferee agrees in writing to be bound by all the terms and conditions in this Agreement.   If the Shareholder does not sell such shares within such 60 day period, then he must again offer his shares to the Corporation and the other Shareholders in accordance with the terms of this Section 7 before selling such shares.

B.    Termination of Employment.

B.1.   In the event that at any time a Shareholder's employment with the Corporation is terminated by the Corporation for any reason (other than his death as provided in Section 4, above or his disability as provided for in Section 8, below), the Corporation shall purchase all (but not less than all) of the terminated Shareholder's shares of stock of the Corporation for a per share purchase price equal to the greater

- 11 -

of (i) the accrual basis book value of each of such shares; or (ii) the amount such Shareholder paid for such shares when they were purchased from the Corporation.

B.2. In the event that at any time a Shareholder's employment with the Corporation is terminated by the Shareholder after the Shareholder has reached the age of 55, the Corporation shall purchase all (but not less than all) of such Shareholders' shares of stock of the Corporation for a per share purchase price equal to the accrual basis book value of each of such shares. As set forth in these Agreements, "accrual value" or "accrual book value" shall be computed by said independent accountant pursuant to and following the Generally Accepted Accounting Principles governing accounting professionals.

B.3. Settlement for the purchase of the shares in accordance with this Section 7.B shall take place within ninety (90) days after either the date of such termination or the determination of the accrual basis book value of such shares, whichever is later, in accordance with Section 7.D.1 of this Agreement. Payment of the purchase price shall be in accordance with the terms and conditions set forth in Section 6.2 of this Agreement.

C.    Determination of Value. For the purposes of this Agreement, the accrual basis book value of the shares and/or

- 12 -

the Formula shall be determined as of the last day of the last
complete fiscal year of the Corporation which occurred prior to
the day the Selling Notice was delivered (as provided in Section
8.A, above); the date on which the Shareholder ceases to be
employed by the Corporation due to his death (as provided in
Section 6, above); or the date the Shareholder's employment with
the Corporation was terminated or the Shareholder quits or
retires (as provided in Section 7.B, above) (collectively
referred to as a "Date of Termination").  The accrual basis book
value of the shares and/or the Formula shall be determined by the
independent certified public accountant regularly serving the
Corporation, and such determination shall be final and binding
upon the parties hereto for the purposes of this Agreement,
except in the event of fraud or mistake.  Each shareholder may,
at his option and sole expense, hire his own accountant to review
the work of the Corporation's independent accountant.  The
Corporation shall cause such determination to be made as
promptly as possible after the Date of Termination.  The
Shareholders hereby agree that such a determination of accrual
basis book value shall be made annually by the independent
certified public accountant regularly serving the Corporation.

       D.   <u>Settlement</u>.  Settlement for the purchase of
the shares shall take place as hereinafter provided.

       D.1.  At settlement, which shall occur at the

- 13 -

times set forth in Sections 6, 7.A and 7.H of this Agreement, the selling Shareholder, or the personal representatives of the deceased Shareholder, shall deliver to the Corporation a certificate or certificates representing the shares being sold properly endorsed in blank.

D.2.  Unless otherwise agreed, the purchase price for the shares (as provided in Sections 6, 8.A and 8.B, above) shall be payable by the Corporation by the delivery at settlement to the selling Shareholder, or the personal representatives of the deceased Shareholder, of a promissory note.  The purchase price shall be paid by means of a Promissory Note, calling for one hundred twenty (120) consecutive equal monthly payments of principal with interest thereon at the Citibank Prime Rate then in effect plus one percent (1%) determined as follows:  For the period of time from the execution of the Note to the last day of the first twelve (12) months in questions, the interest rate in each month therein shall be the Citibank Prime Rate in effect as of the last day immediately preceding the commencement of the Note, plus one percent (1%). The interest rate for each month in each successive year shall be the Citibank Prime Rate if effect as of the last day of the immediately preceding year plus on percent (1%).

Notwithstanding the above, if such an arrangement is found to be unacceptable by any taxing authority, then in all

- 14 -

cases, at such interest rate as determined by the taxing authority. The Note shall be unsecured as to the Corporate Maker, but shall be guaranteed by each surviving or remaining Shareholder and all shares owned by each such surviving or remaining Shareholder shall be pledged to the Payee of the Note to secure the payment of the guaranteed. The Note shall provide that the Maker shall have an unlimited right of prepayment without penalty, and shall further provide for acceleration at the option of the holder in the event of default in the payment of any installment of principal or interest, if such default continues for a period of 30 days after the maker receives written notice of such default; furthermore, the promissory note shall be personally guaranteed by the other Shareholders. Notwithstanding the foregoing provisions of this Section 4.2, in the event that the shares are being purchased by the other Shareholder following the death of a Shareholder and the other Shareholder receives proceeds from any life insurance policy purchased on the life of the deceased Shareholder, the purchase price for the shares shall be payable by the other Shareholder in cash at the settlement to the extent of the amount of such life insurance proceeds received by the other Shareholder. In the event that the shares are being purchased by the other Shareholder following the disability of a Shareholder, the other Shareholder shall be entitled to an offset against the purchase

- 15 -

price payable to the Shareholder equal to the amount of any payments received by the Shareholder pursuant to any disability policy maintained by the other Shareholder on behalf of the Shareholder.

D.3  A Shareholder may elect to retire from the practice of dentistry upon reaching the age of fifty-five (55) years, or earlier, with the permission of the other Shareholder.  Notwithstanding the foregoing provisions of this Section 7.D, in the event that a Shareholder should retire from the practice of dentistry, receive payment for his shares as provided for in Section 7.D.2 of this Agreement and at any time, except as provided below, subsequently return to the practice of dentistry in the District of Columbia on a full or part-time basis without the prior written consent of the Corporation, or in the event that a Shareholder shall be in breach of any covenant not to compete with the Corporation found in any other agreement, the Corporation shall no longer be required to make any payment to the Shareholder on any promissory note required hereunder, and, within thirty (30) days of his unauthorized return to the practice of dentistry, the Shareholder shall pay the Corporation an amount equal to the difference between the amount actually received by the Shareholder hereunder for his shares, and the amount the Shareholder would have been entitled to receive pursuant to Section 7.B.2 hereof if the Shareholder's employment

- 16 -

with the Corporation had been terminated, together with interest on the amount due at that rate of interest per annum provided in Section 8.D.2 hereof.  Notwithstanding anything contained to the contrary in this Section 8.D.3, the forfeiture and repayment provisions of this Section 8.D.3 shall not apply by reason of a retiring Shareholder working at an emergency room treating emergencies, being employed by a company for the exclusive purpose of treating the company's employees, or performing administrative or teaching duties for a hospital or other teaching facility.

E.    <u>Death Prior to Transfer</u>.  If a Shareholder who proposes to transfer Shares does prior to the Closing of the sale and purchase, his Shares shall be subject to sale and purchase under Section 6.

F.    <u>Restrictive Covenant</u>.  In the event that a Shareholder wishes to sell, transfer, encumber, gift or otherwise dispose of all or any portion of his Stock, or, withdraws from the Corporation under the terms of this Article 7, the withdrawing Shareholder shall comply with the terms, conditions and provisions of his Employment Agreement.  In the event the Shareholder breaches any of the terms set forth in his Employment Agreement, and, the Corporation is, in whole or in part, a purchasing party of such Shareholder's Stock, then the withdrawing Shareholder shall be obligated to pay to the

- 17 -

Corporation under the terms, conditions and provisions of the Employment Agreement, the amount of Five Hundred Thousand Dollars ($500,000.00).

In addition, the Corporation shall have, in the event of such a breach, all other rights and remedies to which it is otherwise entitled under the Employment Agreement and by law.

G.  <u>Surplus</u>.  If, on the date of settlement or at the due date of any payment of any installment of principal or interest on any promissory note, the Corporation does not have sufficient surplus to make the payment provided for by such note, then the Corporation shall promptly take such good faith action as may be required to create a surplus that would permit it to pay any such installments of principal or interest, including, but not limited to, the recapitalization of the Corporation so as to reduce its capital and increase its surplus, or a reappraisal of the assets of the Corporation to reflect the fair market value of the assets in the event such fair market value exceeds book value thereof.

H.  <u>Stock Certificate Legends</u>.  The Shareholders agree to cause all of the certificates representing the stock of the Corporation now owned by them or hereafter owned by them to carry the following legend:

The transferability of the shares of

- 18 -

> stock represented by this certificate are
> subject to an Agreement among the
> Shareholders of the Corporation and the
> Corporation, dated July 30, 1990.  The
> Corporation will furnish information
> concerning the restriction to any shareholder
> of the Corporation on request without charge.

7.  <u>Option Upon Involuntary Transfer</u>.  If other than by reason of a Shareholder's death Shares are transferred by operation of law to any person other than the Corporation (such as but not limited to a Shareholder's trustee in bankruptcy, a purchaser at any creditor's or court sale or the guardian or committee or an incompetent Shareholder), the Corporation or the remaining Shareholders, within one hundred (100) days of the Corporation's receipt of actual notice of the transfer, may exercise an option to purchase all but not less than all of the Shares so transferred in the same manner and upon the same terms as provided in Article 7 with respect to Shares proposed to be transferred.

8.  <u>Disability</u>.

A.  <u>Total Disability Defined</u>.  "Disability" and the commencement thereof are hereby defined to be:

A.1.  "Disability" shall mean the total and permanent inability of a Shareholder to satisfactorily perform his regular full-time duties as contemplated under his Employment Agreement for eighteen (18) consecutive months; provided, however, that a Shareholder shall be deemed totally and

- 19 -

permanently disabled upon certification by two (2) attending physicians to the Board of Directors of the Corporation that such Shareholder shall be unable to perform his regular full-time duties as contemplated under his Employment Agreement for eighteen (18) consecutive months.  For the purposes of this Agreement, the potentially disabled Shareholder and the Corporation shall each have the right to select one (1) physician to examine the potentially disabled Shareholder, and, in the event that the two (2) physicians do not unanimously agree that the potentially disabled Shareholder meets the definition set forth herein for "disability" the potentially disabled Shareholder and the Corporation shall each have the right to select a third (3rd) physician to re-examine the potentially disabled Shareholder every six (6) months thereafter until the termination of the said eighteen (18) months.

A.2.   The term "commencement of total disability" shall be the date upon which a Shareholder has not performed his regular full-time duties as set forth under his Employment Agreement for eighteen (18) consecutive months, or, the date upon which two (2) physicians certify to the Board of Directors of the Corporation that such Shareholder shall not be able to perform his regular full-time duties as set forth under his Employment Agreement for eighteen (18) consecutive months, whichever event occurs first.

- 20 -

B.    <u>Total Disability; Mandatory Sale of Stock</u>.    If a Shareholder shall become totally disabled, the remaining Shareholders, within sixty (60) days of the date of commencement of such total disability, shall have an option for sixty (60) days thereafter to purchase all but not less than all of the shares owned by the disabled Shareholder at the time of the commencement of his total disability, in the same manner and upon the same terms and conditions as provided in Section 7.    In the event that the remaining Shareholders do not exercise said option, then the Corporation shall purchase said shares within thirty (30) days after the expiration of the sixty (60) day option period in the same manner and upon the same terms set forth in this Section for purchase by the remaining Shareholders.

C.    <u>Cessation of Total Disability</u>.    If a totally disabled Shareholder ceases to be so totally disabled at some time after the Note payments have commenced, but before they have been completed, the parties have the option to mutually agree to cease said buy-out and, in such case of the former, totally disabled Shareholder shall repay the amount of monies he has received and shall receive his Stock back from the Corporation.

D.    <u>Death of Totally Disabled Shareholder</u>.    Should the totally disabled Shareholder die during the buy-out period under this Article, then said Shareholder's and his estate's rights are limited to those under this Section 9.

- 21 -

E.   Compensation During Disability.   The
Corporation shall compensate a partially disabled Shareholder,
based only upon the compensation to which he is otherwise
entitled under his Employment Agreement, but without reference to
any minimum salary under that Employment Agreement.   The parties
hereto acknowledge that the amount of such compensation may be
zero dollars (-0-) as compensation is based under the Employment
Agreements solely upon gross collected production.

F.   Restrictive Covenant.   In the event that a
Shareholder becomes totally disabled, he shall comply with the
terms, conditions and provisions of his Employment Agreement.   In
the event that the Shareholder breaches any of the terms set
forth in his Employment Agreement, if the Corporation is in whole
or in part, a purchasing party or parties or such Shareholder's
Stock, then the Shareholder shall be obligated to pay to the
Corporation, under the terms, conditions and provisions of the
Employment Agreement, the amount of Five Hundred Thousand Dollars
($500,000.00).

In addition, the Corporation shall have
in the event of such a breach, all other rights and remedies to
which is otherwise entitled under the Employment Agreement and by
law.

G.   Disability Insurance Purchase.   The
Shareholders will purchase, and agree to continue in force by the

- 22 -

continuous payment of premiums when due, insurance policies in an amount equal initially to $360,000.00 on Dr. Guttenberg and $360,000.00 on Dr. Emery.  The Shareholders shall review their needs for disability buy-out insurance at least annually and shall increase the amounts of insurance as necessary to provide sufficient insurance in order to fund the purchase of shares from the estate of a Shareholder who shall become deceased.  Each Shareholder shall be the owner of such policy or policies of disability buy-out insurance purchased on the other Shareholder pursuant to the terms of this paragraph, but no rights of ownership in such policy or policies shall be exercised unless written notice of the intention to exercise such right is given to the other Shareholder or Shareholders with the other Shareholder's or Shareholders' consent to the exercise of such right.  The beneficiaries of each Shareholder's disability buy-out insurance policy shall be the other Shareholder in the amount necessary to allow the other Shareholder to purchase the deceased Shareholder's stock, and the Shareholder's spouse or other designated beneficiary, for the remainder of the proceeds of the life insurance policy.  The amount of disability buy-out insurance for each Shareholder and the allocation to the other Shareholder shall be reviewed at least annually by the Corporation's insurance agent and shall be increased, when and as necessary, so that each Shareholder's policy shall be sufficient

- 23 -

at least to allow the other Shareholder to purchase his stock in the event of his death.  If a Shareholder is not insurable at the time any additional insurance is required, the other Shareholder shall take any steps he shall deem necessary to insure that the necessary funds will be available to implement this agreement.

9.    Term.  This Agreement shall terminate and the certificates representing the Shares of Stock subject to this Agreement shall be released from the terms of this Agreement on the occurrence of any of the following events:

A.    Cessation of the business of the Corporation;

B.    Written agreement of the Corporation and the Shareholders then bound by the terms of this Agreement;

C.    Bankruptcy, receivership or dissolution of the Corporation;

D.    A single Shareholder's becoming the owner of all the Shares of the Corporation, which are then subject to this Agreement;

E.    The death of all the Shareholders within a 30-day period.

10.    Simultaneous Death.  In the event of the simultaneous death of Steven A. Guttenberg, D.D.S. and Robert W. Emery, D.D.S. or their death within thirty (30) days of each other, the estate of each of them shall retain ownership of its respective decedent's Shares of Common Stock and the legal

- 24 -

representatives of their estates shall be entitled to collect the proceeds of the policies held by them and to retain such proceeds free of the terms of this Agreement.  Such an occurrence and death shall immediately release both Shareholders and their Estates from any obligations to make any payments pursuant to these Agreements and the Promissory Note.

11.  <u>Benefit</u>.  This Agreement shall be binding upon the parties, their heirs, legal representatives, successors and assigns.  Each Shareholder, in furtherance thereof, shall execute a Will directing his Executor to perform this Agreement and to execute all documents necessary to effectuate the purposes of this Agreement, but the failure to execute such Will shall not affect the rights of any Shareholder or the obligations of any estate as provided in this Agreement.  This Agreement shall also be binding upon any person to whom any of the Stock of the Shareholders is transferred in violation of the provisions of this Agreement and the executor or administrator or such person.  For the purposes of this article, "person" shall include individuals, estates, trusts, partnerships, joint ventures and corporations.

12.  <u>Amendment and Revocation</u>.  This Agreement shall not be modified, amended or revoked except by a writing signed by the Corporation and each Shareholder.

13.  <u>Specific Performance</u>.  The Shares of the

- 25 -

Corporation cannot be readily purchased or sold in the open market, and for that reason, among others, the parties to this Agreement will be irrevocably damaged in the event that this Agreement is not specifically enforced.  Accordingly, if any person so required under this Agreement fails to give a notice, make an offer, sell shares or close a sale, then, in any such event, if the failure continues for thirty (30) days after the notice to the one in default by one of the Shareholders then holding Shares or by the Corporation, any of the Shareholders then holding Shares or the Corporation, as the case may be, may institute and maintain a proceeding to compel the specific performance of this Agreement by the one in default.  For the purposes of this Article "person" shall mean any individual, trust, estate, administrator, executor, partnership, joint venture or corporation.

14.  <u>Resignation as Officer and Director</u>.  In the event that any Shareholder sells his Stock in the Corporation to the Corporation, or to any other Shareholder in the Corporation, said Shareholder agrees (by himself or, if unable to act, by his committee or nominee) to resign as an Officer and Director upon the acceptance of the offer of sale by the Corporation or the other Shareholder, as the case may be.

15.  <u>Grammatical Usage</u>.  In construing this Agreement, masculine or neuter pronouns shall be substituted for those

- 26 -

feminine in form and vice versa and plural terms shall be substituted for singular and singular for plural at any place in which the context so requires.

16.  <u>Severability</u>.  If any term or provision of this Agreement or the application thereof to any person or the Corporation where circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or the Corporation or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

17.  <u>Election of Directors</u>.  Each Shareholder shall vote all the shares of stock of the Corporation held by him from time to time, in person or by proxy, in favor of each of the other Shareholders at each and every meeting at which directors of the Corporation are elected; provided that, if a Shareholder is no longer the owner of stock of the Corporation, no Shareholder shall vote for him.

18.  <u>Disagreement Between Directors</u>.  In the event of any disagreement between the directors of the Corporation that occurs prior to the full payment by Dr. Emery of the Buy-In Amount referred to in Section 5.c. of the Employment Agreement of even date herewith, the position of Dr. Guttenberg shall prevail

- 27 -

in such matters, except as to decisions concerning and dealing
with the following issues: (1) decisions concerning Key Man Life
Insurance and Disability Insurance maintained by the parties and
supporting this Agreement and (2) the addition of new
stockholders to the Corporation and dental practice.   If Dr.
Guttenberg wishes to add a new stockholder to the Corporation and
Dr. Emery does not wish the proposed individual to become a
shareholder, Dr. Guttenberg shall have the absolute right to
dissolve the Corporation or to cause the Corporation to
terminate Dr. Emery pursuant to the provisions set forth in the
Agreements.

19.   Additional Actions.   The Shareholders hereby
covenant and agree to execute any and all instruments and to do
any and all things necessary or desirable to carry out the
purposes of this Agreement.  Whenever corporate action on the
part of the Corporation is required under any of the terms of
this Agreement, the Shareholders shall vote or cause their shares
of stock in the Corporation to be voted in favor thereof and
shall attend any meetings of shareholders of the Corporation as
may be required, and shall do or cause to be done any and all
things at such meetings or otherwise as may be necessary to cause
such action to be taken.

20.   Notice.   Whenever notice is required or permitted
to be given under the terms of this Agreement, such notice shall

- 28 -

be given in writing by hand delivery or United States registered
or certified mail, return receipt requested, postage prepaid, and
will be deemed to have been given on the date such notice is so
delivered or posted, and if to the Corporation it shall be
addressed to:

> Doctors Guttenberg and Emery, P.C.
> 916 19th Street, N.W.
> Suite 728
> Washington, D.C. 20006

and if to the Shareholders it shall be addressed to:

> Steven A. Guttenberg, D.D.S.
> 8801 Chalon Drive
> Bethesda, Maryland 20817
>
> With a copy to:
> Geoffrey P. Gitner, Esquire
> Mark L. Rosenberg, Esquire
> Gordon, Feinblatt, Rothman,
>  Hoffberger & Hollander
> 1800 K Street, N.W., Suite 600
> Washington, D.C.   20006
>
> Robert W. Emery, D.D.S.
> 8324 Sweet Cherry Court
> Laurel, Maryland 20707
>
> With a copy to:
> Robert B. Scarlett, Esquire
> Heneson and Scarlett
> 19 East Fayette Street, Suite 401
> Baltimore, Maryland 21202-1606

    21.   <u>Notice of Breach and Opportunity to Cure</u>.   In
case of any breach of this Agreement, the breaching party shall
be given thirty (30) days notice of said breach and an
opportunity to cure said breach within thirty (30) day period.

- 29 -

22.  _Entire Agreement_.  This Agreement sets forth the entire integrated understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements.

23.  _Construction_.  This Agreement is made, and all questions relating hereto shall be construed, in accordance with the laws of the District of Columbia.

24.  _Waiver_.  Any waiver by the Corporation or the purchasing Shareholders of any provision of this Agreement shall not operate or be construed as a waiver of any other provision or as a subsequent waiver of the same provision.

25.  _Amendment_.  This Agreement may not be amended except by an instrument in writing signed by all of the parties to this Agreement.

26.  _Headings_.  The headings to the sections of this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal, with the intention of making it a sealed instrument, as of the day and year first above written.

ATTEST:                              STEVEN A. GUTTENBERG, D.D.S., P.C.


                Secretary       By: _____ (SEAL)
                                     Steven A. Guttenberg, President

[SIGNATURES CONTINUED ON NEXT PAGE]

- 30 -

L2474.501 P

WITNESS:                          SHAREHOLDERS

_____          _____ (SEAL)
                                 Steven A. Guttenberg, D.D.S.

_____          _____ (SEAL)
                                 Robert W. Emery, D.D.S.

- 31 -

# Exhibit 6

<u>UNANIMOUS CONSENT OF DIRECTORS IN LIEU OF SPECIAL MEETING</u>

<u>DOCTORS GUTTENBERG AND EMERY, P.C.</u>

The undersigned, being all of the Directors of Doctors Guttenberg and Emery, P.C. (the "Corporation"), a District of Columbia professional corporation, do hereby take the following actions in lieu of special meeting:

RESOLVED, that the following officers are hereby elected for the Corporation for a term to end July 30, 1991:

President - Steven A. Guttenberg, D.D.S.
Vice-President - Robert W. Emery, D.D.S.
Treasurer - Steven A. Guttenberg, D.D.S.
Secretary - Robert W. Emery, D.D.S.

Dated:  July 30, 1990

WITNESS:                          DIRECTORS:

_____           _____
                                  Steven A. Guttenberg, D.D.S.

_____           _____
                                  Robert W. Emery, D.D.S.

**IN WITNESS WHEREOF**, Lessor and Lessee have caused this First Amendment to Lease to be duly signed as of the day and year first above written.

LESSOR:

HEATHER PROPERTIES, L.L.C.

By: Heather Office Corp.,
    its Managing Member

By: _Carl Omark_
Name: CARL OMARK
Title: V.P. Davon Properties Inc.
       As Agent for Managing Member

LESSEE:

DOCTORS GUTTENBERG AND EMERY, P.C.

By: Steven Guttenberg DDS, MD
Name: STEVEN A. GUTTENBERG
Title: President

GUARANTORS:

_Steven Guttenberg DDS, MD_
STEVEN A. GUTTENBERG

_Robert W. Emery_
ROBERT W. EMERY

g:\data\clients\03640LS-OFS0083-nwalsh-04.doc

5

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        Plaintiffs,

       v.

DR. ROBERT W. EMERY

        Defendant.

Case No. 1:08-cv-00085
(Judge John D. Bates)

SUPPLEMENTAL DECLARATION OF
DR. STEVEN A. GUTTENBERG

I, Dr. Steven A. Guttenberg, declare and state as follows:

1.    I am a Plaintiff in the above-captioned matter. I make this declaration is support

of the Plaintiffs' motions for a temporary restraining order and preliminary injunction.

2.    Since 1996 the offices of Doctors Guttenberg and Emery, P.C. have been located

at 2021 K Street, N.W., Washington, D.C. In August, 2007, I was informed by Ms. Donna

Breeyear, the Corporation's clinical supervisor and employee in charge of marketing, that she

had been approached by Dr. Robert Emery to establish an office at 1145-19th Street, N.W.,

Washington, D.C. Ms. Breeyear informed me that Dr. Emery told her he was planning some

type of association with Dr. Keith Progebin. Dr. Progebin is a prosthodontist who has referred

patients to the Corporation for many years. He has offices at 1145-19th Street, N.W. Ms.

Breeyear also informed me that Dr. Emery told her he planned on hiring Dr. Bonnie Arroyo, who

is currently a resident at the Washington Hospital Center, who would serve as Dr. Emery's

associate.

3.     The Corporation's practice (the "Practice") has grown steadily since I started it in 1977. I have been informed by a leading health care consultant who specializes in advising dental surgery practices that the Corporation ranks in the upper one percentile of all practices in the nation in revenues and profits per surgeon. Over the last five years, Dr. Emery and I have each had compensation in excess of $600,000 a year.

4.     I have primarily been informed by Dr. Neil Starr, Dr. Progebin's former business colleague, as well as others, including Dr. Emery, that in the last four years Dr. Progebin separated from a practice with his senior dentist, Dr. Starr. It was my understanding that severe pressure was brought to bear on Dr. Starr by Dr. Progebin in the split up of their practice in order for Dr. Progebin to obtain certain advantages in that break-up. I have also been informed that Dr. Progebin was advised by the same attorneys and accountants that are now representing Dr. Emery. Dr. Emery himself has often told me that he is visiting or traveling with Dr. Progebin and informed me that they went to Colorado between January 19-27, 2008, a few days after I filed my complaint in this case.

5.     On May 24, 2007, I received a demand letter from a former employee's attorney demanding money or a sexual discrimination action would be filed against me and the Corporation (hereafter referred to as the "Employee Claim"). During the period that I was arranging defense through the Corporation's insurance carriers, Dr. Emery, through his newly obtained counsel, demanded that I enter into what has become known as the "Unilateral Agreement." Dr. Emery's counsel  demanded that I execute this agreement by June 15, 2007.

Thereafter, our litigation counsel advised Dr. Emery's attorney of the adverse implications of pursuing the Unilateral Agreement while seeking to defend the Employee Claim. Despite the request of litigation counsel, over the ensuing months, Dr. Emery continued to press

me to sign the Agreement. He let me know that if I did not sign, my wife would be informed of the Employee Claim.

6.      The Employee Claim was settled in August, 2007 by the insurance carrier. I was informed the carrier treated it as a nuisance value claim. I have never admitted to any wrongdoing and continue to assert that I was without fault. Even after the Employee Claim was settled, however, Dr. Emery's lawyer intensified his efforts for the Unilateral Agreement. He wrote to me that Dr. Emery was "VERY SERIOUS." (capitals in original). I interpreted this to mean that unless I signed, my wife (who, apparently Dr. Emery thought was unaware of the claim) would be informed. Around this time, Ms. Breeyear told me that she had a private conversation with Dr. Emery in which he told her that he was pressuring me to sign and believed he would be successful because if I didn't my wife would find out and leave me. In August 2007, I told Dr. Emery that I would not sign the Unilateral Agreement, but proposed a "bilateral agreement" which would be signed by both him and me, under which only upon a "finding" (as opposed to merely an "allegation") of sexual harassment or discrimination would there be adverse consequences. On August 23, 2007, Dr. Emery rejected the bilateral agreement and demanded to be made President of the Corporation immediately "or else."

7.      I believe Dr. Emery wanted to become President so he could terminate me. Even after I offered to make Dr. Emery a co-President, he rejected that overture. I believe he did so because he knew that as the President he, like I, had the power to fire employees, including Dr. Emery.

8.      Despite my seeking to obtain the date that Dr. Emery first learned the Corporation's charter had lapsed, he has refused to provide me with this information. Since October 1, 2007, when the Corporation's charter was reinstated, Dr. Emery has continued to

accept his salary and bonuses from the Corporation, as well as health and other benefits provided by the Corporation, treated the Corporation's patients and otherwise held himself out as a member of the Corporation.

9.      Since October 2007, Dr. Emery's attorneys and accountants have unilaterally, usually without my prior permission or knowledge, made what I believe has been an undue amount of contacts with the Corporation's accountant and benefits coordinator.  I have had long term business relationships with these professionals.  It has been embarrassing to me how Emery's advisors have seen fit to inform these professionals that our practice was being dissolved, a conclusion (or representation) that I do not agree with.  I believe these contacts have been calculated to embarrass me and to put pressure on me to succumb to Dr. Emery's continual demands that he be let out of his restrictive covenants, be allowed to open on office on 19th Street, and take the Corporation's patients and employees, completely contrary to our contractual agreements.  Dr. Emery and his consultants have also sought to interfere with my management of the Corporation. They have tried to drive a wedge between employees and get the employees to divide into camps. All of this has a potentially damaging effect on our ability to give our patients the care they deserve.

10.     I have become informed, through reviewing correspondence that Dr. Emery has sent out to the Corporation's referral network, that he is seeking to direct these referrals to himself.  Whereas in our 17 year history, whenever Dr. Emery sent correspondence to referring doctors he always referred to the Corporation as the service provider, he now fails to mention the Corporation and instead directs everything to himself.  He even directs that his email be sent to his personal site:rwe@mac.com rather than the corporation site: rwe@mouthfacejaw.com.

11.    Since October, 2007 the Employee Claim filed has disappeared. Also five years of Ms. Breeyear's evaluations, which I recall as being superb have suddenly disappeared. In addition the statement for the credit card used by Dr. Emery for August 2007, the month he took Ms. Breeyear to dinner, has disappeared.

12.    I believe that Dr. Emery and his advisors are attempting to create an argument that management of the Corporation is deadlocked. There is no deadlock. First, I have always conducted the management of the Corporation. Second, despite the fact that Dr. Emery and his lawyers have sought to pick arguments on every aspect of our practice, the Practice is doing superbly. In fact we were more profitable this year than last, and even with Dr. Emery's interference, we were more profitable in the second half of 2007 than in the first half. Our billings for 2007 were 6.4 per cent greater than in 2006, and even with the interference that began in the second half of 2007, the Corporation's profits in the second half of 2007 were 5.6 per cent higher than in the first half of 2007. Third, since first making this claim, Dr. Emery has never filed for judicial dissolution, as I believe he and his advisors know no grounds exist.

13.    On May 7, 2007 I was elected President of the American College of Oral and Maxillofacial Surgeons. I believe that Dr. Emery has sought to use this position to increase the pressure on me to succumb to his demands to nullify his employment agreement and the shareholder agreement. He knows that any lawsuit or unseemly and scandalous allegations that he threatens to bring against me may embarrass me before my professional colleagues

14.    Dr. Emery joined my Corporation as an employee in 1988, after a residency. He did not have any patients or referring doctors when he joined my practice.

15.    As a former President of the District of Columbia Society of Oral and Maxillofacial Surgeons, and as the current President of the American College of Oral and

Maxillofacial Surgeons, I am aware of the number and concentration of oral and maxillofacial surgeons in the District of Columbia, including downtown Washington, D.C. Washington, D.C. has one of the highest concentrations of oral surgeons in the nation. Also, within a five block radius of the Corporation's office, I conservatively estimate there are at seven oral and maxillofacial surgeons out of approximately twenty within the District of Columbia.

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: **01. 29. 08**

Dr. Steven A. Guttenberg

# Exhibit 8

AMENDMENT TO THE
DRS. GUTTENBERG & EMERY, P.C.
SHAREHOLDERS AGREEMENT

This Amendment to the Drs. Guttenberg & Emery, P.C. Shareholders Agreement (the "Agreement") is made as of this _____ day of _____ , 2007 by and among STEVEN A. GUTTENBERG, D.D.S. ("Guttenberg") and ROBERT W. EMERY, D.D.S. ( "Emery"), and DRS. GUTTENBERG & EMERY, P.C. (the "Corporation").

RECITALS

R1.    The Corporation desires to impose significant consequences in the event that Guttenberg engages in the conduct of sexual harassment of employees of the Corporation as such conduct is detrimental, harmful, and unacceptable to the Corporation.

R2.    Guttenberg has entered into this Amendment subject to the understanding that he has never engaged in sexual harassment of any employee of the Corporation, and specifically denies any accusation of sexual harassment by any employee of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    In the event that Guttenberg is accused of sexual harassment by any employee (the "Victim Employee") of the Corporation after the date of this Amendment, within ten (10) days of such accusation, Guttenberg shall provide written notice to the Corporation and Emery of such accusation of sexual harassment by the Victim Employee. The written notice shall (i) identify the Victim Employee; (ii) set forth the particulars of such accusation by the Victim Employee; and (iii) include any written complaints and/or documentation from the Victim Employee and/or the Victim Employee's attorney regarding such accusation.

2.    Notwithstanding anything to contrary contained herein, if within ten (10) days following the date of the occurrence of a Sexual Harassment Triggering Event, Guttenberg does not provide Emery and the Corporation with the Sexual Harassment Triggering Event Notice, then Emery may, at any time thereafter, provide a substitute written Sexual Harassment Triggering Event Notice to the Corporation and Guttenberg; which substitute written notice shall be deemed to constitute the Sexual Harassment Triggering Event Notice.

3.    Upon the occurrence of any of the following events, Guttenberg shall be deemed guilty of engaging in sexual harassment: (i) a finding of the U.S. Department of Labor, Equal Employment Opportunity Commission ("EEOC") or any other governmental agency, court of law and/or arbitration proceeding that Guttenberg has engaged in sexual harassment of the Victim Employee of the Corporation by Guttenberg and after exhaustion of all appeals; (ii) Guttenberg has, directly or indirectly, paid the Victim

Employee of the Corporation monetary compensation arising and/or resulting from a claim by the Victim Employee of sexual harassment by Guttenberg; (iii) the Corporation, with the consent of Guttenberg, has, directly or indirectly, paid the Victim Employee of the Corporation monetary compensation arising and/or resulting from a claim by the Victim Employee of sexual harassment by Guttenberg; or (iv) any insurance company which provides insurance coverage to the Corporation for claims arising from sexual harassment has, directly or indirectly, paid the Victim Employee any compensation and/or damages arising and/or resulting from the claim of the Victim Employee of sexual harassment by Guttenberg.

4.     Upon the occurrence of a Sexual Harassment Triggering Event, Guttenberg shall immediately   provide Emery and the Corporation with written notice (the "Sexual Harassment Triggering Event Notice") of Emery's entitlement to purchase all (but not less than all) of his shares of stock in the Corporation.  Emery shall have the option to purchase all (but not less than all) of the shares of stock of the Corporation owned by Guttenberg for a purchase price equal to the accrual basis book value of the shares. Emery shall have the option to purchase all (but not less than all) of the shares of stock for a period of forty-five (45) days from the date of the Sexual Harassment Triggering Event Notice.  Such option shall be exercised by providing written notice within forty-five (45) days after the date of the Sexual Harassment Triggering Event Notice to Guttenberg setting forth Emery's intention to purchase the shares of stock of the Corporation owned by Guttenberg.  If Emery shall not exercise his option to purchase the shares of stock of the Corporation owned by Guttenberg offered in the Sexual Harassment Triggering Event Notice, then the Corporation shall have the same right to purchase the shares of stock of Guttenberg as Emery had in accordance with the terms as specified above.  The Corporation shall have ninety (90) days following the date of the Sexual Harassment Triggering Event Notice to exercise its option to purchase all of the shares of stock owned by the Accused Stockholder.   In determining whether the Corporation shall purchase the shares of stock of Guttenberg, such determination shall be made solely by Emery in his capacity as one or more of being an officer, director and/or shareholder of the Corporation (and Guttenberg shall take any and all actions in his capacity as an officer, director and/or shareholder of the Corporation to ratify and affirm the decision made by Emery). The definition of accrued book value shall be as defined in Section 6(B)(2) of the Agreement.  Settlement for the purchase price of the shares shall take place within one hundred twenty (120) days after the determination of the accrual basis book value of such shares of stock.  For the purposes of this Amendment, the accrual basis book value of the shares of stock shall be determined as of the last day of the last complete fiscal year of the Corporation which shall occur prior to the date of the Sexual Harassment Triggering Event Notice.  The accrual basis book value of the shares of stock shall be determined by the independent certified public accountant regularly serving the Corporation and such determination shall be final and binding upon the parties hereto for the purposes of this Amendment except in the event of fraud or mistake. The purchase price for the shares shall be paid in accordance with the terms of Section 6(D)(2) of the Agreement, and shall be guaranteed by Emery.

5.     Upon the occurrence of a Sexual Harassment Triggering Event, Guttenberg's employment with the Corporation shall be immediately terminated. Upon the accusation of any employee of the Corporation that Guttenberg has engaged in sexual harassment,

Emery shall immediately replace Guttenberg as President of the Corporation. Notwithstanding anything contained in the Agreement, in the event that Guttenberg's employment is terminated as a result of a Sexual Harassment Triggering Event, the terms of Section 4 of the Amendment shall be controlling and the Corporation and/or Emery shall not be subject to the mandatory requirement to purchase Guttenberg's shares of stock. In the event that Guttenberg shall be in breach of any covenant not to compete with the Corporation as set forth in his employment agreement, the Corporation and/or Emery shall no longer be required to make any payments to Guttenberg.

6.      Any dispute, controversy or claim arising out of or relating to this Amendment, or the breach, termination or invalidity of this Amendment or the rights of any party hereunder (each, a "Claim"), shall be submitted for resolution to non-binding mediation in accordance with the commercial rules of the American Arbitration Association. Non-binding mediation shall be conducted within forty-five (45) days of the Claim. If any Claim cannot be resolved by non-binding mediation within forty-five (45) days after being submitted, such Claim shall be settled by a Three (3) Arbitrator Arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association in effect on the day the arbitration is commenced in accordance with this Amendment. The American Arbitration Association shall have jurisdiction over all parties to this Amendment for purposes of the arbitration. The prevailing party may enter such decision in any court having competent jurisdiction. The parties shall share equally the cost of the arbitrator's fees and the fees of the American Arbitration Association.

7.      In all other respects not inconsistent with this Amendment, the Corporation, Guttenberg and Emery hereby confirm and ratify the Agreement.


ATTEST:                                    DRS. GUTTENBERG & EMERY, P.C.


_____                    By:     _____
                                           Name:   _____
                                           Title:  _____


WITNESS:                                   STEVEN A. GUTTENBERG, D.D.S.


_____                    _____


WITNESS:                                   ROBERT W. EMERY, D.D.S.


_____                    _____

# Exhibit 9

AMENDMENT TO THE
DRS. GUTTENBERG & EMERY, P.C.
SHAREHOLDERS AGREEMENT

This Amendment to the Drs. Guttenberg & Emery, P.C. Shareholders Agreement (the "Amendment) is made as of this _____ day of _____, 2007 by and among STEVEN A. GUTTENBERG, M.D., D.D.S. ("Guttenberg") and ROBERT W. EMERY, D.D.S. ( "Emery"), (hereafter collectively referred to as the "Shareholders") and DRS. GUTTENBERG & EMERY, P.C. (the "Corporation").

RECITALS

WHEREAS, the Shareholders of the Corporation desires to reaffirm their commitment to the enforcement of anti-discriminatin laws in the work place; and

WHEREAS, the Shareholders seek to impose significant consequences in the event that either of the Shareholders engages in employment discrimination (including without limitation racial discrimination, gender discrimination and sexual discrimination and harassment) of employees of the Corporation as such conduct is detrimental, harmful, and unacceptable to the Corporation.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    In the event that a Shareholder of the Corporation shall be found to have engaged in unlawful discrimination by a "final determination" (that is, all avenues and venues of appeal having been exhausted) of the U.S. Department of Labor, Equal Employment Opportunity Commission ("EEOC") or any other governmental agency, court of law or arbitration proceeding then that Shareholder shall be deemed to be an Offending Shareholder and a final determination shall be deemed a "Triggering Event."

2.    Upon the occurrence of a Triggering Event, the Offending Shareholder shall provide within five (5) business days notice to the Non-Offending Principals and the Corporation with written notice (the "Triggering Event Notice") of Non-Offending Shareholder's entitlement to purchase all (but not less than all) of the Offending Shareholder's shares of stock in the Corporation.

3.    The Non-Offending Shareholder shall have the option to purchase all (but not less than all) of the shares of stock of the Corporation owned by the Offending Shareholder for a purchase price equal to the accrual basis book value of the shares. The Non-Offending Shareholder shall have the option to purchase all (but not less than all) of the shares of stock for a period of forty-five (45) days from the date of the Triggering Event Notice. Such option shall be exercised by providing written notice within forty-five (45) days after the date of the Triggering Event Notice setting forth the Non-Offending Shareholder's intention to purchase the shares of stock of the Corporation owned by the

Formatted: Different first page

Deleted: greement")

Deleted: TRI. . The

Formatted: Indent: Left: 0", First line: 0.5"

Formatted: Body Text Indent, Left, Indent: Left: 0", First line: 0"

Deleted: Guttenberg

Deleted: the conduct

Deleted: of

Deleted: ¶

Deleted: ¶
R2. . Guttenberg has entered into this Amendment subject to the understanding that he has never engaged in sexual harassment of any employee of the Corporation, and specifically denies any accusation of sexual harassment by any employee of the Corporation. ¶
¶

Deleted: with

Deleted: pursued and completed

Deleted: Guttenberg is accused of sexual harassment by any employee (the "Victim Employee") of the Corporation after the date of this Amendment, within ten (10) days of such accusation, Guttenberg shall provide written notice to the Corporation and Emery of such accusation of sexual harassment b[ ... [1]

Deleted: and/

Deleted: at

Deleted: Guttenberg has engage[ ... [2]

Deleted: 4

Deleted:

Deleted: Sexual Harassment T

Deleted: Guttenberg

Deleted: immediately

Deleted: provide Emery

Deleted: Sexual Harassment

Deleted: Emery's

Deleted: his

Deleted: Emery

Deleted: Guttenberg

Deleted: Emery s

Deleted: Sexual Harassment

Deleted: Sexual Harassment

Deleted: to Guttenberg

Deleted: Emery's

Offending-Shareholder. If the Non-Offending Shareholder shall not exercise his option to purchase the shares of stock of the Corporation owned by Offending Shareholder offered in the Triggering Event Notice, then the Corporation shall have the same right to purchase the shares of stock of the Offending Shareholder as the Non-Offending Shareholder had in accordance with the terms as specified above. The Corporation shall have ninety (90) days following the date of the Triggering Event Notice to exercise its option to purchase all of the shares of stock owned by the Offending Shareholder.

4.     In determining whether the Corporation shall purchase the shares of stock of the Non-Offending Shareholder, such determination shall be made solely by Non-Offending Shareholder in his capacity as one or more of being an officer, director and/or shareholder of the Corporation (and Offending Shareholder shall take any and all actions in his capacity as an officer, director and/or shareholder of the Corporation to ratify and affirm the decision made by Non-Offending Shareholder).

5.     The definition of accrued book value shall be as defined in Section 6(B)(2) of the Agreement. Settlement for the purchase price of the shares shall take place within one hundred twenty (120) days after the determination of the accrual basis book value of such shares of stock. For the purposes of this Amendment, the accrual basis book value of the shares of stock shall be determined as of the last day of the last complete fiscal year of the Corporation which shall occur prior to the date of the Triggering Event Notice. The accrual basis book value of the shares of stock shall be determined by the independent certified public accountant regularly serving the Corporation and such determination shall be final and binding upon the parties hereto for the purposes of this Amendment except in the event of fraud or mistake. The purchase price for the shares shall be paid in accordance with the terms of Section 6(D)(2) of the Agreement, and shall be guaranteed by Non-Offending Shareholder, except however, cotrary to the provisions of Section 6(D)(2) the payout would be in equal payments over a period of sixty (60) months.

6.     Upon the occurrence of a Triggering Event, the Offending-Shareholder's employment with the Corporation shall be immediately terminated. In the event that the Offending Shareholder shall be found by a court of law (and after exhaustion of all appeals) to be in breach of any covenant not to compete with the Corporation as set forth in his employment agreement, the Corporation and/or the Non-Offending Shareholder shall no longer be required to make any payments to Offending-Shareholder.

7.     Any dispute, controversy or claim arising out of or relating to this Amendment, or the breach, termination or invalidity of this Amendment or the rights of any party hereunder (each, a "Claim"), shall be submitted for resolution to non-binding mediation in accordance with the commercial rules of the American Arbitration Association. Non-binding mediation shall be conducted within forty-five (45) days of the Claim. If any Claim cannot be resolved by non-binding mediation within forty-five (45) days after being submitted, such Claim shall be settled by a three arbitrator Arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association in effect on the day the arbitration is commenced in accordance with this Amendment. The American Arbitration Association shall have jurisdiction over all parties to this Amendment for

**Deleted:** Guttenberg.
**Deleted:** Emery
**Deleted:** Guttenberg
**Deleted:** Sexual Harassment
**Deleted:** Guttenberg
**Deleted:** Emery
**Deleted:** Sexual Harassment
**Deleted:** Accused Stockholder.
**Deleted:** Guttenberg.
**Deleted:** Emery
**Deleted:** Non-O
**Deleted:** Guttenberg
**Deleted:** Emery
**Deleted:** Sexual Harassment
**Deleted:** Emery.
**Deleted:** 5
**Deleted:** Sexual Harassment
**Deleted:** Guttenberg's
**Deleted:** Upon the accusation of any employee of the Corporation that Guttenberg has engaged in sexual harassment, Emery shall immediately replace Guttenberg as President of the Corporation. Notwithstanding anything contained in the Agreement, in the event that Guttenberg's employment is terminated as a result of a Sexual Harassment Triggering Event, the terms of Section 4 of the Amendment shall be controlling and the Corporation and/or Emery shall not be subject to the mandatory requirement to purchase Guttenberg's shares of stock.
**Deleted:** Guttenberg
**Deleted:** Emery s
**Deleted:** Guttenberg.
**Deleted:** 6

2

purposes of the arbitration.  The prevailing party may enter such decision in any court having competent jurisdiction.

8.    In all other respects not inconsistent with this Amendment, the Corporation, Guttenberg and Emery hereby confirm and ratify the Agreement.

**Deleted:** The parties shall share equally the cost of the arbitrator's fees and the fees of the American Arbitration Association.¶

**Deleted:** 7

ATTEST:                                    DRS. GUTTENBERG & EMERY, P.C.

_____            By:    _____
                                                   Name:  _____
                                                   Title:   _____

WITNESS:                                  STEVEN A. GUTTENBERG, M.D. D.D.S.

_____            _____

WITNESS:                                  ROBERT W. EMERY, D.D.S.

_____            _____

3

**Page 1: [1] Deleted**                                    **Author**

Guttenberg is accused of sexual harassment by any employee (the "Victim Employee") of the Corporation after the date of this Amendment, within ten (10) days of such accusation, Guttenberg shall provide written notice to the Corporation and Emery of such accusation of sexual harassment by the Victim Employee. The written notice shall (i) identify the Victim Employee; (ii) set forth the particulars of such accusation by the Victim Employee; and (iii) include any written complaints and/or documentation from the Victim Employee and/or the Victim Employee's attorney regarding such accusation.

2.      Notwithstanding anything to contrary contained herein, if within ten (10) days following the date of the occurrence of a Sexual Harassment Triggering Event, Guttenberg does not provide Emery and the Corporation with the Sexual Harassment Triggering Event Notice, then Emery may, at any time thereafter, provide a substitute written Sexual Harassment Triggering Event Notice to the Corporation and Guttenberg; which substitute written notice shall be deemed to constitute the Sexual Harassment Triggering Event Notice.

3.      Upon the occurrence of any of the following events, Guttenberg shall be deemed guilty of engaging in sexual harassment: (i) a finding of t

**Page 1: [2] Deleted**                                    **Author**

Guttenberg has engaged in sexual harassment of the Victim Employee of the Corporation by Guttenberg; (ii) Guttenberg has, directly or indirectly, paid the Victim Employee of the Corporation monetary compensation arising and/or resulting from a claim by the Victim Employee of sexual harassment by Guttenberg; (iii) the Corporation has, directly or indirectly, paid the Victim Employee of the Corporation monetary compensation arising and/or resulting from a claim by the Victim Employee of sexual harassment by Guttenberg; or (iv) any insurance company which provides insurance coverage to the Corporation for claims arising from sexual harassment has, directly or indirectly, paid the Victim Employee any compensation and/or damages arising and/or resulting from the claim of the Victim Employee of sexual harassment by Guttenberg.

# Exhibit 10

**IN THE SUPERIOR COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **DRS. GUTTENBERG & EMERY, P.C.** |
| **and** |
| **DR. STEPHEN GUTTENBERG** |
| **Plaintiffs,** |
| **v.** |
| **DR. ROBERT EMERY** |
| **Defendant.** |

Case No.

## DECLARATION

I, Donna Breeyear, declare and state as follows:

1.    I have been employed with Drs. Guttenberg & Emery, P.C. (the "Practice") for nine years.  For the last five years I have held the position of Clinical Supervisor.  I am the highest ranking and highest paid employee of the 13 staff employees in the Practice.  As part of my duties, I supervise the staff, assist the doctors in surgery and I am the head of marketing to referral doctors and dentists.

2.    Until August, 2007, I have always enjoyed my position with the Practice.  The Practice is one of the most profitable and respected oral surgeries practices in the country and I have always been proud of my association and the Practice's staff morale.

3.    Beginning in August, 2007, Dr. Emery introduced an element into the Practice that has threatened staff morale and over-all productivity.  Since that time, to the present, Dr. Emery has engaged in a pattern of conduct seeking to turn staff members against Dr. Guttenberg, establish his own practice in downtown Washington, D.C., and threaten me because I would not agree to help him in his endeavor.  Dr. Emery has also consistently, and I believe, intentionally engaged in a course of harassment and coercion against me.

4.    On August 14, 2007, Dr. Emery invited me to have dinner with him at Mezza Luna, a restaurant not far from our offices.  During the dinner, Dr. Emery told me he could not stand Dr. Guttenberg because he was always talking about himself.  Dr. Emery then informed me he intended to leave the Practice and open an office at 1145-19th Street, N.W., in some type of association with Dr. Progebin, who has offices at that building.  He told me that I was great in

working with referring doctors and that he wanted me to leave the Practice and join his new firm as Clinical Supervisor and head of marketing. He promised he would give me a raise and even pay for me to have a sabbatical.

5.      During the dinner, Dr. Emery told me he planned on working 3 or 4 days a week, and intended on hiring an associate, Dr. Bonnie Arroyo, a resident at the Washington Hospital Center. I told Dr. Emery that it was a great practice and that he should try and work out his differences with Dr. Guttenberg.

6.      He again brought up that he was trying to get a unilateral agreement from Dr. Guttenberg, who had been accused of sexual harassment by a former employee, Katherine Keyes. He told me that if Dr. Guttenberg's wife found out about the Keyes allegation, that Dr. Guttenberg's wife "would leave him." I understood him to be saying that Dr. Guttenberg would have to sign the unilateral agreement, unless he wanted his wife to know. I was repulsed by his willingness to black mail and use this leverage over Dr. Guttenberg in order to get his way.

7.      Before the August 14, 2007 meeting, I had met with Dr. Emery on August 1, 2007. That day Dr. Emery asked me to have a closed door meeting with him. He told me that he was seeking to have Dr. Guttenberg sign the unilateral agreement that would provide if any allegations of sexual conduct were made against Dr. Guttenberg, that Dr. Guttenberg would be terminated as President of the Practice, that Emery would become President and that Dr. Guttenberg would be terminated. On August 7, 2007, during another closed door meeting with Dr. Emery, I told him that I did not think what he was doing was right, i.e. seeking the agreement from Dr. Guttenberg. I told Dr. Emery that he was being hypocritical because I had personally witnessed him embracing and kissing Jeanne Perrotta, one of the Practice's employees and that he knew "how good of friends Jeanne and I had been." Dr. Emery response was that his affair with Ms. Perrotta was different, because he had told his wife. Although I did not tell Dr. Emery at this time, I was aware that he and Ms. Perrotta had an intimate affair from Ms. Perrotta who had been a friend and confidant. Ms. Perrotta told me she was comfortable with the relationship because of Dr. Emery's wife, and that when Dr. Emery would ask her to go out for happy hour, she would ask me to accompany them, because she did not want to talk about a relationship between them or be left alone with him. She also showed me expensive jewelry Dr. Emery had bought for her birthday.

8.      On August 14, 2007, Dr. Guttenberg told me that Dr. Emery had given him an ultimatum, that either Dr. Guttenberg sign the unilateral agreement, or Dr. Guttenberg's wife would find out about the Keyes allegations.

9.      On August 18, 2007, Dianna Guttenberg called me and told me Dr. Guttenberg had told her about the Keyes allegations and Dr. Emery's attempt to black-mail him. She asked if I could intervene by setting up a meeting between the Guttenberg's and Emery's. After I told her I would, I called Dr. Emery to see if he would agree to a meeting. He sounded shocked. He said, "You mean he told Dianna. Was she upset?" On August 20, 2007, Dr. Guttenberg told me he also tried to set up a meeting, but the Emery's would not meet, because it was "too stressful."

2

10.     On August 23, 2007, I received a telephone call from Dr. Emery who was in Florida with Dr. Progebin. He told me he and Dr. Progebin had "discussed everything."

11.     Beginning on September 7, 2007, Dr. Emery and Jeanne Perrotta began to complain about me in attempt to get me to quit. After Ms. Perrotta had "thrown money at me," about getting the staff lunch. Dr. Emery called me into his office. In a menacing and threatening tone he told me "never to drag his name, Jeanne and his wifes' names through the mud."

12.     On September 10, 2007, Ms. Perrotta sent a letter of complaint about me to Drs. Guttenberg and Emery. This complaint was later rejected by both Dr. Guttenberg and Dr. Emery.

13.     On either September 11, 2007, Dr. Emery asked me into his office. He closed the door and began screaming at me. He was angry and shaking. He said, "Dr. Guttenberg is nothing but a fucking pig and has ruined his and his wife's relationship with Dr. Guttenberg's wife (Dianna), while he is getting blow jobs from Keyes." I cut him off, saying these are only allegations. Emery then got angrier and said that I "should just do my work and never mention him, his wife and Jeanne again." I told him that I would not agree not to speak out on what was true and I believed was right. That afternoon, as I was leaving the building, while in the building lobby, Dr. Emery saw me and in a mocking tone said, "Donna are you okay?" I took it as sarcastic and threatening. On October 30, 2007, Dr. Emery repeated this conduct, when he blocked me when I was in the stairwell, and kept asking me in a mocking tone, "if I was okay?" and "was I sure that I was okay?"

14.     On September 27, 2007, while Dr. Guttenberg was out of his office, I heard Dr. Emery in Dr. Guttenberg's office with the door closed.

15.     On September 28, 2007, Dr. Emery accused me of spying on him. Although I would regularly make marketing calls on Dr. Progebin's office, he told me to stay out of Progebin's office, and not talk to his staff. When I went to leave, he said "don't you walk away from me" again in a menacing tone.

16.     In the last several weeks I have become aware that my personnel file was missing. Dr. Emery admitted that he had taken it. Upon its return, however, there were missing annual evaluations that were highly favorable of me by Dr. Emery.

17.     Starting in October, 2007, for the first time, Dr. Emery has directed me to document my time, where I am and what I am doing. This has never been required in my prior 9 years with the Practice. I believe Dr. Emery is seeking to build a case against me because I have not supported his endeavors.

18.     I have also noted that Dr. Emery is training two of our employees in duties that are being performed by other employees. I interpret this to mean he will seek to take these employees with him, so they can execute the trained procedures with no loss of time to his new

practice. He also pandered to the staff and has said things to them such as "in the new world" they will become supervisors.

19.     This is not a complete statement of everything that has occurred. I reserve the right to add to this statement at a later time. I have, however, attempted to describe what I consider to be the more important occurrences of my knowledge of Dr. Emery's intention to establish his own practice.

I declare under penalties of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

DATED: 11/05/2007

Donna Breeyear

# Exhibit 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DR. STEVEN A. GUTTENBERG
and DOCTORS GUTTENBERG AND
EMERY, P.C.

        **Plaintiffs,**

    **v.**

DR. ROBERT W. EMERY

        **Defendant.**

Case No. 1:08-cv-00085
(Judge John D. Bates)

### SUPPLEMENTAL DECLARATION OF DONNA BREEYEAR

I, Donna Breeyear, declare and state as follows:

1.    I make this declaration as a supplement to my declaration dated November 5, 2007.

2.    During my August 15, 2007 dinner with Emery, I advised Dr. Emery that I would not accept his offer to leave Dr. Guttenberg and open a new practice at 1145-19th Street. Rather, I advised him to patch up his differences with Dr. Guttenberg and I convince him of what a great practice they jointly had. As described I described in my initial declaration, since that time Dr. Emery has harassed me. In addition to what I described in my earlier declaration, in the last several months, when we are alone he has gone out of his way to bump into me, sometimes coming clear across a hallway or room to do so. I have also been informed by another employee, who is known to be very loyal to Dr. Guttenberg, Ms. Lisa Derrington, that Dr. Emery has done the same thing to her on a number of occasions. In addition to what I described in my earlier declaration, since September, 2007, Dr. Emery has toyed with, mocked and otherwise harassed

me. When we are alone in the offices, he continually leers at me and sometimes asks sarcastically "is everything okay? Are you sure?" Or he stands over my desk and gives me a Cheshire cat smile.

4.  I have hired an attorney to place Dr. Emery on notice with a Cease and Desist letter that such conduct is unacceptable in the work place.

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: 1|29|2008

Donna Breeyear

2

# Exhibit 12

# McQuade Byrum P.L.L.C.

## Attorneys and Counselors At Law

Marni E. Byrum (licensed in Va. and D.C.)        Martha JP McQuade (licensed in Va., D.C. and Md.)

November 13, 2007

***VIA MESSENGER***

**PERSONAL & CONFIDENTIAL**
Robert W. Emery, DDS
The Washington Institute
  for Mouth, Face and Jaw Surgery
2021 K Street, NW
Suite 200
Washington, D.C. 20006-1003

Dear Dr. Emery:

This letter will serve as your notice that Donna Breeyear has engaged this firm with respect to all matters related to your intentional actions to defame her reputation and to have her terminated from her position with The Washington Institute.

For nine years, Ms. Breeyear has been a dedicated and accomplished member of the team at The Washington Institute - the individual you have trusted to coordinate your outreach into the medical community. As the Implant Coordinator she has assisted your referring doctors in establishing and implementing their implant protocol, and, throughout the years, you have recognized her efforts with high evaluations and compensation.

However, since August 2007, when Ms. Breeyear declined your proposal to assist you in dissolving the current practice and to join your Anew@ practice, you have been involved in an aggressive campaign to damage her reputation. You have repeatedly harassed her in the workplace, falsely accused her of misconduct, improperly shared confidential personnel information and tried to interfere with her continued employment with the Washington Institute. **This tortious and retaliatory conduct must stop immediately.**

**McQuade Byrum PLLC**
Letter to Robert W. Emery, DDS
November 13, 2007
Page 2

     This letter will also serve as our notice that you have a duty to preserve all paper and electronic records, including e-mails, relating to my client in any way. This duty to preserve records and information extends to your personal electronic data, e-mails, back-up tapes, and any other records or information. You must secure and maintain all information pertaining to my client. Any failure to secure and maintain such information may have serious ramifications for you.

                              Sincerely,

                              Marni E. Byrum

MEB/ms

cc:    Donna Breeyear

# Exhibit 13



Doctors Guttenberg and Emery, PC
ORAL AND MAXILLOFACIAL SURGERY

**Steven A. Guttenberg**, DDS, MD
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*

**Robert W. Emery**, DDS
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*



*ws, American
...tion of Oral and
...axillofacial Surgeons*

September 25, 2007

To: Ms Jeanne Perrotta

Subject: 9/10/07 and 9/14/07 Letters

This is written in response to the concerns raised in you letters to Drs. Guttenberg and Emery dated September 10 and 14., 2007. We have interviewed all employees identified in this correspondence as well as others. As as result of the review of the interviews, we have not found incontrovertible evidence of behavior that constitutes harassment, defamation, or other violation of employee policy and/or procedure. We have addressed the concerns raised with the following action:

1. Office protocol will be reviewed with all management staff on an as needed basis during weekly managerial meetings. It will be emphasized that office practice requires managerial teams work together and avoid directing employees outside respective lines of authority absent exigent circumstances.

2. Office practice advising that all employees interact with one another in a manner that is consistent with the policies and procedures of the office employee handbook will be reviewed with all staff members.

3. Office practice requiring managerial staff to work together in a professional manner and avoid open confrontation with one another will be reemphasized.

We want you to know we will continue to strive to improve the work environment. Our goal is to treat all our employees with respect and dignity.

Steven A. Guttenberg, DDS, MD

Robert W. Emery, DDS

# Exhibit 14



Doctors Guttenberg and Emery, PC
ORAL AND MAXILLOFACIAL SURGERY

Steven A. Guttenberg, DDS, MD
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*

Robert W. Emery, DDS
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*



*Fellows, American
~ciation of Oral and
ªlofacial Surgeons*

**PERSONAL AND CONFIDENTIAL**

**HAND DELIVERED AND SENT BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

November 2, 2007

Dr. Robert Emery
750 Potomac River Road
McLean, VA 22102

Dear R.W.:

I am saddened and disappointed that after our 19 years of practicing together and build-ing one of the finest oral and maxillofacial surgery practices in the nation, I find it necessary to send you this letter. However, the cumulative effect of your efforts over the last five months en-dangers the safety of our patients and the well-being of our employees. As the head officer of the corporation I am compelled to act.

Your actions clearly manifest your intent to leave or destroy the practice. Under your employment agreement you are free to withdraw. (Emery Employment Agreement, ¶ 13.C). All I ask is that you comply with the Employment and Shareholder agreements that you have prom-ised to follow.

Under ¶ 13.C, should you resign, you are required to give six months notice. I am pre-pared to accept your resignation, and in lieu of the six months notice I will offer to pay your salary for six months and the accrued bonus. Under this option, you will not be required to be present at the office and may be relieved of your duties and responsibilities during that period. Further, I would be prepared to issue a press release or other communication that is mutually agreeable announcing your withdrawal from the practice.

If you choose not to elect to withdraw, then please be advised that you are hereby on notice that you are in violation of ¶¶ 13.D. (2), (4), (6), (7) and (8) of your Employment Agree-ment which constitutes grounds for your termination with cause.

These violations include the following:

1. 13.D.(4), (7) :

You have breached the covenants not to compete and solicit business (¶¶ 8.a and 8.c.), in seek-ing to establish your own practice within the District of Columbia; build a personal (non-firm) referral network by directing business to yourself as opposed to the corporation; sought to en-gage an associate dentist for your personal practice; and sought to hire corporate employees to leave with you to open your own firm. You have also sought to conceal your breaches. Addi-tionally, you have harassed and coerced employees in an attempt to have them terminate their



Doctors Guttenberg and Emery, PC
ORAL AND MAXILLOFACIAL SURGERY

Steven A. Guttenberg, DDS, MD
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*

Robert W. Emery, DDS
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*



*Fellows, American
ation of Oral and
llofacial Surgeons*

employment because they either refused to join you in a new practice or support you in your efforts to establish that practice; sought to train staff personnel, while in the employ of the corporation, to undertake duties (already performed by other staff in the corporation), so that they would leave with you and be prepared to perform those duties in your new practice; engaged in a deceptive pattern of conduct intended to divide the loyalty and morale of the staff; and have permitted your focus to be diverted from the care of our patients to scheming in order to forward your own personal interests, thereby endangering the corporation's patients.

2. 13.D. (5) and (6), (7), (8):

Without authorization and in order to further your personal interests you have removed from the office the personnel file of Donna Breeyear and the legal file and personnel file of Katherine Keyes. You have also taken from Ms. Breeyear's the most current seven years of annual evaluation reviews as well as other documents from her file. You are thereby divulging confidential business information, exposing the corporation to liability and engaging in conduct harmful to the corporation. Despite my requests that these files be returned, in their complete condition, you have failed to comply.

In order to avoid further disruption to the office, the staff and our professional practices, however, should you not elect to withdraw under ¶ 13.C., I will offer you the option of being terminated without cause under ¶ 13.B. In this event I am also prepared, in lieu of the six months notice provision to pay your salary for six months and the accrued bonus and you will not be required to be present at the office and may be relieved of your duties and responsibilities during that period. Pursuant to this section, you will receive the termination compensation specified in ¶ 14.A. Also, under any of the options offered your shares will be purchased pursuant to formula set forth in ¶6.B. of the Shareholder Agreement. Please be reminded that under any termination of employment option you will remain bound by the covenants contained in ¶ 8, and that your failure to abide by the covenants would result in the forfeiture of all payments.

Lastly, despite the continuation of your persistent endeavors to seek methods to dissolve and disrupt the corporation, I will leave the door open if you decide to change your mind, to remain with the practice and sincerely desire to resurrect your commitment and attention to the practice. Should you decide in this direction, I remain open to discussing how we could move forward. However, if your disruptive efforts do not immediately cease, I will assume you have no such interest, and that this option is foreclosed.

I believe a reasonable time to advise me of how you would like to proceed is ten days from the date of this letter. Should you decide sooner I would appreciate your advising me.

In the interim (while you make your decision), and thereafter, should you choose to stay, please be advised that pursuant to ¶ 8.d. of your Employment Agreement you are advised to immediately desist in the conduct described under ¶ 13 above and immediately cure the breaches specified. Further, I reserve the right that in the event that these breaches are not cured, or additional breaches occur or are threatened, that you will be terminated for cause, and, if necessary, application for injunctive relief under ¶ 8.d. will be made. In this event you would be entitled only to the compensation specified in ¶ 14.A., and would also remain bound by the ¶ 8 covenants.

As I stated at the beginning of this letter, it grieves me deeply that you have chosen to



Doctors Guttenberg and Emery, PC
ORAL AND MAXILLOFACIAL SURGERY

Steven A. Guttenberg, DDS, MD
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*

Robert W. Emery, DDS
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*



*Fellows, American
·iation of Oral and
lofacial Surgeons*

pursue the path of leaving. Having so chosen, I ask only that you comply with your contractual agreements.

Sincerely,

Steven A. Guttenberg, DDS, MD
President, Doctors Guttenberg and Emery, PC

# Exhibit 15



575 7th Street, NW                 Telephone 202-344-4000        www.venable.com
Washington, DC 20004              Facsimile 202-344-8300

Brian L. Schwalb                    202-344-4356                BLSchwalb@venable.com

November 5, 2007

## BY FACSMILE

Geoffrey P. Gitner, Esquire
Law Offices of Geoffrey P. Gitner
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037

Re:   Dr. Emery and Dr. Guttenberg

Dear Geoff:

As you know, Dr. Emery's view is that Doctors Guttenberg and Emery, P.C. has been dissolved, and that Dr. Guttenberg's unilateral steps purporting to reinstate the company were unauthorized and void. However, we agreed at our meeting on October 18 that, pending our follow up meeting on November 6, we would urge our respective clients to continue seeing patients and avoid exacerbating the situation while we all worked to develop a mutually acceptable way to separate. Unfortunately, it is apparent that Dr. Guttenberg has spent considerable time over the past couple of weeks posturing and trying to "create a record" for litigation purposes. Dr. Guttenberg's letter to Dr. Emery on Friday, as well as the flurry of emails he has recently sent to Dr. Emery, are replete with false and unfounded allegations. We see no benefit or purpose, at this time, rebutting or debating the points. Suffice it to say that we disagree with Dr. Guttenberg's factual and legal assumptions and conclusions.     His communications and approach only serve to confirm why he and Dr. Emery must find a way to separate from one another.

While it is regrettable that Dr. Guttenberg chose to couple it with threats and posturing, we recognize that his November 2 letter contains a proposal for separation. For that reason, we look forward to our meeting tomorrow afternoon, and to what will, hopefully, be a constructive dialogue. I trust you received, and have had a chance to review, the proposed agenda that Joe circulated last week, but in the event that you did not, I am enclosing another copy of it. So that we will be in a better position to understand the proposal in Dr. Guttenberg's November 2 letter, please let us know precisely what he believes Dr. Emery's "salary for six months and the accrued bonus" would amount to. Also, please advise whether Dr. Guttenberg's proposal that Dr. Emery be terminated without cause under ¶ 13.B of the Employment Agreement includes the payment, pursuant to ¶ 14.B, of the amount of the Buy-In-Adjustment credited to Dr. Guttenberg.

# VENABLE LLP

---

Geoffrey P. Gitner, Esquire
November 5, 2007
Page 2


       Should you wish to discuss this in advance of our meeting tomorrow, please feel free to call me.

                            Sincerely yours,

                            Brian L. Schwalb

BLS:pb

cc:    Dr. Robert Emery
        Joe A. Shull, Esq.
        Bruce E. Kauffman, Esq.

## Schwalb, Brian L.

| | |
|---|---|
| **From:** | Shull, Joe A. |
| **Sent:** | Thursday, November 01, 2007 9:45 PM |
| **To:** | 'gitner@blankrome.com'; 'wang@blankrome.com' |
| **Subject:** | Drs. Guttenberg and Emery, P.C. - Agenda for Next Tuesday's Meeting at Venable |
| **Attachments:** | RE: September Financial statements; Drs. Guttenberg and Emery, P.C. Fixed Benefit Pension Plan; Scan001.PDF |

Dear Geoff and Eric,

Attached is our proposed agenda for the meeting this next Tuesday at 3:00 pm in our offices, to which you are welcome to add any items you like. Also attached are copies of financial information which was provided to us by the company's accountant and pension plan administrator.

Eric, Geoff said to us earlier that he likes to receive only mail and fax for some reason. I will be out of town tomorrow so I cannot provide him that convenience. Would you kindly see that he gets a copy of this communication and confirm to me that he did receive it. Thank you.

**Joe A. Shull**
Venable LLP
575 7th Street, N.W., Washington, D.C. 20004-1601
Tel: 202-344-4821;   Fax: 202-344-8300
www.venable.com;  Email: jashull@venable.com

Drs. Guttenberg and Emery, P.C.

Items for Discussion at Meeting on November 6, 2007

1. Terms of a Mutually Agreeable Separation

    a)   Dr. Emery's Proposal

    b)   Dr. Guttenberg's Proposal

2. Conduct of the Business Pending Separation

    a)   Donna Breeyear.

    b)   Lisa Derrington

    c)   Director Meetings

    d)   Election of Corporate Officers

    e)   Selection of Corporate Counsel

11/5/2007

f)   Signatories on Corporate Bank Account

g)   Patient Notes

h)   Allocation of Referrals from Website and e-mail account

i)   Communications with Office Personnel

j)   Sexual Harassment and EEO Policies

k)   Maintenance of Employee Records

l)   Staffing

m)   Division of Profits

n)   Funding of Pension Plan (last year and this year)

3. Arranging for a Joint Meeting with the Doctors and Counsel

4. Options if the Parties Cannot Agree on Terms of a Separation

a)   Mediation

b)   Court Proceeding

c)   Injunction

5. Bylaws

6. Company Files



VENABLE LLP
*Including professional corporations*
575 7th Street, N.W.
Washington, DC 20004-1601
(202) 344-4000; Fax (202) 344-8300
www.venable.com

MARYLAND • WASHINGTON, DC • VIRGINIA

## FAX COVER SHEET

**DATE:**   November 5, 2007

**CLIENT/MATTER NUMBER:**    26539    :    251045

**TO:**

| Name | Company | Fax No. | Telephone No. |
|------|---------|---------|---------------|
| Geoffrey P. Gitner, Esq. | | 202-772-5858 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**FROM:**

Name:    **Brian L. Schwalb**         Telephone No.:   **202-334-4356**

Assistant:   **Pam Bransfield**                **202-344-4223**

Number of page(s) ___5___ (including cover page)

| Message: |
|----------|
| |

### CONFIDENTIALITY NOTICE

### WARNING:
**Unauthorized Interception of this telephonic communication could be a violation of Federal and State Law**

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged.  The information is intended only for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.  If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.

# Exhibit 16



Doctors Guttenberg and Emery, PC

ORAL AND MAXILLOFACIAL SURGERY

Steven A. Guttenberg, DDS, MD
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*

Robert W. Emery, DDS
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*



*Fellows, American
Association of Oral and
Maxillofacial Surgeons*

**PERSONAL AND CONFIDENTIAL**

**HAND DELIVERED AND SENT BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

December 14, 2007

Dr. Robert Emery
750 Potomac River Road
McLean, VA 22102

Dear Doctor Emery:

As your response to my letter to you of November 2, 2007 has been to decline to pursue any of the options open to you, please be advised as follows:

Though I believe grounds exist to terminate your employment with cause under Paragraph 13.D., of your Employment Agreement of July 30, 1990 (the "Employment Agreement"), at this time in order to avoid further harm to the Corporation and its employees, and to avoid litigation as to whether or not cause may or may exist, please be advised that as of the date of this letter your employment is terminated without cause pursuant to Paragraph 13.C. of the Employment Agreement.

Pursuant to Paragraph 13.C, you will be paid your existing monthly salary for the next six months, through June 13, 2008. Your current health, disability and life insurance coverage will also continue to be covered through June 13, 2008. You will also receive your 2007 bonus, prorated through December 14, 2007. On June 13, 2008, you will be given the option to elect to pay for continued health insurance coverage under COBRA.

During this period, you will be required to comply with the provisions of Paragraph 16 of the Employment Agreement.

As required under Section 6.B. of the July 30, 1990 Shareholder Agreement (the "Shareholder Agreement"), enclosed herewith is a check payable to you in the amount of $31,250.00. Under Section 6.B of the Shareholder Agreement upon termination for any reason, you are required to sell your shares in the Corporation back to the Corporation for a purchase price equal to the greater of (i) the accrual basis book value of the stock; or (ii) the amount you paid the Corporation for the stock. As provided in Section 6.C. the accrual basis value has been calculated by William Beale, the certified public accountant who has regularly served the Corporation to be a negative amount (-$207,903). Accordingly, the greater amount is what you paid to purchase the stock, $31,250.00. Further, please be advised that under Section 6.F. of the Shareholder Agreement, though you are no longer a Corporation shareholder, you are required to continue to comply with the terms of your Employment Agreement (including the covenants which survive your termination), and that in the event you breach any of the terms set forth in your Employment Agreement you shall be obligated to pay to the Corporation the amount of Five Hundred Thousand Dollars ($500,000.00).



Doctors Guttenberg and Emery, PC
ORAL AND MAXILLOFACIAL SURGERY

Steven A. Guttenberg, DDS, MD
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*

Robert W. Emery, DDS
*Diplomate, American
Board of Oral and
Maxillofacial Surgery*

*Fellow, American
College of Oral and
Maxillofacial Surgeons*



*Fellows, American
Association of Oral and
Maxillofacial Surgeons*

Please be advised that under your Employment Agreement, you will continue to be bound by the covenants contained in Paragraphs 8.a, b and c, as well as the liabilities contained in Paragraph 8.d. Please be advised that violations of those provisions may be deemed to constitute grounds for termination with cause. As provided in Paragraph 8.c you may be relieved of your obligations under Paragraph 8.c. by payment to the Corporation of $500,000.

Under Paragraphs 13.C and 14.B. of your Employment Agreement, you are entitled to receive the amount of the Buy-In Adjustment as determined under Paragraph 5.c., which was $370,000 (the "Buy-In"). Under Paragraph 14.B., you will receive fifty per cent (50%) of the Buy-In, $185,000.00, on July 13, 2008. The remainder shall be paid to you in monthly installments (or annually should you so choose) with interest at the Prime Rate established by Citibank, New York, New York, over the "term" which is equal to the time when you entered the Employment Agreement, July 30, 1990, and June 13, 2008.

Under Paragraphs 16.A. and B. of your Employment Agreement you are required to take all steps requested by the Corporation to transfer all patients that you have treated or may be treating to the Corporation. Further, under Paragraphs 16.A. and 16.B. of your Employment Agreement, all records of the Corporation, including all patient records, belong to the Corporation, and you are required to surrender those records to the Corporation. To the extent that you possess any of these records outside the office, or on your personal computers, you are hereby instructed to immediately return those records to the Corporation's office, and surrender or delete any software programs on your personal computers that allow you access to the Corporation's servers.

The Corporation hereby reserves the right to terminate you with cause between now and June 13, 2008, should the Corporation determine that cause exists under the Employment or Shareholder Agreements. Should this occur you will no longer be entitled to the payments addressed in Paragraph 14.B. or to the continuation of salary and benefits.

Sincerely,

Steven A. Guttenberg, DDS, MD
President, Doctors Guttenberg and Emery, P.C.

# Exhibit 17



575 7th Street, NW
Washington, DC 20004

Telephone 202-344-4000
Facsimile 202-344-8300

www.venable.com

---

Brian L. Schwalb

202-344-4356

BLSchwalb@venable.com

December 17, 2007

**VIA E-MAIL and U.S. MAIL**

Geoffrey P. Gitner, Esquire
Law Offices of Geoffrey P. Gitner
Watergate, Twelfth Floor
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037

      Re:    Drs. Guttenberg & Emery, P.C.

Dear Geoff:

As you know, your client, Dr. Guttenberg, sent Dr. Emery a letter on Friday afternoon, December 14, purporting to terminate Dr. Emery's employment with the P.C. without cause. Dr. Guttenberg lacks any legal or proper authority to terminate Dr. Emery and, accordingly, we view his letter purporting to do so as a nullity. Dr. Emery remains an employee, as well as a 50% shareholder, director and officer, of the P.C. and is entitled to all of the legal rights and privileges attendant to those positions. Dr. Emery has no obligation to sell back his shares of the P.C. nor any present intention to do so.

Dr. Guttenberg's letter from Friday is, regrettably, a continuation of his pattern of attempting to act unilaterally for the P.C. even though he lacks the legal authority to do so. Dr. Emery is an equal owner and director of the P.C., and is legally entitled to an equal voice in managing the affairs of the business; Dr. Guttenberg's refusal to acknowledge that business reality is what has led to and exacerbated the current unhappy state of affairs.

Because I remain of the view that Drs. Emery and Guttenberg should continue to try to work out their business affairs through negotiation, I will refrain from a more detailed response to Dr. Guttenberg's letter, or a more detailed recitation of Dr. Guttenberg's misconduct and how it has harmed the P.C. and Dr. Emery.  Needless to say, this letter is not (and should not be deemed to be) a waiver of any of Dr. Emery's arguments or rights, all of which are expressly reserved to the extent a settlement is not reached.

We await your detailed response to the Term Sheet we forwarded on Thursday, which you indicated you would be getting to me either later this evening or tomorrow morning.  In the meantime, we will continue our efforts to ascertain how and in what amounts Dr. Guttenberg has caused corporate monies to be spent and to calculate the 2007 accrued profits that are properly distributable to each of the P.C.'s equal owners. We expect that Dr. Guttenberg will not take any steps to cause the disbursement of corporate funds without Dr. Emery's advance consent, nor

# VENABLE LLP

Geoffrey P. Gitner, Esquire
December 17, 2007
Page 2

take any further unilateral steps regarding the business affairs of the P.C. in contravention of Dr. Emery's rights.

Sincerely yours,

Brian L. Schwalb

BLS:pb

cc.    Dr. Robert W. Emery, III
       Bruce E. Kauffman, Esq.
       Joe A. Shull, Esq.

# Exhibit 18

# CURRICULUM VITAE:                     Steven A. Guttenberg, DDS, MD

## PERSONAL DATA

| | |
|---|---|
| Date of Birth: | February 9, 1944 |
| Place of Birth: | Passaic, New Jersey |
| Home: | 8801 Chalon Drive |
| | Bethesda, Maryland  20817-3040 |
| Office: | 2021 K Street, NW, Suite 200 |
| | Washington, D.C.  20006-1003 |
| | 202.466.3323 |
| | Fax:  202.466.5236 |
| E-Mail: | sag@mouthfacejaw.com |
| Website: | www.mouthfacejaw.com |

## EDUCATION

| | |
|---|---|
| 1961-1965: | Bachelor of Arts (Psychology) |
| | State University of New York at Buffalo |
| 1965-1969: | Doctor of Dental Surgery |
| | School of Dental Medicine |
| | State University of New York at Buffalo |
| 1971-1974: | Residency in Oral and Maxillofacial Surgery |
| | Washington Hospital Center, Washington, DC |
| 2000-2001: | Doctor of Medicine |
| | School of Medicine, University of Health Sciences Antigua |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1969-1971: | Dental Officer, United States Army, Fort Knox, Kentucky |
| 1970-1971: | Chief, Oral Surgery Section, Craven Army |
| | Dental Clinic, Fort Knox, Kentucky |
| 1974-    : | Private practice, Oral and Maxillofacial Surgery |
| 1974-    : | Teaching Staff, Washington Hospital Center, Oral and Maxillofacial Surgery |
| 1974-1977: | Training and Education Committee, |
| | Washington Hospital Center |
| 1975-1977: | Guest Lecturer, School of Dentistry, Georgetown University |
| 1976-1977: | Medical Records Committee, Doctors' Hospital of |
| | Prince Georges County |
| 1977-    : | Consultant in Oral and Maxillofacial Surgery |
| | to the Peace Corps |
| 1980-1983: | Oral Surgery Consultant, American Cancer |
| | Society of the District of Columbia |
| 1980-1982: | Tissue Committee and Medical Records Committee, |
| | Capitol Hill Hospital |
| 1981-    : | Resident Training and Education Committee, Department of Oral and |
| | Maxillofacial Surgery, Washington Hospital Center |
| 1981-1989: | Medical Records and Audit Committee, |
| | Washington Hospital Center |
| 1981-    : | Consultant in Oral and Maxillofacial Surgery |
| | to the National Zoo |
| 1981-1991: | Chief, Section of Oral and Maxillofacial Surgery, |
| | Capitol Hill Hospital |
| 1983-1985: | Operating Room Committee, Capitol Hill Hospital |
| 1984-1986: | Medical Advisory Committee, Rehabilitation |
| | Services Administration, District of Columbia |
| 1986-1988: | Mortality and Morbidity Committee, Capitol Hill Hospital |
| 1987-2000: | Maxillofacial Consultant, Transplantation Services, American Red Cross |

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 2
November 13, 2007

| | |
|---|---|
| 1988-1991: | Secretary-Treasurer, Department of Oral and Maxillofacial Surgery, Washington Hospital Center |
| 1988-1991: | Operating Room Committee, Capitol Hill Hospital |
| 1989-       : | Practice Committee, Department of Oral and Maxillofacial Surgery, Washington Hospital Center |
| 1991-1994: | Vice-Chairman, Department of Oral and Maxillofacial Surgery, Washington Hospital Center |
| 1992-1993 : | Medical and Dental Staff Development Committee, Washington Hospital Center |
| 1993-1994 : | Managed Care Advisory Task Force, Washington Hospital Center |
| 1997-       : | Clinical Associate Professor, Oral and Maxillofacial Surgery, Temple University, Philadelphia, Pennsylvania |
| 1999-       : | Chairman of Training and Education Committee, Department of Oral and Maxillofacial Surgery, Washington Hospital Center |
| 2000-       : | Professor of Surgery, Nova Southeastern University, School of Dental Medicine |
| 2001-2003   : | Editorial Review Board Consultant, The Internet Medical Journal |
| 2002-       : | Editorial Board, Oral Surgery, Oral Medicine, Oral Pathology, Oral Radiology and Endodontology |
| 2004-       : | Administrative Editor, Practical Reviews in Oral and Maxillofacial Surgery |

## SOCIETIES AND MEMBERSHIPS

International Association of Oral and Maxillofacial Surgeons: Fellow
Academy of Dentistry International: Fellow
International College of Dentists: Fellow
Federation Dentaire Internationale
International Congress of Oral Implantologists: Diplomate
American Dental Association
American Medical Association
American Association of Oral and Maxillofacial Surgeons: Fellow
           Task Force on the Legal and Ethical Advertising of Degrees
American College of Oral and Maxillofacial Surgeons: Fellow,
           President
           President-Elect
           Vice President,
           Chairman of Committee on Continuing Education
           Regent of District II - Middle Atlantic; Co-General Chairman, 23rd Annual Scientific Session, 2002; Local Arrangements Co-Chair 2000;
           Scientific Committee, Editorial Committee-ACOMS Review
American College of Oral Implantology: Diplomate
American Society of Osseointegration: Fellow
American Society for Laser Medicine and Surgery: Fellow
American Board of Forensic Dentistry: Diplomate
American Academy of Cosmetic Surgery: Fellow
           Practice Parameters Task Force
American Dental Society of Anesthesiology
American Trauma Society
American Academy of Sleep Medicine
Academy of Osseointegration
American College of Forensic Examiners: Fellow
American Cleft Palate-Craniofacial Association
Middle Atlantic Society of Oral and Maxillofacial Surgeons
Pan American Medical Society
Greater Washington Society of Oral and Maxillofacial Surgeons:
           Office Anesthesia Evaluation Committee

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 3
November 13, 2007

District of Columbia Society of Oral and Maxillofacial Surgeons:
>President, Secretary-Treasurer, Office Anesthesia Evaluation Committee (Chair)

District of Columbia Dental Society:
>Vice President; Spring Meeting-General Chairman, General Chair-Elect, Vice-General Chair; Secretary, Board of Directors; Editor-in-Chief of Society Newsletter; Tellers Committee–Chair; Associate Editor of Society Journal

Medical Society of the District of Columbia

Alpha Omega Dental Fraternity:
>President, President-Elect, Sergeant at Arms, Trustee of Sherril Siegal Memorial Foundation

Maimonides Dental Society:
>President, President-elect, Vice-President, Secretary, Treasurer, Executive Committee

Metropolitan Study Club:
>President, Scientific Program Director

## HONORS AND SPECIAL TRAINING

George B. Snow Prize, State University of New York at Buffalo,School of Dental Medicine, 1969
Oral Surgery Externship, Ireland Army Hospital, 1970
Commendation Medal, United States Army, 1971
Advanced Oral Pathology, Armed Forces Institute of Pathology, 1972
Certificate in Forensic Odontology, Armed Forces Institute of Pathology, 1972
Harry H. Kerr Medical Essay Competition, First Prize, Washington Hospital Center, 1973
Alton Brashear Post-Graduate Course in Head and Neck Anatomy,
>Medical College of Virginia, 1973

Harry H. Kerr Medical Essay Competition, Fourth Prize, Washington Hospital Center, 1974
Microsurgery for Oral and Maxillofacial Surgeons, University of Washington, 1981
Branemark Osseointegration Course, Washington Hospital Center, 1986
Advanced Concepts in Rigid Facial Skeletal Fixation, School of Medicine,
>University of Maryland, 1987

Innovations in Dental Implantology and Restoration of the Implant Patient,
>State University of New York at Buffalo, 1988

The Art of Cosmetic Facial Surgery, Graduate Hospital of the
>University of Pennsylvania, 1989

Update In Cutaneous Laser Surgery, Harvard University Medical School, 1989
Facial Aesthetic Considerations in the Surgical Correction of Dentofacial
>Deformities, University of Florida College of Dentistry, 1991

Open and Closed Rhinoplastic Surgery for the Oral and Maxillofacial Surgeon,
>University of Michigan School of Dentistry, 1991

Esthetic Maxillofacial Surgery, American Association of Oral and Maxillofacial
>Surgeons, Chicago, Illinois, 1991

Excellence in Continuing Education Award, District of Columbia Dental Society, 1988, 1989,
>1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001,
>2002, 2003, 2004, 2005, 2006

Pulsed Dye Cutaneous Laser Surgery-A "Hands-On" Supervised Workshop for
>Physicians, Georgetown University Medical Center, 1992

Dermabrasion and Chemical Peel, Gulf South Medical and Surgical Institute,
>Burks-Farber Clinics, New Orleans, Louisiana, 1992

Open Structure Rhinoplasty, Harvard University Medical School, 1992
Tumor and Reconstructive Surgery, American Association of Oral and
>Maxillofacial Surgeons, Chicago, Illinois, 1992

OMFS Practitioner Innovation Award, Oral and Maxillofacial Surgery Foundation, 1993
Lasers in Oral and Maxillofacial Surgery, Alexandria, Virginia, 1994

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 4
November 13, 2007

Preceptorship in Laser Assisted Uvulopalatoplasty, Department of Surgery,
        Medical College of Virginia, Richmond, VA, 1994
Laser Course on Office Based ENT Procedures, Philadelphia, PA, 1994
Advances in the Diagnosis and Treatment of Sleep Apnea and Snoring, University of
        Pennsylvania Medical Center, Philadelphia, PA, 1994
Advanced Cardiac Life Support Certification, 1980, 1995, 2004
Preceptorship in Laser Cosmetic Skin Resurfacing, Facial Plastic Surgery Center,
        Indianapolis, IN, 1995
Golden Spear Point Award for Teaching Excellence and Outstanding Contributions to the Oral and
        Maxillofacial Surgery Residency Training Program,
        Washington Hospital Center, 1996
Outstanding Clinical Instructor Award, Department of Oral and Maxillofacial Surgery, Washington
        Hospital Center, 1997, 1998, 1999, 2000, 2001, 2002, 2004, 2005, 2006, 2007
The Aging Face '97, American Academy of Facial Plastic and Reconstructive Surgery,
        Indianapolis, IN, October 16-19, 1997
Best Dentists List (Oral and Maxillofacial Surgery), Washingtonian Magazine, December, 1997
Oral Surgery Honor Society, Temple University School of Dentistry,
        Elected as an honorary member, 2000
Continuing Medical Education Award, American Academy of Cosmetic Surgery, 1999
Valedictorian, University of Health Sciences Antigua, School of Medicine, January 19, 2002
Exemplary Leadership Award, University of Health Sciences Antigua, School of Medicine,
        January 19, 2002
Best Dentists List (Oral and Maxillofacial Surgery-top vote getter), Washingtonian Magazine,
        February, 2003
Endoscopy for Mandibular Reconstruction and Salivary Disease, Harvard Medical School, Boston,
        Massachusetts, October 9-10, 2004
Best Dentists List (Oral and Maxillofacial Surgery-top vote getter), Washingtonian Magazine,
        October, 2006
Sterling V. Mead Award for outstanding achievements in dentistry (Highest award given by District
        of Columbia Dental Society) June, 2007

## LICENSES AND BOARDS

District of Columbia
Northeast Regional Board
National Dental Board, Parts I and II
American Board of Oral and Maxillofacial Surgery-Diplomate

## PUBLICATIONS AND PRESENTATIONS

Oral Surgeon Within the Hospital Environment, OR Tech, January/February 1973
Osteoradionecrosis of the Jaw, American Journal of Surgery, March 1974
Common Non-Neoplastic Disorders of the Major Salivary Glands,
        District of Columbia Dental Journal, Spring 1978
Oral and Maxillofacial Surgery:  An Overview, Editorial,
        District of Columbia Dental Journal, Spring 1978
Masseteric Intramuscular Hemangioma:  Report of Case and Literature Review,
        Washington Hospital Center Archives, 1974
Osteoradionecrosis of the Jaw, Reprinted for "Selected Readings in General
        Surgery", The University of Texas
Maxillofacial Osteoradionecrosis:  Unpublished Clinical Investigation, 1971-1972
Arthritic Disorders of the Temporomandibular Joint,
        District of Columbia Dental Journal, Winter 1978
Oral and Maxillofacial Surgery, Guest Lecture, Association of Surgical Technologists, Regional
        Meeting, Silver Spring, MD, October 6, 1979

District of Columbia Dental Journal, Theme Editor, Spring 1980, Volume 54, Number 3

District of Columbia Dental Journal, Theme Editor, Spring 1981, Volume 55, Number 2

Oral Surgery Panel Discussion, Moderator, District of Columbia Dental Journal,
Spring 1981, Volume 55, Number 2

Oral and Maxillofacial Surgical Considerations in Midface Trauma, Guest Lecture,  Ocular and
Orbital Trauma Symposium, Washington Hospital Center, March 30-31, 1984

Dental Involvement in Midface Trauma, Guest Lecture, Metropolitan Dental Study Club,
Williamsburg, Virginia, June 9,1984

Jaw Reconstruction with Hydroxylapatite, Guest Lecture, Metropolitan Dental
Study Club, Williamsburg, Virginia, June 10, 1984

Midface Trauma for the Emergency Room Physician, Guest Lecture, Emergency Medicine
Department, Capitol Hill Hospital, June 13, 1984

Orthognathic Surgery for the General Practitioner, Lunch and Learn Lecture,
District of Columbia Dental Society 53rd Annual Spring Meeting,
April 15, 1985

Maxillofacial Injuries, Inservice Lecture, Nursing Staff, Capitol Hill Hospital, November 5, 1985

Newsletter of The District of Columbia Dental Society, Editor-in-Chief, Published Monthly,
June 1985-June 1987

The Medical Letter for Dentists, Editor and Publisher, Published Quarterly,
March 1985-1995

A Symposium on Acquired Immune Deficiency Syndrome, Lunch and Learn Lecture, Alpha
Omega Dental Fraternity, Rockville, Maryland, January 21, 1986

Hydroxylapatite-Coated Titanium Osseointegrated Dental Implants, Guest Lecture, Metropolitan
Dental Study Club, Rockville, Maryland, March 12, 1986

Diagnosis and Treatment of Oral and Maxillofacial Injuries, Inservice Lecture,
Emergency Room Nursing Staff, Capitol Hill Hospital, March 26, 1986

Assessment and Management of Maxillofacial Injuries, Guest Lecture, Pediatric Dentistry,
Children's Hospital National Medical Center, Washington, DC, April 16, 1986

Costochondral Grafting in Condyle Replacement and Mandibular Reconstruction, Poster Session,
(Co-authored with Georgi Obeid and Peter Connole), 68th Annual Scientific
Sessions of the American Association of Oral and Maxillofacial Surgeons,
New Orleans, Louisiana, September 26, 1986

It's Time To Wake Up And Smell The Coffee, The Newsletter of the District of Columbia Dental
Society, October 1986

Utilization of the Integral Implant System, Table Clinic, 62nd Annual Session of the Greater New
York Dental Meeting, New York, New York,December 1, 1986

Successful Dental Implantology with the Integral System, Guest Lecture, Diagnostics Unlimited
Study Club, Washington, DC, January 29, 1987

Jaw Reconstruction with Costochondral Grafts, Guest Lecture, Hospital of San Juan de Dios,
San José, Costa Rica, March 2, 1987

Jet Lag:  Proper Dietary Preparation May Prevent It, The Newsletter of The District of Columbia
Dental Society, Spring Meeting Edition,1987

Osseointegrated Implants-Simplified, Lunch and Learn Lecture, District of Columbia Dental
Society 55th Annual Spring Meeting, April 23, 1987

Costochondral Grafting in Condyle Replacement and Mandibular Reconstruction, Table Clinic,
(Co-authored with Georgi Obeid and Peter Connole), District of Columbia
Dental Society 55th Annual Spring Meeting, April 26, 1987

Fish, Fish, Fish, and More Fish, The Newsletter of The District of Columbia Dental Society,
May 1987

Nuclear Magnetic Resonance Imaging (MRI), The Newsletter of the District of
Columbia Dental Society, November 1987

Complicated Orbital Fractures, Advances in Ophthalmic Plastic and Reconstructive Surgery,-
Orbital Trauma, Volume VII, Pergamon Press, New York, 1988

Advances/Standards in Trauma, Panel Discussion (also, Drs. Phillip J. Boyne, John N. Kent, Robert V. Walker), American College of Oral and Maxillofacial Surgeons, Palm Beach, Florida, March 21, 1988

Costochondral Graft for TMJ Reconstruction, Presentation of Case Reports, American College of Oral and Maxillofacial Surgeons, Palm Beach, Florida, March 23, 1988

Costochondral Grafting in Condyle Replacement and Mandibular Reconstruction, (Co-authored with G. Obeid and P. Connole), J Oral and Maxillofac Surg, March 1988

Surgical Aspects of the Integral Implant System, Instructor, Implant Course, Dallas Texas, June 9-12, 1988

Benign Mesenchymoma of the Palate: Report of a Case, (Co-authored with Jane Marie Daly), J Oral and Maxillofac Surg, October 1988

Surgical Aspects Osseointegrated Dental Implants, Guest Lecture, Metropolitan and District of Columbia Dental Study Clubs, Washington, DC, March 22, 1989

Computers in the Dental Practice, Participation Clinic, District of Columbia Dental Society 57th. Annual Spring Meeting, April 6, 1989

TMJ, Guest Lecture, Nursing Staff, Capitol Hill Hospital, October 17, 1989

Cranial Arteritis Mimicking Odontogenic Pain: Report of Case, (Co-authored with R.W. Emery, S. Milobsky, and M. Geballa), JADA, November 1989

Orthognathic Surgery, Guest Lecture, Nursing Staff, Capitol Hill Hospital,    March 6, 1990

Cranial Arteritis Mimicking Odontogenic Pain: Report of Case, (Abstract), Dental Abstracts, March-April 1990

Chemical Injury Of The Oral Mucosa From Verapamil, N Engl J Med, August 30, 1990

Why There Should Not Be A Specialty of Dental Anesthesiology, ACOMS Review, September, 1990

Soft Tissue Laser Surgery, Guest Lecture, Greater Washington Dental Science Club, Rockville, MD, May 9, 1991

Diagnosis and Treatment of Facial Bone Fractures: Part I, (Co-authored with R.W. Emery), Trauma, October 1991

Diagnosis and Treatment of Facial Bone Fractures: Part II, (Co-authored with R.W. Emery), Trauma, December 1991

Laser Surgery of the Oral Cavity, Guest Lecture, Yater Clinic, Washington, DC, March 26, 1992

Advanced Techniques for Treating the Challenging Implant Patient, Lecture, University of Maryland, School of Dentistry Continuing Education Program, Baltimore, Maryland, May 1, 1992

Surgical Management of the Implant Patient, Lecture, Brookdale Hospital Maxi-Course in Oral Implantology, New York University New York, New York, October 24, 1992

Advanced Implant Techniques, Guest Lecture, DC Metropolitan Dental Study Club, Washington, DC, November 18, 1992

Diagnosis and Treatment Planning for the Implant Patient, Lecture, Residents of the University of Maryland, School of Dentistry, Baltimore, Maryland, January 25, 1993

Surgical Technique for Implant and Abutment Placement, Lecture, Residents of the University of Maryland, School of Dentistry, Baltimore, Maryland, February 22, 1993

Advanced Surgical Techniques for Implants, Lecture, Residents of the University of Maryland, School of Dentistry, Baltimore, Maryland, April 26, 1993

Adjunctive Surgical Implant Techniques, Guest Lecture, Progressive Dental Study Club, Bethesda, Maryland, May 13, 1993

Advanced Surgical Implant Techniques; Longitudinal Report on HA-Coated Implants in Private Practice, Lecture, University of Pennsylvania, School of Dental Medicine/The Compendium of Continuing Education in Dentistry Symposium on HA-Coated Implants, Philadelphia, Pennsylvania, June 14, 1993

Determination of Blood Flow in the Posterior Mandible by Means of Laser Doppler Flowmetry, Clinical Investigation, 1992, 1993

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 7
November 13, 2007

Longitudinal Report on HA-Coated Implants and Advanced Surgical Techniques in a Private
Practice, The Compendium of Continuing Education in Dentistry,
October 1993

Advanced Surgical Implant Techniques and Statistical Analysis of HA-Coated Implant
Success, Lecture, Renaissance Dental Study Club,
Washington, DC, October 5, 1993

Medical Evaluation of the Dental Patient Made Easy, Lunch and Learn Lecture, Alpha Omega
Dental Fraternity, Rockville, Maryland, January 23, 1994

Advanced Implant Related Surgical Procedures and Management of Surgical Complications,
Lecture, 6th Annual Mid Winter Dental Convention and Implant Symposium,
Barbados Dental Association, Dover Convention Centre, February 10, 1994

Utilization of an Hydroxylapatite Coated Implant System and Long-Term Followup, Lecture, 6th
Annual Mid Winter Dental Convention and Implant Symposium, Barbados
Dental Association, Dover Convention Centre, February 12, 1994

Advanced Implant Related Surgical Procedures, Lecture, District of Columbia Dental Hygienists'
Association, Washington, DC, May 12, 1994

Orthognathic Surgery, Lecture, Comprehensive Care Study Sessions,
Washington, DC, June 24, 1994

Long-Term Experience with Posterior Mandibular Implants, Lecture, Abstract Session, 76th
Annual Scientific Sessions of the American Association of Oral and
Maxillofacial Surgeons, Denver, Colorado, September 29, 1994

Laser Doppler Flowmetry: Identification of Neurovascular Parameters and  Proximity During
Implant Placement, (Co-authored with R.W. Emery and Hamid Kazemi),
Lecture, Abstract Session, 76th Annual Scientific Sessions of the American
Association of Oral and Maxillofacial Surgeons, Denver, Colorado,
September 28, 1994

Long-Term Experience with Posterior Mandibular Implants, Abstract, J Oral Maxillofac Surg,
1994:52 (suppl): 95-96

Therapeutic Uses of Carbon Dioxide Lasers in Oral and Maxillofacial Surgery, Lectures, Denver,
Colorado, September 28 and 29, 1994

Advancing the Practice of Oral and Maxillofacial Surgery, A practical hands-on and lecture course,
focusing on applications, indications and techniques for using the $CO_2$ laser,
Cleveland, Ohio, December 3, 1994

Diagnosis and Treatment of Sleep Disorders, Lecture, Delta Sigma Delta Dental Fraternity,
Washington, DC, January 17, 1995

Advancing the Practice of Oral and Maxillofacial Surgery, A practical hands-on and lecture course,
focusing on applications, indications and techniques for using the $CO_2$ laser,
Orlando, Florida, January 28, 1995

Advancing the Practice of Oral and Maxillofacial Surgery, A practical hands-on and lecture course,
focusing on applications, indications and techniques for using the $CO_2$ laser,
Emory University, Atlanta, Georgia, February 18, 1995

Reconstructive Orthognathic Surgery and The Treatment of Sleep Disorders, Lecture, District of
Columbia Dental Society 63rd Annual Spring Meeting,
Washington, DC, March 4, 1995

Malpractice Pitfalls in Oral and Maxillofacial Surgery, Lecture, American Bar Association Annual
Meeting, San Francisco, California, April 8, 1995

Long-Term Implant Success:  Private Practice Perspective, Lecture, Calcitek's 1995 International
Implant Symposium, La Jolla, California, April 28, 1995

Use of the $CO_2$ Laser in Clinical Oral and Maxillofacial Surgery, Lecture, Great Lakes Society of
Oral and Maxillofacial Surgeons, Indianapolis, Indiana, May 7, 1995

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 8
November 13, 2007

Applications, Indications and Techniques for Using the CO2 Laser in Oral and Maxillofacial
            Surgery and Diagnosis and Treatment of Sleep Disorders, Lecture and Hands-
            on Instruction, Northeastern Association of Oral and Maxillofacial Surgeons,
            Mystic, Connecticut, May 8, 1995
Lasers in the Oral and Maxillofacial Surgery Practice, Lecture and Hands-on Instruction, Dental
            School, University of Maryland, Baltimore, Maryland, May 13, 1995
Long-Term Experience Utilizing Hydroxylapatite Coated Implants, Lecture, Implant Study Group,
            University of Paris, School of Dentistry, Paris, France, June 9, 1995
Long-Term Implant Success: A Private Practice Perspective, Lecture,
            College de Parodontie du Sud-Ouest, Toulouse, France, June 10, 1995
Advanced Implant Related Surgical Procedures to Improve Long-Term Success, Lecture,
            Renaissance Dental Study Club, Washington, DC, October 11, 1995
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, University of Texas, Dental Branch, Houston, Texas,
            October 21, 1995
Demonstration Course in the Use of the CO2 Laser for Facial Cosmetic Surgery, Treatment of
            Skin Lesions and Laser Assisted Uvulopalatoplasty,
            Washington, DC, November 15, 1995
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, Chicago, Illinois, November 18, 1995
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
            Demonstration Course, Washington, DC, December 9, 1995
Cosmetic Treatment of Facial Lesions and Wrinkles with the CO2 Laser, Brunch and Learn
            Lecture, Alpha Omega Dental Fraternity, Bethesda, Maryland,
            January 21, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, Denver, Colorado, January 27, 1996
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
            Demonstration Course, Washington, DC, February 3, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, Charlotte, North Carolina, February 24, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, Albany New York, March 16, 1996
Use of the CO2 Laser in Cosmetic Oral and Maxillofacial Surgery, Lecture, Southern Maryland
            Academy of General Dentistry, Rockville, Maryland, March 27, 1996
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
            Demonstration Course, Washington, DC, March 30, 1996
Using the Laser to Treat Dermatologic Pathology and Cosmetic Deficiencies of the Skin, Guest
            Lecture, Progressive Dental Study Club, Bethesda, Maryland, April 11, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, St. Louis, Missouri, April 20, 1996
Current Concepts in Facial Cosmetic Laser Surgery, Guest Lecture, Dental Progress Study Club,
            Chevy Chase, Maryland, April 22, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
            Instruction Course, Tampa, Florida, April 27, 1996
Skin Resurfacing Procedures Using the CO2 Laser, Lecture, American College of Oral and
            Maxillofacial Surgeons 17th Annual Meeting, Philadelphia, Pennsylvania,
            May 9, 1996
Laser Safety and the Operation of the Laser for Cosmetic Surgery and the Removal of
            Dermatologic Lesion, Eight Lectures and Hands-on Sessions, American
            College of Oral and Maxillofacial Surgeons 17th Annual Meeting,
            Philadelphia, Pennsylvania, May 10 ,11, and 12, 1996

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 9
November 13, 2007

The CO2 Laser for Treatment of Dermatologic Lesions and Cosmetic Skin Resurfacing, Guest
             Lecture, St. Luke's Roosevelt Hospital Center,
             New York, New York, June 7, 1996
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
             Demonstration Course, Washington, DC, June 8, 1996
Long-Term Experience with HA-Coated Implants:  Clinical Analysis and Proposals for Success,
             Guest Lecture, Legacy Emanuel Hospital & Health Center, Portland, Oregon,
             June 19, 1996
Treatment of Pathologic and Cosmetic Facial Lesions with the CO2 Laser, Guest Lecture, Oregon
             Health Sciences University, Portland, Oregon, June 20, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
             Instruction Course, Seattle Washington, June 22, 1996
Use of the CO2 Laser in Oral, Facial and Sleep Disorder Surgery, Lecture and Hands-on
             Instruction Course, Louisville, Kentucky, July 13, 1996
Long-Term Evaluation of HA-Coated Implants:  Paradigm for Success, Lecture, Calcitek's
             1996 International Implant Symposium, San Diego, California, August 3, 1996
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
             Hands-on Instruction Course, San Francisco, California, August 24, 1996
The CO2 Laser for Treatment of Dermatologic Lesions and Cosmetic Skin Resurfacing, Guest
             Lecture, Columbia Presbyterian Hospital, New York, New York,
             September 7, 1996
CO2 Laserabrasion for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
             Demonstration Course, Washington, DC, September 28, 1996
The CO2 Laser for Treatment of Dermatologic Lesions and Cosmetic Skin Resurfacing, Lecture,
             Atlanta, Georgia, October 13 1996
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
             Demonstration Course, Washington, DC, November 2, 1996
Laser Physics and Principles of Laser Surgery, Guest Lecture, Middle Atlantic Society of Oral and
             Maxillofacial Surgeons, Ellicot City, Maryland, November 7, 1996
Removal of Facial Lesions and Cosmetic Skin Resurfacing, Guest Lecture, Middle Atlantic
             Society of Oral and Maxillofacial Surgeons, Ellicot City, Maryland,
             November 7, 1996
Statistical Analysis of HA-Coated Endosseous Implants, Lecture, 1996 HA-Coated Implant
             Symposium, Tokyo, Japan, November 16, 1996
Adjunctive Procedures to Promote Long-Term Implant Success, Lecture, 1996 HA-Coated
             Implant Symposium Tokyo, Japan, November 17, 1996
Laser Cosmetic Skin Resurfacing, Article, Newsletter of the American Society Of Laser In
             Dentistry & Advanced Technologies, Fall 1996 Issue
The CO2 Laser for Treatment of Dermatologic Lesions and Cosmetic Skin Resurfacing, Lecture,
             Detroit, Michigan, December 7, 1996
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
             Hands-on Instruction Course, Santa Barbara, California, December 14, 1996
Long-Term Evaluation of HA-Coated Implants:  Paradigm for Success, Abstract,
             Implant Dentistry: Volume 5, Number 4, 1996
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture,
             Boston, Massachusetts, January 12, 1997
Bone Grafting and Nerve Repositioning Surgery to Improve the Success of Endosseous Implants,
             Guest Lecture, Central Maryland Implant Society, Columbia, Maryland,
             January 16, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
             Hands-on Instruction Course, Pittsburgh, Pennsylvania, January 18, 1997
Skin Resurfacing Procedures Using the Carbon Dioxide Laser, Lecture and Demonstration
             Course, Washington, DC, February 1, 1997

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 10
November 13, 2007

Laser Treatment for Facial Pathology and Cosmetic Defects, Lecture, District of Columbia Dental
     Society 65th Annual Meeting, Washington, DC, February 15, 1997
Cosmetic Skin Resurfacing, Lecture at the Louisiana State University School of Dentistry Course
     on Lasers in Oral and Maxillofacial and Cosmetic Surgery, New Orleans,
     Louisiana, February 22, 1997
Marketing Your Practice for Cosmetic Surgery, Lecture at the Louisiana State University School of
     Dentistry Course on Lasers in Oral and Maxillofacial and Cosmetic Surgery,
     New Orleans, Louisiana, February 22, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, Chicago, Illinois, March 1, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, St. Louis, Missouri, March 8, 1997
Laser Assisted Uvulopalatoplasty (LAUP) for the Treatment of Obstructive Sleep Disorders, Guest
     Lecture, Metro Study Club, Bethesda, Maryland, March 12, 1997
Laser-Assisted Cosmetic Skin Resurfacing and Dentistry, (Co-authored with Robert S. Emery),
     MSDA Journal, Volume 40 Number 1, Winter 1997
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
     Live Surgery Demonstration Course, Washington, DC, March 15, 1997
CO2 Laser Skin Resurfacing Course, Lecture, American College of Oral and Maxillofacial
     Surgeons 18th Annual Meeting, San Diego, California, March 20, 1997
CO2 Laser Skin Resurfacing Course, Clinical Sessions (6), American College of Oral and
     Maxillofacial Surgeons 18th Annual Meeting, San Diego, California,
     March 21 and 22, 1997
Laser Facial Skin Resurfacing, Lecture, Georgetown University, Washington, DC,
     March 26, 1997
Microsporidiosis of the Mandible in a Patient with Acquired Immunodeficiency Disease,
     (Co-authored with James Belcher and Barry Schmookler), J Oral Maxillofac
     Surg, 55:424-426, April 1997
Laserabrasion for Cosmetic Skin Resurfacing, Lecture, Kentucky Society of Oral and
     Maxillofacial Surgeons, Louisville, Kentucky, April 5, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, Ohio State University, April 19, 1997
Laser Cosmetic Skin Resurfacing and Removal of Dermatologic Pathology, Lecture and Hands-on
     Instruction Course, Dallas, Texas, April 26, 1997
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
     Live Surgery Demonstration Course, Washington, DC, May 3, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, New York, New York, May 10, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, Kansas City, Missouri, May 31, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, Denver, Colorado, June 7, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, Orlando, Florida, July 12, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, Monterey, California, July 26, 1997
Use of the CO2 Laser for Facial Cosmetic Surgery and the Treatment of Skin Lesions, Lecture and
     Live Surgery Demonstration Course, Washington, DC, September 13, 1997
Laser Assisted Removal of Facial Rhytids and Lesions, Lecture, Surgical Clinic, 79th Annual
     Scientific Sessions of the American Association of Oral and Maxillofacial
     Surgeons, Seattle, Washington, September 19, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
     Hands-on Instruction Course, San Francisco, California, October 4, 1997

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 11
November 13, 2007

Use of the CO2 Laser for Facial Cosmetic Surgery, Treatment of Skin Lesions and
Blepharoplasties, Lecture and Live Surgery Demonstration Course,
Washington, DC, October 23, 24, 25, 1997
CO2 Laser Workshop for Oral and Maxillofacial Surgeons, Lecture and Hands-on Instruction
Course, Coral Gables, Florida, October 31, November 1, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course,Stamford, Connecticut, November 15, 1997
Laser Cosmetic Skin Resurfacing, Lecture Course, Scottsdale, Arizona, December 6, 1997
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Cincinnati, Ohio, December 12 and 13, 1997
Use of the CO2 Laser for Facial Cosmetic Surgery, Treatment of Skin Lesions and
Blepharoplasties, Live Surgery Demonstration Course, Washington, DC,
January 10, 1998
Safety and Successfulness of Hydroxylapatite Coated Implants, Testimony before the Dental
Products Panel Meeting of the Food and Drug Administration on the
Reclassification of Endosseous Implant Subgroups, Rockville, Maryland,
January 13, 1998
Ask the Expert, Answering Health Questions at the NBC 4 Your Health and Fitness Expo,
Washington, DC, January 17, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course,St. Louis, Missouri, January 24, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Atlanta, Georgia, January 30 and 31, 1998
Surgical Procedures to Improve Prosthetic Results and Implant Survival Outcomes, Lecture,
Scientific Sessions of International Congress of Oral Implantologists Winter
Symposium, Tarpon Springs, Florida, February 5, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Bellevue, Washington, February 14, 1998
Use of the CO2 Laser for Facial Cosmetic Surgery, Treatment of Skin Lesions and
Blepharoplasties, Lecture and Live Surgery Demonstration Course,
Washington, DC, February 19, 20, 21, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Iselin, New Jersey, February 27 and 28, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Chicago, Illinois, March 14, 1998
Laser Treatment of Skin Lesions, Lecture, Twelfth Annual University of Pennsylvania Oral and
Maxillofacial Surgery Conference, Palm Beach, Florida, April 3, 1998
Complications of Laser Surgery, Lecture, Twelfth Annual University of Pennsylvania Oral and
Maxillofacial Surgery Conference, Palm Beach, Florida, April 4, 1998
Update on Current Techniques to Improve Implant Success, Lecture, Greater Baltimore Implant
Study Club, Timonium, Maryland, April 14, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Pittsburgh, Pennsylvania, April 17 and 18, 1998
Surgical Procedures to Increase Implant Success, Lecture, 25th Annual Scientific Sessions of
The Academy for Implants and Transplants, Washington, DC, April 30, 1998
Use of the CO2 Laser for Facial Cosmetic Surgery, Treatment of Skin Lesions and
Blepharoplasties, Live Surgery Demonstration Course, Washington, DC,
May 16, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Costa Mesa, California, May 29 and 30, 1998
Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
Hands-on Instruction Course, Chicago, Illinois, June 19 and 20, 1998

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 12
November 13, 2007

Use of the CO2 Laser in the Treatment of Pathologic and Cosmetic Facial Lesions, Lecture and
    Hands-on Instruction Course, Charlotte, North Carolina, July 10 and 11, 1998
Effect of Managed Care on Oral and Maxillofacial Surgery, Interview by Charles Bierbauer, CNN,
    Broadcast on July 15, 1998
Laser Assisted Skin Resurfacing and Blepharoplasties, Abstract, J Oral Maxillofac Surg, August
    1998:56, Number 8, Supplement 4: 131-132
Symposium on Laser Types and Uses, Moderator of Major Symposium at 80th Annual Scientific
    Sessions of the American Association of Oral and Maxillofacial Surgeons, New
    Orleans, Louisiana, September 16, 1998
Laser Assisted Skin Resurfacing and Blepharoplasties, Lecture, Surgical Clinic, 80th Annual
    Scientific Sessions of the American Association of Oral and Maxillofacial
    Surgeons, New Orleans, Louisiana, September 17, 1998
Laser-Assisted Facial Cosmetic Surgery and Treatment of Common Dermatologic Lesions, Lecture
    and Hands-on Instruction Course, Scottsdale, Arizona,
    October 30 and 31, 1998
Laser-Assisted Facial Cosmetic Surgery and Treatment of Common Dermatologic Lesions, Lecture
    and Hands-on Instruction Course, Cleveland, Ohio,
    November 13 and 14, 1998
Laser-Assisted Facial Cosmetic Surgery and Treatment of Common Dermatologic Lesions, Lecture
    and Hands-on Instruction Course, Dallas, Texas, December 11 and 12, 1998
Pediatric Facial Fractures: Who Should Treat What, and How?, Correspondence and Brief
    Communications, Letter to the Editor (Co-authored with Robert W. Emery),
    Plast. Reconstr. Surg. 103:  325, 1999
Lasers and Facial Surgical Procedures, Lecture and Surgical Demonstration Course, Temple
    University School of Dentistry, Philadelphia, Pennsylvania,
    January 8 and 9, 1999
Site Preparation and Development for Optimal Dental Implant Placement, Lecture, Rockville Study
    Club, Rockville, Maryland, January 18, 1999
Surgical Techniques to Enhance Implant Success, Brunch and Learn Lecture, Alpha Omega Dental
    Fraternity, Columbia, Maryland, January 24, 1999
Treatment of the "Baggy Eyelid" Deformity: Blepharoplasty and Laser, Lecture, American College
    of Oral and Maxillofacial Surgeons 20th Annual Meeting, Orlando, Florida
    February 26, 1999
Oral Brush Biopsy: A Minimally Invasive Computer Assisted Diagnostic Tool, Lecture,
    Washington, DC, April 6, 1999
Laser-Assisted Facial Cosmetic Surgery and Treatment of Common Dermatologic Lesions, Lecture
    and Hands-on Instruction Course, Boston, Massachusetts
    April 10 and 11, 1999
Oral Brush Biopsy: A Minimally Invasive Computer Assisted Diagnostic Tool, Lecture,
    Washington, DC, April 20, 1999
Oral Brush Biopsy: A Minimally Invasive Computer Assisted Diagnostic Tool, Lecture,
    Washington, DC, May 4, 1999
Advanced Surgical Considerations for the Implant Patient, Lecture Course, Ohio State University,
    Columbus, Ohio, May 19, 1999
Laser Resurfacing and Oral and Maxillofacial Surgeons, Letter to the Editor (Co-authored with
    Robert W. Emery), Dermatol Surg 25: 519, June 1999
Highly Crystalline MP-1 Hydroxylapatite Coating Part II: In Vivo Performance on Endosseous
    Root Implants in Dogs, (Co-authored with Ann V. Burgess, Brooks J. Story,
    William R. Wagner, Paolo Trisi, and Michael Pikos), Clinical Oral Implant
    Research, 10: 257-266, 1999
Management Priorities and Treatment Strategies for Medical Emergencies in the Dental Office
    (Co-authored with Robert W. Emery) Chapter in Dental Clinics of North
    America, WB Saunders, Volume 43, Number 3: 401-419, July 1999

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 13
November 13, 2007

Surgical Approaches to Expedite Dental Implant Placement, Enhance Aesthetics and Improve
        Survival Statistics, Lecture Course, Temple University School of Dentistry,
        Philadelphia, Pennsylvania, July 30, 1999
Laser Assisted Skin Resurfacing and Blepharoplasties, Abstract, J Oral Maxillofac Surg, August
        1999:57, Number 8, Supplement 1: 153-154
Surgical Strategies to Facilitate Excellent Implant Restorative, Cosmetic and Functional Outcomes,
        Lecture, 22nd Annual Greater Niagara Frontier Dental Meeting, Buffalo, New
        York, September 30, 1999
Laser Assisted Skin Resurfacing and Blepharoplasties, Lecture, Surgical Clinic, 81st Annual
        Scientific Sessions of the American Association of Oral and Maxillofacial
        Surgeons, Boston, Massachusetts, October 1, 1999
Enhancing the Facial Profile by Restructuring the Underlying Bone, Lecture, Symposium on Body
        Contouring and Facial Profile Enhancement, American Academy of Cosmetic
        Surgery, Chicago, Illinois, October 15, 1999
Advanced Maxillofacial Surgical Techniques in Dental Implantology, Lecture, University of Hong
        Kong, Hong Kong Association of Oral and Maxillofacial Surgeons,
        November 6, 1999
Current Concepts in Dental Implantology, Lectures and Surgical Demonstrations, Hokkaido Health
        Sciences University, Sapporo, Japan, November 12, 13, 14, 1999
Hydroxylapatite Facts and Fiction: A Report on Long-term Implant Success, (Co-authored with
        Osamu Tanaka, Takeo Maida, Tomoaki Sato, and Makoto Tamura),
        Dental Outlook Journal (Japan), Volume 95 No. 2, February 2000
Facial Cosmetic Surgery and Treatment of Common Dermatologic Lesions, Lecture Course,
        Montana Society of Oral and Maxillofacial Surgeons, Big Sky, Montana,
        February 11, 2000
Dentoalveolar Ridge Reconstruction for the Placement of Dental Implants, Lecture Course,
        Montana Society of Oral and Maxillofacial Surgeons, Big Sky, Montana,
        February 12, 2000
Lasers, Cosmetic Facial Surgery and Implantology, Eight Lectures, Medical College of Virginia
        Continuing Education Course, February 20-27, 2000
Sleep Apnea and Snoring: Recognition and Therapy, Lecture, Tysons Dental Study Club,
        Vienna, VA, March 6, 2000
Use of the CO2 Laser for Facial Cosmetic Enhancement, Guest Speaker, Lecture, 47th Annual
        Symposium of the Society of Air Force Clinical Surgeons,
        Biloxi, Mississippi, April 6, 2000
Cosmetic Surgery Symposium, Moderator, American College of Oral and Maxillofacial Surgeons
        21st Annual Meeting, Washington, DC, April 17, 2000
Reconstructive Surgery to Facilitate Dental Implant Placement and Success , Lecture Course,
        Francis Scott Key Study Club, Frederick, MD, May 3, 2000
Laser Cosmetic Surgery, Lectures, Florida Society of Oral and Maxillofacial Surgeons,
        Long Boat Key, July 28 and 29, 2000
The 3 B's of Upper Face Rejuvenation: Blepharoplasty, Browlifting and Botulinum, Abstract, J
        Oral Maxillofac Surg, August 2000:58, Number 8, Supplement 1: 107
Laser Assisted Skin Resurfacing and Blepharoplasties, Abstract, J Oral Maxillofac Surg, August
        2000:58, Number 8, Supplement 1: 124-125
Esthetic Cutaneous Laser Surgery and Chemical Peels, Chapter in Oral and Maxillofacial Surgery
        (a seven volume textbook),Volume 6, Section III, Chapter 19, 421-457,
        Ray Fonseca, ed., WB Saunders, Philadelphia, 2000
Surgical Procedures to Facilitate Ideal Implant Restorations, Lecture, Rancho Santa Fe, CA,
        September 8, 2000.
Cosmetic and Functional Aspects of Orthognathic Surgery: A Primer for Dentists, Alpha Omegan,
        Volume 93, Number 3, August/September 2000. Scientific Issue.

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 14
November 13, 2007

The 3 B's of Upper Face Rejuvenation: Blepharoplasty, Browlifting and Botulinum, Lecture,
Surgical Clinic, 82nd Annual Scientific Sessions of the American Association
of Oral and Maxillofacial Surgeons, San Francisco, California,
September 20, 2000

Laser Assisted Skin Resurfacing and Blepharoplasties, Lecture, Surgical Clinic, 82nd Annual
Scientific Sessions of the American Association of Oral and Maxillofacial
Surgeons, San Francisco, California, September 22, 2000

Orthognathic and Craniofacial Surgery, Reactor Panelist, Abstract Session , 82nd Annual
Scientific Sessions of the American Association of Oral and Maxillofacial
Surgeons, San Francisco, California, September 23, 2000

Oral Surgical Adjuncts to Dental Aesthetics, Lecture, Comprehensive Care Study Sessions (Seattle
Study Club), Chevy Chase, MD, November 1, 2000

Scope of Oral and Maxillofacial Surgery, Interview by KFNX Radio Show "Tooth Talk",
Broadcast on November 9, 2000

Temporomandibular Disorders, Lecture, Peace Corps Medical Division, Washington, DC,
December 19, 2000

Advances in the Reconstruction of Deficient Dentoalveolar Ridges: An Overview, Lecture,
American College of Oral and Maxillofacial Surgeons 22nd Annual Meeting,
Las Vegas, Nevada, April 29, 2001

Contemporary, Office Based, Aesthetic Facial Enhancement, Lecture, The International Academy
for Dental Facial Esthetics, Paris, France, May 11, 2001

Lasers, Cosmetic Facial Surgery and Implantology, Series of Lectures, Medical College of
Virginia Continuing Education Course/Mediterranean Cruise, May 12-19, 2001

Scope of Oral and Maxillofacial Surgery, Interview by KFNX Radio Show "Tooth Talk",
Broadcast on May 31, 2001

A Single Standard in Double Degree, Letter to the Editor,
J Oral Maxillofac Surg, 59: 714-715, June 2001

Techniques to Improve Communication and Team Collaboration, Lectures (2), 2001 American
Association of Oral and Maxillofacial Surgeons Dental Implant Conference,
Chicago, Illinois, November 30, 2001

Techniques for Use in Medical Emergencies I and II, Lectures (2), District of Columbia Dental
Society, 70th Annual Nation's Capital Dental Meeting, Washington, DC,
March 2, 2002

Current Strategies to Increase Jaw Bone Volume and Implant Success,Lecture, American College
of Oral and Maxillofacial Surgeons 23rd Annual Meeting, Biloxi, Mississippi
April 12, 2002

Cosmetic Rejuvenation: of the Upper Face, Lecture, Howard University Hospital,
Washington, DC, May 2, 2002

Nerve Repositioning for Implant Placement, (co-authored with Robert W. Emery), Implant News
and Views, May/June 2002 Volume 4, Number 3: 6-10

Techniques to Improve Communication and Team Collaboration,, Lecture, Maryland Dental
Implant Study Club, Baltimore, Maryland, May 14, 2002

Surgical Modalities to Improve Implant Restorative Success, Lecture, Prizm Dental Clinical
Session, Bethesda, Maryland, May 21, 2002

Communicating to Enhance Collaboration of the Implant Team, Lecture, San Diego Mini
Residency Implant Study Club, San Diego, California, July 17, 2002

Altering the Anatomically Deficient Alveolar Ridge, Lecture, San Diego Mini Residency Implant
Study Club, San Diego, California, July 17, 2002

Removing Facial Moles, Lumps and Bumps, Lecture, Cosmetic Symposium, 84th Annual
Scientific Sessions of the American Association of Oral and Maxillofacial
Surgeons, Chicago, Illinois, October 3, 2002

The 3 B's of Upper Face Rejuvenation: Blepharoplasty, Browlifting and Botulinum, Lecture,
Surgical Clinic, 84th Annual Scientific Sessions of the American Association of
Oral and Maxillofacial Surgeons, Chicago, Illinois, October 2, 2002

Surgical Techniques to Enhance Functional and Esthetic Dental Implant Success, Lecture, Surgical
Mini-Lecture, 84th Annual Scientific Sessions of the American Association of
Oral and Maxillofacial Surgeons, Chicago, Illinois, October 5, 2002
Botulinum: It's Not Just for Poisoning Anymore, Lecture, 2002 New Era of Medicine Symposium,
St. John, US Virgin Islands, December 10, 2002
Understanding Skin Quality, Lecture, American College of Oral and Maxillofacial Surgeons
Cosmetic Symposium, Biloxi, Mississippi, January 20, 2003
Procedures to Enhance Cosmetic Facial Surgery, Lecture, Cosmetic Symposium, American College
of Oral and Maxillofacial Surgeons, Biloxi, Mississippi, January 20, 2003
Lasers, Cosmetic Facial Surgery and Implant Surgery, Eight Lectures, Medical College of Virginia
Continuing Education Course, March 9-16, 2003
Platelet Rich Plasma and Bone Grafting, Lecture, Comprehensive Care Study Sessions (Seattle
Study Club), Chevy Chase, MD, March 17, 2003
Update on Common Medicine Conditions, Lecture, District of Columbia Dental Society, 71st
Annual Nation's Capital Dental Meeting, Washington, DC, March 27, 2003
Treatment of Medical Emergencies in the Dental Office, Lecture, District of Columbia Dental
Society, 71st Annual Nation's Capital Dental Meeting, Washington, DC,
March 27, 2003
So, What's New in Medicine? Lecture, District of Columbia Academy of General Dentistry,
Washington, DC, April 23, 2003
Bone Grafting... in Half the Time?, Lecture, Friadent 10th Annual Implant Symposium,
Mannheim, Germany, May 16, 2003
Update on Contemporary Oral and Maxillofacial Surgery, Numerous Lectures (all day program),
Fort Gordon, Augusta, Georgia, June 16, 2003
Cosmetic Facial Enhancement Without Surgery, Lecture, Renaissance II Study Club,
Washington,. DC, July 16, 2003
Surgical Techniques to Enhance Functional and Esthetic Dental Implant Success, Abstract, J Oral
and Maxillofacial Surg 61:8 Suppl.1:104, 2003
The 3 B's of Upper Face Rejuvenation: Blepharoplasty, Browlifting and Botulinum, Abstract, J
Oral and Maxillofacial Surg 61:8 Suppl.1:109, 2003
The 3 B's of Upper Face Rejuvenation: Blepharoplasty, Browlifting and Botulinum, Lecture,
Surgical Clinic, 85th Annual Scientific Sessions of the American Association of
Oral and Maxillofacial Surgeons, Orlando, Florida, September 10, 2003
Surgical Techniques to Enhance Functional and Esthetic Dental Implant Success, Lecture, Surgical
Mini-Lecture, 85th Annual Scientific Sessions of the American Association of
Oral and Maxillofacial Surgeons, Orlando, Florida, September 13, 2003
Enhancing Facial Aesthetics by Manipulation of the Underlying Osseous Structures, Lecture,
American Academy of Cosmetic Surgery Symposium on Body Augmentation
and Contouring, October 10, 2003, Philadelphia, Pennsylvania
How to Make Your Face Look Better Without Surgery, Lecture, Hadassah Nurses Council,
Rockville, Maryland, Scheduled for November 12, 2003
Noninvasive Ways of Improving Facial Beauty, Lecture, 2003 New Era of Medicine Symposium,
St. Croix, US Virgin Islands, December 10, 2003
Aesthetic and Functional Use of Botulinum Toxin in the Maxillofacial Region, Lecture, Cosmetic
Symposium, American College of Oral and Maxillofacial Surgeons, NOVA
Southeastern University, Fort Lauderdale, Florida, January 19, 2004
Update on Contemporary Oral and Maxillofacial Surgery, Numerous Lectures (all day program),
NOVA Southeastern University, Ft. Lauderdale, Florida, February 16, 2004
Bone Enhancement - Local and Systemic: Plenary Session II, Panelist and Panel Chairman, World
Congress of Oral Implantology 6, Honolulu, Hawaii, March 5, 2004
Onlay Bone Grafting for Vertical and Horizontal Augmentation of the Maxilla and Mandible,.
Lecture, World Congress of Oral Implantology 6, Honolulu, Hawaii,
March 6, 2004

Wrinkle Reduction Using BOTOX: Cosmetic in Oral and Maxillofacial Surgery, Three Lectures,
            American College of Oral and Maxillofacial Surgeons 25th Annual Meeting,,
            Hollywood, Florida, April 17, 2004
Osseous Recreation of Deficient Dentoalveolar Ridges, Lecture, American College of Oral and
            Maxillofacial Surgeons 25th Annual Meeting,, Hollywood, Florida,
            April 18, 2004
Enhancing Facial Aesthetics Without Surgery, Lecture, Galil Hadassah, Rockville, Maryland,
            April 26, 2004
Update on Common Medicine Conditions, Lecture, District of Columbia Dental Society, 72nd
            Annual Nation's Capital Dental Meeting, Washington, DC, May 13, 2004
Treatment of Medical Emergencies in the Dental Office, Lecture, District of Columbia Dental
            Society, 72nd Annual Nation's Capital Dental Meeting, Washington, DC,
            May 13, 2004
Lasers in Oral and Maxillofacial Surgery, Oral and Maxillofacial Surgery Clinics of North
            America, Co-Editor, Volume 16 Number 2, WB Saunders,
            Philadelphia, May 2004
Preface, Oral and Maxillofacial Surgery Clinics of North America, Vol. 16 Number 2, xi-xii,
            WB Saunders, Philadelphia, May 2004
Laser Physics and Tissue Interaction, Chapter in Oral and Maxillofacial Surgery Clinics of North
            America, Vol. 16 Number 2, 143-147, WB Saunders, Philadelphia, May 2004
Laser Dermatopathology, Chapter in Oral and Maxillofacial Surgery Clinics of North America,
            Vol. 16 Number 2, 189-195, WB Saunders, Philadelphia, May 2004
Laser Cosmetic Skin Resurfacing, Chapter in Oral and Maxillofacial Surgery Clinics of North
            America, Vol. 16 Number 2, 197-213, WB Saunders, Philadelphia, May 2004
BOTOX Cosmetic and Restylane: Strategies to Enhance Facial Beauty, Lecture and Demonstration
            Course, Greater Washington Academy of Women Dentists, Washington, DC,
            June 3, 2004
BOTOX: Cosmetic and Functional Uses in Oral and Maxillofacial Surgery, Lecture, Surgical
            Clinic, 86th Annual Scientific Sessions of the American Association of Oral and
            Maxillofacial Surgeons, San Francisco, California, September 30, 2004
Building and Maintaining an Insurance-Free Practice, Lecture, 86th Annual Scientific Sessions of
            the American Association of Oral and Maxillofacial Surgeons, San Francisco,
            California, October 2, 2004
Update on Common Medicine Conditions, Lecture, District of Columbia Dental Hygienists'
            Association Capital Symposiums, Washington, DC, October, 23, 2004
Management of Medical Emergencies in the Dental Office, Lecture, District of Columbia Dental
            Hygienists' Association Capital Symposiums, Washington, DC,
            October, 23, 2004
Orthognathic and Cosmetic Surgery, Lecture, Howard University, School of Dentistry,
            Washington, DC, November 24, 2004
Facial Cosmetic Procedures to Augment Cosmetic Dental Results, Lecture, District of Columbia
            Academy of General Dentistry, Washington, DC, January 12, 2005
Perioral and Gingival Cosmetic Surgery, Laboratory Instructor, Cosmetic Symposium, American
            College of Oral and Maxillofacial Surgeons, Louisiana State University Health
            Sciences Center, New Orleans, Louisiana January 15 and 16, 2005
Nonsurgical Strategies to Improve Facial Beauty, Lecture, Miami Winter Meeting and Dental Expo,
            Miami Beach, Florida, January 21, 2005
Medical Update for Practicing Dentists, Lecture, Miami Winter Meeting and Dental Expo, Miami
            Beach, Florida, January 21, 2005
Dental Healthcare, Guest interview (one hour) by Armstrong Williams on his television program,
            "The Right Side with Armstrong Williams", March 14, 2005
Educational Purpose and Content: More on the Offshore Degree,
            J Oral Maxillofac Surg, 63: 571-572, April 2005

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 17
November 13, 2007

Platelet Rich Plasma Preparation and Maxillary Sinusplasty with Bone Graft, Interview and Live
Procedure Video by Eliza Bussy, Reuters Health, May 24, 2005
Cutting the Umbilicus: Creating a Profitable Private Practice, Academic Day Mark Wein Memorial
Lecture, OMS and GPR programs, University of Miami School of Medicine,
Miami Beach, Florida, June 18, 2005
Three Dimensional Digital Imaging, Interview by IJ Hudson, WRC TV 4 (NBC), June 23, 2005
The 3 B's of Upper Face Rejuvenation: Browlifts, Blepharoplasties, and Botox, Lecture, American
College of Oral and Maxillofacial Surgeons 26th Annual Meeting,, Halifax,
Nova Scotia, June 24, 2005
Botox: Cosmetic and Functional Uses in Oral and Maxillofacial Surgery, Abstract, J Oral and
Maxillofacial Surg 63:8 Suppl.1:111, 2005
In-office Pre and Post Operative Implant Imaging with the i-CAT Digital 3-D Computed
Tomogram:  A  Significant Technological Advance, Lecture, 9th Congress of the
International Congress of Oral Implantologists (ICOI) Asia Pacific Section,
Jeju Island, South Korea, September 2, 2005
i-CAT 3 Dimensional Digital Imaging:  Improving Patient Care, Lecture, Living Well Hospital,
Dental Symposium, Seoul, South Korea, September 4, 2005,
Ethics Seminar: :Offshore Degrees-Sorting Through the Ethical Issues', Invited Panelist, 87th
Annual Scientific Sessions of the American Association of Oral and
Maxillofacial Surgeons, Boston, Massachusetts, September 21, 2005
Building and Maintaining an Insurance-Free Practice, Lecture,  87th Annual Scientific Sessions of
the American Association of Oral and Maxillofacial Surgeons, Boston,
Massachusetts, September 22, 2005
BOTOX: Cosmetic and Functional Uses in Oral and Maxillofacial Surgery, Lecture, Surgical
Mini-Lecture, 87th Annual Scientific Sessions of the American Association of
Oral and Maxillofacial Surgeons, Boston, Massachusetts, September 24, 2005
Dentofacial Deformities: Orthognathic and Esthetic Surgery, Lecture, Howard University, School
of Dentistry, Washington, DC, October 12, 2005
Update on Medical Conditions and Medical Emergencies in the Dental Office, Lecture, 28th
Annual Greater Niagara Frontier Dental Meeting, Buffalo, New York,
October 27, 2005
Oral and Maxillofacial Surgery: What's New and How Can it Benefit You and Your Patients?,
Lecture, 28th Annual Greater Niagara Frontier Dental Meeting, Buffalo, New
York, October 27, 2005
i-CAT Digital 3-D Computed Tomography: Improving Implantology, Lecture, Washington, DC
November 19, 2005.
The Latest on Early Detection of Oropharyngeal Cancer, Live interview by Andrea
Roane on WUSA-TV, Washington, DC, November 23, 2005
TMJ: Fact, Fantasy and Fiction, Lecture, 2006 New Era of Medicine Symposium,  Grand Cayman
Island, January 20, 2006
Innovations in Dentistry: In-office 3 Dimensional Digital Radiographic Imaging, Lecture, Robert T.
Freeman Dental Society, Washington, DC, February 21, 2006
Medical Emergencies in the Dental Office, Lecture, Vietnamese-American Dental Study Club,
McLean, Virginia, March 29, 2006
Introduction to Facial Cosmetic Surgery, Lecture, Howard University OMS Residents,
Washington, DC,  April 3, 2006
Update on Medical Conditions and Medical Emergencies in the Dental Office, Lecture, 74th
Annual Nation's Capital Dental Meeting, Washington, DC, April 20, 2006
Dental Implantology: Yesterday, Today and Tomorrow Lecture, American College of Oral and
Maxillofacial Surgeons 27th Annual Meeting,, Las Vegas, Nevada, May 1, 2006
Perioral Chemical and Laser Skin Resurfacing, Lecture, American College of Oral and
Maxillofacial Surgeons 27th Annual Meeting,, Las Vegas, Nevada, May 3. 2006

Soft tissue lipoma with the radiographic appearance of a neoplasm within the mandibular canal, Pass, B, Guttenberg, S, Childers, ELB and Emery, RW, Dentomaxillofacial Radiology,(2006) 35, 299-302

Upgrading Dental Implant Diagnostics and Treatment Results with 3 Dimensional Radiographs: In-Office Cone Beam Computed Tomography, Lecture, Guy's Hospital, London, England, July 3, 2006

Improved Dentofacial Diagnostics and Treatment Outcomes Using i-CAT CBCT Imaging, Lecture, London, England, July 4, 2006

Dental and Oral and Maxillofacial Applications for the i-CAT Cone Beam Computed Tomogram, Lecture, Universitat Internacional de Catalunya ( UIC ) Dental School, Barcelona, Spain, July 7, 2006

Early Detection and Treatment of Oropharyngeal Cancer, Lecture, Medicine in the 21st Century Conference, Mediterranean Cruise, July 14, 2006.

Practical Integration of Intreactive CT Technology for the Oral and Maxillofacial Surgery Practice, Lecture for Clinical Interest Group on Dental Implantology, 88th Annual Scientific Sessions of the American Association of Oral and Maxillofacial Surgeons, San Diego, California, October 5, 2006.

Update on Medicine and the Latest on Bisphosphonate Induced ONJ, Lecture, District of Columbia Academy of General Dentistry, Washington, DC, October 25, 2006.

Diagnosis and Treatment Planning for Mandibular Fractures, Lecture, George Washington University Hospital, Washington, DC, November 10, 2006

Dentofacial Deformities: Orthognathic and Esthetic Surgery, Lecture, Howard University, School of Dentistry, Washington, DC, November 22, 2006

The Bone Wasn't Where I Thought It Was: Intraoperative Problem Solving and Current Preoperative Problem Avoidance Using In-office CBCT Technology, Lecture, Symposium on Treatment Planning Complications, 2006 American Association of Oral and Maxillofacial Surgeons, Dental Implant Conference, Chicago, Illinois, December 1, 2006.

Lasers in Cosmetic Facial Surgery, Lecture and Hands-on Demonstrations, Cosmetic Symposium, American College of Oral and Maxillofacial Surgeons, New Orleans, LA, January 13 and 14, 2007

Enhanced In-Office Radiology for All Dentists: i-CAT 3 Dimensional Computed Tomography, Lecture, Maimonides Dental Society, Washington, DC, January 23, 2007

Update on Medicine for the Dental Community, Lecture, Renaissance Dental Study Club, Washington, DC, January 30, 2007

Effects of Dental Disease on the Rest of the Body, Interview by Pat Brogan, WMAL Radio, Broadcast on multiple occasions, February 28, 2007

Medical Updates for Dentists, Lecture, Dr. Scott Goodove Peer Practicum, Virginia Beach, Virginia, March 9, 2007

The Latest on Diagnosic Dental Radiology: Cone Beam CT, Lecture, Dr. Scott Goodove Peer Practicum, Virginia Beach, Virginia, March 9, 2007

Keeping Up with Current Medical Events, Lecture, Howard County Dental Hygienists Association, Columbia, Maryland, April 11, 2007

Update on Medical Conditions for Dental Professionals, Lecture, 75th Annual Nation's Capital Dental Meeting, Washington, DC, April 19, 2007

Cone Beam CT Technology for Oral and Maxillofacial Surgeons, Lecture, American College of Oral & Maxillofacial Surgeons 28th Annual Scientific Conference, Orlando, Florida, April 29, 2007

In-Office 3 Dimensional Cone Beam Computed Tomography, Lecture, International Oral and Maxillofacial Surgery Congress, Antalya, Turkey, May 17, 2007

Plenary Session 2, Chairperson, International Oral and Maxillofacial Surgery Congress, Antalya, Turkey, May 17, 2007

Curriculum Vitae: Steven A. Guttenberg, DDS, MD
Page 19
November 13, 2007

Bisphosphonate-related exposed, non-vital bone (osteonecrosis) of the jaws: a report of three cases
demonstrating striking variability in outcomes and morbidity, Co-authored with
Kumar, V., Pass, B, Ludlow, JB, Emery, RW, Tyndall, DA and Padilla, RJ,
J Am Dent Assoc, 2007 138: 602-609.

New Techniques and Technology in Implant Dentistry Reduce Treatment Time, Co-authored with
Emery, R.W. and Watkins, B., Inside Dentistry, June 2007: 86-88.

Aesthetic Orthognathic Surgery, Lecture, Internatioanal Conference of Facial Esthetics, Vienna,
Austria, June 16, 2007

Chairman for Section on the Masticatory Organ I, Internatioanal Conference of Facial Esthetics,
Vienna, Austria,, June 16, 2007

Computer Planned and Guided Implant Surgery, Lecture, Internatioanal Conference of Facial
Esthetics, Vienna, Austria, June 16, 2007

Profit in 3 Dimensions, Co-authored with Emery, RW, Dental Economics, 2007, 97: 52-60.

Update in Medicine for Dentists, Lecture, Chevy Chase Millennium Dental Study Club,
Washington, DC, September 27, 2007

The Current Scourges: Bisphosphonate Induced Osteonecrosis of the Jaws and Methicillin
Resistant Staphylococcus Aureus, Lecture, Washington Dental Study Club,
Washington, DC, October 24, 2007

Dentofacial Deformities: Orthognathic and Esthetic Surgery, Lecture, Howard University, School
of Dentistry, Washington, DC, Scheduled for November 21, 2007

Facilitating Improved Dental Impant Outcomes by Utilizing in-Office Computed Tomographic
Technology, Lecture, AAOMS Dental Implant Conference, Exhibitor
Showcase, Chicago, Illinois, Scheduled for November 29, 2007

Avoiding Complications Through Three-Dimensional Imaging, Lectures (2), Academy of
Osseointegration 23rd Annual Meeting, Boston Massachuesetts,
Scheduled for February 29, 2008

Update on Medical Conditions for Dental Professionals, Lecture, 76h Annual Nation's Capital
Dental Meeting, Washington, DC, Scheduled for April 24, 2008

The Contribution of Cone Beam Computed Tomography to Successful Reconstruction Results,
Lecture, The Creation of a Beautiful Smile from Soft and Hard Tissue
Reconstruction Seminar, Miami, Florida, Scheduled for April 25-26, 2008

Bisphosphonate Induced Osteonecrosis of the Jaws: Current Treatment and Prevention
Strategies, Lecture, Multidisciplinary CME Conference, WHC Alaska Cruise,
Scheduled for July 11-18, 2008

"Primum non nocere", Editorial, Oral Surgery, Oral Medicine, Oral Pathology, Oral Radiology
and Endodontology, Accepted for and pending publication